UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RACHEL COLANGELO, *et al.*,
individually and on behalf of a class of
similarly situated individuals,

Plaintiffs,

-against-                                                       6:18-CV-1228 (LEK/ML)

CHAMPION PETFOODS USA, INC.,
 *et al.*,

Defendants.

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiffs Rachel Colangelo and Kathleen Paradowski, individually and on behalf of

others similarly situated, bring this putative class action against defendants Champion Petfoods

USA, Inc. and Champion Petfoods LP (hereinafter "Defendants" or "Champion"). Dkt. No. 54

("Amended Complaint"). Plaintiffs, who seek to represent a class of New York purchasers of

Champion dog food, assert that Champion falsely advertised that its dog food did not contain (or

have a risk of containing) a variety of unpleasant substances, including heavy metals, bisphenol

A ("BPA"), and pentobarbital. Am. Compl. ¶¶ 17–20. Plaintiffs assert nine causes of action

against Champion: violations of New York General Business Law § 349, violations of New York

General Business Law § 350, breach of express warranty, breach of implied warranty of

merchantability, fraudulent misrepresentation, fraud by omission, negligent misrepresentation,

negligence per se, and unjust enrichment. Id. ¶¶ 122–204. Today, the Court considers

Defendants' motion to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). Dkt.

Nos. 62 ("Motion to Dismiss"); 62-1 ("Memorandum"); see also Dkt. Nos. 63 ("Response"); 67 ("Reply").

For the reasons that follow, Defendants' Motion to Dismiss is granted in part and denied in part.

## II.   BACKGROUND

At the motion to dismiss stage, the Court assumes all factual allegations in the Complaint are true. Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012).

### A.  Overview

This is a case about dog food. Champion promotes its dog food as—to paraphrase— fresh, high quality, and just what dogs need. Based on this advertising, Plaintiffs were willing to pay a premium for Champion dog food. But Plaintiffs later learned that the dog food for which they paid a premium contained a variety of unwelcome substances, including heavy metals, BPA, and maybe even pentobarbital. Plaintiffs claim that Champion's advertising led them to believe that these substances were not present in the food, and that they would not have bought the food had they known the truth.

### B.  The Parties

Champion Petfoods USA, Inc. is incorporated in Delaware and has its principal place of business in Kentucky. Am. Compl. ¶ 21. Since March 2016, Champion Petfoods USA, Inc. has sold all the dog food at issue in this case. Id. Champion Petfoods LP is a Canadian limited partnership and has its principal place of business is in Alberta. Id. ¶ 22. Champion Petfoods LP "wholly owns, operates, and/or controls" Champion Petfoods USA, Inc. Id. Prior to March 2016, Champion Petfoods LP sold all the dog food at issue. Id. Defendants "formulate, develop,

manufacture, label, distribute, market, advertise, and sell" the dog food in question under the brand names Orijen and Acana. Id. ¶ 23.

Plaintiffs Rachel Colangelo and Kathleen Paradowski purchased Defendants' dog food at their local pet stores and online. Id. ¶¶ 17, 19. Colangelo and Paradowski state that they "paid the premium price on the assumption that the labeling of the Contaminated Dog Foods[1] was accurate and that the Contaminated Dog Foods were healthy, superior quality, natural, and safe for dogs to ingest." Id. ¶¶ 18, 20. They "would not have paid this money had [they] known that the Contaminated Dog Foods contained any levels of the heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements." Id.

Plaintiffs bring the action individually and on behalf of "[a]ll persons who reside in the State of New York who, from July 1, 2013, to the present and purchased the Contaminated Dog Foods for household or business use, and not for resale." Id. ¶ 111. The Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Id. ¶ 15.

### C. The Dog Food

Plaintiffs claim that Defendants' dog food contains a variety of contaminants. Plaintiffs provide a chart that lists twenty-one of Defendants' products and the corresponding levels of arsenic, cadmium, mercury, lead, and BPA in each. Am. Compl. ¶ 7. A portion of that chart is reproduced below:

---

[1] Plaintiffs consistently refer to the dog food at issue in this case as the "Contaminated Dog Food." See Am. Compl. ¶ 24 (listing the various types of dog food included in the Plaintiffs' defined term "Contaminated Dog Food"). While the Court employs less partial shorthand—such as "defendants' dog food," or "the dog food," or simply "the product"—it does at times quote Plaintiffs' language verbatim.

| Product Name | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|---|
| Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry Dog Food | 3256.40 | 32.50 | 113.00 | 51.20 | 249.30 |
| Orijen Six Fish With New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Dog Food | 3169.80 | 39.50 | 200.50 | 54.90 | 38.70 |
| Orijen Original Chicken, Turkey, Wild-Caught Fish, Eggs Dry Dog Food | 907.60 | 0.00 | 93.20 | 10.80 | 489.80 |
| Orijen Regional Red Angus Beef, Boar, Goat, Lamb, Pork, Mackerel Dry Dog Food | 849.40 | 43.60 | 123.10 | 21.40 | 167.70 |
| Acana Regionals Meadowland with Poultry, Freshwater Fish and Eggs Dry Dog Food | 846.40 | 82.70 | 37.50 | 8.70 | 489.00 |
| Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Dog Food | 358.20 | 82.90 | 32.50 | 14.90 | 336.70 |

Id.[2]

Plaintiffs allege that the heavy metals—arsenic, mercury, cadmium, and lead—"can cause serious illness to humans and animals." Id. ¶ 25; see also id. ¶¶ 26–38 (detailing various health risks caused by each).[3] BPA, likewise, is "an industrial chemical" that "has been linked to

___

[2] Plaintiffs do not provide a source for this information other than mentioning much later in the Amended Complaint, in apparent reference to this chart, that they conducted "third-party scientific testing." Id. ¶ 81; see also Response at 2.

[3] Plaintiffs also note that "[a]rsenic occurs naturally in the environment as an element of the earth's crust; it is found in rocks, soil, water, air, plants, and animals." Id. ¶ 26.

various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems." Id. ¶ 55.

Plaintiffs also allege that some of Defendants' dog food was contaminated with pentobarbital:

> On May 8, 2018, Defendants were notified they were sold beef tallow contaminated with pentobarbital by MOPAC, an eastern Pennsylvania rendering facility belonging to JBS USA Holdings Inc. Three shipments of adulterated beef tallow were delivered by MOPAC and JBS to Defendants' DogStar® Kitchens and used to manufacture thousands of pounds of Defendants' Contaminated Dog Foods.

