# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **RACHEL COLANGELO and KATHLEEN PARADOWSKI, individually and on behalf of a class of similarly situated individuals,** | Case No.  6:18-CV-01228-LEK-DEP |
| **PLAINTIFFS,** | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| **V.** | |
| **CHAMPION PETFOODS USA, INC. and CHAMPION PETFOODS LP,** | <u>**DEMAND FOR JURY TRIAL**</u> |
| **DEFENDANTS.** | |

.

# TABLE OF CONTENTS

JURISDICTION AND VENUE ...................................................................................... 4

PARTIES ........................................................................................................................ 5

    A.    Plaintiffs ................................................................................................... 5

    B.    Defendants ................................................................................................ 7

FACTUAL ALLEGATIONS ......................................................................................... 9

I.    EVOLUTION OF DEFENDANTS' PACKAGING CLAIMS ........................... 9

    A.    Original Packaging Claims Were Plain and Generic ............................... 9

    B.    Introduction of Misleading Packaging Claims ...................................... 10

    C.    Defendants Charged Consumers Premium Prices .................................. 12

II.    MISLEADING PACKAGING CLAIMS AND OMISSIONS ......................... 14

    A.    Biologically Appropriate™ .................................................................... 14

    B.    "Fresh Regional Ingredients" ................................................................. 15

    C.    "Provid[e] a Concentrated Source of Virtually Every Nutrient Your Dog Needs to Thrive, Naturally, Without Long Lists of Synthetic Supplements – Only Zinc Is Added" ........................................................................... 16

    D.    "Guaranteed to Keep Your Dog Healthy, Happy, and Strong" ............. 16

    E.    "Nourish as Nature Intended" and "Delivering Nutrients Naturally" ... 17

    F.    Omissions ............................................................................................... 17

III.    WHY PACKAGING CLAIMS AND OMISSIONS WERE MISLEADING .................. 17

    A.    Heavy Metals ......................................................................................... 18

        1.    *Contaminated Dog Food Contained Heavy Metals, Which Are a Known Risk* ............................................................................... 18

        2.    *Defendants Knew the Contaminated Dog Food Contained Heavy Metals but Failed to Disclose* .................................................. 22

    B.    BPA ........................................................................................................ 23

    C.    Non-Fresh Ingredients ........................................................................... 24

D.        Non-Regional Ingredients ...........................................................27

IV.    MISLEADING PACKAGING CLAIMS AND OMISSIONS MISLED AND
       DECEIVED CONSUMERS .................................................................29

V.     MISLEADING CLAIMS AND OMISSIONS VIOLATED NEW YORK LAWS ...........30

VI.    CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE....................31

VII.   DEFENDANTS' KNOWLEDGE OF THE MISREPRESENTATIONS,
       OMISSIONS, AND THEIR MATERIALITY .................................................33

VIII.  DEFENDANTS ACTED INTENTIONALLY TO MISLEAD CONSUMERS ..............34

IX.    NOTICE OF BREACHES OF EXPRESS WARRANTIES ...............................34

X.     BENEFICIARIES OF DEFENDANTS' EXPRESS WARRANTIES ............................35

CLASS ACTION ALLEGATIONS .................................................................35

CLAIMS FOR RELIEF ...............................................................................39

COUNT I - Violation of New York General Business Law § 349 .................................39

COUNT II - Violation of New York General Business Law § 350.................................41

COUNT III -  Breach of Express Warranty Against Defendants on Behalf of the Class.............43

COUNT IV -  Fraudulent Misrepresentation Against Defendants on Behalf of the Class............45

COUNT V -  Fraud by Omission Against Defendants on Behalf of the Class...........................47

PRAYER FOR RELIEF ...............................................................................48

JURY DEMAND .......................................................................................49

1.      Plaintiffs Rachel Colangelo ("Plaintiff Colangelo") and Kathleen Paradowski ("Plaintiff Paradowski") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Second Amended Class Action Complaint against defendants Champion Petfoods USA, Inc. ("Champion USA") and Champion Petfoods LP ("Champion Canada") (collectively, "Defendants"), for their improper marketing practices, such as their misleading packaging claims and misleading omissions concerning the quality and characteristics of their Contaminated Dog Food (as defined herein) diets and the ingredients used to make them.

2.      Defendants' dog food misleading packaging claims included, among others, the following:

(a)      Biologically Appropriate™;

(b)      "Fresh Regional Ingredients";

(c)      "Provid[e] a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added";

(d)      "Guaranteed to keep your dog healthy, happy, and strong";

(e)      "Nourish as Nature Intended"; and

(f)      "Delivering Nutrients Naturally."

3.      The above packaging claims are hereafter referred to as the "Misleading Packaging Claims."

4.      From July 1, 2014, to the present, Defendants' dog food packaging contained the above packaging claims.

5.      Defendants' packaging claims were misleading and fraudulently omitted the fact that Defendants' dog foods contained and/or had a material risk of containing undisclosed and non-conforming contaminants and ingredients, such as heavy metals, Bisphenol A ("BPA"), non-fresh ingredients, such as "regrinds," which are reused, twice cooked pet food, and non-regional ingredients.

6.      Defendants' Misleading Packaging Claims and fraudulent omissions injured consumers, such as Plaintiffs, who reasonably relied upon the Misleading Packaging Claims and/or were otherwise misled by the omissions when purchasing Defendants' dog food at premium prices.

7.      Indeed, Defendants' dog foods have been shown to contain arsenic, mercury, lead, cadmium, and/or BPA (all of which are known to pose health risks to humans and animals, including dogs) at levels consistent with the following:

| Product Name | Arsenic ug per kg | BPA ug per kg | Cadmium ug per kg | Mercury ug per kg | Lead ug per kg |
|---|---|---|---|---|---|
| Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry Dog Food | 3256.40 | 32.50 | 113.00 | 51.20 | 249.30 |
| Orijen Six Fish With New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Dog Food | 3169.80 | 39.50 | 200.50 | 54.90 | 38.70 |
| Orijen Original Chicken, Turkey, Wild- Caught Fish, Eggs Dry Dog Food | 907.60 | 0.00 | 93.20 | 10.80 | 489.80 |
| Orijen Regional Red Angus Beef, Boar, Goat, Lamb, Pork, Mackerel Dry Dog Food | 849.40 | 43.60 | 123.10 | 21.40 | 167.70 |

| Product Name | Arsenic ug per kg | BPA ug per kg | Cadmium ug per kg | Mercury ug per kg | Lead ug per kg |
|---|---|---|---|---|---|
| Acana Regionals Meadowland with Poultry, Freshwater Fish and Eggs Dry Dog Food | 846.40 | 82.70 | 37.50 | 8.70 | 489.00 |
| Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Dog Food | 358.20 | 82.90 | 32.50 | 14.90 | 336.70 |
| Acana Regionals Grasslands with Lamb, Trout, and Game Bird Dry Dog Food | 262.80 | 0.00 | 30.60 | 9.60 | 305.00 |
| Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food | 1066.50 | 37.70 | 62.10 | 21.70 | 138.50 |
| Acana Singles Duck and Pear Formula Dry Dog Food | 523.40 | 102.70 | 30.90 | 15.40 | 537.40 |
| Acana Singles Lamb and Apple Formula Dry Dog Food | 401.20 | 73.20 | 35.00 | 3.20 | 423.40 |
| Acana Heritage Free-Run Poultry Formula Dry Dog Food | 292.90 | 62.20 | 27.80 | 3.30 | 290.20 |
| Acana Heritage Freshwater Fish Formula Dry Dog Food | 977.70 | 0.00 | 56.20 | 27.40 | 486.80 |
| Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish Dry Dog Food | 2173.90 | 39.70 | 92.20 | 58.80 | 55.10 |
| Orijen Tundra Goat, Venison, Mutton, Bison, Arctic Char, Rabbit Dry Dog Food | 1628.50 | 40.30 | 134.50 | 43.60 | 471.80 |

| Product Name | Arsenic ug per kg | BPA ug per kg | Cadmium ug per kg | Mercury ug per kg | Lead ug per kg |
|---|---|---|---|---|---|
| Orijen Grain Free Puppy Chicken, Turkey, Wild-Caught Fish, Eggs Dry Dog Food | 791.20 | 32.20 | 87.20 | 12.20 | 490.80 |
| Acana Singles Mackerel and Greens Formula Dry Dog Food | 1510.70 | 40.10 | 112.20 | 29.60 | 251.10 |
| Acana Heritage Meats Formula Dry Dog Food | 384.80 | 58.30 | 24.40 | 6.40 | 1731.90 |
| Acana Singles Pork and Squash Formula Dry Dog Food | 373.70 | 57.60 | 25.60 | 4.00 | 329.60 |

8.     The above diets are hereafter referred to as the "Contaminated Dog Food." Photographs of the packaging for the Contaminated Dog Food can be found in Exhibit A.

