# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF NEW YORK MAIN OFFICE (SYRACUSE)

| | |
|---|---|
| RACHEL COLANGELO and KATHLEEN PARADOWSKI, individually and on behalf of a class of similarly situated individuals, | CIVIL ACTION NO.: 6:18-cv-01228-LEK-ML |
| Plaintiff, | |
| v. | |
| CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
EXCLUDE PLAINTIFF'S EXPERT BRUCE G. SILVERMAN**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................................1

II.     SUMMARY OF RELEVANT FACTS .....................................................................2

        A.      Plaintiff's Claims ...........................................................................................2

        B.      Champion's Premium Dog Food ....................................................................2

        C.      Mr. Silverman's Opinions...............................................................................6

III.    LEGAL STANDARD...................................................................................................9

IV.     ARGUMENT ..............................................................................................................10

        A.      Mr. Silverman's Opinions Are Methodologically and Factually Unreliable..........10

                1.      Mr. Silverman's Testimony Is Methodologically Unreliable ....................10

                2.      Mr. Silverman's Testimony Does Not "Fit" the Facts of this Case............13

        B.      Mr. Silverman Has No Relevant Experience ...............................................16

        C.      Mr. Silverman Offers Nothing Helpful to the Jury.....................................20

V.      CONCLUSION...........................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*,
  No. 13-cv-324, 2017 WL 3528606 (D. Del. Aug. 16, 2017)..................................13

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
  No. 16-cv-885, 2020 WL 1673687 (S.D.N.Y. Apr. 6, 2020), *aff'd*, No. 2020-
  1847, 2021 WL 840844 (Fed. Cir. Mar. 5, 2021) ..................................21

*Cross Com. Media, Inc. v. Collective, Inc.*,
  No. 13-cv-2754, 2014 WL 11343849 (S.D.N.Y. Aug. 21, 2014), *vacated in
  part on other grounds*, 841 F.3d 155 (2d Cir. 2016) ..................................21

*FLIR Sys., Inc. v. Fluke Corp.*,
  No. 10-cv-00971, 2012 WL 13051121 (D. Or. Nov. 5, 2012) ...............................19

*Hadley v. Kellogg Sales Co.*,
  No. 16-cv-04955, 2019 WL 3804661 (N.D. Cal. Aug. 13, 2019) ..........................19

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
  No. 17-cv-01613, 2017 WL 10399343 (C.D. Cal. Nov. 17, 2017) .........................12

*Hobbs v. Brother Int'l Corp.*,
  No. 15-cv-1866, 2016 WL 7647674 (C.D. Cal. Aug. 31, 2016) ...........................19

*Kosta v. Del Monte Foods, Inc.*,
  308 F.R.D. 217 (N.D. Cal. 2015)....................................................12

*Krommenhock v. Post Foods*, *LLC*,
  334 F.R.D. 552 (N.D. Cal. 2020).....................................................19

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999).......................................................1, 10, 11, 16

*LinkCo, Inc. v. Fujitsu Ltd.*,
  No. 00-Civ.-7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ...........................17

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016) *aff'd*, 720 F. App'x 24 (2d Cir. 2017).......10, 16, 17, 19

*In re Lyman Good Dietary Supplements Litig.*,
  No. 17-cv-8047, 2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019)....................9, 10, 20

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)..................................................21

*Price v. L'Oréal USA, Inc.*,
  No. 17-cv-614, 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020).........................18, 19

*Prime Media Grp., LLC v. Acer Am. Corp.*,
  No. 12-cv-05020-BLF, 2015 WL 452192 (N.D. Cal. Jan. 22, 2015)...............21, 22

*Repro-Med Sys., Inc. v. EMED Techs. Corp.*,
  No. 13-cv-01957, 2019 WL 1427978 (E.D. Cal. Mar. 29, 2019)...........................12

i

*Weiner v. Snapple Beverage Corp.*,
    No. 07-cv-8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)....................................12, 16, 21

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009)............................................................................................16

## Other Authorities

Fed. R. Evid. 702 .............................................................................................................9, 17, 19

## I.      INTRODUCTION

This motion illustrates the importance of the *Daubert* standard.  Absent any evidence supporting her claims that Defendants Champion Petfoods USA Inc. and Champion Petfoods LP's (collectively, "Champion") dog food packaging was misleading, Plaintiff seeks to smuggle pure *ipse dixit* speculation to the jury under the guise of expert testimony.  Plaintiff proffers Mr. Bruce G. Silverman, a former advertising executive, to testify as to what he thinks consumers hypothetically might think of Champion's packaging if Plaintiff's allegations were true, without doing anything to assess what real consumers think about the actual product at issue.  For example, Mr. Silverman opines that "pet parents would object to the presence or possible presence of heavy metals, BPA, non-fresh ingredients, and non-regional ingredients in Champion's dog food products."  *See* Expert Report of Bruce Silverman ("**Exhibit 1**," hereinafter "Report") at 53.  Such opinions are inadmissible for a host of reasons.

*First*, there is an absolute dearth of any empirical, methodological, or factual support for Mr. Silverman's opinions.  He employed no methodology that meets any of *Daubert's* reliability metrics.  He conducted no consumer surveys, interviews, or focus groups—despite acknowledging he would do so if assessing these issues as part of his advertising practice—and did not even review the deposition transcripts of the very consumers at issue in these cases, *the named Plaintiffs*.  Such arbitrary opinions that are "connected to existing data only by the *ipse dixit* of the expert" are the hallmark of inadmissible testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999).

*Second*, Mr. Silverman repeatedly touts his 50-year experience in the advertising industry, but admittedly lacks any experience with the particular issues on which he opines that could bridge his lack of factual or methodological support.  For example, although he worked on two pet food advertising projects back in the 1970s, he has no experience—much less temporally relevant experience—with the "premium" or "super premium" dog food categories at issue here, which he

acknowledges have different consumers with different perspectives.  He similarly lacks any experience with and has no expert knowledge of pet nutrition, pet food ingredients or their sourcing, heavy metals, or BPA.  Irrelevant experience—however extensive it might be—cannot salvage methodologically unreliable testimony, and Mr. Silverman's opinions fail for this additional reason.