Id. ¶ 50. "Pentobarbital is a Class II controlled substance, and there is no safe or set level for it in pet food." Id. ¶ 43. A pet that ingests pentobarbital may suffer a variety of health effects, including vomiting, neurologic abnormalities, coma, and death. Id.

### D.  The Marketing

This is the crux of the case. Defendants' marketing, packaging, and labeling led Plaintiffs to believe that the dog food did not contain heavy metals, BPA, or pentobarbital. Am. Compl. ¶ 10. Defendants' deceived Plaintiffs into this belief both through individual labels and statements on its website, as well as by the message conveyed by their marketing as a whole. Id. ¶¶ 24, 57–88.

Plaintiffs document Champion's marketing materials at length. Broadly, Plaintiffs allege that:

> Defendants warrant, claim, state, represent, advertise, label, and market their Contaminated Dog Foods as natural, fit for human consumption, fit for canine consumption, in compliance with relevant EU regulations and standards, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables that are "delivered daily from local farms and ranchers;" containing "only 1 supplement – zinc;" "provid[ing] a natural source of virtually every nutrient your

> dog needs to thrive;" and "guaranteed to keep your dog healthy, happy and strong."

Id. ¶ 66. Plaintiffs provide the specific source of many of these alleged statements, noting, for instance, that Defendants "warrant, promise, represent, mislead, label, and/or advertise that the Contaminated Pet Foods are free of any heavy metals, pentobarbital, toxins, BPA, and/or unnatural ingredients by making assurances that the food represents an evolutionary diet that mirrors that of a wolf—free of anything 'nature did not intend for your dog to eat.'" Id. ¶ 10. Plaintiffs provide the follow advertisements as a source of this statement:



<u>Id.</u>  Plaintiffs also state that Champion's "packaging emphasizes to consumers that the Contaminated Dog Food is made with 'unmatched regional ingredients delivered fresh'" and provide the following image:



<u>Id.</u> ¶ 61. Plaintiffs allege, however, that Defendants' use ingredients, including meats, sourced from regions far from Kentucky, including India, New Zealand, and other countries. <u>Id.</u> ¶ 92.

Plaintiffs also expand on their allegation that Defendants falsely claim they meet the European Union's standard for pet food:

> Defendants have represented that their DogStar® [k]itchens meet the European Union's standard for pet food: "USA Dogstar® kitchens, ingredients, processes, and foods all meet the strictest European Union standards – which are stricter than those set by AAFCO, the CFIA or FDA. Likewise, Defendants proclaim that Orijen is "[u]nmatched by any other pet food maker anywhere, our kitchens meet the strictest standards in the world, including the Government of Canada, and the European Union." Indeed, Defendants' own CEO has stated that "[e]ven if we're selling in Canada or the U.S or Asia, we manufacture to the EU standard . . . "

<u>Id.</u> ¶ 62. Plaintiffs allege that under this EU standard, "arsenic must not exceed 2ppm [parts per million]" in animal feed and that "certain of Defendants' products have exceeded the European Union's maximum level for arsenic in animal feed." <u>Id.</u> ¶ 64.

Plaintiffs allege that they relied on these false statements in deciding to pay a premium for Defendants' dog food. <u>Id.</u> ¶ 96–98. And they claim that Defendants knew that these substances were in the dog food, stating that "Defendants' own actions show their knowledge that a reasonable consumer would care about the inclusion of heavy metals as they specifically

addressed this concern on their website by touting that they require their suppliers to 'provide heavy metals and mercury test results, for which we also test our final food products.'" Id. ¶ 41

Further, Plaintiffs allege that Defendants received notice that their dog food contained higher levels of these substances than their competitors:

> Defendants received notice of the contaminants in their dog and cat foods, including the Contaminated Dog Foods, through the Clean Label Project, which found higher levels of heavy metals in their dog and cat food products. In fact, Defendants responded to the Clean Label Project's findings. Defendants spoke with the Clean Label Project by phone regarding its findings and methodology, which showed that Orijen pet foods have high levels of heavy metals when compared to other pet foods. The Clean Label Project informed Defendants that it compared Orijen pet foods to competitors' products and gave them a one-star rating, meaning they contained higher levels of contaminants than other products on the market.

Id. ¶ 101.

Lastly, Plaintiffs note that "Defendants' marketing and advertising campaign has been sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiffs to plead reliance upon each advertised misrepresentation." Id. ¶ 94.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (citing Twombly, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Put another way, a claim is plausible if it is supported by "enough fact[s] to raise a reasonable expectation that discovery will reveal

evidence of [the alleged misconduct]." <u>Twombly</u>, 550 U.S. at 556. In assessing whether this standard has been met, courts "must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party[] . . . ." <u>In re NYSE Specialists Sec. Litig.</u>, 503 F.3d 89, 95 (2d Cir. 2007) (internal citation omitted).

## IV. DISCUSSION

While Plaintiffs assert nine causes of action, Defendants first raise two arguments that apply broadly to all claims: (1) that Plaintiffs' claims fail because they do not allege that the dog food contains unsafe levels of any substance; and (2) that Plaintiffs' claims fail because they do not allege that Defendants made any actionable false or misleading statements. Defendants then articulate additional, specific reasons why the Court should dismiss each of Plaintiffs' individual claims.

### A. Defendants' Arguments for Dismissal of All Claims

#### 1. Levels of Heavy Metals and BPA

Defendants argue that the Court should dismiss all claims because Plaintiffs do not allege that the levels of heavy metals, BPA, or pentobarbital in the dog food exceed any relevant health standard, and thus, that Defendants' marketing cannot have been misleading. Mem. at 11–15.[4]

First, with respect to the heavy metals, Defendants assert that "the initial complaint alleged <u>no standard or baseline</u> for the level of heavy metals that would be unsafe for pet food. Plaintiffs tried to correct this deficiency in the Amended Complaint by relying upon limits set by the EU, but their attempt falls short." <u>Id.</u> at 12. Even under the EU standards, Defendants note,

---

[4] Whether Plaintiffs have sufficiently alleged that Defendants' marketing was deceptive under New York law is discussed in more depth in the below sections on Plaintiffs' individual claims. This section merely addresses Defendants' threshold argument that the failure to allege unsafe substance levels precludes Plaintiffs from claiming that Defendants' marketing was in any way misleading.

the alleged levels of cadmium, lead, and mercury in their dog food fall well below the EU

maximum tolerable limits ("MTLs"). Id. While Plaintiffs do allege that a few of the products had

arsenic levels exceeding the EU's 2 mg/kg MTL,[5] this allegation elides a crucial distinction

between inorganic and organic arsenic:

> The EU has set a 2 mg/kg limit for inorganic arsenic, but a 10 mg/kg limit for total arsenic (organic plus inorganic) . . . Plaintiffs do not allege that Champion's dog food contains inorganic arsenic at or above 2 mg/kg. Nor could they, because as reflected in the incorporated White Paper, "[s]ea plant and fish ingredients are the source of most arsenic found in animal food including pet food. The majority of arsenic found in these sources is organic, and virtually non-toxic."