9.     Plaintiffs bring this action individually and on behalf of all other similarly situated consumers within New York who purchased the Contaminated Dog Food, in order to cause the disclosure of the presence and/or risk of inclusion of heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements in the Contaminated Dog Food. Plaintiffs seek relief for consumers who have been misled by Defendants' Misleading Packaging Claims and omissions, and to obtain redress for those who have purchased the Contaminated Dog Food.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Class (as defined herein) reside in states other than the states in which Defendants are citizens and in

which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiffs are citizens of the State of New York and suffered injury as a result of Defendants' acts in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants conduct substantial business in this District, Defendants have intentionally availed themselves of the laws and markets of this District, and Defendants are subject to personal jurisdiction in this District.

## PARTIES

### A.     Plaintiffs

12.     Plaintiff Colangelo purchased both Acana and Orijen dog food products. More specifically, Plaintiff Colangelo purchased the following Contaminated Dog Food for her three dogs, a three-year-old Lab-Hound mix named Chewbacca, a two-year-old Dachshund-Jack Russell Terrier mix named Yoda, and a five-year-old Chihuahua-spaniel min-pin mix named Leia: Orijen Original Adult Food and Acana Heritage Free Run Poultry. Plaintiff Colangelo purchased the Contaminated Dog Food from her local pet store, Pet Supplies Plus, and online on a monthly basis (at approximately two to three bags per month).

13.     Plaintiff Paradowski purchased the following Contaminated Dog Food for her two German Shepherds dogs, a three-year-old Lab-Hound named Deacon, and a four-year-old named Neika: Orijen Regional Red and Acana Regionals Meadowland. Plaintiff Paradowski purchased the Contaminated Dog Food from her local pet stores Pet Supplies Plus and Country Max from approximately 2014 until June 2018.

14.     Prior to purchase, Plaintiffs saw and relied upon Defendants' packaging when making their decision to buy the Contaminated Dog Food, including the following packaging claims, among others:

(a)     Biologically Appropriate™;

(b)     "Fresh Regional Ingredients"'

(c)     "Provid[e] a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added";

(d)     "Guaranteed to keep your dog healthy, happy, and strong";

(e)     "Nourish as Nature Intended"; and

(f)     "Delivering Nutrients Naturally."

15.     Plaintiffs were deceived by Defendants' Misleading Packaging Claims and omissions because the Contaminated Dog Food contained and/or had a material risk of containing contaminants and ingredients that did not conform to the packaging, such as:

(a)     heavy metals;

(b)     BPA;

(c)     non-fresh ingredients (such as regrinds);

(d)     non-regional ingredients; and/or

(e)     contain unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

16.     Plaintiffs, like other reasonable consumers, reasonably relied on Defendants' Misleading Packaging Claims when deciding to pay premium prices for the Contaminated Dog Food. Plaintiffs were unaware of Defendants' inclusion and/or risk of including these non-

conforming contaminants and ingredients, at least in material part, because of Defendants' Misleading Packaging Claims.

17.     In addition to the Misleading Packaging Claims, Defendants' packaging was also misleading because it failed to disclose the fact that the Contaminated Dog Food contained and/or had a material risk of containing: heavy metals, BPA, certain non-fresh ingredients (such as regrinds), and/or certain non-regional ingredients. Defendants intentionally omitted these contaminants and ingredients in order to induce and mislead reasonable consumers, such as Plaintiffs, to purchase the Contaminated Dog Food at premium prices.

18.     As the result of Defendants' wrongful conduct, as alleged herein, Defendants injured Plaintiffs when Plaintiffs were reasonably misled to pay premium prices for Defendants' Contaminated Dog Food because the Contaminated Dog Food did not deliver what was promised. Plaintiffs and the members of the class would not have purchased the Contaminated Dog Food at all, let alone at Defendants' premium prices had Defendants not used these Misleading Packaging Claims or had Defendants properly disclosed the risk and inclusion of non-conforming contaminants and ingredients.

19.     Plaintiffs and the members of the proposed Classes will continue to purchase dog food, and when they encounter the Contaminated Dog Food in the future, they will not be able to purchase the Contaminated Dog Food as a result of their inability to rely on the truthfulness of the packaging unless Defendants correct their Misleading Packaging Claims and misleading omissions.

**B.     Defendants**

20.     Defendant Champion USA is incorporated in Delaware. Its headquarters and principal place of business, as of March 2016, is located at 12871 Bowling Green Road, Auburn,

KY 42206. Since that time, all Acana and Orijen dog foods sold in the United States are manufactured, sourced, and sold by Champion USA.

21.     Defendant Champion Canada is a Canadian limited partnership with its headquarters and principal place of business located at 11403-186 St NW, Edmonton, Alberta T5S 2W6. Defendant Champion Canada wholly owns, operates, and/or controls defendant Champion USA. Prior to March 2016, all Acana and Orijen dog foods in the United States were manufactured, sourced and sold by Champion Canada.

22.     Defendants formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold the Contaminated Dog Food to distributors throughout the United States, including in this district, during the Class Period (as defined herein).

23.     The packaging for the Contaminated Dog Food that Plaintiffs relied upon, was prepared, reviewed, and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents through packaging and labeling that contained the misrepresentations alleged herein. Defendants similarly prepared, reviewed, and/or approved the packaging for the Contaminated Dog Food despite the omissions alleged herein.

24.     Defendants intended for consumers, such as Plaintiffs, to rely on the Misleading Packaging Claims and to be misled by the omissions when deciding to purchase the Contaminated Dog Food. As a result of Defendants' Misleading Packaging Claims and misleading omissions, reasonable consumers, including the Plaintiffs and the Classes, were deceived into purchasing the Contaminated Dog Food at premium prices.

25.     Defendants owned, manufactured, and distributed the Contaminated Dog Food and created, allowed, and/or authorized, the unlawful, fraudulent, and deceptive use of their Misleading Packaging Claims and omissions.

26.     Defendants were responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including conducting sufficient heavy metal and BPA testing, for the Contaminated Dog Food and ingredients.

27.     Defendants knew or should have known that there were material omissions from the packaging concerning the Contaminated Dog Food and its ingredients. Defendants also knew or should have known that the Contaminated Dog Food and its ingredients were deceptive because it did not conform to their Misleading Packaging Claims.

## FACTUAL ALLEGATIONS

## I.     EVOLUTION OF DEFENDANTS' PACKAGING CLAIMS

28.     Defendants evolved their Misleading Packaging Claims over time to appeal to and induce reasonable consumers, such as Plaintiffs, to purchase the Contaminated Dog Food at premium prices.

### A.     Original Packaging Claims Were Plain and Generic

29.     Founded in the 1970s, Defendants entered the dog food industry by selling a traditional, dry dog food kibble that used plain and minimal packaging with few claims.

30.     In the 1990s, Defendants launched their Acana brand, which made packaging claims such as "premium" and "high quality" on its packaging. The following is an example of Defendants' original Acana packaging:

*Old Acana Packaging:*





**B.**     **Introduction of Misleading Packaging Claims**

31.     Defendants believed that some consumers perceived their dogs as members of the family. Defendants referred to these consumers as "Pet Lovers" and targeted these Pet Lovers as potential consumers for their dog food.

32.     Defendants believed that consumers, including Pet Lovers, would be willing to pay premium prices for dog foods that advertised and represented that they contained fresh, locally or regionally sourced ingredients.