*Third*, absent reliable methodology or experience, Mr. Silverman offers nothing of use to the factfinder.  His regurgitation of dictionary definitions, news articles, and discovery documents in support of what he "thinks a consumer would think" do not constitute scientific, technical, or specialized knowledge that is helpful to the jury.  Instead, Mr. Silverman serves as nothing more than a mouthpiece for Plaintiff's counsel's arguments, an independent ground for exclusion.

Courts have excluded Mr. Silverman for all of these reasons; this Court should do the same.

## II.    SUMMARY OF RELEVANT FACTS

### A.    Plaintiff's Claims

Plaintiff's Second Amended Complaint (ECF No. 76, "SAC") alleges (i) violation of the New York General Business Law §§ 349 and 350; (ii) breach of express warranty; (iii) fraudulent misrepresentation; and (iv) fraud by omission.  The common denominator for each claim is Plaintiff's allegation that Champion sold dog foods that "contained and/or had a material risk of containing undisclosed and non-conforming contaminants and ingredients, such as heavy metals, BPA, non-fresh ingredients, such as 'regrinds,' which are reused, twice cooked pet food, and non-regional ingredients." SAC ¶ 5.  Plaintiff does not claim that any of her dogs suffered illness from or were malnourished by consuming Champion dog food.  Rather, Plaintiff alleges that she was "misled to pay premium prices" for dog food that "did not deliver what was promised."  *Id.* ¶ 18.

### B.    Champion's Premium Dog Food

Unlike traditional dog food which relies on significant amounts of basic grains and/or other fillers and many nutritional supplements, Champion's "Biologically Appropriate" approach uses

primarily animal-based proteins in an attempt to mirror how wolves or wild dogs get nutrition in nature (albeit within the limitations of dry kibble form). *See* Champion's Statement of Undisputed Material Facts (ECF No. 130-2, hereinafter "SUMF") at ¶ 2. Champion's dog food consists of a variety of diets under the brand names ORIJEN and ACANA. *Id.* ¶ 4. Beginning in approximately 1990, Champion manufactured all of its dog food out of its NorthStar kitchen in Morinville, Alberta, Canada. *Id.* ¶ 6. In approximately January 2016, Champion opened its new DogStar kitchen in Auburn, Kentucky where nearly all of its dog food sold in the United States (except for Alaska) is now manufactured. *Id.* ¶ 7.

Plaintiff alleges that, in mid-2016, she purchased two different ACANA brand dog food diets: "ACANA Heritage Free-Run Poultry" and "ACANA Regionals Meadowland." SUMF ¶ 10. Before making her first purchase of Champion dog food, Plaintiff researched the food on the internet, and visited the Champion Petfoods website. *See* Deposition of Plaintiff Kathleen Paradowski (ECF No. 130-8, hereinafter "Paradowski Dep. Tr.) at 24:20-25:15. She also read the ingredient panels of both ACANA diets. SUMF ¶ 41.

During all relevant times, the front of the packaging for the diets Plaintiff purchased stated the diet was "Biologically Appropriate Dog Food." SUMF ¶ 13. Champion explains its "Biologically Appropriate" philosophy on its ACANA Meadowland and Free-Run Poultry packages by stating that "[o]ur foods mirror the richness, freshness and variety of meats for which dogs are evolved to eat." *Id.* ¶ 14. On each bag purchased by Plaintiff, Champion indicated that the diet contained some "fresh" ingredients, *among other ingredients in other forms*. *Id.* ¶ 19. For example, the front of the DogStar ACANA Meadowland package states it is ACANA's "Free-Run Poultry Formula **with** fresh cobb chicken, turkey, & nest-laid eggs." *Id.* ¶ 20. The top left front corner the DogStar ACANA Free-Run Poultry and Meadowland packages also states that they contain "unmatched regional ingredients FRESH OR RAW." *Id.* ¶ 24.

Critically, it is undisputed that Champion's products did, in fact, contain a significant amount of fresh ingredients.  SUMF ¶¶ 19, 25, 26, 28.   It is similarly undisputed that Champion never states 100%, each, every, or all ingredients are fresh, that its ingredients are "never frozen," or that its dog food contains no frozen ingredients. *Id.* ¶ 32. To the contrary, the front of both packages makes clear that they are "infused with freeze-dried chicken liver." *Id.* ¶ 21. Moreover, as required by AAFCO regulations,[1] the back of every Champion package has an ingredient panel that lists all ingredients in order of weight, which Plaintiff testified she read.  *Id.* ¶¶ 40, 41.   As the excerpt below illustrates, the back of a 25-pound bag of ACANA Meadowland prominently clarifies that "this 25 lb package of ACANA is made with 17 ½ lb [of] premium animal ingredients.  Half are FRESH or RAW and loaded with goodness, and half are DRIED or OILS to provide a strong and natural source of animal proteins and fats":



*Id.* ¶ 25.  Similarly, the back of a 13-pound bag of ACANA Free-Run Poultry states "this 13 lb package of ACANA is made with over 7 ¾ lb [of] free-run poultry & egg ingredients.  Half are FRESH or RAW and loaded with goodness and taste, and half are DRIED or OILS to provide a

---

[1] The Association of American Feed Control Officials ("AAFCO") provides a forum for state regulatory officials to come together and create model guidelines to ensure that the regulation of animal feeds is as uniform as possible from state to state.  SUMF ¶ 29.

strong and natural source of animal proteins and fats." *Id.* ¶ 26.