Id. at 4. Defendants go on to assert that "[t]he mere presence of naturally occurring elements

cannot be assumed to pose a health risk when the alleged levels are well below the EU standards

relied on by Plaintiffs in the Amended Complaint." Id. at 6–7.

Defendants also argue that Plaintiffs similarly fail to allege that any of the dog food

contained unsafe levels of BPA or that Defendants were aware its food apparently contained

BPA. Id. at 7–8. Finally, with respect to pentobarbital, Defendants point out that while Plaintiffs

allege that one of Champion's suppliers informed Champion that it had shipped beef tallow

containing pentobarbital, Plaintiffs never alleged that they actually purchased any dog food

containing pentobarbital. Id. at 8. Further, Plaintiffs do not allege they performed any testing that

revealed a detectable amount of pentobarbital in any of the dog foods in question. Id.

Plaintiffs' respond, in essence, that Defendants are missing the point. The issue is not

whether heavy metals and BPA made the food unsafe. The issue is whether the presence of those

---

[5] Plaintiffs allege that the EU limit on arsenic is 2 parts per million. Am. Compl. ¶ 64. The highest level of arsenic listed in Plaintiff's chart is 3256.40 ug/kg. Id. ¶ 7. 3256.40 ug/kg is equal to 3.2564 mg/kg, and mg/kg is the same measurement as parts per million. See Mem. at 7. Thus, the highest alleged arsenic level in Defendants' dog food is 3.2564 parts per million. Id.

metals—regardless of whether the level at which they were present exceeds some health standard—would have discouraged reasonable consumers from buying the product. Resp. at 2–3. Plaintiffs say that it would have, and that at the motion to dismiss stage, the Court should accept that allegation as true. Id. at 3. Specifically, Plaintiffs argue that the Court "must accept as true Plaintiffs' allegations that (1) consumption of foods containing BPA, heavy metals, and pentobarbital carries known risks, (2) whether a pet food contains heavy metals, BPA, pentobarbital, and/or other unnatural or other ingredients that do not conform to the label is material to a reasonable consumer, and (3) [Champion] was aware of these risks and their materiality to consumers." Id. (internal citations omitted).

When it comes to the heavy metals and BPA, Plaintiffs are correct. The fact that Plaintiffs do not allege that the dog food contained unsafe levels of heavy metals or BPA does not, at least at this stage, undermine the claim that the advertising was deceptive. Plaintiffs' claim is that these substances have "known risks," and that they would not have paid a premium for the products had they known they contained *any* level of heavy metals or BPA. Resp. at 2–3. A claim that a plaintiff "would not have paid the premium" but for the misleading advertising is enough to survive a motion to dismiss. See, e.g., Kacocha v. Nestle Purina Petcare Co., No. 15-CV-5489, 2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016) ("Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price he paid' to buy the Products had he 'known the truth.' Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive.").

Other courts considering similar allegations against Champion have agreed. See Leppert v. Champion Petfoods USA Inc., No. 18-CV-4347, 2019 WL 216616, at *6 (N.D. Ill. Jan. 16, 2019) ("Plaintiffs' failure to allege facts sufficiently showing heavy metals and BPA were

present at 'unsafe' levels does not doom Plaintiffs' remaining theories of the case based on Defendants' marketing the cat foods as healthy, natural and high quality. It is entirely plausible that a consumer purchasing what she believes to be healthy, natural and high-quality cat food would not purchase that cat food if she knew it contained any amount of heavy metals and/or BPA."); Zarinebaf v. Champion Petfoods USA Inc., No. 18-CV-6951, 2019 WL 3555383, at *4 (N.D. Ill. July 30, 2019) ("Plaintiffs have stated a plausible claim that they relied on Defendants' statements marketing their dog food as natural and high quality, but would not have purchased the dog food if they had known it contained heavy metals. That theory does not require Plaintiffs to plead that the dog food contained enough heavy metals to be unsafe or dangerous.").

The Court agrees with Defendants, however, that the pentobarbital allegations are insufficiently pled to form the basis of any claim. While the Court accepts as true that Plaintiffs would find the presence of pentobarbital material, Plaintiffs simply have not alleged that they purchased any dog food containing pentobarbital. Mem. at 8. Plaintiffs also do not allege that testing revealed the presence of pentobarbital in any Champion product. Id.; see also Am. Compl. ¶ 7 (listing the level of arsenic, BPA, cadmium, mercury, and lead present in Champion products, but not mentioning pentobarbital).

Plaintiffs states that they have "specifically pled that adulterated beef tallow was used to manufacture thousands of pounds of the Products and that the marketing mislead them into believing that trusted suppliers of quality ingredients were utilized, not a rendering facility that accepts euthanized horses," Resp. at 12 (citing Am. Compl ¶¶ 50–52), and argue that "class representatives may pursue claims for like-products with similar defects that share the same underlying concerns." Resp. at 24 (quoting Atik v. Welch Foods, Inc., No. 15-CV-5405, 2016 WL 11480151, at *5 (E.D.N.Y. Aug. 5, 2016), report and recommendation adopted, No. 15-CV-

5405, 2016 WL 5678474 (E.D.N.Y. Sept. 30, 2016)). But <u>Atik</u> simply suggests that parties with similar defects may pursue class claims. <u>Atik</u>, 2016 WL 11480151 at *5 ("The alleged misrepresentation is also the same across products: that the packaging of the Fruit Snacks misleads consumers into believing that the product contains substantial amounts of real fruit, and that it is as healthy as real fruit."). Here, Plaintiffs' dog food does not contain a similar defect to dog food purchased by others that contained pentobarbital because the presence of pentobarbital is itself the defect, and Plaintiffs do not allege their dog food contained it.