33.     In 2006, Defendants launched their new dog food brand, Orijen. Before launching Orijen, Defendants developed new packaging claims and labels for Orijen's packaging that aligned with their belief that consumers were willing to pay premium prices for dog foods that contained fresh, locally or regionally sourced ingredients. Defendants designed their new packaging claims to target and appeal to such consumers.

10

34.     Defendants' new packaging claims for their Orijen brand included the representation that Orijen was Biologically Appropriate™. Biologically Appropriate™ is a trademarked, objective advertising concept that Defendants intended to communicate to consumers that they designed their dog food to mirror a dog's natural diet. Defendants' packaging defined Biologically Appropriate™ as dog food that "mirrors the richness, freshness, and variety of … meats … dogs are evolved to eat."

35.     By using the marketing concept of Biologically Appropriate™, Defendants intentionally represented to consumers that Orijen diets contained fresh ingredients, which Defendants advertised were purchased from local or regional farmers, ranchers, and fisheries.

36.     Defendants included these packaging claims on their labels to emphasize and induce consumers to purchase Orijen diets based on their represented inclusion of ingredients that were fresh, natural, and nourishing.

37.     After Orijen's launch, Defendants saw that they could sell the dog food at premium prices because they represented that it contained fresh, locally or regionally sourced ingredients and omitted the inclusion and/or risk of including non-conforming contaminants and ingredients. Defendants eventually conformed Acana's packaging claims to be substantially similar to those advertised on Orijen.

38.     Defendants also expanded their packaging claims and began representing that Defendants made the Contaminated Dog Food from "Fresh Regional Ingredients." Defendants' packaging claim of "Fresh Regional Ingredients" promised and represented to consumers that Defendants used fresh ingredients that they sourced locally or regionally, in the Contaminated Dog Food.

39.     Defendants also added the packaging claims of "Nourish as Nature Intended," and "Delivering Nutrients Naturally" to the Contaminated Dog Food packaging. Defendants added these "natural" packaging claims to communicate to consumers that the Contaminated Dog Food and the ingredients used in the Contaminated Dog Food were natural and nutritious.

40.     Finally, Defendants added the packaging claims of "Provid[e] a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added" and "Guaranteed to keep your dog healthy, happy, and strong" to the Contaminated Dog Food packaging in order to convey to consumers that the Contaminated Dog Food did not contain any contaminants that were non-nutritious, such as heavy metals, or unnatural, such as BPA.

**C.     Defendants Charged Consumers Premium Prices**

41.     Defendants charged consumers premium prices for the Contaminated Dog Food based on Defendants' Misleading Packaging Claims and misleading omissions. Defendants' BAFRINO packaging claims (their abbreviation for Biologically Appropriate, Fresh Regional Ingredients, and Never Outsourced) were the driving force that increased the sale of the Contaminated Dog Food and secured their status as a leader and innovator in the premium priced dog food market.

42.     Defendants charged one of the highest, if not the highest, price premiums in the market for their dog foods.

43.     Defendants' average retail price for their Orijen diets was approximately $9 per kilogram ($4 per pound) and $7 per kilogram ($3 per pound) for Acana diets.

44.     The average price point for premium dry dog food is approximately at $4 per kilogram ($2 per pound). On average, the Alleged Premium Dog Food had a premium price point

of $7 per kilogram ($3 per pound) – almost double the average price that consumers paid for other premium priced dog foods.

45.     Defendants knew or should have known that the Contaminated Dog Food was one of the most expensive dog foods sold in retail markets.

46.     The following is a representative example of the old Acana packaging compared to a representative example of the Contaminated Dog Food packaging (Acana Regionals Meadowland):

*Old Acana Packaging:*



*New Acana Packaging:*



## II.   MISLEADING PACKAGING CLAIMS AND OMISSIONS

47.   During the Class Period, the Contaminated Dog Food contained the Misleading Packaging Claims.

### A.   Biologically Appropriate™

48.   The following images are some representative examples of Defendants' Biologically Appropriate™ packaging claims with regard to the Contaminated Dog Food respectively:

*As Represented on Orijen Regional Red:*



14

*As Represented on Acana Regionals Meadowland:*



**B.      "Fresh Regional Ingredients"**

49.     The following images are some examples of Defendants' "Fresh Regional Ingredient" packaging claim with regard to the Contaminated Dog Food respectively:

*As Represented on Orijen Regional Red:*



*As Represented on Acana Regionals Meadowland*:



**C.**     **"Provid[e] a Concentrated Source of Virtually Every Nutrient Your Dog Needs to Thrive, Naturally, Without Long Lists of Synthetic Supplements – Only Zinc Is Added"**

50.     The following images are some examples of Defendants' "Provid[e] a concreated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added" packaging claim with regard to the Contaminated Dog Food respectively:

*As Represented on Orijen Regional Red:*



That's why ORIJEN features richly nourishing ratios of meat, organs and cartilage, plus whole fish and eggs, providing a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements — only zinc is added.

**D.**     **"Guaranteed to Keep Your Dog Healthy, Happy, and Strong"**

51.     The following images are some examples of Defendants' "Guaranteed to keep your dog healthy, happy, and strong" packaging claim with regard to the Contaminated Dog Food respectively:

*As Represented on Orijen Regional Red:*



Prepared exclusively in our state-of-the-art DogStar® Kitchens, award-winning ORIJEN is guaranteed to keep your cherished dog happy, healthy and strong.

*As Represented on Acana Regionals Meadowland:*



Prepared in our Kentucky DogStar® Kitchens with Fresh Regional Ingredients, this unique and Biologically Appropriate™ food is guaranteed to keep your dog healthy, happy and strong. Read our ingredients and we think you'll agree!

E.  **"Nourish as Nature Intended" and "Delivering Nutrients Naturally"**

52.  The following images are some representative examples of Defendants' "Nourish as Natured Intended" and "Delivering Nutrients Naturally" packaging claims with regard to the Contaminated Dog Food respectively:

*As Represented on Orijen Regional Red:*



*As Represented on Acana Regionals Meadowland:*



F.  **Omissions**

53.  As discussed herein, Defendants' packaging also misleadingly and intentionally omitted any reference as to the presence of heavy metals, BPA, their lack of heavy metal and BPA testing, non-fresh ingredients, and non-regional ingredients on the Contaminated Dog Food packaging. Defendants intentionally omitted this material information in order to induce and mislead reasonable consumers to purchase Defendants' dog food at premium prices.

III.  **WHY PACKAGING CLAIMS AND OMISSIONS WERE MISLEADING**

54.  As alleged below, Defendants' Misleading Packaging Claims were misleading due to Defendants' wrongful conduct that allowed the Contaminated Dog Food to contain and/or have

a material risk of containing contaminants and ingredients that did not conform to the packaging. In addition, the Contaminated Dog Food packaging misleadingly omitted material information regarding Defendants' wrongful conduct of allowing the Contaminated Dog Food to contain and/or have a material risk of containing non-conforming ingredients.

A. **Heavy Metals**

1. *Contaminated Dog Food Contained Heavy Metals, Which Are a Known Risk*

55. Exposure to toxins like arsenic, mercury, cadmium, and lead can cause serious illness to humans and animals.

56. A pet food manufacturing company should be vigilant to take all reasonable steps to avoid causing family pets to ingest arsenic, mercury, cadmium, and lead.

57. The Contaminated Dog Food contained arsenic, which is a carcinogen and toxin. Arsenic is a semi-metal element in the periodic table. It does not degrade or disappear and is odorless and tasteless. Arsenic occurs naturally in the environment as an element of the earth's crust; it is found in rocks, soil, water, air, plants, and animals. Arsenic is combined with other elements such as oxygen, chlorine, and sulfur to form inorganic arsenic compounds. Historically, arsenic compounds were used in many industries, including: (i) as a preservative in pressure-treated lumber; (ii) as a preservative in animal hides; (iii) as an additive to lead and copper for hardening; (iv) in glass manufacturing; (v) in pesticides; (vi) in animal agriculture; and (vii) as arsine gas to enhance junctions in semiconductors. The United States has canceled the approvals of some of these uses, such as arsenic-based pesticides, for health and safety reasons. Some of these cancellations were based on voluntary withdrawals by producers. For example, manufacturers of arsenic-based wood preservatives voluntarily withdrew their products in 2003 due to safety concerns, and the U.S. Environmental Protection Agency ("EPA") signed the cancellation order.