On each bag purchased by Plaintiff, Champion indicated that its dog food contained "regional" ingredients. SUMF ¶ 33.  It is undisputed that a significant amount of ingredients on both the DogStar ACANA Meadowland and Free-Run Poultry packages at issue were, in fact, regionally sourced, and their sources were stated on the front of the packaging.  *Id.* ¶¶ 36-38.  For example, the ACANA Meadowland package states: "Free-Run Chicken: Mayfield, Kentucky; Free-Run Turkey: Mercer County, Ohio; Freshwater Catfish: Paducah, Kentucky."  *Id.* ¶ 37.  The ACANA Free-Run Poultry package states: "Free-Run Chicken: Mayfield, Kentucky; Free-Run Turkey: Mercer County, Ohio; Nest-laid Eggs: Paducah, Kentucky; Fruits & Vegetables: Louisville, Kentucky."  *Id.* ¶ 38.  Critically, however, it is also undisputed that Champion never states on any of its packaging that 100%, each, every or all ingredients are exclusively regional or local; nor does Champion limit the word "regional" to a certain distance or location.  *Id.* ¶ 42.  To the contrary, ingredients sourced over 1,000 miles from Kentucky are also clearly listed on these packages along with their source, such as "Rainbow Trout: Soda Springs, Idaho" (approximately 1,600 miles from Champion's DogStar Kitchen) and "New England Mackerel."  *Id.* ¶ 37; *see* SAC Ex. A at (h).  Emphasizing this, the front of each package states that the "fertile farms and meadows" and "fertile farmlands" of "America" are Champion's "source of inspiration and fresh regional ingredients."  *Id.* ¶ 35.

As with nearly all foods, whether for humans or pets, Champion's dog foods contain trace levels of heavy metals—such as arsenic, cadmium, lead, and mercury.  SUMF ¶ 56.  These heavy metals are naturally occurring elements that are ubiquitous in the environment.  *Id.* ¶ 57.  The trace levels of heavy metals in Champion's dog food are naturally occurring in the source ingredients used to make the food, such as mercury in fish. *Id.* ¶ 58.  It is undisputed, and should go without saying, that Champion does not *add* heavy metals as ingredients.  *Id.* ¶ 59. Nor does Champion

advertise its dog foods as being free of heavy metals, or make any representation about heavy metals. *See* Declaration of Chinedu Ogbonna (ECF No. 130-4) at Ex. A, B. The levels of heavy metals in Champion's dog food are below the maximum tolerable limits ("MTLs") set by the FDA, the National Research Council and the EU safety standards for heavy metals in pet food. SUMF ¶¶ 64-68. The analytical firm retained by Plaintiff tested hundreds of dog foods and found the presence of heavy metals in almost all of them. *Id.* ¶ 69. The levels of naturally occurring heavy metals in ACANA and ORIJEN dog food diets do not present a health risk to dogs, *id.* ¶ 71, and Plaintiff does not claim that Champion is violating any known safety standard or guideline for dog food.

Plaintiff also alleges that some samples of Champion dog food contain trace amounts of BPA, a monomer used in the production of plastics that, because of its ubiquity, has been found to be present in samples of air, water, and dust. SUMF ¶ 74. The analytical firm retained by Plaintiff tested hundreds of dog foods and found BPA in a third of them. *Id.* ¶ 81. It is undisputed that Champion does not add BPA as an ingredient. *Id.* ¶ 79. Nor does Champion advertise its food as "BPA Free," or make any representations about BPA. *Id.* ¶ 80. Plaintiff also does not claim that any of her dogs suffered any adverse health consequence from BPA exposure from any source. The levels of BPA Plaintiff alleges are present in Champion's dog food would not cause an adverse health effect in a dog, *id.* ¶ 88, and Plaintiff can identify no evidence to the contrary.

### C.    Mr. Silverman's Opinions

Plaintiff proffers Mr. Silverman, a former advertising executive with "50 years of professional experience in the marketing-communication industry" to "opine on consumer perceptions" of the following statements found on the ACANA Heritage Free-Run Poultry and ACANA Regionals Meadowland packages:

- "Biologically Appropriate";

- "Delivering Nutrients Naturally"; and

- "Fresh Regional Ingredients."

Report ¶¶ 4-5 (the "Challenged Statements").  As part of his opinions, Mr. Silverman accepts Plaintiff's allegations as true that Champion's "packaging claims were misleading and fraudulently omitted the fact that Defendants' dog foods contained and/or had a material risk of containing undisclosed and non-conforming contaminants and ingredients, such as heavy metals, Bisphenol A ("BPA"), non-fresh ingredients, such as 'regrinds,' which are reused, twice cooked pet food, and non-regional ingredients." *Id.* ¶ 2.  He acknowledges that he did nothing to determine the veracity of those statements.  *See* Deposition of Bruce Silverman dated November 24, 2020 ("**Exhibit 2**," hereinafter, "Dep. Tr.") at 85:11-16; Report ¶ 112.

Many of the opinions summarized at Paragraph 32 of Mr. Silverman's expert report are mere recitations of obvious platitudes, such as "most consumers make food purchasing decisions for themselves and their families based on their perception that the products they choose are healthy," "Many consumers treat their pets as family members," "The Challenged Statements communicate to consumers that the Champion Products at issue are healthy," and "Consumers are positively influenced by the Challenged Statements."  Report ¶¶ 32(a)-(f).  However, Mr. Silverman goes far beyond such general advertising platitudes when he opines that:

- Consumers who purchase premium-priced dog food are concerned about the possible presence of heavy metals, BPA, non-fresh ingredients, and non-regional ingredients in those products.

- Consumers would see the possible presence of heavy metals, BPA, non-fresh ingredients, and non-regional ingredients as inconsistent with the challenged Champion statements, and material to their purchasing decisions.

- It is unreasonable to expect consumers to proactively determine whether the Challenged Statements that appear on the front surface of Defendants' packaging are true, or to somehow determine if Defendants had omitted on their packaging the presence of Heavy Metals, non-fresh and non-regional ingredients, and the possible presence of BPA in their products.

- Had Champion's packaging disclosed that its products contained and/or had a risk of containing heavy metals, BPA, a material amount of ingredients that were not fresh, and/or a material amount of ingredients that were not local or regional, such disclosures

7

would have adversely affected consumers' willingness to purchase the Champion Products.

- Assuming Plaintiffs' allegations are true, a reasonable consumer would be misled and deceived by Champion's packaging as a whole.