Accordingly, Plaintiffs' pentobarbital allegations cannot serve as the factual basis for any of their claims. <u>See</u> <u>Zarinebaf</u>, 2019 WL 3555383 at *5 ("As Defendants point out, then, there is an important allegation missing from the Complaint—that Plaintiffs purchased dog food containing pentobarbital. Without that allegation, Plaintiffs claims about Defendants' dog food containing pentobarbital are merely speculative and cannot give rise to a plausible claim.").

### 2. *False or Misleading Claims*

Moving to the specific marketing statements at issue, Defendants argue that Plaintiffs fail to allege that any of Defendants' representations are misleading. Defendants identify the following as the statements (or categories of statements) on which most of Plaintiffs' claims are based, and argue that each is not misleading as a matter of law:

- "Fit for Human Consumption"
- "Biologically Appropriate"
- "Fresh, Regional Ingredients" and "Unmatched Regional Ingredients Delivered Fresh"
- "Only 1 Supplement—Zinc"
- "Providing a Natural Source of Virtually Every Nutrient Your Dog Needs to Thrive" and "Guaranteed to Keep Your Dog Healthy, Happy and Strong"

Mem. at 9–13.

### 1. "Fit for Human Consumption"

The Court agrees with Defendants that Plaintiffs cannot base their claims on Champion's alleged representation that the dog food is "fit for human consumption" because Champion did not make such a representation.

Plaintiffs allege that Defendants advertise their dog food as "fit for human consumption." Compl. ¶ 72. But Plaintiffs do not provide a source for this claim, and it appears to be a mischaracterization of Defendants more specific representations that their dog food is "made with fresh protein sources that are '[d]eemed fit for human consumption,'" id. ¶ 12, and that their "ingredients are deemed fit for human consumption when they arrive at our kitchens," id. ¶ 70.

Other courts considering similar claims have agreed. See Leppert, 2019 WL 216616, at *6 ("Plaintiffs also cannot rely on the allegations in their Complaint that Defendants falsely marketed their cat foods as being 'fit for human consumption' because Defendants never made such statements. Read in full, the statements on Orijen packaging as pictured in the Complaint provide that certain proteins are 'deemed fit for human consumption *before inclusion into Orijen ingredients*.'") (emphasis in original); Reitman v. Champion Petfoods USA, Inc., 18-CV-1736, 2019 WL 1670718, at *4 (C.D. Cal. Feb. 6, 2019) ("Plaintiffs cannot rely on the first statement listed above that the pet food is 'fit for human consumption' because as alleged, Defendants state the food is made with 'protein sources that are "Deemed fit for human consumption"' before inclusion into the ingredients or before inclusion into the finished pet foods. Defendants did not market their pet foods as 'fit for human consumption.'") (internal citations omitted).[6]

---

[6] In their Response, Plaintiffs argue that they should at least be able to proceed on Defendants' representation that they use protein sources fit for human consumption. See Resp. at 6. But the only allegation Plaintiffs can point to regarding the protein sources pertains to the pentobarbital claims, see id., which not viable for the reasons discussed above.

Thus, Plaintiffs cannot base their claims on Defendants' alleged representation that their dog food is fit for human consumption because, as Defendants succinctly state, "Champion never suggested that people should be eating its dog food." Mem. at 9.[7]

### 2. "Only 1 Supplement—Zinc" and "Fresh Regional Ingredients"

Defendants take issue with Plaintiffs' reliance on the statement "Only 1 Supplement—Zinc" because Plaintiffs do not allege that Champion adds any heavy metals or BPA to its dog food as a supplement. Mem. at 11–12. This is true. But like Defendants' focus on whether Plaintiffs' allege that the dog food violates any health standards, it misses the point. Plaintiffs allege that this statement leads reasonable consumers to believe the dog food does not contain heavy metals or BPA. Resp. at 8. Defendants might be correct that such a statement would not lead reasonable consumers to believe anything about the presence or non-presence of heavy metals and BPA, but as discussed above (and in more depth in below), this is a question for a jury. See Brady, 2020 WL 158760, at *9 ("[W]hether a statement is deceptive or misleading is a question of fact that is improper for the Court to resolve on a motion to dismiss.")

Defendants also argue that the "fresh regional ingredients" statements should not be the basis of any claims because Plaintiffs merely make conclusory allegations that ingredients are shipped from places far from Kentucky, including India and New Zealand. Mem. at 17. But this

---

[7] Defendants also take issue with several other statements that Plaintiffs attribute to them. Mem. at 12–13 ("[S]everal of Plaintiffs' claims also rely on the unsupported allegations that Champion marketed its pet food as 'nutritious,' 'superior quality,' 'pure,' 'natural,' and 'healthy and safe for consumption.' [Am. Compl.] ¶¶ 127, 137, 145, 158, 169, 194. However, Plaintiffs never allege where these alleged statements appeared."). In their Response, Plaintiffs clarify that "the words and/or phrases [Defendants] take issue with are clearly not intended to be verbatim. Rather, these words and/or phrases are meant as summary place-holders for longer statements directly attributable to [Defendants] that hold the same meanings in the minds of reasonable consumers." Resp. at 6.

is an allegation of fact that Plaintiffs assert to contradict Defendants' representation, and it is sufficient at the motion to dismiss stage.

### 3. "Biologically Appropriate," "Providing a Natural Source of Virtually Every Nutrient Your Dog Needs to Thrive," and "Guaranteed to Keep Your Dog Healthy, Happy and Strong"

Defendants argue these statements are non-actionable puffery. Mem. at 16, 18. While less concrete than some of Defendants' other statements, the Court finds these representations convey sufficiently specific health and dietary claims to avoid being labeled puffery as a matter of law.

"Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 159 (2d Cir. 2007) (quoting Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993)); see also Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC, 832 F. Supp. 2d 194, 209 (E.D.N.Y. 2010) ("Statements that are 'expression[s] of opinion,' rather than of fact, have been labeled as 'mere puffing' that cannot form the basis of a fraud claim.") (quoting ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC, 858 N.Y.S.2d 94, 95 (2008)). To determine whether a statement is puffery, courts can look at a variety of factors, including "(i) vagueness; (ii) subjectivity; and (iii) inability to influence the buyers' expectations." Avola v. Louisiana-Pac. Corp., 991 F. Supp. 2d 381, 392 (E.D.N.Y. 2013).