In the Notice of Cancellation Order, the EPA stated that it "believes that reducing the potential residential exposure to a known human carcinogen is desirable."

58.     Inorganic arsenic is highly toxic and a known cause of human cancers. The association between inorganic arsenic and cancer is well documented. As early as 1879, high rates of lung cancer in miners from the Kingdom of Saxony were attributed, in part, to inhaled arsenic. By 1992, the combination of evidence from Taiwan and elsewhere was sufficient to conclude that ingested inorganic arsenic, such as is found in contaminated drinking water and food, was likely to increase the incidence of several internal cancers. The scientific link to skin and lung cancers is particularly strong and longstanding, and evidence supports conclusions that arsenic may cause liver, bladder, kidney, and colon cancers as well.

59.     Based on the risks associated with exposure to higher levels of arsenic, both the EPA and U.S. Food and Drug Administration ("FDA") have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA).[1]

60.     The Contaminated Dog Food also contained lead, which is another carcinogen and developmental toxin known to cause health problems.  Lead is a metallic substance formerly used as a pesticide in fruit orchards, but the use of such pesticides is now prohibited in the United States.

61.     Lead poisoning can occur from ingestion of food or water containing lead.  Lead, unlike many other poisons, builds up in the body over time as the person is exposed to and ingests

---

[1] The FDA has taken action based on consumer products exceeding this limit, including testing and sending warning letters to the manufacturers. *See*, *e.g*., Warning Letter from FDA to Valley Processing, Inc. (June 2, 2016), https://www.fda.gov/iceci/enforcementactions/warningletters /2016/ucm506526.htm.

it, resulting in a cumulative exposure which can, over time, become toxic and seriously injurious to health. Acute or chronic exposure to lead can lead to chronic poisoning, cancer, developmental and reproductive disorders, severe brain and kidney damage, and untimely death.

62.     In recognition of the dangers of lead, the State of New York has enacted laws establishing lead prevention programs, N.Y. Pub. Health Law § 1370-a, as well as screening and abatement programs.  The State of New York has also directed the "commissioner [to] establish the maximum quantity of lead or cadmium (and the manner of testing therefor) which may be released from glazed ceramic tableware, crystal, china and other consumer products…. Until such maximum quantity of lead or cadmium established by the commissioner is effective, no glazed ceramic tableware shall be offered for sale which releases lead in excess of 7 parts per million, or cadmium in excess of .5 parts per million."

63.     Exposure to lead in food builds up over time. Buildup can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems100 milliliters of blood.

64.     The FDA has set standards that regulate the maximum parts per billion of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic. *See* 21 C.F.R. § 165.110(b)(4)(iii)(A).

65.     The Contaminated Dog Food also contained mercury, a known toxin which can damage the cardiovascular system, nervous system, kidneys, and digestive tract in dogs.  The impact of the various ways humans and animals are exposed and ingest mercury has been studied

for years. In fact, in as early as 1997, the EPA issued a report to Congress that detailed the health risks to both humans and animals.[2]

66.     Continued exposure to mercury can injure the inner surfaces of the digestive tract and abdominal cavity, causing lesions and inflammation. Mercury can also cause lesions in the central nervous system (spinal cord and brain), kidneys, and renal glands.[3]

67.     Based on the toxicity and risks of mercury, regulations have been enacted at both the Federal and state levels.

68.     Finally, the Contaminated Dog Food contained cadmium, which has been observed to cause anemia, liver disease, and nerve or brain damage in animals eating or drinking it.[4]  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[5]  It has been specifically noted that "[k]idney and bone effects have … been observed in laboratory animals ingesting cadmium."[6]

69.     Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection

---

[2] U.S. Environmental Protection Agency, *Mercury Study Report to Congress, Vol. V: Health Effect of Mercury and Mercury Compounds* (Decl. 1997), available at https://www3.epa.gov/airtoxics/112nmerc/volume5.pdf.

[3] *Mercury Poisoning in Dogs*, Wag!, https://wagwalking.com/condition/mercury-poisoning (last visited Apr. 21, 2020).

[4] Agency for Toxic Substances and Disease Registry, *Public Health Statement: Cadmium* (Sept. 2012), https://www.atsdr.cdc.gov/ToxProfiles/tp5-c1-b.pdf.

[5] Agency for Toxic Substances and Disease Registry, *Public Health Statement for Cadmium* (Sept. 2012), https://www.atsdr.cdc.gov/phs/phs.asp?id=46&tid=15

[6] *See* source cited *supra* note 4.

with its heavy metals workgroup looking to reduce the risks associated with human consumption of heavy metals.[7]

   2.   *Defendants Knew the Contaminated Dog Food Contained Heavy Metals but Failed to Disclose*

70.   Despite the known risks of exposure to these heavy metals, Defendants have knowingly sold the Contaminated Dog Food without disclosing that the Contaminated Dog Food contained levels of arsenic, mercury, cadmium, and lead to consumers like Plaintiffs. Indeed, Defendants have publicly acknowledged that consumers "have deep feelings and a sense of responsibility for the well-being of their dogs and cats."[8]

71.   Defendants knew that consumers purchased the Contaminated Dog Food based on the reasonable expectation that Defendants' manufactured the Contaminated Dog Food to the highest standards, which exceeded consumer expectations as to the Contaminated Dog Food. Based on this expectation, Defendants knew or should have known that consumers reasonably inferred that Defendants would hold the Contaminated Dog Food to the highest standards for preventing the inclusion of heavy metals and for testing for heavy metals.

72.   Throughout the Class Period, Defendants did not consistently test their ingredients or finished products for heavy metals.

73.   Defendants knew that a reasonable consumer would care about the inclusion of heavy metals as they specifically addressed this concern on their website by touting that they

---

[7] FDA, *Metals and Your Food*, https://www.fda.gov/Food/FoodborneIllnessContaminants /Metals/default.htm (last visited Apr. 21, 2020).

[8] Chris Atchison, *How once-tiny pet-food maker took a bite of the global market*, The Globe and Mail (Jan. 16, 2018), https://www.theglobeandmail.com/amp/report-on-business/small-business/canadian- powerhouse-export-your-dog-is-eating-it/article37605774/.

require their suppliers to "provide heavy metals and mercury test results, for which we also test our final food products."[9]

**B.    BPA**

74.    Certain Contaminated Dog Food was sold by Defendants that contained levels of BPA—an industrial chemical that "is an endocrine disruptor. It's an industrial chemical that according to Medical News Today '… interferes with the production, secretion, transport, action, function and elimination of natural hormones.'"[10]  BPA has been linked to various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems.[11]

75.    The dangers of BPA in human food are recognized by the FDA, along with various states. For instance, manufacturers and wholesalers are prohibited from selling any children's products that contain BPA and any infant formula, baby food, or toddler food stored in containers with intentionally added BPA.

76.    Despite these known dangers, Defendants did not consistently test their ingredients or finished products for BPA nor required their suppliers to do so throughout the Class Period.

77.    Despite the risk and/or actual presence of these unnatural and potentially harmful chemicals, Defendants prominently warrant, claim, feature, represent, advertise, or otherwise market the Contaminated Dog Food as made from Biologically Appropriate™ and "Fresh Regional Ingredients" consisting entirely of fresh meat, poultry, fish, and vegetables that are "delivered daily

---

[9] Champion Petfoods, *F.A.Q.* (Mar. 4, 2013), https://web.archive.org/web/20130304164531 /http://www.championpetfoods.com/faq

[10] Dr. Karen Beeker, *A Major Heads Up: Don't Feed This to Your Dog,* Healthy Pets (Feb. 13, 2017), https://healthypets.mercola.com/sites/healthypets/archive/2017/02/13/dogs-canned-food-dangers.aspx.

[11] Christian Nordquist, *Bisphenol A: How Does It Affect Our Health?* Medical News Today (May 24, 2017), https://www.medicalnewstoday.com/articles/221205.php.

from local farms and ranchers." Indeed, each bag prominently displays the percentage of these ingredients on the front.