*Id.* ¶¶ 32(g)-(k).  At deposition, he characterized these opinions as his attempt to approximate "what consumers might think," Dep. Tr. at 49:19-24, or what he "think[s] that . . . consumers think about those" issues, *id.* at 52:22-25.

In formulating these opinions, Mr. Silverman did not conduct any consumer surveys or focus groups, *id.* at 30:7-21, despite it being his standard practice as an advertiser to do so, Report ¶¶ 26-27.  He did not conduct any research studies at all in connection with this case.  Dep. Tr. at 48:5-10.  Mr. Silverman did not interview a single consumer, much less any consumer who purchased Champion dog food.  *Id.* at 30:7-10.  He did not speak with any class members and did not even review the deposition transcript of the named Plaintiff in this case or those of any plaintiff in the analogous suits against Champion brought by Plaintiff's attorneys around the country.  *Id.* at 29:21-25, 117:14-20, 139:6-11.  His opinions derive primarily from news articles and websites he Googled and a handful of Champion's internal documents selected for him by Plaintiff's counsel. Report, Ex. A.

Mr. Silverman has never consulted for a pet food company.  Dep. Tr. at 21:19-21.  Although he worked on two dog food accounts (both mass producers of non-premium dog food) at his advertising agency back in the 1970s, he testified he has not performed any advertising work for any pet food company since 1980.  *Id.* at 21:22-23:14.  Moreover, Mr. Silverman testified that the dog food brands he worked with 40 years ago were "popular-priced" dog food brands, whereas he characterizes Champion's dog food as "premium" and "super premium" dog food with different consumers who have different consumer perceptions and habits.  *Id.* at 42:25-43:17, 63:21-64:1, 94:19-95:2, 126:19-25, 135:11-14 ("You know, consumers—I doubt very much that consumers that are inclined to buy a product like Acana or Orijen are, you know, hot to buy Pedigree.  They're

oriented to get a premium product for their dog."). Mr. Silverman acknowledged his pet food experience is outdated and that he has no experience with consumers of premium or super premium dog food. *Id.* at 42:1-10 ("I've already told you I worked on two dog food accounts so, you know, I can arguably say that they were similar, but I don't think they were similar. They weren't selling premium products. I'm not even sure if there were premium products in those days."). He also acknowledged that comparing popular-priced dog foods with premium and super premium dog foods, "as a consumer . . . it's an apple to oranges comparison." *Id.* at 133:14-134:3.

Mr. Silverman further acknowledged that he has no experience or expertise with (i) the ingredients or preparation of dog foods; (ii) pet food nutrition; (iii) heavy metals; (iv) BPAs; (v); biology; or (v) toxicology. Dep. Tr. at 25:7-23, 113:1-8, 120:8-11, 132:14-25.

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"'[T]he proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact.'" *In re Lyman Good Dietary Supplements Litig.*, No. 17-cv-8047, 2019 WL 5682880, at *4 (S.D.N.Y. Oct. 31, 2019) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted)). "This means that the testimony must be both reliable *and* relevant in that it 'fits'

the facts of the case." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 641 (S.D.N.Y. 2016) (quoting *Daubert*, 509 U.S. at 591-92), *aff'd*, 720 F. App'x 24 (2d Cir. 2017). "The 'fit' and 'reliability' requirements overlap: Testimony is neither helpful nor reliable where 'there is simply too great an analytical gap between the data [on which the expert relies] and the opinion proffered.'" *Id.* (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)).  "[T]he district court acts as the 'ultimate gatekeeper' against unreliable expert testimony."  *In re Lyman*, 2019 WL 5682880, at *3.  "This gatekeeping obligation 'applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge.'" *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 141).

## IV.   ARGUMENT

### A.   Mr. Silverman's Opinions Are Methodologically and Factually Unreliable

#### 1.   Mr. Silverman's Testimony Is Methodologically Unreliable

At the first step of the admissibility inquiry under *Daubert*, "'the Court must . . . determine 'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.'"  *In re Lyman*, 2019 WL 5682880, at *3.  "To determine whether a proposed expert opinion is reliable, courts must consider several factors, including [1] 'whether a theory or technique . . . can be (and has been) tested'; [2] 'whether the theory or technique has been subjected to peer review and publication'; [3] whether uniform 'standards controlling the technique's operation'" exist; and [4] whether the theory enjoys 'general acceptance' within an identifiable relevant scientific or professional community."  *Id.* at *6 (quoting *Daubert*, 509 U.S. at 593-94). While these metrics are flexible and are not always easily applicable to an expert's testimony, "the Court's ultimate objective is to 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Id.* at *3 (citing *Kumho Tire*

*Co.*, 526 U.S. at 152.).

Mr. Silverman's testimony meets none of the *Daubert* reliability indicia.  It is undisputed that his opinions regarding premium-dog food consumers' perceptions of the "possible presence of heavy metals, BPA, non-fresh ingredients, and non-regional ingredients" in Champion's dog food, *see* Report ¶¶ 32(g)-(k), are untested and untestable, have not been subject to peer-review and publication, are not subject to uniform standards, and have no general acceptance within any identifiable professional community.

Nor did Mr. Silverman employ "the same level of intellectual rigor that characterizes [his] practice in [his] relevant field."  *Kumho Tire Co.*, 526 U.S. at 152.  When attempting to describe the methodology he employed in this case, he testified that "my process is to sort of reverse engineer the process I used when creating advertising."  Dep. Tr. at 137:2-16.  Yet he did not follow that process, which he testified "starts with trying to understand what consumers want or need to hear." *Id.*  To understand consumers, Mr. Silverman opined that it was his common practice as an advertising executive to conduct consumer surveys, focus groups, and interviews:

> One of the keys to creating effective advertising campaigns is to 'walk in the consumer's shoes'—to do everything possible to understand how they learn, think and feel about the products and services they are considering purchasing.  For that reason, advertisers and agencies spend millions of dollars annually on primary and secondary research studies that provide insights into what consumers understand and believe. . . I estimate that over the course of my career I have personally interviewed more than 5,000 consumers and attended at least 3,500 focus group sessions for products ranging from automobiles to dog toys.