Courts will, on occasion, rule that representations are puffery as a matter of law. For instance, in Loubier v. Allstate Ins. Co., a court held on a motion to dismiss that the statement "you're in good hands with Allstate" was merely puffery. No. 09-CV-261, 2010 WL 1279082, at *5 (D. Conn. Mar. 30, 2010); see also Pelman v. McDonald's Corp., 237 F. Supp. 2d 512, 528 (S.D.N.Y. 2003) ("Merely encouraging consumers to eat its products 'everyday' is mere puffery, at most, in the absence of a claim that to do so will result in a specific effect on health.").

16

However, courts are more often reluctant to label claims non-actionable puffery—and thus rule that the statements cannot be deceptive—at the motion to dismiss stage. See Shema Kolainu-Hear Our Voices, 832 F. Supp. 2d at 209 ("[W]hen a statement is not obviously puffing, the question of whether it is fact or opinion is 'almost always a question of fact for a jury's resolution.'").

While these statements are close, they "are not so obviously 'puffing' that their significance should be determined as a matter of law." Yuzwak v. Dygert, 144 A.D.2d 938, 939–40, 534 N.Y.S.2d 35 (1988) (declining to find defendant's representations "that this was a good horse for children" were puffery as a matter of law). While a jury may be skeptical that these statements could suggest to reasonable consumers that there is *no* level of naturally occurring heavy metals in the dog food, the statements convey enough factual health and nutritional information that it should be up to a jury to make that determination. Other courts considering nearly identical statements have agreed. See Leppert 2019 WL 216616, at *7 ("[T]he statements that the cat food is 'biologically appropriate' and made from 'fresh regional ingredients' are assertions of fact . . . ."); id. at *8 ("Although a closer call, the same is true of the statement that the cat food will keep a cat 'healthy, happy and strong.' Such statements go beyond mere puffery because they convey the cat food is nutritious and safe."); Reitman, 2019 WL 1670718, at *4 ("Whether the food is 'biologically appropriate' or made from 'fresh regional ingredients' can be proven through discovery. It is a closer call as to 'a natural source of virtually every nutrient your dog needs to thrive' and 'guaranteed to keep your dog healthy, happy and strong,' but such statements do convey to consumers that the pet foods are safe, nutritious, and natural. As pled,

the claims are actionable.").[8]

Plaintiffs bolster their argument that the representations are not puffery by claiming that Champion's "overall packaging and advertising is misleading to consumers," Resp. at 9; see Am. Compl. ¶ 5, and that Champion's marketing creates the impression that its food is "fresh, quality, and properly sourced" and allows Champion to "hold [it] out as high quality, and thus charge a premium." Id.; see La Vigne v. Costco Wholesale Corp., 284 F. Supp. 3d 496, 512 (S.D.N.Y. 2018), aff'd, 772 F. App'x 4 (2d Cir. 2019) ("Courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole.").

### B. Defendants' Arguments for Dismissal of Each Individual Claim

#### 1. Statutory Claims

Plaintiffs state a claim for violation of New York General Business Laws ("GBL") §§ 349 and 350. Compl. ¶ 122–142.

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business" and § 350 prohibits "[f]alse advertising in the conduct of any business." "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000). "[D]eceptive acts"

---

[8] The Court does note, however, that with regard to the statement "unmatched regional ingredients delivered fresh," while "regional ingredients delivered fresh" is actionable, the assertion that such ingredients are "unmatched" is not. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 160 (2d Cir. 2007) ("[A] general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion.") (quoting Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 496 (5th Cir. 2000)).

are acts that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." Id. (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26 (1995)). "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." Goshen v. Mut. Life Ins. Co. of New York, 98 N.Y.2d 314, 324 (2002); Maurizio, 230 F.3d at 522 ("The same interpretation [of Section 349] has also been applied to Section 350."). "Courts have generally held that such a reasonableness inquiry is an issue of fact for the jury and should not be resolved on a motion to dismiss." Rodriguez v. Hanesbrands Inc., No. 17-CV-1612, 2018 WL 2078116, at *3 (E.D.N.Y. Feb. 20, 2018), report and recommendation adopted, No. 17-CV-1612, 2018 WL 1686105 (E.D.N.Y. Mar. 30, 2018).

Plaintiffs argue that "Defendants' failure to disclose material facts that their Contaminated Dog Foods contained heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements was misleading in a material respect because a reasonable consumer acting reasonably under the circumstances would have been misled by Defendants' conduct." Am. Compl. ¶ 130. Defendants raise multiple objections to this claim. First, they argue that their statements are merely puffery, Mem. at 14, but as discussed above, this is not the case. Next, Defendants argue that "Plaintiffs have not pled why the inclusion of heavy metals or BPA in Champion's dog food at the levels alleged would make any of these statements deceptive, misleading, false, or unfair" and that "Champion never represented that its natural ingredients are 'free of heavy metals.'" Mem. at 21. Defendants also repeatedly note that the heavy metals are "naturally occurring." Id.

This argument is related to Defendants' previously discussed assertion that all claims should be dismissed because Plaintiffs do not allege that there were unsafe levels of the substances in the food. But while the Court determined that the failure to allege unsafe levels was not fatal, the question still remains whether Plaintiffs adequately allege that they were deceived into believing there was *no level* of heavy metals or BPA in the dog food.

Plaintiffs make a strong enough case to overcome the relatively low bar present at the motion to dismiss stage. In Segedie v. Hain Celestial Grp., Inc., a court found a defendant's representations "plausibly misleading to a reasonable consumer" and thus sufficient to survive a motion to dismiss several claims, including under GBL § 349. No. 14-CV-5029, 2015 WL 2168374, at *11 (S.D.N.Y. May 7, 2015). The Segedie court explained:

> The Complaint alleges that Defendant labeled the challenged products as "natural" or "all natural," that Defendant knew and intended that consumers would rely on that representation, that Plaintiffs relied on the representation in making their purchases and understood it to mean that the products were free from synthetic ingredients, and that the challenged products contained synthetic ingredients. It is not unreasonable as a matter of law to expect that a product labeled "natural" or "all natural" contains only natural ingredients.

Id. at 12; see also Yuzwak, 144 A.D.2d at 939–40. The claim here is similar. The logical leap between "natural" and "no synthetic ingredients" may be smaller than the leap between "biologically appropriate" and "no arsenic"—especially when considering that arsenic occurs naturally—but the connection is not so tenuous as to fail the plausibility standard. See also Atik, 2016 WL 11480151, at *8 ("[W]hether a business practice is deceptive will usually be a question of fact not appropriate for decision on [a motion to dismiss]."); Brady v. Anker Innovations Ltd., No. 18-CV-11396, 2020 WL 158760, at *9 (S.D.N.Y. Jan. 13, 2020) ("[W]hether a statement is

deceptive or misleading is a question of fact that is improper for the Court to resolve on a motion to dismiss.").