### C.   Non-Fresh Ingredients

78.   At all times during the Class Period, Defendants knew or should have known that the Contaminated Dog Food contained non-fresh ingredients, such as regrind ingredients, expired ingredients, frozen ingredients, and refreshed ingredients.

79.   Defendants knew or should have known that their packaging claims were misleading to consumers due to Defendants' use of "regrinds." "Regrinds" is Defendants' term for already cooked dog and cat food that had failed nutritional testing, water activity testing, product temperature testing, and/or microbiological testing and are subsequently used by Defendants as an ingredient in the Contaminated Dog Food. Defendants also used regrinds from finished dog and cat food that was too old to sell.

80.   By using regrinds in their manufacturing process, Defendants used ingredients that they cooked twice—first in the production that resulted in out-of-specification dog food and second as a reused ingredient.

81.   Defendants routinely incorporated the non-fresh regrind ingredients in the Contaminated Dog Food.

82.   Defendants had a common practice of routinely using regrind ingredients throughout the Class Period. Defendants routinely used regrinds as a major ingredient in the Contaminated Dog Food.

83.   Defendants had flowcharts that tracked the various dog and cat food diet regrinds that they used as an ingredient in each dog food diet. Defendants used cat food as a regrind ingredient in the Contaminated Dog Food.

84.     Defendants used millions of pounds of regrinds each year during the Class Period.

85.     In fact, Defendants' nickname for their regrind inventory at one of their production facilities was "Regrind Mountain." Defendants often used regrinds as a major ingredient in the Contaminated Dog Food. For example, some production lots of Orijen contained up to 5-6% regrinds, while some Acana production lots contained up to 15-16% regrinds.

86.     Defendants did not disclose their use of regrinds as an ingredient on the Contaminated Dog Food ingredient panels or anywhere on the Contaminated Dog Food packaging.

87.     By using regrinds in their manufacturing process, Defendants used ingredients that they cooked twice—first in the production that resulted in out-of-specification dog food and second as a reused ingredient.

88.     As a double cooked ingredient, Defendants knew that regrinds were not fresh. In addition, Defendants were aware that reprocessing and recooking regrinds caused the Contaminated Dog Food to lose nutritional value and taste.

89.     Defendants knew or should have known that their use of regrinds contradicted their packaging claims. Defendants took active steps to try to hide their use of regrinds during consumer, retailer, and distributor visits to their kitchens. Defendants also omitted any reference to their misleading use of regrinds on the Contaminated Dog Food packaging.

90.     Consistent with Defendants' use of non-fresh regrinds as an ingredient, Defendants also used expired and "refreshed" ingredients in the Contaminated Dog Food. "Refreshed" ingredients were frozen at some point prior to their inclusion in the Contaminated Dog Food. Defendants' monitoring and evaluation of ingredients was insufficient to prevent the use of non-fresh, expired ingredients in the Contaminated Dog Food.

91.     Expired and refreshed ingredients were not fresh, and Defendants knew that.

92.     Defendants also knew that frozen ingredients were frequently used in the Contaminated Dog Food. Defendants were also aware that a reasonable consumer would not understand that the "raw" ingredients described in their packaging referred to "frozen" ingredients. Defendants misleading omitted any definition that explained that "raw" ingredients meant that the ingredients were frozen or previously frozen.

93.     Despite Defendants' knowledge that the Contaminated Dog Food contained non-fresh ingredients, Defendants knowingly sold the Contaminated Dog Food while misleadingly omitting that the Contaminated Dog Food contained the non-fresh ingredient as alleged herein. Defendants' misleading omission as to the presence of the non-fresh ingredients, as alleged herein, from the Contaminated Dog Food packaging was intended to induce and deceive consumers to purchase the Contaminated Dog Food at premium prices.

94.     Defendants knew or should have known that their use of regrind ingredients failed to substantiate their packaging claims. Regrind ingredients are not fresh because regrinds are dried, twice-cooked ingredients. Regrind ingredients are also not Biologically Appropriate™ because regrinds are nutritionally deficient compared to fresh, Biologically Appropriate™ ingredients.

95.     Defendants' Biologically Appropriate™ packaging claim was misleading because expired ingredients are nutritionally deficient.

96.     Defendants' "Fresh Regional Ingredients" packaging claim was misleading based on inclusion of regrind, frozen, expired, and refreshed ingredients in the Contaminated Dog Food. None of these ingredients are fresh.

### D.      Non-Regional Ingredients

97.      At all times during the Class Period, Defendants knew or should have known that their packaging claims were misleading because Defendants sourced many ingredients from non-local and non-regional ingredient suppliers, including international ingredient suppliers.

98.      Defendants' Misleading Packaging Claims for the Contaminated Dog Food emphasized and represented that Defendants focused on the use of fresh, regional ingredients that were local to their kitchens from trusted suppliers.

99.      During the Class Period, Defendants manufactured the Contaminated Dog Food using imported, non-regional ingredients from international and non-regional ingredient suppliers.

100.      Defendants purchased and used the following foreign ingredients and imported the following non-regional ingredients for the Contaminated Dog Food: spray dried sardines from Peru, spray dried mackerels from Morocco, herring oil and herring meal from Denmark, salmon oil from Chile, duck meal and pork meal from the European Union, palatants and vitamins from China, turmeric from India, and large amounts of lamb, cattle, goat, and mutton ingredients from New Zealand and Australian.

101.      Despite Defendants featuring local, family owned farmers and ranchers as their ingredient suppliers on the Contaminated Dog Food packaging, Defendants did not purchase the majority of their ingredients from regional or local ingredient suppliers. During the Class Period, Defendants sourced a majority of their ingredients from undisclosed, non-regional ingredient suppliers. For example, in 2017, Defendants sourced about 70% of their ingredients outside of Kentucky, with 25% sourced internationally.

102.      Defendants represented to consumers that they focused on local and regional ingredients in the Contaminated Dog Food. Yet, Defendants sourced a majority of their pork meat

and beef from outside of Kentucky in 2017. Defendants also sourced a majority of their goat, lamb, and mutton from international ingredient suppliers in 2017.

103.     While Defendants referenced New Zealand lamb in one place on their Acana packaging, Defendants' packaging claims overall emphasized the use of Kentucky lamb. For example, Defendants' Acana Singles Lamb and Apple packaging referenced the use of Kentucky lamb seven times, often in larger and bolded text, and associated these claims with photographs of lamb raised in Kentucky. Furthermore, Defendants' Orijen packaging did not disclose that any lamb came from New Zealand.

104.     Defendants' recipes for the Contaminated Dog Food incorporated various palatants, vitamin premixes, and botanical blends, which included ingredients sourced from China and India.

105.     Defendants knew or should have known that sourcing ingredients from non-regional locations, such as China and India, did not align with Defendants' "Fresh and Regional Ingredients" packaging claim. Defendants nonetheless purchased palatants and vitamins from China and turmeric from India.

106.     Defendants did not disclose that they used Chinese or Indian ingredients anywhere on the Contaminated Dog Food packaging.

107.     Despite Defendants' knowledge that the Contaminated Dog Food contained non-regional ingredients, Defendants knowingly sold the Contaminated Dog Food while misleadingly omitting that the Contaminated Dog Food contained ingredients from non-regional suppliers. Defendants' misleading omission as to the presence of non-regional ingredients on the Contaminated Dog Food packaging was intended to induce and deceive consumers to purchase the Contaminated Dog Food at premium prices.

108.    Defendants' "Fresh Regional Ingredients" packaging claim was misleading, in part, because Defendants regularly used non-regional ingredients from North Africa, South America, Europe, New Zealand, and Australia. Defendants purchased the majority of some of their meat ingredients, such as lamb, from international suppliers. Furthermore, the Contaminated Dog Food contained only a minority of ingredients that were actually regional or local.

109.    Defendants' use of undisclosed imported meat ingredients was also deceiving to consumers because these imported ingredients were frozen, and thus, was misleading in that it was not consistent with Defendants' "Fresh Regional Ingredients" packaging claim.

## IV.    MISLEADING PACKAGING CLAIMS AND OMISSIONS MISLED AND DECEIVED CONSUMERS

110.    Defendants' Misleading Packaging Claims and omissions were misleading to consumers because Contaminated Dog Food contained and/or had a material risk of containing contaminants and ingredients that did not conform to the packaging.