Report ¶¶ 26-27.  But Mr. Silverman did none of those things in this case.  He did not conduct a single consumer survey, focus group, research study, or interview.  Dep. Tr. at 29:21-25, 30:7-10, 48:5-10.  He did not speak with a single consumer who purchased Champion dog food, including the consumers who brought this lawsuit and similar lawsuits around the country in which Mr. Silverman also seeks to proffer expert testimony. *Id.* at 29:21-25, 30:7-10.  Nor did he even read those Plaintiff's depositions. *Id.* at 117:14-20, 139:6-11.

11

These methodological failings alone are grounds for exclusion. *See Weiner v. Snapple Beverage Corp.*, No. 07-cv-8742, 2010 WL 3119452, at *8 (S.D.N.Y. Aug. 5, 2010) (excluding plaintiff's expert who failed to "design[], much less conduct[], his own study of consumer perceptions about 'All Natural' labeling" or "read the plaintiffs' depositions, which describe how the plaintiffs purchased Snapple beverages," relying instead "primarily [on] newspaper articles and websites concerning generalized consumer perceptions about 'natural products'" and "internal Snapple marketing strategy documents"); *see also Repro-Med Sys., Inc. v. EMED Techs. Corp.*, No. 13-cv-01957, 2019 WL 1427978, at *7 (E.D. Cal. Mar. 29, 2019) ("Without consumer survey information or other specific examples of consumers being misled, the vague anecdotal evidence alone submitted by [plaintiff's expert] is insufficient to prove that the public is likely to be misled."); *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 224–25 (N.D. Cal. 2015) (declaration by expert who did not "survey[] any consumers who purchased products" insufficient to constitute class-wide proof that labeling statements are "deceptive and material").

Mr. Silverman's testimony was recently rejected by a federal court in California for just these reasons:

> Mr. Silverman does not present any evidence indicating what an actual consumer would do, such as a consumer survey. Instead, Mr. Silverman merely speculates what a hypothetical consumer would do and then draws the legal conclusion that Defendants' advertisements constitute a material deception. Because Plaintiffs have not offered anything more than these bare, conclusory statements from their expert, Plaintiffs have not provided sufficient evidence that Defendants' advertisements are materially deceptive.

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, No. 17-cv-01613, 2017 WL 10399343, at *3 (C.D. Cal. Nov. 17, 2017). Indeed, Mr. Silverman's opinions have been rejected even where he did *far more* than he did in this case:

> Silverman's "informal survey" is also excluded because it lacks indicia of reliability. Silverman offers the "informal survey" to "bolster[ ]" his conclusion that a "reasonably careful consumer" could confuse Plaintiff and Defendant even if that consumer uses a travel agent to book her cruise. The informal survey consisted of Silverman directing "an experienced market research professional" to contact travel

12

agents in nine states to ask the question, "Do you or your customers ever get confused as to which company is which?" Plaintiff failed to provide any information on how these agents were selected, whether they are representative, and how their responses were categorized. While Plaintiff is correct, the survey "need not be a scientific survey" in any formal sense, to be admissible, the survey must be moored in some reliable process that can be tested on cross-examination.

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, No. 13-cv-324, 2017 WL 3528606, at *7 (D. Del. Aug. 16, 2017).

Mr. Silverman's methodologically baseless opinions should be rejected here for the same reasons.

### 2.    Mr. Silverman's Testimony Does Not "Fit" the Facts of this Case

In addition to lacking any methodological support, Mr. Silverman's opinions that consumers would be "misled and deceived by Champion's packaging as a whole" due to the "possible presence of heavy metals, BPA, non-fresh ingredients, and non-regional ingredients," *see* Report ¶¶ 32(g)-(k), are also untethered to the facts of the case, and thus fail *Daubert*'s "fit" requirement.

On its face, Champion's "packaging as a whole" directly contradicts Mr. Silverman's speculative opinions that Challenged Statements like "Fresh Regional Ingredients" are somehow misleading merely because not *all* ingredients are "fresh" or "regional." *Id.* Mr. Silverman acknowledges that Champion's dog food does, in fact, contain a high amount of fresh regional ingredients. Dep. Tr. at 56:2-7, 71:1-3, 76:21-24. He concedes that Champion does not market its products as *exclusively* locally sourced, exclusively fresh, or 100 percent natural ingredients. *Id.* at 52:2-4, 93:10-13. To the contrary, he acknowledges that other statements prominently featured on the front and back of Champion's packages make clear that they contain ingredients that are *not* locally sourced—such as ingredients sourced internationally, Report at 73 n.101 ("some of Champion's Products note some non-regional ingredient suppliers, such as New Zealand lamb"), and from locations all over "America," Dep. Tr. at 90:19-24, that are nonregional to Kentucky, *id.* at 54:5-7 ("Idaho"), *id.* at 132:5-10 ("Atlantic Mackerel"). Mr. Silverman also acknowledges that

Champion's packages clearly state that they contain some ingredients that are *not* fresh, such as "dried" and "dehydrated" ingredients, *id.* at 83:25-84:9 ("Q. You'd agree that a dried ingredient is not fresh, Correct?  A. Yes."), *id.* at 132:5-10.  Moreover, Mr. Silverman could not identify any premium brands of dog food that were healthier for dogs or that had higher inclusions of locally-sourced ingredients, fresh or raw ingredients, or natural ingredients than Champion's dog food that could render Champion's statements misleading in comparison.  *Id.* at 67:13-17, 67:24-68:3, 79:15-21.