The cases on which Defendants rely are unconvincing. In arguing that courts can resolve this inquiry on a motion to dismiss, Defendants cite frequently to <u>Fink v. Time Warner Cable</u>, in which the Second Circuit affirmed the dismissal of a class action false advertising complaint against a cable company. 714 F.3d 739 (2d Cir. 2013); Mem. at 14–15. But the <u>Fink</u> court dismissed the claim because the plaintiffs were unable to produce the advertising they referenced in their complaint. <u>Id.</u> at 741–42 ("Plaintiffs' submission is perplexing . . . the allegations of the Complaint are materially inconsistent with the sole advertisement Plaintiffs have submitted. We therefore easily conclude that Plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss."). While Plaintiffs misconstrue Defendants' "fit for human consumption" claim, Plaintiffs have also documented many of the exact representations. <u>See, e.g.</u>, Am. Compl. ¶ 5 (picture of packaging with the phrase "unmatched regional ingredients delivered fresh").

To be sure, courts will, on occasion, dismiss claims at the motion to dismiss stage because the alleged deception is simply too implausible. These cases, however, involve a level of plaintiff-cluelessness not present in the case at hand. In <u>Kommer v. Bayer Consumer Health</u>, a court dismissed the claims because it found that it was unreasonable for the plaintiff to think he was buying individually-designed, custom orthotics when, after using the automated foot-measuring machine in question, the machine directed him to pick out one of several pre-packaged pairs of orthotics sitting on a shelf. 252 F. Supp. 3d 304, 311 (S.D.N.Y. 2017) ("At the point that the consumer is directed to select a pre-packaged Insert stacked along shelves on the side of the Kiosk, however, it is no longer reasonable for him to think that he is getting a product 'individually designed' for his feet") <u>aff'd sub nom.</u> <u>Kommer v. Bayer Consumer Health, a</u>

division of Bayer AG, 710 F. App'x 43 (2d Cir. 2018); see also Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 404 (S.D.N.Y. 2010) ("[Plaintiff's] argument that Hotels.com's failure to disclose that it was making a profit on each reservation was deceptive and misleading under G.B.L. § 349 is not persuasive. The argument attributes to consumers a level of stupidity that the Court cannot countenance and that is not actionable under G.B.L. § 349 . . . Any reasonable consumer would understand that businesses are in business to make a profit.").

While Plaintiffs' claims do not rise to the level of obliviousness in Kommer and Chiste, the Court emphasizes that the question of whether Champion's statements were misleading remains unanswered. See Segedie, 2015 WL 2168374, at *12 ("[T]he Court is not establishing a rule of law that foods labeled "natural" may not contain synthetic ingredients—far from it. The alleged presence of synthetic ingredients merely brings the claim of deception into the realm of plausibility. The plausibility standard is not akin to a probability requirement. Whether the labels would mislead a reasonable consumer is a question of fact for the jury.") (internal quotation marks and citations omitted).

Finally, in support of their argument that "Champion never represented that its natural ingredients are 'free of heavy metals,'" Defendants point out that "Champion published a White Paper that disclosed the safe levels of naturally occurring heavy metals in its dog food." Mem. at 15. But even assuming the Court can consider the White Paper at this stage, a reasonable consumer would not be expected to read the White Paper to disabuse themselves of any misconception they might have as a result of allegedly false advertising. See Williams v. Gerber Prods., 552 F.3d 934, 939 ("We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box."); Segedie, 2015 WL 2168374,

at *11 ("A jury may ultimately find that the appearance of ingredients that are obviously synthetic on an ingredient list undercuts Plaintiff's theory of deception. But again, the Court cannot make this determination at this stage.").

### B. Breach of Express Warranty Claim

Plaintiffs state a breach of express warranty claim.

"To prevail on a claim of breach of express warranty, a plaintiff must show an affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase and that the warranty was relied upon." Factory Assocs. & Exporters, Inc. v. Lehigh Safety Shoes Co. LLC, 382 F. App'x 110, 111–12 (2d Cir. 2010) (internal quotation marks omitted). However, "[s]uch an affirmation of fact must be distinguished from puffery, which is not actionable." Daley v. McNeil Consumer Prod. Co., a div. of McNeil-PPC, 164 F. Supp. 2d 367, 376–77 (S.D.N.Y. 2001).

Defendants argue that all marketing statements on which Plaintiffs relied are either "true or subjective statements that cannot support a breach of express warranty claim." Mem. at 26. Plaintiffs counter that the statements are not puffery but rather are "factual promises" that are "concrete, capable of being proved or disproved, and expected to influence buyers' expectations prior to their purchase, as they did Plaintiffs' expectations." Resp. at 18.

The Court has already addressed these arguments. While Defendants are correct that some of the alleged statements are simply not what Champion represented and therefore not actionable, Plaintiffs have also alleged that Champion made several other actionable statements.

Therefore, Plaintiffs sufficiently allege a breach of express warranty claim. See Yuzwak v. Dygert, 534 N.Y.S.2d 35, 36 (App. Div. 1988) ("Whether representations made by a seller are

warranties and, therefore, a part of the bargain, or merely expressions of the seller's opinion, or mere 'puffing', is almost always a question of fact for a jury's resolution.").

*C. Breach of Implied Warranty of Merchantability Claim*

Plaintiffs do not, however, state a claim for breach of implied warrant of merchantability.

"[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C. § 2-314(1). To succeed on an implied warranty claim, a plaintiff "must show both the existence and breach of the warranty and that the breach was the proximate cause of plaintiff's damages." Bellevue S. Associates v. HRH Const. Corp., 579 N.E.2d 195, 203 (N.Y. 1991). "Privity is not required in a personal injury action for breach of express or implied warranty." Ross v. Alexander Mitchell & Son, Inc., 31 N.Y.S.3d 703, 703 (App. Div. 2016). However, "no implied warranty will extend from a manufacturer to a remote purchaser not in privity with the manufacturer where only economic loss and not personal injury is alleged." Mahoney v. Endo Health Sols., Inc., No. 15-CV-9841, 2016 WL 3951185, at *4–5 (S.D.N.Y. July 20, 2016) (quoting Lexow & Jenkins, P.C. v. Hertz Commercial Leasing Corp., 504 N.Y.S.2d 192, 193–94 (App. Div. 1986); see also Adirondack Combustion Techs., Inc. v. Unicontrol, Inc., 793 N.Y.S.2d 576, 579 (App. Div. 2005) ("A claim based upon a breach of an implied warranty requires a showing of privity between the manufacturer and the plaintiff when there is no claim for personal injuries.").