111.    The following generally summarizes the Misleading Packaging Claims and omissions that Defendants intentionally used to mislead and deceive reasonable consumers.

112.    Reasonable consumers, like Plaintiffs, paid Defendants' premium prices for the Contaminated Dog Food because the consumers reasonably relied on the accuracy of Defendants' Misleading Packaging Claims and omissions.

113.    Reasonable consumers, like Plaintiffs and other Class members, considered the above packaging claims and omissions to be material to their decision to purchase Defendants' Contaminated Dog Food.

114.    Defendants knew or should have known that the Contaminated Dog Food contained and/or had a material risk of containing ingredients and contaminants that were non-conforming to these packaging claims. Defendants also intentionally omitted any reference to the inclusion

and/or material risk of containing heavy metals, BPA, and/or regrind ingredients on the Contaminated Dog Food packaging.

115.    Defendants knew or should have known that consumers would consider these non-conformances with their packaging claims to be a material consideration when purchasing Defendants' Contaminated Dog Food.

116.    A reasonable consumer would not have paid Defendants' premium prices had they known that the Contaminated Dog Food contained and/or had a material risk of containing the non-conforming contaminants and ingredients alleged herein.

117.    As a result of these false or Misleading Packaging Claims and misleading omissions, consumers, like Plaintiffs, suffered substantial financial losses by overpaying premium prices for the Contaminated Dog Food that did not conform to their packaging claims, as alleged herein.

## V.    MISLEADING CLAIMS AND OMISSIONS VIOLATED NEW YORK LAWS

118.    New York laws were designed to ensure that a company's packaging claims and representations about its products were truthful and accurate. New York laws were also designed to prevent companies from omitting material information from their packaging.

119.    Defendants violated New York laws by intentionally misrepresenting that the Contaminated Dog Food conformed to the following packaging claims:

(a)    Biologically Appropriate™;

(b)    "Fresh Regional Ingredients";

(c)    "Provid[e] a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added";

(d)    "Guaranteed to keep your dog healthy, happy, and strong";

(e)    "Nourish as Nature Intended"; and

(f)    "Delivering Nutrients Naturally."

120.    Defendants also violated New York laws by fraudulently omitting the use and/or risk of using non-conforming contaminants and ingredients.

121.    Defendants also owed consumers a duty to disclose that the Contaminated Dog Food contained and/or had a material risk of containing heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or other ingredients and contaminants that did not conform to Defendants' packaging claims.

122.    Defendants omitted on their packaging any reference to the presence of contaminants and ingredients that did not conform to their Misleading Packaging Claims, as alleged herein, in an effort to induce unsuspecting consumers to pay Defendants' premium prices for the Contaminated Dog Food.

123.    Defendants' deceptive marketing practices implicated the public, as consumers, because Defendants directed their Misleading Packaging Claims and misleading omissions at the market generally.

124.    Defendants engaged in this long-term and misleading advertising campaign to deceive potential customers into paying Defendants' premium prices for the Contaminated Dog Food based on the reasonable belief that Defendants used ingredients that conformed to all of their packaging claims and effectively prevented the inclusion of the non-conforming contaminants and ingredients.

## VI.    CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE

125.    Plaintiffs reasonably relied upon Defendants' Misleading Packaging Claims and misleading omissions alleged herein when Plaintiffs made their decision to purchase the Contaminated Dog Food.

126.    A reasonable consumer would consider the packaging of a dog food product (as alleged herein) when deciding whether to purchase said dog food.

127.    Consumers reasonably relied upon Defendants' Misleading Packaging Claims as objective statements that communicated, represented, and advertised that the Contaminated Dog Food had certain product characteristics.

128.    Consumers also reasonably relied upon Defendants' packaging for the Contaminated Dog Food by expecting that Defendants would not omit the use of, and/or material risk of containing contaminants and ingredients that reasonable consumers would find material in their decision to purchase the Contaminated Dog Food.

129.    Plaintiffs, along with other reasonable consumers, reasonably interpreted, trusted, and relied upon Defendants' misleading packaging claim of Biologically Appropriate™ to mean that the Contaminated Dog Food did not contain biologically inappropriate, unnatural, or non-nutritious ingredients and contaminants.

130.    Plaintiffs' reliance and interpretation that the Contaminated Dog Food did not contain non-fresh and non-regional ingredients based on Defendants' marketing of "Fresh Regional Ingredients," was also reasonable because Defendants packaging repeatedly advertised and emphasized this packaging claim.

131.    Reasonable consumers, like Plaintiffs, reasonably relied on Defendants' "Provid[e] a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added"; "Guaranteed to keep your dog healthy, happy, and strong"; "Nourish as Nature Intended"; and "Delivering Nutrients Naturally" Misleading Packaging Claims to mean that the Contaminated Dog Food did not contain and/or have a material risk of containing any non-nutritious and unnatural contaminants, such as BPA.

132.    As discussed herein, Defendants foresaw and intended for Plaintiffs to rely on their Misleading Packaging Claims. Defendants also foresaw and intended that reasonable consumers, including Plaintiffs, would have reasonably relied on Defendants to not omit their use of and/or material risk of using the non-conforming contaminants and ingredients, as alleged herein. Defendants designed their packaging claims to target and induce reasonable consumers, like Plaintiffs, to pay premium prices for the Contaminated Dog Food based on Defendants' Misleading Packaging Claims and misleading omissions.

## VII. DEFENDANTS' KNOWLEDGE OF THE MISREPRESENTATIONS, OMISSIONS, AND THEIR MATERIALITY

133.    Defendants had exclusive knowledge of the physical and chemical makeup and formula of the Contaminated Dog Food and ingredients, including whether any of the Contaminated Dog Food contained and/or had a risk of containing the non-conforming contaminants and ingredients as alleged herein.

134.    Defendants had exclusive knowledge as to the presence and/or risk of heavy metals and/or BPA in the Contaminated Dog Food.

135.    Defendants also had exclusive knowledge of their suppliers, including where the ingredients were sourced, how the ingredients arrived, whether the ingredients were frozen, regrinds, expired, or refreshed, the quality of received ingredients, and whether any of the supplied ingredients contained and/or had a material risk of containing heavy metals and/or BPA.

136.    Defendants had exclusive knowledge as to the details of the Contaminated Dog Food formulas and ingredient supply chains.

137.    Defendants also had exclusive knowledge as to their use of expired ingredients, frozen ingredients, and refreshed ingredients, as well as the millions of pounds of regrinds Defendants used as an ingredient in the Contaminated Dog Food.

138.    Defendants actively worked to conceal the presence and/or material risk of the dog food containing the non-conforming contaminants and ingredients, as alleged herein, by omitting any reference to their use on the Contaminated Dog Food packaging.

## VIII.   DEFENDANTS ACTED INTENTIONALLY TO MISLEAD CONSUMERS

139.    Defendants acted intentionally to deceive consumers by misleading and omitting the true quality and composition of the Contaminated Dog Food. Defendants willingly misrepresented and omitted that the Contaminated Dog Food contained and/or had a material risk of containing heavy metals, BPA, non-fresh ingredients, and non-regional ingredients.

140.    Defendants did so despite knowing that the presence and/or material risk of the Contaminated Dog Food containing these non-conforming ingredients was material to a reasonable consumer. Defendants knew that consumers trusted and relied on Defendants to ensure that the Contaminated Dog Food conformed to their packaging claims.

## IX.   NOTICE OF BREACHES OF EXPRESS WARRANTIES

141.    Defendants had sufficient notice of their breaches of express warranties. Defendants have, and had, exclusive knowledge of the physical and chemical makeup of the Contaminated Dog Food. Defendants also had exclusive knowledge regarding their suppliers, including whether any ingredients contained and/or were at a material risk of containing heavy metals and/or BPA.

142.    Defendants also had sufficient notice that the Contaminated Dog Food contained heavy metals and/or BPA.

143.    Furthermore, Defendants had sufficient notice that the Contaminated Dog Food contained non-regional and non-fresh ingredients.

144.    Defendants also had sufficient notice because Plaintiffs filed their lawsuit within a reasonable amount of time of discovering that Defendants were in breach of their expressed warranties.