Mr. Silverman's only attempt to account for these prominently-displayed statements flatly contradicting his opinions is to speculate that, although "certain information appears on the back label of the Challenged Packages that disclaims or limits [the Challenged Statements,] . . . those disclaimers are most likely not going to be read at retail by a significant percentage of consumers." Report ¶ 118.  But, once again, this assertion is not only unsupported, it is also belied by all record evidence.  As illustrated by the label excerpted *supra* at 4, the prominently displayed statements on Champion's packaging making it clear that Champion is not claiming that *all* ingredients are fresh or regionally sourced—such as  "Half are FRESH or RAW and loaded with goodness, and half are DRIED or OILS"—are not "disclaimers" under Mr. Silverman's own definition of that term.  *See* Deposition of Bruce Silverman dated March 17, 2021 ("**Exhibit 3**," hereinafter "Dep. Tr. Vol. 2") at 26:5-17 ("[Disclaimers] are statements made in ads or in television commercials or labels that limit the—limit the claims or limit the conditions that the consumer has to meet to make the purchase.  The best example I can think of is in automobile advertising . . . there'll be a very long, almost impossible to read superimposed copy on the television screen that states all the conditions that you would have to meet to lease the vehicle.").  Rather, these statements are part of, and add context to, the very "marketing message[s]" Plaintiff's claim are deceptive.  *Id.* at 26:21-27:1.

Mr. Silverman agreed that such context is important when it comes to marketing statements

on packaging.  Dep. Tr. at 35:23-25.  He also acknowledged that purchasers of premium dog food are "information seekers," inclined to closely read all information on a package.  *Id.* at 70:11-17; *see also* Dep. Tr. Vol. 2 at 24:4-16.  He further admitted that the Champion packages at issue actually encouraged consumers to read their ingredients to provide context for the Challenged Statements—"read our ingredients and we think you'll agree."  Dep. Tr. at 69:12-23.  And, most importantly, the named Plaintiff in this case testified she did just that.  Paradowski Dep. Tr. at 80:16-23, 83:1-3, 99:16-19, 115:22-116:12 ("Q. And so, when you were purchasing this product you knew that it included dried ingredients and oils; correct? A: Correct. Yes.") (objection omitted). *Mr. Silverman ignored this testimony.*  Dep. Tr. at 29:21-25, 117:14-20, 139:6-11.  His opinion that consumers of premium dog food would be misled based on the fact that Champion's dog food includes some non-regional or non-fresh ingredients, as expressly stated on its packaging, thus not only lacks any factual support—it runs contrary to all the record evidence in this case.[2]

Mr. Silverman's opinions on heavy metals and BPAs are similarly counterfactual.  Those opinions are based on his assumption that "I think if consumers were aware that there were high levels of some kind of contaminant [in their dog food], they would be concerned."  Dep. Tr. at 115:8-10.  But Mr. Silverman did nothing to determine, and thus had no opinion regarding, the levels of heavy metals or BPAs in Champion's dog foods—whether they were "high" or not.  *Id.* at 106:8-10, 109:2-9.  He agreed that Champion's packages do not represent that they are free of heavy

---

[2] The arbitrariness of Mr. Silverman's opinion on this issue are laid bare by his own advertising experience.  He prides himself on his advertising campaign for Pace Picante Sauce, for which he wrote the following copy: "Pace is made in San Antonio with fresh vegetables and spices," Report ¶ 40, a representation that is the functional equivalent of Champion's "made with" or "with" "Fresh Regional Ingredients" statements on its packaging.  Mr. Silverman acknowledged that his copy did not imply that "fresh vegetables and spices" were the exclusive ingredients in Pace or that all ingredients were made or sourced in San Antonio.  Dep. Tr. at 57:2-58:13. His own experience thus belies his unsupported opinion here that "consumers would perceive the presence of non-fresh ingredients in Champion's Products as inconsistent with the Challenged Statements."  Report ¶ 185.

metals or BPA.  *Id.* at 110:15-111:3.  He further agreed that heavy metals occur naturally in the ingredients Champion uses to process its foods, such as mercury in fish.  *Id.* at 114:6-11.  Mr. Silverman could not identify any dog food that has no detectable levels of heavy metals or BPA. *Id.*  105:25-106:6.  Nor did he have any opinion on the levels of any of those substances in other companies' dog food or what levels are safe for dogs.  *Id.* at 105:5-106:10  He is not aware of any pet food manufacturer in the world that discloses or warns about the presence of heavy metals or BPA in their food.  *Id.* at 111:4-13.  The named Plaintiff in this case testified similarly.  Paradowski Dep. Tr. at 14:11-15:10.  There is simply no factual basis for his opinion that consumers of premium dog food would be misled based on Champion not disclosing the potential but safe presence of trace levels of heavy metals or BPA on its packaging.

These failings go beyond mere factual quibbles that would be appropriate for cross-examination—they go to the absolute lack of any methodological and factual basis for Mr. Silverman's arbitrary and speculative opinions.  The law is clear that "'nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"  *Weiner*, 2010 WL 3119452, at *7 (quoting *Kumho Tire*, 526 U.S. at 157)).  "[T]estimony fails *Daubert*'s 'fit' requirement [where] [i]t is a mismatch for the facts of th[e] case," *i.e.*, where the expert "has adduced no evidence [in] support[,] . . . and [t]he record evidence is to the contrary."  *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 642; *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) ("'[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are . . . unrealistic and contradictory.'").  Mr. Silverman's unreliable testimony should be excluded at the threshold for these reasons.

### B.      Mr. Silverman Has No Relevant Experience

Absent any methodological or factual support for his opinions, Mr. Silverman repeatedly

invoked his "experience" to defend those opinions at his deposition.  But experience must be directly relevant in order to pass muster under *Daubert*.  W]here an expert witness relies "solely or primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendment.  This requirement is designed to guard against a situation where an expert "offer[s] credentials rather than analysis …. instead, he "must provide some explanation for [his] conclusions, rather than referring generally to [his] experience." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002); *see also LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 642 ("[A] vague claim of 'prior experience' cannot salvage an opinion . . . that is the product of guesswork. Otherwise, proffered expert witnesses could easily circumvent the requirements of Daubert by resorting to ambiguous claims of 'past experience.") (citation omitted).