As Defendants argue, Plaintiffs are not in privity with Champion because they purchased the dog food from retailers, not Champion. Mem. at 27; Am. Compl. ¶¶ 17, 19. Plaintiffs attempt to argue that "[p]rivity exists because Defendants impliedly warranted to Plaintiffs and the Class through the warranting, packaging, advertising, marketing, and labeling that the Contaminated Dog Foods healthy, natural, and suitable for consumption and by failing to make any mention of

heavy metals, pentobarbital, toxins, and/or unnatural or other ingredients." Am. Compl. ¶ 165.

But Plaintiffs cite no caselaw to support this circular, conclusory statement. And the only case on

which they broadly rely, <u>Mahoney v. Endo Health Sols., Inc.</u>, does not support their claims. No.

15-CV-9841, 2016 WL 3951185, at *5 (S.D.N.Y. July 20, 2016). In fact, <u>Mahoney</u> dismissed the

plaintiff's claim for breach of implied warranty because "no implied warranty will extend from a

manufacturer to a remote purchaser not in privity with the manufacturer where only economic

loss and not personal injury is alleged." <u>Id.</u>; <u>see also</u> <u>In re Scotts EZ Seed Litig.</u>, No. 12-CV-

4727, 2013 WL 2303727, at *8 (S.D.N.Y. May 22, 2013) ("[C]ourts have expressed a policy

against holding manufacturers liable to end-consumers under a theory of implied warranty where

the parties are not in privity.") (quotation marks omitted).

      Plaintiffs attempt to circumvent the privity requirement by arguing that "intended

beneficiaries may bring a breach of implied warranty claims, despite a lack of direct contractual

privity." Resp. at 22 (citing <u>Praxair, Inc. v. Gen. Insulation Co.</u>, 611 F. Supp. 2d 318, 330

(W.D.N.Y. 2009)). This argument fails, however, because Plaintiffs' Amended Complaint does

not even allege that the retailers from which Plaintiffs purchased the dog food had contracts with

Champion, much less that Plaintiffs were the intended beneficiaries of those contracts. <u>See</u> Resp.

at 23 n.14 (arguing that "[d]iscovery will reveal the existence" of these contracts, but not

pointing to any allegation in the Amended Complaint that those contracts exist); <u>Cummings v.</u>

<u>FCA US LLC</u>, 401 F. Supp. 3d 288, 313 (N.D.N.Y. 2019) ("[T]o the extent that Plaintiff relies

[on] an exception to the privity requirement based on being a third-party beneficiary of the

contract between Defendant and its authorized dealer, Plaintiff has failed to allege facts plausibly

suggesting the applicability of such exception here because she has not included any factual

allegations regarding the contract between Defendant and the authorized dealer, much less any

factual allegations plausibly suggesting that the contract was intended to provide a sufficiently immediate benefit to her.").

### D. Fraudulent Misrepresentations and Fraud by Omission Claims

Plaintiffs allege both fraudulent misrepresentation and fraud by omission. Am. Compl. ¶¶ 168–182. They have stated a claim for both.

#### i. Fraudulent Misrepresentation

To establish fraud under New York law, a plaintiff must prove "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 170 (2d Cir. 2015). Additionally, Plaintiffs must satisfy the heightened pleading standard of Rule 9(b), which places "two further burdens on fraud plaintiffs—the first goes to the pleading of the circumstances of the fraud, the second to the pleading of the defendant's mental state." Id. at 171; see also Fed. R. Civ. P. 9(b). As to the first, the Complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Id. (citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004)). As to the second, "though mental states may be pleaded 'generally,' Plaintiffs must nonetheless allege facts 'that give rise to a strong inference of fraudulent intent.'" Id. (citing Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006)). "At the pleading stage, . . . a fraud plaintiff may establish a strong inference of scienter . . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 177.

Defendants assert that Plaintiffs have not pled their fraud claims with sufficient particularity, arguing that Plaintiffs' allegation that the they saw the representations on packaging and relied on them to make the purchase do not satisfy the "who, what, where, when, and how" requirements to plead fraud. Mem. at 23. Plaintiffs counter that they have alleged fraud with sufficient particularity:

> The [Amended Complaint] clearly names each plaintiff and defendant (the "who") and alleges when each plaintiff began purchasing the Products, how frequently, and when they stopped (the "when"). Plaintiffs describe from where they each purchased the Products, as well as the specific Products and package labels at issue (the "where"). They also describe and provide photographs of the claims on the Products and website that they contend are false or misleading (the "what"). Finally, they describe why [Champion's] claims about the Products are false "and allege that plaintiffs would not have purchased [the] Products had they known of the presence of those contaminants" and the true source of Defendants' ingredients.

Resp. at 14.

Plaintiffs are correct. The Complaint details who purchased the products, the exact products purchased, the stores from which they were purchased, and the time frame over which those purchases were made. Am. Compl. ¶¶ 17, 19. And as discussed, Plaintiffs have adequately explained why these statements were deceptive. See, e.g., id. ¶ 18 ("Plaintiff Colangelo would not have paid this money had she known that the Contaminated Dog Foods contained any levels of the heavy metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements."); see also Reitman, 2019 WL 1670718, at *5 ("Whether the statements that the pet foods are natural, biologically appropriate, fresh, meet European Union standards, or contain only one supplement are disputable facts that may or may not be true; but Plaintiff has sufficiently alleged facts to put Defendants on notice of the circumstances giving rise to their [fraud] claims.").

The sole case on which Defendants rely, Bruno v. Zimmer, Inc., dismissed fraud claims because the complaint was "devoid of any facts indicating the precise statements which Plaintiffs contend were fraudulent." No. 15-CV-6129, 2017 WL 8793242, at *9 (E.D.N.Y. Aug. 11, 2017), report and recommendation adopted, No. 15-CV-6129, 2018 WL 671234 (E.D.N.Y. Feb. 1, 2018). This case has little relevance to the case at hand, where Plaintiffs allege several specific representations and even provide photographs of many of the statements in question. See, e.g., Am. Compl ¶¶ 5, 24.