## X.    BENEFICIARIES OF DEFENDANTS' EXPRESS WARRANTIES

145.    Defendants knew that consumers, such as Plaintiffs and the members of the proposed Class, would be the end purchasers of the Contaminated Dog Food. Defendants knew that they were targeting and directly marketing to these consumers through Defendants' packaging claims and representations.

146.    Defendants intended that consumers, such as Plaintiffs and the proposed Class, would consider and rely on their packaging claims and representations when deciding whether to purchase the Contaminated Dog Food.

147.    Plaintiffs and the members of the Class did not directly enter into contracts with Defendants because Defendants did not sell the Contaminated Dog Food directly to consumers. Rather, the Contaminated Dog Food was sold from distributors to retailers, and then purchased by Plaintiffs and the members of the Class.

## CLASS ACTION ALLEGATIONS

148.    Plaintiffs bring this action individually and on behalf of the following Class pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons who reside in the State of New York who, from July 1, 2014, to the present (the "Class Period") and purchased the Contaminated Dog Foods for household or business use, and not for resale (the "Class").

149.    Excluded from the Class are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

150.    This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

151.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Class members in a single action will provide substantial benefits to the parties and Court.

152.    Questions of law and fact common to Plaintiffs and the Class include, but are not limited to, the following:

(a)    whether Defendants owed a duty of care to Plaintiffs and the Class;

(b)    whether Defendants knew or should have known that the Contaminated Dog Food contained and/or had a material risk of containing heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or any other ingredients or contaminants that did not conform to the packaging claims;

(c)    whether Defendants failed to test the Contaminated Dog Food and ingredients for the presence of heavy metals, BPA, and/or unnatural or other contaminants that did not conform to the packaging claims;

(d)    whether Defendants wrongfully represented that the Contaminated Dog Food conformed to the following packaging claims: Biologically Appropriate™; "Fresh Regional Ingredients"; "Provid[e] a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added"; "Guaranteed to keep your dog healthy, happy, and strong"; "Nourish as Nature Intended"; and "Delivering Nutrients Naturally."

(e)     whether Defendants wrongfully represented and continue to represent that consumers could trust Defendants to hold the Contaminated Dog Food to higher, if not the highest, standards, and exceed all consumer expectations and government requirements;

(f)     whether Defendants wrongfully represented and continue to represent that consumers could trust Defendants to test the Contaminated Dog Food and ingredients for non-conforming contaminants, including, but not limited to, heavy metals and/or BPA;

(g)     whether Defendants wrongfully represented and continue to represent that consumers could trust that Defendants manufacture the Contaminated Dog Food to conform to all of their packaging claims;

(h)     whether Defendants wrongfully represented and continue to represent that the Contaminated Dog Food was natural, nutritious, and of a superior quality;

(i)     whether Defendants wrongfully represented that the manufacturing of the Contaminated Dog Food was subjected to rigorous quality assurances and standards;

(j)     whether Defendants' omissions were false, deceptive, and misleading;

(k)     whether Defendants' representations in their warranties, packaging, and/or labeling are false, deceptive, and misleading;

(l)     whether those representations are likely to deceive a reasonable consumer;

(m)     whether Defendants' omissions were likely to deceive a reasonable consumer;

(n)     whether a reasonable consumer would consider that the Contaminated Dog Food containing and/or having a material risk of containing the following ingredients or contaminants to be a material fact in purchasing dog food: heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or any other ingredients and contaminants that did not conform to the labels, packaging, advertising, and statements;

(o)     whether Defendants had knowledge that the representations on the packaging of the Contaminated Dog Food were false, deceptive, and misleading;

(p)     whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(q)     whether Defendants' representations and descriptions on the packaging of the Contaminated Dog Food was likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(r)     whether Defendants violated New York law;

(s)     whether Defendants engaged in misleading advertising;

(t)     whether Defendants breached their express warranties;

(u)     whether Defendants made fraudulent misrepresentations;

(v)     whether Defendants made fraudulent omissions;

(w)     whether Defendants had a duty to disclose the misleading omissions concerning the Contaminated Dog Food and its ingredients;

(x)     whether Plaintiffs and the members of the Class are entitled to actual, statutory, and treble damages; and

(y)  whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief.

153.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

154.  Plaintiffs' claims are typical of those of the members of the Class because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

155.  Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

156.  Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

157.  Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

158.  As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of New York General Business Law § 349

159.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

160.    Plaintiffs and the Class are "persons" within the meaning of N.Y. Gen. Bus. §
349(h).

161.    Each Defendant is a "person, firm, corporation or association or agent or employee
thereof" within the meaning of N.Y. Gen. Bus. § 349(b).

162.    Defendants are the exclusive distributors of the Contaminated Dog Food, thereby
creating a marketing partnership.

163.    Under the New York Deceptive Acts & Practices Statute, "[d]eceptive acts and
practices in the conduct of any business, trade or commerce or in the furnishing of any service"
are unlawful. N.Y. Gen. Bus. § 349.

164.    Defendants engaged in deceptive acts and practices in the conduct of business,
trade, and commerce by manufacturing, distributing, marketing, and selling Contaminated Dog
Food to Plaintiffs and the Class. Defendants' Misleading Packaging Claims are untrue or
misleading and fail to make any mention that the Contaminated Dog Food contains and/or has a
material risk of containing heavy metals, BPA, non-fresh ingredients, non-regional ingredients,
and/or unnatural or other ingredients.

165.    Defendant has a duty to disclose material information to Plaintiffs and the Class
regarding the Contaminated Dog Food. Defendants violated its duty to disclose and failed to
exercise due care when it sold the Contaminated Dog Food to Plaintiffs and the Class based on:
(1) its exclusive knowledge of the ingredients, content, and sourcing materials of the Contaminated
Dog Food; and (4) failing to disclose to Plaintiffs and the Class that their Contaminated Dog Food
contained heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or
other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

166.   Plaintiffs and the Class were unaware, and did not have reasonable means of discovering, the material facts that Defendants both misrepresented and failed to disclose.

167.   Defendants' failure to disclose material facts that their Contaminated Dog Food contained heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements was misleading in a material respect because a reasonable consumer acting reasonably under the circumstances would have been misled by Defendants' conduct.

168.   Defendants' failure to disclose these material facts and their deceptive conduct induced Plaintiffs and the Class to purchase Contaminated Dog Food and pay a premium price for it.

169.   These acts and practices were consumer-oriented because they had a broad impact on consumers at large, affecting all purchasers of the Contaminated Dog Food, including purchasers in the State of New York.

170.   As a direct and proximate result of Defendants' unlawful methods, acts, and practices, Plaintiffs and the Class were injured because, among other reasons, they purchased the Contaminated Dog Food and did not receive the full value of their purchase.

171.   Defendants' acts and practices were willful and knowing.

172.   Plaintiffs and the Class are entitled to injunctive relief, recovery of actual damages or fifty dollars per violation (whichever is greater), treble damages up to one thousand dollars, and their reasonable costs and attorneys' fees. *See* N.Y. Gen. Bus. § 349(h).

**COUNT II**
**Violation of New York General Business Law § 350**

173.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

174.   Defendants' labeling and advertisements contain the following untrue and materially misleading statements representing that their Contaminated Dog Food is:

(a)   Biologically Appropriate™;

(b)   "Fresh Regional Ingredients";

(c)   "Provid[e] a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added";

(d)   Guaranteed to keep your dog healthy, happy, and strong";

(e)   "Nourish as Nature Intended"; and

(f)   "Delivering Nutrients Naturally."

175.   Defendants' Contaminated Dog Food does not conform to Defendants' statements and representations in advertising because they:

(a)   contain levels of heavy metals;

(b)   contain levels of BPA;

(c)   contain non-fresh ingredients;

(d)   contain non-regional ingredients; and/or

(e)   contain unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

176.   Defendants made these material, untrue, and misleading statements and misrepresentations in their advertising and the Contaminated Dog Food packaging and labeling. Defendants made these untrue and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

177.   Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large, including purchasers of Contaminated Dog

42

Food in the State of New York. Moreover, all consumers purchasing Contaminated Dog Food were and continue to be exposed to Defendants' material misrepresentations.

178.    Plaintiffs and the Class were induced to purchase Contaminated Dog Food by Defendants' advertising, packaging, and labeling. They have been injured as they relied upon the labeling, packaging, and advertising and paid a premium for the Contaminated Dog Food, which does not have the characteristics set forth in Defendants' advertising. Accordingly, Plaintiffs and the Class received less than what they bargained and paid for.

179.    As a result of Defendants' recurring and unlawful deceptive acts and practices, Plaintiffs and the Class are entitled to monetary, compensatory, treble and punitive damages; injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct; and interest, attorneys' fees, and costs.

## COUNT III -
### Breach of Express Warranty Against Defendants on Behalf of the Class

180.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

181.    Defendants marketed and sold their Contaminated Dog Food into the stream of commerce with the intent that the Contaminated Dog Food would be purchased by Plaintiffs and the Class.

182.    Defendants expressly warranted, advertised, and represented to Plaintiffs and the Class that their Contaminated Dog Foods are:

(a)    Biologically Appropriate™;

(b)    "Fresh Regional Ingredients";

43

(c)      "Provid[e] a concentrated source of virtually every nutrient your dog

needs to thrive, naturally, without long lists of synthetic supplements –

only zinc is added";

(d)      "Guaranteed to keep your dog healthy, happy, and strong";

(e)      "Nourish as Nature Intended"; and

(f)      "Delivering Nutrients Naturally."

183.    Defendants made these express warranties regarding the Contaminated Dog Food

and the ingredients used on the Contaminated Dog Food's packaging and labels. These express

warranties became part of the basis of the bargain that Plaintiffs and the Class entered into upon

purchasing the Contaminated Dog Food.

184.    Defendants' advertisements, warranties, and representations were made in

connection with the sale of the Contaminated Dog Food to Plaintiffs and the Class. Plaintiffs and

the Class relied on Defendants' advertisements, warranties, and representations regarding the

Contaminated Dog Food in deciding whether to purchase Defendants' products.

185.    Defendants' Contaminated Dog Food does not conform to Defendants'

advertisements, warranties, and representations in that they:

(a)      contain levels of heavy metals;

(b)      contain levels of BPA;

(c)      contain non-fresh ingredients;

(d)      contain non-regional ingredients; and/or

(e)      contain unnatural or other ingredients that do not conform to the products'

labels, packaging, advertising, and statements.

186.    Defendants were on notice of this breach as they were aware of the included heavy metals and/or BPA in the Contaminated Dog Food.

187.    Distributors and agents are under the direction and control of Defendants with respect to the sale of Defendants' Contaminated Dog Food to Plaintiffs and the Class. Specifically, Defendants have exclusive and final control over the packaging, distribution, advertising, display, and pricing of its Contaminated Dog Food.

188.    Privity exists because Defendants expressly warranted to Plaintiffs and the Class, directly and through its agents, that the Contaminated Dog Food conformed to the Misleading Packaging Claims.

189.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages in that they purchased Contaminated Dog Food that was worth less than the price they paid and that they would not have purchased at all had they known of the risk and/or presence of heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements .

190.    Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' failure to deliver goods conforming to their express warranties and resulting breach.

### COUNT IV
### Fraudulent Misrepresentation Against Defendants on Behalf of the Class

191.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

192.    Defendants falsely represented to Plaintiffs and the Class that their Contaminated Dog Food is:

    (a)      Biologically Appropriate™;

    (b)      "Fresh Regional Ingredients";

    (c)      "Provid[e] a concentrated source of virtually every nutrient your dog needs to thrive, naturally, without long lists of synthetic supplements – only zinc is added";

    (d)      "Guaranteed to keep your dog healthy, happy, and strong";

    (e)      "Nourish as Nature Intended"; and

    (f)      "Delivering Nutrients Naturally."

193.    Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase their Contaminated Dog Food.

194.    Defendants knew that their representations about the Contaminated Dog Food were false in that the Contaminated Dog Food contains levels of heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements. Defendants allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class.

195.    Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Contaminated Dog Food to their detriment.  Given the deceptive manner in which Defendants advertised, represented, and otherwise promoted the Contaminated Dog Food, Plaintiff and the Class's reliance on Defendants' misrepresentations was justifiable.

196.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages in that they purchased Contaminated Dog Food that was worth less than the price they paid and that they would not have purchased at all had they known of the risk

and/or presence of heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

197. Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT V
### Fraud by Omission Against Defendants on Behalf of the Class

198. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

199. Defendants concealed from and failed to disclose to Plaintiffs and the Class that their Contaminated Dog Foods contained heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

200. Defendants were under a duty to disclose to Plaintiffs and members of the Class the true quality, characteristics, ingredients, and suitability of the Contaminated Dog Food because: (1) Defendants were in a superior position to know the true state of facts about their products; (2) Defendants were in a superior position to know the actual ingredients, characteristics, and suitability of the Contaminated Dog Food; and (3) Defendants knew that Plaintiffs and the Class could not reasonably have been expected to learn or discover that the Contaminated Dog Food was misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Contaminated Dog Food.

201. The facts concealed or not disclosed by Defendants to Plaintiffs and the Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Contaminated Dog Food.

202.    Plaintiffs and the Class justifiably relied on the Defendants' omissions to their detriment. The detriment is evident from the true quality, characteristics, and ingredients of the Contaminated Dog Food, which is inferior when compared to how the Contaminated Dog Food is advertised and represented by Defendants.

203.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages in that they purchased Contaminated Dog Food that was worth less than the price they paid and that they would not have purchased at all had they known of the risk and/or presence of heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements.

204.    Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendants to bear the costs of class notice;

B.    An order enjoining Defendants from selling the Contaminated Dog Food until the levels of heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements are removed or full disclosure of the risk and/or presence of such appear on all labels, packaging, and advertising;

C.      An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

D.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

E.      An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of New York law, plus pre- and post-judgment interest thereon;

F.      An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

G.      An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

H.      An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiffs and the Class; and

I.      An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: April 24, 2020                    Respectfully submitted,

s/ Charles J. LaDuca
CHARLES J. LADUCA (N.Y. Bar No. 3975927)
KATHERINE VAN DYCK (admitted *pro hac vice*)
BRENDAN S. THOMPSON (admitted *pro hac vice*)
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
E-mail: charles@cuneolaw.com

kvandyck@cuneolaw.com
brendan@cuneolaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
ROBERT K. SHELQUIST (admitted *pro hac vice*)
REBECCA A. PETERSON (admitted *pro hac vice*)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
        rapeterson@locklaw.com

ROBBINS LLP
KEVIN A. SEELY (admitted *pro hac vice*)
STEVEN M. MCKANY (admitted *pro hac vice*)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsllp.com
        smckany@robbinsllp.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON (admitted *pro hac vice*)
KARLA M. GLUEK
RAINA C. BORRELLI (admitted *pro hac vice*)
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
        kgluek@gustafsongluek.com
        rborrelli@gustafsongluek.com

LITE DEPALMA GREENBERG, LLC
JOSEPH DEPALMA (admitted *pro hac vice*)
SUSANA CRUZ HODGE (admitted *pro hac vice*)
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
        scruzhodge@litedepalma.com

WEXLER WALLACE LLP
KENNETH A. WEXLER

UMAR SATTAR
55 West Monroe, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail: kaw@wexlerwallance.com
      us@wexlerwallace.com

POMERANTZ LLP
GUSTAVO F. BRUCKNER
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463.1044
E-mail: gfbruckner@pomlaw.com

ANDREWS DEVALERIO LLP
DARYL DEVALERIO ANDREWS (admitted *pro hac vice*)
265 Franklin Street, Suite 1702
Boston, MA 02110
Telephone: 617-936-2796
Email: daryl@andrewsdevalerio.com

**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2020 I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

**Cynthia E. Neidl**
Greenberg Traurig, LLP - Albany Office
54 State Street
6th Floor
Albany, NY 12207
518-689-1435
Fax: 518-689-1499
Email: neidlc@gtlaw.com


**David A. Coulson**
Greenberg Traurig, PA - Miami Office
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131
305-579-0754
Email: coulsond@gtlaw.com


*s/ Charles J. LaDuca*
CHARLES J. LADUCA