Mr. Silverman has no relevant experience that could overcome the factual and methodological deficiencies of his opinions and satisfy *Daubert*'s reliability requirements.  He acknowledged that his limited work for pet food companies back in the 1970s was both outdated and in a different, "popular priced" category than the "premium" brand at issue here.  Dep. Tr. at 42:1-10; *see also id.* at 21:19-23:14, 42:25-43:17, 63:21-64:1, 94:19-95:2, 126:19-25, 135:11-14. He conceded that the consumers of premium dog food are different from the consumers of popular priced dog food and have different perceptions and behaviors such that it would be "an apple to oranges comparison."  *Id.* at 42:25-43:17, 63:21-64:1, 94:19-95:2, 126:19-25, 133:14-134:3, 135:11-14.  Thus, he admittedly has no relevant experience—despite his 50 years as an advertising executive—with the precise consumer category whose minds he attempts to read in opining on their perceptions of Champion's packages.

Mr. Silverman similarly admitted that he has no experience or expertise with dog food

ingredients, heavy metals, or BPA.  Dep. Tr. at 25:7-23, 113:1-8, 132:14-25; *see also id.* at 120:8-11 ("I'm not an expert in how dog food is formulated.").  Indeed, despite opining on how consumers would perceive the presence of "regrinds" in Champion's dog food, he had never even heard the term "regrinds" before this case and has no opinion as to the nutritional value of the regrinds allegedly used in Champion's products.  *Id.* at 49:19-24, 51:21-52:1 ("I would have to be a nutritionist, I suppose, to have an expertise in that area.").  His testimony is rife with similar admissions that he could not opine on the levels of heavy metals or BPA or the health implications of those substances in Champion's products because he had no experience or expertise in those areas.  *See, e.g., id.* at 109:6-9 ("It's not my area of expertise.").  For example, when asked "Well, if the levels of heavy metals in the ingredients in the fresh food are at a healthy level, then why should a manufacturer make any kind of disclosure about it?" his response was "That's outside—you know, that's not my area of expertise, that's for lawyers to determine." *Id.* at 115:15-21.  Along similar lines, although Mr. Silverman seeks to opine that consumers "reasonably expected that Champion would ensure that heavy metals are processed out of food," he acknowledged that he does not even know "whether it is scientifically possible to process heavy metals out of pet food." *Id.* at 108:9-17; *see also id.* at 92:12-16 ("That was not part of my assignment.").

Mr. Silverman's attempt to opine on what consumers with whom he has no experience—premium pet food consumers—would think about substances with which he has no experience—*e.g.*, regrinds, heavy metals, and BPA—falls woefully short of *Daubert*'s experienced-based reliability standard.  Under strikingly similar circumstances, Judge Schofield recently excluded analogous opinions Mr. Silverman sought to offer as unreliable in *Price v. L'Oréal USA, Inc.*, No. 17-cv-614, 2020 WL 4937464, at *13 (S.D.N.Y. Aug. 24, 2020).  Although Judge Schofield noted that some courts had permitted Mr. Silverman to offer generic advertising opinions even where he

failed to conduct a consumer survey—based on his extensive advertising experience[3]—the court precluded his testimony regarding the presence of keratin (a protein found in hair treatment) in hair products based on the lack of any reliable methodology or experience:

> Mr. Silverman's opinion that keratin is a well known ingredient in hair products, and that "many women . . . are already aware of (or have ample opportunity to be aware of) the restorative properties of keratin" in hair products is not based on his experience, nor is it based on a reliable methodology. ***Mr. Silverman does not claim to have any experience from which he can opine on consumer knowledge of keratin as an ingredient in hair products***. Rather, this opinion is based on certain Google searches (one of which consisted of a search for "keratin shampoos" and others which he did not identify), a search on Amazon.com for "keratin shampoos" and a review of emails and testimony from Defendants' employees and the United States Patent and Trademark Office's ("USPTO") ruling on Defendants' trademark application.

*Id.* at *4 (emphasis added).  Mr. Silverman's testimony was excluded for similar reasons in *FLIR Sys., Inc. v. Fluke Corp.*, No. 10-cv-00971, 2012 WL 13051121, (D. Or. Nov. 5, 2012), where he sought to opine on "advertising in the thermal imaging camera industry," because that particular industry was "outside Silverman's experience and outside his expertise."  *Id.* at *3.

"The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 646 (quoting Fed. R. Evid. 702, Advisory Committee Note).  Because Mr. Silverman offers nothing more in support of his opinions here, the they should be excluded on that independent ground.

---

[3]  Mr. Silverman's testimony was permitted by California courts in *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 580 (N.D. Cal. 2020) (cereal); *Hadley v. Kellogg Sales Co.*, No. 16-cv-04955, 2019 WL 3804661, at *24 (N.D. Cal. Aug. 13, 2019) (cereal); *Hobbs v. Brother Int'l Corp.*, No. 15-cv-1866, 2016 WL 7647674, at *4 (C.D. Cal. Aug. 31, 2016) (printers).  None of these cases involved Mr. Silverman attempting to opine on the perceptions of consumers with whom he had no experience regarding ingredients and substances with which he had no experience.  To the contrary, the courts in those decisions relied on Mr. Silverman's experience in the relevant fields at issue, *e.g.*, "experience in th[e cereal] field, including attending numerous focus groups centered on marketing cereal and developing marketing plans for cereal products."  *Krommenhock*, 334 F.R.D. at 580.  These cases are not persuasive because Mr. Silverman, by his own admission, has no relevant experience here, nor any methodological or factual basis for his opinions.

C.      Mr. Silverman Offers Nothing Helpful to the Jury

Unsupported by any reliable methodology, record evidence, or relevant experience, Mr. Silverman's opinions are essentially a narrative summary of dictionary definitions, online articles that he Googled, and some internal Champion documents provided by Plaintiff's counsel, interspersed with anecdotal commentary and speculation about "what consumers might think," Dep. Tr. at 49:19-24, or what he "think[s] that . . . consumers think," *id.* at 52:22-25.  By way of just a few examples, Mr. Silverman's report contains opinions such as:

- "the word 'Biologically' will remind consumers of their high school Bio classes," Report ¶ 102;

- "[C]onsumers are far more likely to understand 'raw' as it is defined by Merriam-Webster," *id.* ¶ 111; *see also* ¶¶ 123, 139, 187 (quoting Merriam Webster);

- "Champion [uses] the words 'raw' and 'fresh' a[s] interchangeable.  In my experience, few consumers would see it that way. Having personally visited street markets in small towns in Egypt, China, Vietnam, Cambodia, Brazil and Paraguay, raw meat is most certainly not always fresh. (The nose knows.)," *id.* ¶ 113;

- "The Whole Foods Market supermarket chain is often referred to as 'Whole *Wallet*' because the prices of the products they sell are often significantly higher than similar (but not identical products) sold at most other national chains. But customers still flock to Whole Foods in droves because they believe its produce, meats, chicken, fish and seafood products are superior," *id.* ¶ 136;

- "I have reviewed documents that evidence Champion's awareness of consumer concerns over the possible presence of heavy metals in its products," *id.* ¶¶ 157-173 (summarizing internal Champion documents);

- "[I]t is my opinion that pet parents have had access to many media reports regarding the dangers posed to themselves and their pets by the presence of heavy metals and the possible presence of BPA, and would therefore be very concerned about the possible presence of those contaminants," *id.* ¶ 198; *see also, e.g., id.* ¶ 146 (citing a "60 Minutes report" on lead in Flint, Michigan); *id.* ¶ 147 (citing study from an "ABC network affiliate in Washington DC" on heavy metals); *id.* ¶ 149 (citing a 2007 *New York Times* article on lead in dog toys).

Mr. Silverman's rehashing of documents that require no "scientific, technical, or specialized knowledge" to interpret is independently excludable because it "offers nothing more than what [Plaintiff's] attorneys can argue in closing arguments or what the jury is already capable of understanding and deciding without the expert's help."  *In re Lyman*, 2019 WL 5682880, at *4 (internal quotation marks omitted).  Courts routinely exclude expert testimony that constitutes a

"review of the evidence [that] is not more sophisticated than the analysis of which a lay juror is capable," and that "simply rehash[es] otherwise admissible evidence about which [the expert] has no personal knowledge . . . [b]ecause the jury would be engaging in the same process when assessing [the plaintiff's] claims." *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-cv-885, 2020 WL 1673687, at *3-4 (S.D.N.Y. Apr. 6, 2020), *aff'd*, No. 2020-1847, 2021 WL 840844 (Fed. Cir. Mar. 5, 2021); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 654 (S.D.N.Y. 2007) ("[A]n expert is not supposed to be doing the work of counsel; an expert must "bring to the jury more than the lawyers can offer in argument." (internal quotation marks omitted)); *Cross Com. Media, Inc. v. Collective, Inc.*, No. 13-cv-2754, 2014 WL 11343849, at *8-9 (S.D.N.Y. Aug. 21, 2014) (excluding testimony of expert who "did not perform a consumer survey" but rather opined on the defendant's internal documents and the definitions of words because "he is doing no more than that which the finder of fact could him or herself do."), *vacated in part on other grounds*, 841 F.3d 155 (2d Cir. 2016); *Weiner*, 2010 WL 3119452, at *8 (excluding expert who relied "primarily [on] newspaper articles and websites concerning generalized consumer perceptions about 'natural products'" and "internal Snapple marketing strategy documents").

Here yet again, Mr. Silverman's testimony has been excluded by other federal courts on this basis due to his impermissible rehashing of record evidence and serving as a mouthpiece for counsel's arguments. For example, in *Prime Media Grp., LLC v. Acer Am. Corp.*, No. 12-cv-05020-BLF, 2015 WL 452192 (N.D. Cal. Jan. 22, 2015), the court held:

> Aspects of Silverman's opinions . . . purport[] to assess the inferences that should be drawn from certain deposition testimony. With respect to these opinions, the court finds Silverman's testimony inadmissible. The jury will be hearing testimony and reviewing documents and will be asked to evaluate that evidence and draw reasonable inferences to determine the facts of the case. This is exactly what Silverman purports to do in evaluating the deposition testimony presented to him. . . . Silverman appears to be simply performing the role of a jury—assessing the meaning and credibility of various evidence—in light of his experience in the industry. Although this may involve certain inferences that are aided by Silverman's experience, it also necessarily involves inferences—especially with respect to

assessing credibility—that do not lie beyond the common knowledge of the average layperson. Inferences of this sort are the exclusive province of the jury. Any marginal benefit the jury may get from hearing Silverman's opinions on what inferences should be drawn is vastly outweighed by the risk of the jury according undue weight to his opinions, which would impermissibly abrogate the critical function of the jury as the trier of fact.

*Id.* at *7.

Mr. Silverman's unhelpful testimony should be excluded for this independent reason.

## V.   CONCLUSION

For all the foregoing reasons, the Motion should be granted, and Mr. Silverman's testimony should be excluded.

DATED: April 15, 2021                              GREENBERG TRAURIG, LLP

By: */s/ David A. Coulson*
David A. Coulson, Esq. (*pro hac vice*)
Jared R. Kessler, Esq. (*pro hac vice*)
Robert S. Galbo, Esq. (*pro hac vice*)
Elisa H. Baca, Esq. (*pro hac vice*)
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: 305-579-0754
Facsimile: 305-579-0500
Email: coulsond@gtlaw.com
        kesslerj@gtlaw.com
        galbor@gtlaw.com
        bacae@gtlaw.com

Rick L. Shackelford, Esq. (*pro hac vice*)
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: 310-586-3878
Facsimile: 310-586-7800
Email: shackelfordr@gtlaw.com

Cynthia Neidl, Esq. (513737)
54 State Street
Albany, NY 12207
Telephone: 518-689-1435
Facsimile:  518-689-1499
Email: neidlc@gtlaw.com

*Attorneys for Defendants Champion Petfoods*
*USA Inc. and Champion Petfoods LP*