Plaintiffs have also sufficiently alleged fraudulent intent. Plaintiffs pled, for instance, that "Defendants have publicly stated on their website that they require their suppliers to 'provide heavy metals and mercury test results, for which we also test our final food products.'" Am. Compl. ¶ 100. Plaintiffs also allege that:

> Defendants received notice of the contaminants in their dog and cat foods, including the Contaminated Dog Foods, through the Clean Label Project, which found higher levels of heavy metals in their dog and cat food products. . . . The Clean Label Project informed Defendants that it compared Orijen pet foods to competitors' products and gave them a one-star rating, meaning they contained higher levels of contaminants than other products on the market. . . . Defendants also issued a white paper in defense of the Clean Label Project findings that acknowledges that their products contain heavy metals.

Id. ¶¶ 101–02. This is enough to allege Defendants' fraudulent intent at this stage. It shows that Defendants knew about the presence of heavy metals, and knew that the issue was important enough to consumers that it must be addressed. And despite acknowledging the presence of heavy metals in the White Paper, Defendants continued to market their products in a way that— according to Plaintiffs—led them to believe that there were no heavy metals in the dog food. See Loreley Fin. (Jersey) No. 3 Ltd., 797 F.3d at 174 ("At the pleadings stage, the alleged fraud need only be plausible based on the complaint; it need not be more likely than other possibilities.").

28

Champion protests that it lacked the requisite knowledge that its representations were false because "Champion believes its dog food is safe," Mem. at 23 n.9, but this once again rebuts an argument Plaintiffs are not making. Champion allegedly tricked Plaintiffs into believing there was *no amount* of BPA or heavy metals in the dog food. Thus, the question for now is whether Defendants knew there was any amount present and that even a minimal amount mattered to consumers. Plaintiffs have adequately alleged that.

Defendants also argue that the fraud claim should be dismissed because it is based on statements that are merely puffery. Mem. at 18–19. But as discussed, the court does not find that the alleged statements are puffery as a matter of law.

### ii. Fraud by Omission

Fraudulent omission requires that a plaintiff plead "(1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 90—91 (2d Cir. 2005). Defendants focus on the first requirement, arguing that Plaintiffs failed to plead a duty to disclose. Mem. at 19–20. Among other circumstances, a duty to disclose arises "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." TVT Records, 412 F.3d at 91 (internal quotation marks omitted).

Defendants object that Plaintiffs' allegation that "Champion had a duty to disclose because they were in a superior position to know the facts about their products" is "conclusory." Mem. at 26. However, Plaintiffs allege that Defendants had extensive knowledge of the BPA and heavy metals in their products, see e.g., Am. Compl. ¶¶ 101–02, and that Champion knew that consumers relied on the mistaken belief that the products did not contain BPA and heavy metals in making their purchases, see e.g., id. ¶¶ 17–20. These allegations are sufficient to allege a duty

to disclose at this stage. See Watts v. Jackson Hewitt Tax Serv. Inc., 579 F. Supp. 2d 334, 352 (E.D.N.Y. 2008) (finding that plaintiffs stated a claim for fraudulent omission against tax preparers because, despite the lack of a fiduciary relationship, the tax preparers "had superior and exclusive knowledge of the actual charges applied . . . Without knowledge of the seasonal multiplier fee and hidden fees for financial products, customers can be expected to act on the misleading impressions conveyed by the minimum fee fliers.").[9]

### E. Negligence Claims

Plaintiffs allege negligent misrepresentation, Am. Compl. ¶ 183–88, as well as negligence per se based on violations of New York's Agriculture and Markets Law, N.Y. Agric. & Mkts. Law § 128, et seq., id. ¶ 189–98. Both claims are dismissed

Plaintiffs' negligence claims are barred by the economic loss doctrine. "[I]t is well settled that 'New York law holds that a negligence action seeking recovery for economic loss will not lie.'" Black Radio Network, Inc. v. NYNEX Corp., No. 96-CV-4138, 2000 WL 64874, at *3 (S.D.N.Y. Jan. 25, 2000) (quoting Suffolk Cty. v. Long Island Lighting Co., 728 F.2d 52, 62 (2d

---

[9] Both parties rely on decisions in similar litigation against Champion from other jurisdictions, but these cases are of limited applicability to Plaintiffs' New York fraudulent omission claim. Though the Court comes to the same conclusion as Reitman, cited by Plaintiffs, the Reitman court does not provide enough explanation for this Court to determine if its holding under California law is relevant to this case. See 2019 WL 1670718, at *5. And in Leppert, cited by Defendants, the court dismissed the fraudulent omission claim based on an Illinois requirement that a "superior knowledge" claim must involve a "relationship of trust and confidence." Leppert, 2019 WL 216616, at *11. Defendants do not argue that there is any such requirement under New York law. Reply at 8–9; See also Watts, 579 F. Supp. 2d at 352 (finding that plaintiffs stated a claim for fraudulent omission based on defendants' superior knowledge without addressing any "relationship of trust and confidence" requirement); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 151 (2d Cir. 1993) ("[W]e observe a tendency in New York to apply the rule of 'superior knowledge' in an array of contexts in which silence would at one time have escaped criticism.").
.

Cir. 1984)). Plaintiffs appear to argue that the economic loss doctrine does not apply to their negligence per se claim, Resp. at 25, but only cite case law discussing broadly what negligence per se is, see Higgins v. W. 50th St. Assocs., LLC, 930 N.Y.S.2d 174 (Sup. Ct. 2011); Van Gaasbeck v. Webatuck Cent. Sch. Dist. No. 1, 234 N.E.2d 243 (1967), or explaining the justification for the economic loss doctrine, see In re Mission Const. Litig., No. 10-CV-4262, 2013 WL 4710377 (S.D.N.Y. Aug. 30, 2013). Thus, Plaintiffs' negligence and negligence per se claims are dismissed. See Vitolo v. Dow Corning Corp., 651 N.Y.S.2d 104, 105 (1996) (dismissing negligence and negligence per se claims under the economic loss doctrine).

### F. Unjust Enrichment Claim

Plaintiffs voluntarily dismiss their claim for unjust enrichment. Resp. at 25 n.16.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 62) is **GRANTED** as to Plaintiffs' claims for breach of implied warranty, negligence, and negligence per se; and it is further

**ORDERED**, that Defendants' Motion to Dismiss is **DENIED** as to Plaintiffs' claims for violations of GBL §§ 349 and 350, breach of express warranty, fraudulent misrepresentation, and fraud by omission; and it is further

**ORDERED**, that Plaintiffs' claim for unjust enrichment is voluntarily **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED:      February 18, 2020
                Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge