# EXHIBIT 2

                UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA (DMN)

CASE NO. 0:18-cv-03205-PJS-KMM

JENNIFER SONG and SCOTT WERTKIN, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP,

Defendants.
/

VIA ZOOM
Miami, Florida
November 24, 2020
Tuesday, 12:49 p.m.

VIDEOTAPED DEPOSITION OF BRUCE SILVERMAN

Taken before Theresa M. Cohen, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

\- - -

APPEARANCES:

ROBBINS LLP
By: TREVOR LOCKO, ESQUIRE
tlocko@robbinsarroyo.com
5040 Shoreham Place
San Diego, California 92112
On behalf of the Plaintiffs.

GREENBERG TRAURIG
By: DAVID A. COULSON, ESQUIRE
coulsond@gtlaw.com
and
ELISA H. BACA, ESQUIRE
333 Southeast Second Avenue
Suite 4400
Miami, Florida 33131
On behalf of the Defendants.

ALSO PRESENT:
JASON COOPER, Videographer.

INDEX

| WITNESS | DIRECT | CROSS |
|---|---|---|
| BRUCE SILVERMAN | 5 (Coulson) | 139 (Locko) |

EXHIBITS

Defendant's Composite Exhibit No. 1 Page 15
(Expert Report)
Defendant's Exhibit No. 2 Page 127
(Label)
Defendant's Exhibit No. 3 Page 129
(Comparison Document)

THEREUPON:

THE VIDEOGRAPHER: We are now on the record.

Participants should be aware that this proceeding is being recorded and, as such, all conversations held will be recorded unless there is a request and an agreement to go off the record.

Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording the witness is being spotlighted on all video screens while in speaker view.

We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness.

For anyone who doesn't want the witness' video to take up the large part of your screen you may click the gallery view button in the upper right corner of the remote depo interface.

This is the remote video recorded deposition of Bruce Silverman.

Today is Tuesday, November 24th, 2020. The time is now 4:49 p.m. UTC time zone. That would make it 12:49 p.m. in the Eastern Time zone.

We are here in the matter of Jennifer Song versus Champion Petfoods USA, Inc.

My name is Jason Cooper. I'm the remote video technician on behalf of U.S. Legal Support. I'm not related to any party in this action, nor am I financially interested in the outcome.

At this time will the reporter Teri Cohen on behalf of U.S. Legal Support please enter the statement for remote proceedings into the record.

THE REPORTER: The attorneys participating in this proceeding acknowledge that I am not physically present in the proceeding room and that I will be reporting this proceeding remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MR. LOCKO: Trevor Locko. I agree.

MR. COULSON: David Coulson for the defendants. We agree.

THE REPORTER: Raise your right hand.

Do you swear the testimony you're about to give is the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes.

BRUCE SILVERMAN

called as a witness on behalf of the Defendants herein and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COULSON:

Q Good morning. I apologize for the late start. We had a court hearing in a related case and we had some technical problems there trying to fix them, but it ultimately failed so now I'm back in my office and hopefully we'll be productive going forward.

Would you tell us your name for the record and spell it?

A Yes. It's Bruce G. Silverman. B-r-u-c-e, initial G, Silverman, S-i-l-v-e-r-m-a-n.

Q What is your home address?

A [redacted]

Q Who is your employer?

A Silverman Consulting, LLC.

Q What is the address for Silverman Consulting?

A It is the same address I just gave you.

Q I take it you've been deposed before. Correct?

A That's correct.

Page 6

Q Okay. I'll just go over a few ground rules here.
Of course, as you know, you have to answer audibly so the court reporter can take it down. Is that okay?
A Yes.
Q If do you not understand one of my questions, let me know so I can try to rephrase it. Is that okay?
A Yes.
Q If you cannot hear me for whatever reason, let me know so I can restate the question. Is that okay?
A Okay.
Q Are you on any kind of medication today that would impact your ability to testify truthfully or impact your memory?
A No.
Q Do you own any pets?
A I do.
Q What pets do you own?
A A dog.
Q What breed?
A Standard Poodle.
Q And what do you feed your Standard Poodle?
A Dog food.
Q What kind of dog food? What brand?
A I think it's called Zignature.

Page 7

I have to admit that that's a -- picking out the dog food and all that kind of stuff is something my wife tends to do.
Q And why did you and your wife choose Zignature for your dog?
A We adopted the dog, who was three-years-old when we got her.
She had been a show dog and we adopted her from the breeder and that's what the breeder was feeding them so we just stuck with it.
Q Before this Standard Poodle dog you own had you owned other dogs in the past?
A Yes.
Q So have you continuously been someone who owned a dog most of your life or is it just sporadically when you have a dog?
A We didn't have a dog when I was a child, but I've owned dogs, oh, boy, probably since at least 1980.
So that's forty years. Right?
Q And what were the dog foods that you recall feeding your dogs since 1980?
A Let's see. I think we fed -- we definitely fed Eukanuba for a while. I remember that brand.
I don't know what we were feeding before the dog we have now. Her name is Ali. I don't remember what we

Page 8

were feeding the dogs before that. Might have been Eukanuba that entire time.
Q And, as you explained, you started using Zignature for Ali on the recommendation of the breeder who had raised her. Correct?
A Yes, that's correct.
Q Have you ever purchased Acana or Orijen?
A No, I have not.
Q When is the first time you ever heard of the brands Acana or Orijen?
A When I was contacted about this case.
Q Before you were contacted about this case had you ever heard of Champion Petfoods?
A No.
Q Is there any particular diet of the Zignature brand that you and your wife purchase?
A Gosh. I think it's either chicken or turkey.
You know, we have a container so we get the thing shipped to us from that mail order dog food company, pet food company and it goes into a container so the package disappears within minutes of it arriving so I just really don't know.
Q You don't buy like the Kangaroo diet put out by Zignature?
A I can say with great assurance that we don't use

Page 9

anything called Kangaroo. I would have noticed that.
Q Have you ever actually read the packaging of the Zignature dog product that your purchase?
A Yes, I did.
I was unfamiliar with that brand and the breeder -- you know, we were dealing with a three-year-old dog and so we didn't really want to change anything, so the breeder actually gave us a bag to take with us when we took Ali home, and I read it when we got home and I was curious because I hadn't heard about it.
I'm a brand guy by my job, so I do kind of research these things.
Q Was there anything on the Zignature packaging that attracted you to want to continue with the food?
A That wasn't -- for us it wasn't about the packaging.
It was about the recommendation from the breeder.
Q Do you have any close friends or family who purchase Orijen or Acana?
A Not to my knowledge.
Q As I understand it, you've been engaged to be an expert witness in the matter of Song versus Champion Petfoods. Is that right?
A That's correct.
Q Who engaged you to be an expert witness?

Page 10

A Mr. Locko's firm, Robbins Arroyo.
Q When were you engaged for this matter?
A I actually am going to look down. I made some notes yesterday because I expected these questions.
So I was initially contacted back in April, mid-April of this year, but I really didn't get going on Champion in any meaningful way until I think probably June.
Q Do you recall you produced an expert witness report in a case called Renfro versus Champion that was pending in Denver, Colorado Federal Court?
A Yes.
Q Besides litigation where Champion is a defendant in what other cases have you been engaged where a pet food manufacturer is a defendant?
A There was another case where the defendant was a company called WellPet.
Q And when were you engaged, approximately, in that case?
A Also back in April.
Q Have you produced an expert report in that case?
A Yes.
Q Have you had your deposition taken in the WellPet case?
A No.

Page 11

Q Of the work you've done in, let's say, the last ten years, approximately what percentage of it involves serving as an expert witness or a litigation consultant as opposed to other type of work?
A Out of the course of the last ten years you're asking? On average I would say it's about 30 percent of my time is spent as an expert witness or at least 30 percent of my revenues.
Q And what about if we narrow it to the last five years? What percent would be dedicated to expert witness work, whether you're a testifying expert or consulting for lawyers in litigation?
A It's about the same. About the same.
Q And when you gave me the 30 percent, was that the approximate percentage of your income revenue-wise that you take in?
A Yes. My rates as a consultant are consistent with my rates as an expert witness, and I keep track of my time by quarter hours, so looking at revenues is about as good a way as I know to think about percentages.
Q And before this matter had you ever been -- before this matter and I guess the WellPet case had you ever been engaged by the Robbins Arroyo firm in the past?
A No.
Q What about a firm called Wexler out of Chicago?

Page 12

Have you ever been engaged previously by the Wexler law firm?
A No.
Q Okay. Are you sure about that? Because I think you testified in a case in San Francisco where the Wexler firm was one of the plaintiffs' counsel.
I'm for getting the defendant. But you don't recognize -- do you recognize the name Ken Wexler?
A I don't. You know, I don't know what case it is, obviously, but they may have been a co-counsel, but that name doesn't register with me.
Q What about the law firm Lockridge Grindal Nauen out of Minnesota? Have you ever been engaged by that firm before?
A No. I understand that they are co-counsel with Mr. Locko's firm.
Q Same question as to Gustafson Gluek out of Minneapolis? Have you ever been retained by that law firm before the Well Pet/Champion case?
A The firm is Gustafson something?
Q Yes. Gustafson Gluek, G-l-u-e-k.
A No.
Q So how did it come about that you, to your understanding, that you came to get engaged by some plaintiffs' lawyers against pet food companies?

Page 13

A I received a call one day from -- I believe it was from Mr. Locko. I think he was the first person I spoke with.
I've done a lot of expert work over the past twenty years and so he heard of me in some way. I don't recall. I usually ask how did you find me, but I don't remember the answer to that and he called and told me about the case, cases.
Q Before approximately April of 2020 had you ever been engaged in a litigation case that involved pet food manufacturers?
A No.
Q What is your hourly rate?
A My hourly rate is $575 an hour for consultation, writing reports, doing research, whatever.
Q Do you charge anything differently if you're testifying at trial or in a deposition?
A I do.
Q What is that?
A I charge $5,000 per day as a flat rate.
Q Okay. So let's put aside the WellPet case.
So focusing on Champion pet food only, approximately how many hours have you worked in connection with Champion Petfoods, whether it's the case that was in Denver or the Song case or any of the other related cases?

Page 14

A Gosh. I can tell you what I billed. I would have to do the math to answer the question. You asked in terms of turn it into hours.
Q Why don't you at least start with what you've billed.
A I've billed $56,000 to date.
Q And that's through what date?
A That would be through today.
Q Okay. And then today you'll be earning another $5,000 for the deposition?
A I will.
Q Has there been anyone else at Silverman Consulting who has assisted you in the matter whose time goes into that 56,000?
A Yes. I have the proofreader who assists me and he works at $100 an hour.
So within that 56,000 his time was also billed because he proofread the reports on both cases.
Q Okay. Anybody else?
A Not in this case, no.
Q Who have the attorneys been with whom you've communicated with respect to Champion Petfoods?
A Primarily Mr. Locko.
Q Aside from Mr. Locko, anybody else?
A I spoke with Mr. Robbins very early on and I

Page 15

think that's it.
Q Have you ever spoken with Rebecca Peterson?
A I've never spoken with Miss Peterson. I've had some e-mails that went back and forth and they related purely to billing.
Q Have you ever spoken with Raina Borrelli?
A No.
Q Have you ever spoken with Dan Gustafson?
A No. Let me just say very early on I think before I was engaged when I was, you know sort of being interviewed there may have been other parties on the phone. I just don't remember who they were.
Q So besides Mr. Locko and the brief conversation you had with Mr. Robbins do you recall any other specific attorney for plaintiffs with whom you've communicated orally in connection with your work against Champion Petfoods?
MR. LOCKO: Objection. Asked and answered.
THE WITNESS: I don't think I've really spoken with anyone else.
MR. COULSON: Let's mark as the first exhibit your expert report.
Ms. Baca will assist me by using the share screen function.
(The document was marked "Defendant's Composite

Page 16

Exhibit No. 1 for Identification.")
BY MR. COULSON:
Q Sir, do you have in front of you your expert report for the Jennifer Song case dated November 2nd, 2020?
A I have it on another computer off to my side. I can pull it up.
If it's easier, I would certainly prefer to look at it on a screen share basis.
Q We'll try that. Okay. Let's show the entirety of the front.
Does this appear to be the front cover of your November 2nd, 2020 expert report in the Song case?
A Yes.
Q Okay. I'd like to go to Exhibit A. Scroll through the entirety of it. Do you see it?
A Yes.
Q Exhibit A goes from Page 84 to 89 of your expert report and the question for you is what is Exhibit A purporting to show?
A It is a list of documents that were sent to me by the firm as well as documents that I found online or what-have-you or books or pleadings or whatever.
Q Does Exhibit A list all the documents that you relied on in forming your expert opinions in this case?

Page 17

A I believe it does.
Q Okay. It shows here that you read the deposition of Julie Washington. Is that right?
A Yes. I think I cited some things from Miss Washington's deposition transcript.
Q What was the time period in which Miss Washington worked at Champion Petfoods?
A I don't recall.
Q Then you read the deposition of Peter Muhlenfeld apparently taken December 4th, 2018.
Do you see that?
A I'm not seeing that.
Q Let's scroll to the front.
A Okay.
MR. COULSON: Ms. Baca, let's try to stay on that first page.
THE WITNESS: There you go. Yes.
BY MR. COULSON:
Q Mr. Muhlenfeld has been deposed numerous times. Is this the only transcript you read for Mr. Muhlenfeld?
A Yes.
Q Okay. Who chose these depositions for you to read?
A The attorneys.
Q You did read the second amended complaint. Is

                                                              Page 18

that correct?
A I did.
Q As per these Champion documents am I correct that plaintiffs' counsel selected them and sent them to you for your review? Is that right?
A That's correct.
Q Did you ask plaintiffs' counsel for any particular documents that were not sent to you?
A I don't believe so. I'm not sure how I would have known what to ask for.
Q As far as the literature and public sources that are shown on Pages 84 through 89, are all those ones that you found yourself through your research or were any of them ones sent to you by plaintiffs' counsel?
A It's a mix. Some were sent to me by plaintiffs' counsel and some was material that I found online.
Q Is there any way for you to point to which were the ones sent to you by plaintiffs' counsel?
A Not at this point. I wouldn't be able to remember where I got some, especially if they came from public sources.
Q Other than the deposition of Miss Washington and the December 4th, 2018 deposition transcript of Peter Muhlenfeld, have you reviewed any other deposition transcripts in this case?

Page 19

A I don't think so, no.
Q You have not read the depositions of Miss Song or Mr. Wertkin, who are the plaintiffs/representatives in this case. Is that correct?
A That's correct.
Q It's also true you've not read the depositions of any of the Champion pet food consumers who are plaintiffs in related cases. Is that correct?
A Yes, that would be correct.
Q Have you reviewed any expert report from Stefan Bottinger?
A I don't think so, no.
Q Do you know who Mr. Bottinger is?
A No.
Q Have you ever spoken with Mr. Bottinger?
A I don't believe so.
Q How many hours did it actually take you to prepare this report?
A I would have to look at my invoices, but I think it's fair to say that I did keep track because there were two reports. There was a report for the Colorado case, which I did first, and the report for the Minnesota, which I did second.
I did keep track of my time separately for each, but the Minnesota report, a significant portion of the

Page 20

Minnesota report was cut and pasted from the Colorado report, but I would have to look at my invoices to answer that question accurately.
Q When you gave me the 56,000 figure, did that include both the work you did for the Denver case and the work in the Minnesota case?
A It did.
Q Just on a high level, what are the differences between the report you did in the Denver case and the report you did for the Minnesota case?
A My understanding was that some of the claims were different.
In the Minnesota case particularly one of the claims involved BPA, so there was, you know, a whole section about BPA and, you know, there were some claims in the Colorado case that really weren't made in the Minnesota case so they were coming out.
But if I was to break it down, I would guess that the -- I'd rather not guess. I was going to try to tell you what I spent on each one, but without the invoices that wouldn't be accurate.
Q I'd just like to go over your background a bit and I see in Exhibit B you included your CV.
I guess we can show Exhibit B. Is this CV up-to-date or is there anything you feel you should add to

Page 21

it?
A This is up-to-date. The CV is up-to-date.
Q Where did you attend college?
A Where did I attend college?
Q Yes.
A I attended and graduated from Adelphi University, which is in Garden City, New York.
Q And what was your degree in?
A It was a Bachelor of Arts in history.
Q What year did you graduate?
A 1966.
Q And have you had any -- have you earned any postgraduate degrees?
A No.
Q Do you have any certifications?
A No.
Q Do you have any licenses?
A No. Advertising people aren't licensed.
Q Have you ever performed consulting work for a pet food company?
A Not as a consultant.
When I was in the advertising agency business I worked on two dog food accounts.
Q One of them was with Gaines-Burgers?
A They weren't burgers. They were Gaines meal.

Page 22

You know what? They might have been Gaines burgers. That's quite a long time ago.
Q Okay. I was going to ask you -- we'll just call it Gaines.
When did you do the advertising work for Gaines?
A It was in the early 1970's.
Q What type of pet food was Gaines?
A What do you mean? It was a dog food.
Q Was it dry kibble food? Was it a canned food? Was it some type of --
A It was dried kibble.
Q What advertising work did you do for Gaines?
A I think we did everything that you typically did in those days. Television commercials, magazine endorsements. We may even have done radio.
You know, it's a long time ago. The things I remember best from that was television and magazine ads.
Q In contrast, has Champion Petfoods let's say before 2019 ever advertised on television?
A Not to my knowledge, no.
Q Before 2019 had Champion Petfoods ever advertised in print newspapers?
A In print newspapers? I don't believe so, no.
Q Before 2019 had Champion Petfoods ever advertised in magazines?

Page 23

A They may have -- there may have been something in a trade magazine. I don't think they did consumer advertising.
Q This is a long shot, but do you recall the ingredients that were used in the Gaines pet food diets back in the 1970's?
A No. That is a long shot. No.
Q What was the other pet food company? Ralston Purina?
A Yes.
Q When did you do advertising work for Ralston Purina?
A That was in the late 1970's. I would say 1978 through 1980. It would have been '78, '79 and '80.
Q What advertising work did you do for Purina?
A My recollection is television advertising and there may have been some magazine advertising.
Q I was going to ask you have you reviewed any actual packages of Champion pet food?
A Yes. There's a pet food store that we go to, although not for -- we don't go there for pet food. There's some other things we buy there and so they carry Acana, so that gave me an opportunity to look at the actual packages while I was in the store.
Q When was it when you were in the store and looked

Page 24

at the Acana packaging?
A I don't recall the date. We're in those stores -- we're in that store fairly frequently.
Q It was sometime after April 2020, I take it?
A Oh, definitely, yes.
I would have had no reason to look at the packages before that.
Q Have you ever looked at the Orijen packaging?
A I don't think so. I don't think that this store I'm referring to carries Orijen.
Q Which particular Acana diets did you review when you were in that pet food store?
A I don't recall. You know, they probably had three varieties on the shelf. No more than that.
Q You just don't recall what they were?
A No.
Q I take it you've done no work to compare the ingredients of Orijen or Acana diets to those of the Purina diets that you helped advertise in the late '70s?
A No.
Q Since 1980, just to be clear, had you done or had you performed any advertising work for any pet food company?
A No.
Q Now, of course, you're not a veterinarian.

Page 25

Correct?
A No, I'm not.
Unfortunately, there is a Bruce Silverman whose office -- who is a veterinarian whose office is about three miles from mine and I sometimes get calls from people who think I'm a veterinarian.
Q You're not trained as a toxicologist. Correct?
A No, I am not.
Q Okay. And you're not an expert in the subject of heavy metals, are you?
A I am not.
Q You're not an expert in the subject of Pentobarbital. Is that correct?
A Definitely not.
Q You're not an expert in the subject of bisphenol A known as BPA. Is that correct?
A That's correct.
Q And you're not an expert in pet food nutrition. Is that correct?
A That's correct.
Q And you're neither a chemist nor a biologist. Correct?
A That's correct.
Q Let's look at Exhibit C in your report, some past testimony.

MS. BACA: What page?
MR. COULSON: 109. You have Exhibit C, Page 109.
BY MR. COULSON:
Q Does Exhibit C provide all of your past testimony in the last four years from 2016 to 2020?
A It does.
Q Before 2016 had you testified in litigation?
A Yes.
Q Okay. When was the first time that you testified in litigation?
A The first time that I testified in a deposition was -- I believe it was in the year 2000.
Q Okay. And since the year 2000 approximately how many times have you testified as an expert witness in trial?
A At trial? Well, trials and arbitrations a total of twenty times.
Q Since 2000 and before today how many times have you been deposed in litigation, whether it's in regular litigation or arbitration?
A About fifty times.
Q Have you ever had any of your opinions excluded in whole or in part by a judge?
A I've never had my opinions in whole excluded, but I've had in part some parts of opinions excluded.

Q What was your understanding as to the reasoning for those exclusions?
MR. LOCKO: Objection.
THE WITNESS: I'm really not aware of many. You know, oddly enough, you know, I don't get told a lot of stuff. I discovered I'm not always told stuff by my clients.
Most recently there was a case I worked on where part of my testimony, my deposition testimony or my written report was excluded because it involved -- I used some magazine articles, I referenced certain magazine articles that appeared after the class period.
I can think of one other -- gosh, I'm wrong about that. I really can't think of others, but I know there's one or two others.
BY MR. COULSON:
Q Okay. So out of the cases in which you've testified how many of them were consumer class action cases where it was a claim that the defendant had engaged in false advertising of some type?
A Class action cases?
Q Where there's allegations by consumers that they were misled by advertising.
A Yes, I understand your question.

There haven't really been -- probably no more -- are you asking in cases where I've actually testified and deposed or at least deposed or all cases?
Q Okay. So of all the cases where you served as an expert witness in how many of them did you provide an expert report that was in a case where a consumer sued a manufacturer or distributor of product claiming false advertising?
A I don't recall. It's a lot of cases. It's not a large percentage.
Q What's the greatest percentage of the types of cases that you've provided reports and testified in?
A I would guess about 45 -- I've been retained -- I can sort of give it to you this way.
I've been retained 125 times. Some of those cases literally were just pure consulting and didn't go any further.
Some I didn't even write a report. Some were State cases where reports are not necessarily required.
I can tell you that 45 of the cases that I've worked on are trademark cases, trademark infringement cases so they wouldn't be class action cases.
About an equal number are false advertising cases, but I don't think -- actually, I'm pretty sure that they certainly were not all class action cases, and then

the balance of the work that I do involves publicity rights, advertising industry custom and practice cases where an ad agency is being sued by a former client or they're suing their client or what-have-you. I've had cases that involve the value of the media.
Q Have you ever -- before April 2020 have you ever served as an expert witness in a litigation case concerning heavy metal, whether they be cadmium, arsenic, lead or mercury?
A No.
Q Have you ever served previously before April 2020 as an expert witness in case involving Pentobarbital?
A No.
Q Before April 2020 have you ever served as an expert witness in a case concerning BPA?
A No.
Q As part of your work in this case have you spoken with any other expert witnesses or consultants engaged by the plaintiffs?
A No.
Q Have you spoken with any of the class member consumers who had purchased Orijen or Acana food --
A No.
Q -- in connection -- what were you asked to do as part of your engagement for this case?

Page 30

A Well, really the focus of my assignment was to review the claims that were on the package, the statements that the plaintiffs were alleging were false or deceptive using my expertise as a marketing expert, branding expert, communications expert to provide opinions as to whether or not those claims would have been material to consumers.

Q As part of your work in this case have you interviewed any consumers who have purchased Acana or Orijen diets in the past?

A No.

Q As part of your work in this case have you performed any focus groups -- I'll strike that.

As part of your work in this case have you performed or conducted any focus groups that tested any of the statements on the bags of Acana or Orijen?

A No, I did not.

Q As part of your work in this case have you conducted or oversaw the conducting of any consumer surveys as to any of the advertising statements on packages of Acana or Orijen?

A No.

Q Let's go to the early part of your report. Let's actually go to the introduction on Page 1.

In Paragraph 2 you provide an understanding of plaintiffs' claims.

Page 31

Did you get that from the second amended complaint or was that given to you by the plaintiffs' counsel or how did you get that information?

A You can see there's a footnote. It's from the complaint, from the second amended complaint.

Q And in Paragraph 2 it says, "I understand that plaintiffs allege that Champion intentionally packaged their dog food to include packaging claims that targeted consumers who were willing to pay premium prices based on defendants' representation and warranties that their dog food contained fresh, local and regionally sourced ingredients."

Did I read that correctly?

A Yes, you did.

Q What do you take the verb "contain" to mean in the context of this allegation?

A That the dog food is made -- that the ingredients of the dog food include fresh, local and regionally sourced ingredients.

Q Then in the next Paragraph 3 it says, "I further understand that Champion alleges defendants' packaging claims were misleading due to the, again quote, inclusion of non-disclosed and nonconforming ingredients and contaminants, end quote."

Do you see that?

Page 32

A I do.

Q What did you take nonconforming ingredients to mean?

A I took nonconforming ingredients to mean ingredients that were not necessarily fresh, were not locally sourced.

Local meaning somewhere relatively close to the place where the products were actually manufactured, and were not regional. You know, regional in the sense of the region in and around where the products were made.

Q In answering that question what is your definition of regional?

A My definition of regional based on the context here is within -- you know, relatively close to the manufacturing location, be it in Kentucky or be it in Canada.

I certainly don't -- you know, that's what I think a reasonable consumer would take away.

Q Let's go to Page 2. Actually, you see on Pages 2 to 3 there's a number of Champion products listed in the left-hand column and then Champion's statements on products in the right-hand column.

Do you see that?

A I do.

Q Have you actually reviewed the entirety of the

Page 33

packaging for all these Champion products?

A I was provided with pictures of labels and I believe that I had -- I'm almost certain I was sent pictures for each of these and I did review them.

Q Why are they not listed in your Exhibit A where you purported to list the exhibits you relied on?

A If they're not in there, that is my error.

Q So what else is not in Exhibit A that you relied on in forming your opinions?

A I can't answer that.

You're asking me what else isn't in there. I am not aware of anything that isn't in there in that list in Exhibit A.

Q Now, are you aware that at least some of these products were made both in Alberta, Canada and in Kentucky?

A Yes, I am aware of that.

Q Okay.

A But my understanding is that once from the point that Champion started producing in Kentucky that everything that was sold in the U.S. came from the Kentucky location with the exception of one or two products.

One or two Orijen products I believe they were.

Q But what is the time period for the class period

Page 34

in the Song case?

A Oh, I don't recall.

Q Do you know when the class period starts in the Song case?

A I think I just answered that. I don't recall.

Q Okay. And are you sure that you actually read the packaging of all the products as they were both made in Canada and in Kentucky that were sold in the United States during the class period?

A I'm not sure if I read the packaging for everything that came from Canada.

I think in most of the packaging that I received -- I think most of the packaging that I received was from the packaging made in the U.S.

I know I received some of the packaging that was made -- some of the pictures of the packaging that were made in Canada, but I can't say that I saw every package.

Q What does biologically appropriate mean?

A In my report I used Champion's own definition of biologically appropriate.

Do you want to go to that page and I'll be happy to read it?

Q Let's just start with the word appropriate. What does the word appropriate mean?

A The word appropriate? You're asking me to define

Page 35

the word appropriate?

Q Yes.

A Appropriate means correct.

Q Does it mean suitable?

A I think that's a good synonym too.

Q What does biologically mean?

A Biologically -- my understanding of the word biologically means that in the sense of for a in this case an animal that it is bio -- that it is -- biologically means that it relates to the systems used to fuel the body of living creatures.

Q And in this situation Champion is selling dog food. Right?

A That's correct.

Q And so does biologically mean it's suitable for a dog?

A Yes, I think that's a broad definition that it's suitable for a dog, but that is my understanding of how Champion defines it.

Q Champion provides context in its labeling on its bags. Is that correct?

A Yes.

Q And as an advertiser you agree that the context is important?

A I do.

Page 36

Q I was just curious on this. I saw that actually started attending the Albany Law School for a year and then sort of switched paths.

What led to that?

A I liked law school. I absolutely did.

The reason I was a history major, at least, you know, in the college I was at that was the recommended path for people interested in pursuing a career in law.

You know, it's history, political science, those kind of subjects.

I went to law school. I actually didn't love Albany, New York. It's not a great town, but the law school was really good.

I did pretty well and -- but it's a little weird. I didn't have a car, so I was going home for the very short spring break we had on a Greyhound bus.

I was at the bus station looking for something to read on the bus other than a law book, and I came across on a used book rack a book called Confessions of an Advertising Man. It sounded like it would be interesting. You know, the word confessions kind of set me off.

So I bought this used book. It happened to be written by David Ogilvy it turned out. I later learned it had been a New York Times Best Seller.

By the time I got off the bus I finished the book

Page 37

and I had decided that I really wanted to look into working in advertising, and I literally dragged myself from the Port Authority bus station in New York City, which is over on Eighth Avenue and 42nd Street, to Ogilvy & Mather's offices on 48th Street and Fifth Avenue. I looked them up in the phone book back when there were phone books.

Went in, went to the personnel department, told them how I read this book and that I was really interested in going to work for Mr. Ogilvie.

I was very naive. I didn't have a resume. I didn't have a background in business and they interviewed me. They were very kind. They offered me a summer job and that summer job stretched out to thirteen years.

The summer job was basically as a mail boy, and I stayed for thirteen years, and by the time I left I was on the Board of Directors and I was executive creative director of Ogilvy's New York office. I loved working at Ogilvy & Mather.

It turned out that I was good at advertising. Advertising in my experience, although they certainly teach you it in many schools, it's one of those fields that is best learned on the job.

I lecture as a guest lecturer from time to time at colleges and universities and I always say you really

Page 38

learn this on the job. It's always good to take some courses, but if I were you, and I say this to young people, I wouldn't waste my time studying advertising in college. I'd use the college experience for a broader understanding of the humanities.

Q Well, that's a great story and it sounds like you've come full circle now spending a lot of your time involved in the law.

A You're absolutely right. I've come full circle.

I find that somewhat ironic, but, you know, one year in law school I never pretended that I knew very much.

Actually, the law school was very kind. They gave me a leave of absence. They were hoping -- I was in the top five percent of my first year class -- you know, hoping I would come back. Obviously I never went back, but about the only thing I really remember from law school is the meaning of the word tort.

Q Speaking of advertising agencies, before 2007 -- actually, before 2018 had Champion Petfoods ever engaged an advertising agency?

A Not to my knowledge. I don't think so. I certainly didn't see anything about that.

Q To your knowledge based on what you've read, did Mr. Muhlenfeld have any training in advertising?

Page 39

A Which Mr. Muhlenfeld?

Q Actually, either of them, but really my question was directed toward Peter.

A I don't believe so, but I didn't see any evidence of that.

I don't recall reading very much about his background other than what might have been expressed in his deposition.

Q And did Mr. Muhlenfeld have anyone in his sort of marketing team that had any formal training in advertising?

MR. LOCKO: Object to the form. Speculative.

THE WITNESS: I don't recall, you know, the whole marketing team. I don't think it was a very big marketing team, but I don't recall their background.

BY MR. COULSON:

Q When was the first year that Champion ever had conducted a consumer survey?

A I don't --

MR. LOCKO: Objection to form. Calls for speculation.

THE WITNESS: I don't know the first year that they ever did it.

The only -- I was provided with some information which was cited in my report. I don't know if that

Page 40

was the first time they ever did anything like that or the last time.

BY MR. COULSON:

Q The information you cite in your report, sir, was from 2017.

Do you recall that?

A I don't recall the actual date. I'd have to look at it in my report.

Q Do you know whether before 2017 Champion Petfoods ever had conducted, either directly or indirectly, a consumer survey on its products?

A I don't know.

Q Now, when you were an advertising executive isn't it true that most of your clients were, you know, relatively large public companies?

A No, not necessarily.

A lot depended on which agency I worked at. During the years I worked at Ogilvy & Mather, which was thirteen years, that would be true. I think most of them were big -- most of the clients were pretty large.

They weren't all public. One of our clients, for example, is the Drakett Company. They made Drano. That was a family-owned business.

In fact, when I first started the president of the agency was the son of the owner of the Drakett

Page 41

Company. That does happen sometimes in advertising.

When I went to -- the next agency I worked at was Bozell & Jacobs. We certainly had some large public companies, American Airlines, and others were privately held and there were a few small companies as well.

At BBDO they were mostly public companies.

At Asher Gould, which I was at eleven years and which was an agency I co-owned, we had a mix and some of our clients were quite small.

We also did a lot of work for the governments, a lot of work for the State of California, State of Oregon, State of Washington and the CDC, but I had a mix of, you know, large companies, small companies.

I would say the same thing when I was at Wong Doody.

When I was Initiative Media, I was there for six years, we had some very big companies. The Walt Disney Company was our largest client. You know, more than a billion dollars a year with us.

But we also had some very small clients, some very, you know, individual owned family-owned businesses, and then, you know, in the past fifteen years as a consultant I've worked with big companies, small companies, privately owned businesses. Kind of an interesting mix.

Page 42

Q Of all the companies you've worked for as an advertising executive which was the most similar to Champion Petfoods?

A Well, the way I look at it, you know, I've already told you I worked on two dog food accounts so, you know, I can arguably say that they were similar, but I don't think they were similar.

They weren't selling premium products. I'm not even sure if there were premium products in those days. I don't recall.

I think the ones that are most similar, the way I would characterize it as a marketing expert, is products that are sold at retailers, either at mass merchandisers or specialty stores that come in packages where packaging itself serves as an advertising medium.

That would include -- that would basically include packaged goods. Packaged goods is a business category. Basically it's grocery products, things that are sold in cans, boxes, bags, things like that.

We've been going now for close to an hour and a half. Can we take a very short break?

Q Actually, I was just about to suggest that. I just have one follow-up on what you said.

A Sure.

Q You mentioned, you know, it may not have been a

Page 43

premium dog food back in the 1970's. I wanted to ask you how has the dog food industry in the United States evolved since 1980 to 2018?

A Well, you know, it's certainly clear to me now that there is a -- that there are segments in the dog food category or the pet food category, I guess, that range from what I would call popular-priced products, the kind of dog food products or cat food products that you might see at a supermarket or maybe in a big box store like Costco or Walmart, and then from moving up to premium-priced products and then even super premium-priced products.

That is consistent with a lot of marketing today where you segment based on -- in essence, on the ability -- partly on the ability of consumers to pay and partly on their desire to pay.

They're not necessarily the same.

MR. COULSON: This is a good time to take a break. Take about a ten-minute break?

THE WITNESS: That's good with me.

THE VIDEOGRAPHER: Okay, folks. I'll take us off the video. The time is now 5:55 in the UTC, 1:55 in the Eastern.

(A brief recess was taken.)

THE VIDEOGRAPHER: We're back on the video record

Page 44

now. The time is 6:04 p.m. in the UTC, 2:04 Eastern.

BY MR. COULSON:

Q Let's go back to your report. Let's turn to Paragraph 18 on Page 8.

I wanted to focus in on this Mercedes-Benz advertising statement "Engineered like no other car in the world."

What involvement did you have in developing that statement?

A I wrote that.

Q And isn't this true of every car?

A Well, I don't believe that to be true based on my experience working on car accounts, but the intent of that statement was to say it's the best engineered car in the world, which I believe to be true.

Q You can say the same of the Yugo, that the Yugo is engineered like no other car in the world. Right?

A I guess you could. I think that -- I think if Yugo was still around and if they used that, it would be laughable because I think consumers would understand the sentence to mean exactly the way we wrote it to mean that it's, you know, better engineered than other vehicles, but that's the way advertising copy works.

Q Right. Was Mercedes-Benz able to charge more for its cars than Yugo only because of your advertising

Page 45

statement or because they in fact had very good engineering?

A Well, I think the reason that Mercedes-Benz costs more than -- well, first of all, Yugo didn't exist during the time I handled the Mercedes-Benz advertising, but even if it did, Mercedes-Benz, the cost of Mercedes-Benz vehicles was a combination of their hard costs, you know, the cost of building the cars, the cost of developing the cars, the cost of shipping cars and then what consumers were willing to pay.

And consumers -- I think the advertising played a role in the consumer perception that the cars were better than -- particularly better than the Detroit cars that were available at that time.

Q Okay. And isn't the slogan similar to biologically appropriate where for any dog food being sold in the market that meets the nutritional minimum set by the regulatory agencies, aren't all those suitable for a dog?

A Well, first of all, I saw no evidence whatsoever that biologically appropriate should be defined as something that meets regulatory standards.

At least I didn't see that. I don't think that's an appropriate definition for the term as is used by Champion.

Page 46

And I've just actually lost track of what your question was. Would you mind repeating that?
Q We can take, I think you called it, a popular-priced product like, let's say, a basic Purina dog food.
Isn't just the basic Purina dry food also biologically appropriate?
A Well, my understanding of biologically appropriate is based on the definition provided by your client, which I actually, I think, I literally included it in my report.
I think that's how they want consumers to understand the term. If we take it in its broadest sense, I suppose one could say that, you know, dog foods are biologically appropriate for dogs so long as they don't, you know, kill the dogs and, you know, they don't include contaminants and things like that.
Dog foods are dog foods, I guess, but I don't think that's -- certainly that's not the intent of biologically appropriate.
Biologically appropriate as used by your client is a marketing term.
Q And, again, just looking at the words biologically appropriate by themselves -- strike that.
Let's go to Page 10 of your report. You say here

Page 47

in Paragraph 25, "One of the keys to creating effective advertising campaigns is to walk in the consumers' shoes to do everything possible to understand how they learn, think and feel about the products and services they are considering purchasing. For that reason, advertisers and agencies spend millions of dollars annually on primary and secondary research studies that provide insight into what consumers understand and believe or disbelieve about the client's brand, its products, its competitors' products, its advertising and especially relevant to this matter its packaging."
Did I read that correctly?
A You di.
Q When you were an advertising executive would you conduct or under supervision have conducted research studies to understand what consumers understood and believed about advertising statements?
A We would do studies in some instances. Certainly not in all because studies are expensive. We would do studies.
We would also use secondary source information, syndicated services, et cetera to understand consumer practices, and then you can apply what you've learned from sometimes all of those studies to other instances.
It's a little bit like understanding case method

Page 48

in your profession. You apply what you learned from Case A sometimes to Case B.
So that's what that paragraph refers to and that's the actual practice.
Q For this litigation with respect to Champion have you conducted any research studies?
A You've --
MR. LOCKO: Objection to form.
THE WITNESS: -- asked me that earlier and the answer to that is no.
BY MR. COULSON:
Q There's a Post Foods case where the Wexler law firm was representing the defendants.
Do you recall that case, doing any work for the Wexler law firm?
A I certainly worked on the -- I didn't realize the Wexler firm was associated with the Post case. I suppose they might be listed if I were ever to go back and look at the complaint, but I had no contact with them.
My contact on the Post case was with a firm actually in San Diego. Not the Robbins firm, but --
Q What about the Hadley versus Kellogg's Sales as also noted in California?
Was the Wexler firm involved representing the plaintiffs in that case?

Page 49

A I don't know. I'd have to look at the -- I'd have to go look at the complaint or any of the pleadings whether they're listed, but I didn't deal with them.
Q Looking at -- let's go to Page 11 in your summary of opinions.
In 29A let me ask you do you have any opinion that the ingredients used in Champion pet foods are not high quality?
A Well --
MR. LOCKO: Objection. Outside the scope of his report.
BY MR. COULSON:
Q Have you formed any opinion that the ingredients used by Champion are not natural?
A Well, you asked first about high quality.
I'm not sure if there's a way for me to answer this, to give an opinion that they're not high quality or they're not natural.
You know, again, my responsibility is to speak to what consumers might think, but I certainly have read, I have learned that Champion sometimes uses regrinds, and as I wrote in my report, I never even heard of the term regrinds until this case, but they don't sound high quality to me.
Q Okay. Well, sir, have you ever heard the term

Page 50

reworks?
A Reworks? Actually, I'm not sure I heard that. I'm not sure I ever heard that term before.
I guess you'd say they reworked something? Yeah.
Q Well, what experience do you have in pet food manufacturing?
A I'm not a pet food manufacturer. I'm a marketing person.
Q What experience, if any, do you have in the manufacturing of human food?
A In manufacturing of human food? I'm not a manufacturer of human food.
I've marketed an awful lot of human food or I helped market an awful lot of human food.
Q And how are regrinds used in -- well, when regrinds are used in any Champion products, how are they used?
A From what I understand, they're, you know, just included in the mix when the food is actually being formulated, so it becomes an ingredient along with the other ingredients that comprise the food.
Q And so in terms of what are the regrinds that are going to be constituted or composed of the original ingredients that are used to make the regrinds. Correct?
A I don't know that.

Page 51

I'm trying to remember exactly what I read because there was some information in e-mails and things like that, but I think the regrinds were from dog foods, but I'm almost certain that there was a statement somewhere that said they might even be regrinds from cat food.
So if it's cat food, it's not from the original dog food.
Q Are you aware that cats are -- are you aware that cats are carnivores just like dogs?
A I am. I owned cats.
Q So do you know if there's any differences in the formulations of certain Champion cat food diets as compared to dog food diets?
MR. LOCKO: Objection.
THE WITNESS: I don't know. I don't know the difference.
Again, I think -- I made no efforts to learn about their cat food products.
BY MR. COULSON:
Q Do you have any opinions as to nutritional value of the regrinds as used sometimes in Champion pet food product?
A I don't have an opinion, no.
I would have to be a nutritionist, I suppose, to

Page 52

have an expertise in that area.
Q Does Champion advertise that the pet foods are composed of 100 percent natural ingredients?
A I don't believe I ever saw that, no.
Q Let's go to Page 12. I was going to ask you up here at the top you refer to sourced from local or regional suppliers.
What is your opinion as to what does local mean in the context of Champion Petfoods' packaging?
A Well, you know, my expertise is purchasing behavior, so my opinion about what local means would be what a consumer would take it to mean, and local would mean close to the place where the product is manufactured.
Q What does regional mean then?
A Same. Regional would be -- you know, local generally speaking is very close.
Regional is somewhat wider. In my industry, for example, radio stations or television stations might be local. They might be limited to ten or twelve miles from wherever they're being transmitted, and then regional they could be a lot bigger because they have repeaters.
So when I say a lot bigger, the region might be Southern California versus the city or county of Los Angeles, but I think that's how consumers think about those.

Page 53

Based on my experience that's certainly how they think about it. Local means close. Regional means relatively close.
Q Well, what's the objective verifiable metrics to determine whether an ingredient is, you know, local or regional?
A Well, I don't know what -- I really don't know how to answer that to say if there's a specific metric.
You know, my expertise is how consumers tend to think and what they're used to, et cetera, what they think about products, and I think that they would think about regional generally speaking as within, you know, maybe within a hundred miles, but that's based on my experience.
I don't know if there's an official metric, but it certainly wouldn't be thousands of miles away.
Q Okay. Let's say is the area around Boston, Massachusetts regional to Western Kentucky or the --
THE REPORTER: Or the what?
MR. COULSON: I'll restate it.
BY MR. COULSON:
Q Is Boston, Massachusetts area regional to the location of the Kentucky DogStar Kitchen for Champion Petfoods?
A I don't believe consumers would see it as regional to Western Kentucky, but I also understand that

Page 54

if you're selling -- if you're utilizing fish that comes from Atlantic waters, that cannot possibly be associated with Western Kentucky and I think consumers would understand and appreciate that.

Q What about lakes and rivers in Idaho? Would that be regional to the DogStar Kitchen in Kentucky?

A I don't believe it would be, no.

Q What about --

A I think that -- I think that a reasonable consumer when you're talking about freshwater fish and they're being told that the product is being regionally sourced would assume that the products, the ingredients, the fish ingredients would be coming from a lot closer to home than Idaho.

Q What about South Carolina? Would that be regional to the DogStar Kitchen in Kentucky?

A I'd have to look at a map to figure out how close South Carolina is to Kentucky, but I don't think so.

Q Okay. What about Ohio? Would Ohio be regional to Kentucky?

A It could be. I know that Kentucky and Ohio are contiguous states. I have been to Cincinnati and I recall actually driving across a bridge into Kentucky.

Q Is your definition of regional based -- is your definition of how consumers would perceive regional to be

Page 55

based on anything other than your personal opinion?

A It's not based on my personal opinion.

It's based on my professional opinion and my expertise in dealing with consumers.

You know, Champion is certainly not the only company that ever markets products where they speak about, you know, being -- that their products are made or sourced close to home on a regional basis or a local basis, but I think consumers would define local or regional as very close to the place where the product is made and shipped from.

I think that's a reasonable interpretation how consumers -- based on my experience, that's how consumers would see it.

Q Have you formed any opinion as to what amount of regional or local ingredients were used to manufacture the various Orijen and Acana diets?

A You're asking if I formed an opinion as to the percentage of local and regional ingredients in the two brands?

Q In the diets under the two brands.

A The diets under the two brands. I haven't formed an opinion about that.

I've looked at -- in some cases, you know, you can see that ingredients have come from other places that

Page 56

are not local or regional.

Q My question is isn't it a fact that the Acana diets and Orijen diets actually contain a material amount of regional ingredients?

A In most cases -- in most cases I would say that they do have local and regional ingredients, a material percentage.

It depends on the diet. I think that I -- you know, you asked about Boston, and my understanding is they get fish from the northeast, from the Atlantic waters in the northeast.

I wouldn't say that's regional, but I also think that there's no other way to do that or at least I wouldn't be aware of any other way to do that.

I don't know how you have saltwater fish in Kentucky.

Q Let's go to Page 14 of your report. I want to focus on the work you did for -- is it Pace picante sauce?

A Yes, Pace picante sauce.

Q And you were the lead for that advertising launch?

A Well, yes, I was the creative head of that. I was with Bozell & Jacobs at that time, and as it happens I literally, you know, originally wrote the original advertising -- I wrote the original commercials and I

Page 57

produced the original commercials.

Q Let's go to Page 15. As an advertising executive were you aware of the ingredients in the picante sauce?

A Yeah, I was, actually. I spent quite a time at their facility in San Antonio. It was a privately held company. It was a family-owned business at that time, and they took me through the entire process of how they made the products, et cetera.

Q Okay. So did you actually create the slogan yourself or this language "Pace is made in San Antonio with fresh vegetables and spices by people who know what picante sauce is supposed to taste like"?

A I wrote that, yes.

Q So when you said Pace is made in San Antonio, I take it that's the manufacturing facility that created the end product. Is that right?

A That's correct.

Q You were not implying that all of the ingredients were also made in San Antonio, were you?

A No, I was not implying that. I said it was made in San Antonio.

Q So it says, "Pace is made in San Antonio with fresh vegetables and spices."

I want to stop right there. So the verb before the preposition is "made with fresh vegetables and

spices."
Would you agree with that?
A Yes.
Q And does "made with fresh vegetables and spices" mean that fresh vegetables and spices are the exclusive ingredients in the Pace picante sauce?
A I don't think they were the exclusive ingredients, no.
Q In fact, there were ingredients in addition to fresh vegetables and spices in the Pace picante sauce. Is that correct?
A I believe that's true. I haven't actually looked at a Pace label in a lot of years.
Q Do you know whether Pace continued with that same -- you know, the same ingredients for a long time after 1982?
A I have no reason to believe they made substantial changes, but I also know that the Pace Food Company was sold to Campbell Soup so I have no idea what -- I have no idea whatsoever what Campbell did with it.
It does taste the same. I continue to use the product.
Q Did you do any evaluation of whether in fact the ingredients used in Pace picante sauce were superior to those of competitors?

A The ingredients? No.
Q Did you do any evaluation of whether in fact the product was superior to competitors?
A Well, if you're asking if we did scientific evaluations, the answer would be no, but I will tell you that Pace became the number one selling salsa in America so consumers thought it was better. They had choices.
Q And when you created this language that we've just covered did you run it by focus groups?
A I don't believe we did, no. I have no recollection of focus groups.
Pace was a small family-owned business and they trusted us to know or at least use our best efforts based on our experience to come up with advertising that would appropriately promote the product.
Q Let's turn to Paragraph 41 on Page 16. If you look on Paragraph 41 you refer to the following. You state in the last sentence, "At focus groups consumers told us the price differential was fair and reasonable," and so I ask you did you in fact use focus groups in connection with the development of the television advertising for Pace?
A The focus group -- you asked about did we use focus groups to help create the original advertising. As I said, the answer to that is no.

But we did do focus groups later, and the reason for that was when Pace was launched it was only sold in the State of Texas and it was unusually successful, and so we started expanding our advertising, and one of the things that we were concerned about as when we went into particularly the northeast was this advertising with the consumers were they going to be impressed about it being made in San Antonio, et cetera, so those focus groups were probably done eighteen months later.
We were somewhat concerned with New Yorkers who would think we were insulting New York City, but they were asked and we continued using it. They continue to use it even now.
Q Let's go to Page 20. Here you discuss humanization of pets.
Have you heard of the concept of anthropomorphism?
A Yes.
Q What is anthropomorphism?
A Anthropomorphism is where people will take sometimes an inanimate object and look at it in terms of human qualities.
Q Sometimes they take animals and look at it in terms of human qualities?
A I think that's true. I think humanization of

pets I think is basically speaking to anthropomorphism, although it's not a word I used in this report.
Q But when you looked at the approach that Champion Petfoods was using, isn't it geared toward feeding dogs the way their ancestors would have eaten in the wild?
A Yes. Well, that's certainly the way they talk -- that's basically how they define biologically appropriate, but I don't think that's inconsistent with the humanization of pets idea.
The humanization of pets idea, as I understand it, is to -- it's in many ways in which you treat a pet, and part of that is wanting to give your -- if you want to give your family the best possible nutrition, best possible food, best possible way of life, then you extend that to your dog or cat.
I don't feed -- I don't feed -- we don't feed Ali -- I don't think the food that we feed Ali is the equivalent to the way biologically appropriate seems to be defined by Champion, but I will tell you we certainly treat Ali as a member of the family and we try to do the best things we can do for her all the time.
Q Let's turn to --
A That would have applied to all of Ali's predecessors.
Q Let's turn to Page 21. In Paragraph 55 you

Page 62

state, "According to NPD, a leading market research company, 90 percent of U.S. consumers read the nutrition labels on packaged food products. Consumers are interested in the content of the foods they eat and the nutrition facts label is the best source for this information says Darren Seifer, NPD food and beverage industry analyst."

I want to stop there. In forming your opinions here are you assuming that most of Champion Petfoods' consumers actually read the ingredient panel labels on the back of the package?

A I think at least in my experience consumers tend to -- you know, consumers that read labels, particularly the back labels, whether they're looking at a box of cereal, they're looking at a jar of peanut butter, what-have-you, they tend to follow the same patterns, and it seems to me that based on this information that 90 percent of the consumers check out nutrition labels, that consumers that are willing to pay premium prices for dog foods and treat their dogs as members of the family would at some point check out those nutrition labels on the back of the packages as well.

Is it 90 percent? I do not know that.

Q Do you recall seeing language on Champion packages that encouraged consumers to read the ingredients

Page 63

in saying something like "Read our ingredients and we think you'll agree"?

A I do recall that.

Q Let's go to Page 22. Let's scroll this up just a bit.

Let's look at Paragraph 56. Here you point to some statistics about premium dog food purchasers and you say, "It should come as no surprise that as illustrated by the chart above a significant percentage of dog food consumers pay close attention to labeling claims as well, particularly those that one way or another reference ingredients or processing techniques that communicate healthiness."

Do you see that?

A Yes.

Q Are you familiar with the educational level of Champion pet food purchasers?

A I don't recall if I saw that kind of demographic information.

I may have. I just don't recall at this point.

Q But you know -- where do you place the Orijen and Acana pet food in the marketplace? Would they be premium-priced or super premium-priced?

A My understanding is that Acana is a premium-priced product and Orijen are super premium-priced

Page 64

products.

Q Let's go to Page 23. You'll see up here at the top a reference to a 2017 market study conducted on behalf of Champion by the market research firm Leger, L-e-g-e-r.

I asked this question earlier, but I want to just make sure we're clear on this.

Before this Leger marketing study in 2017 had Champion ever commissioned a prior marketing or consumer survey?

A I don't recall.

Q You're not aware of one. Right?

A I don't remember whether I saw one or not.

Q Well, in your report do you refer to any marketing study before the year 2017 that was conducted on behalf of Champion?

A I don't think I did, no.

Q Let's go to paragraph -- let's go to Page 24.

This is Paragraph 60. You state, "Champion took the information from Leger and other market data sources it may have had to heart." I'm going to stop you there.

What other market data sources did Champion have that it took to heart?

A I don't know and that's why I wrote the sentence the way I did. It may have had. It may have had other -- they may have done other surveys and they may have had

Page 65

some information that they relied on.

I didn't want to say that they absolutely did or didn't so I incorporated the words "it may have had."

Q When was Orijen developed?

A I don't recall.

Q When was the first year that Orijen was sold in the United States market?

A I don't recall.

Q When was the first time that Acana advertised -- was advertised as biologically appropriate?

A I don't recall when that began.

Q Well, how could Champion have taken the Leger survey to heart in doing its marketing if the Leger survey occurred in 2017 and Orijen was developed in 2006?

A Well, if the product was launched in 2006, they either had beliefs, they had some understanding -- excuse me. They may have had some understanding about the market they were attempting to reach, but certainly from the point -- this most likely helped confirm some things they were already doing.

You know, it's not unusual for a company, especially what appears to me to be a family-owned business, at least at this point, at the point in 2016 or '17 for a family-owned business to, you know, use information that they learned along the way.

Page 66

Usually you can't build a successful business just on a whim and whimsy. You have to, you know, use things you learn along the way from your customers, from the marketplace.

Here the Leger survey apparently provided them with harder data. You know, more quantitative data which would help steer them going forward and it probably confirmed much of what they were already doing.

Q Let's turn to Page 25. In Paragraph 62 you have a reference to Peter Muhlenfeld and Michelle Granger.

Were you aware that for many years Mr. Muhlenfeld and Miss Granger were the only marketing employees at Champion Petfoods?

A No, I was not aware of that.

I suppose you can have a director of marketing without a staff. I have seen that in small companies and I guess this is a small company.

Q Then in Paragraph 63 you refer to a May 24th, 2017 internal e-mail at Champion where if you look at the last part it says, "Our ability to source transparently, put in parenthesis, named sourcing, 100 mile diet, end paren, and leverage our local smaller suppliers gives us the great advantage."

I want to ask you did Champion ever advertise on its packaging that it was sourcing within 100 miles?

Page 67

A I don't recall ever seeing that, no.

Q Do you know whether this was a concept the company internally discussed but never actually implemented?

A I don't know.

Q Let's look at Paragraph 64. You'll see at the end here the last sentence states, "Individually and collectively the challenged statements match up well with one or more of the product attributes that rank highly with pet lovers inclined to purchase premium-priced dog food such as higher inclusions of fresh meats locally sourced from trusted suppliers." I'm going to stop there.

Sir, can you identify any other premium-priced or super premium-priced dog food sold in the United States that have higher inclusions of fresh meats locally sourced than does Orijen or Acana?

A No.

Q Let's go to Page 27. In Paragraph 69 you state, "That is why the challenged statements in this matter are so material to consumers. They communicate why Champion's products are allegedly so much better than other dog foods making them worth their extraordinarily high price points."

My question for you is do you have an opinion, sir, that there are any other dog foods sold in the United

Page 68

States from the period of 2014 through 2018 that are better than Orijen or Acana?

A No.

Q Let's go to Paragraph 28. I'm sorry. Page 28. In Paragraph 72 you state, "In this instance Champion's statements convey usually individually and especially together and in the context of other packaging elements the message that Champion's products are superior. These messages are material to a substantial number of consumers in that they provide support for their exceptionally high price points."

I wanted to ask you what do you mean "in the context of other packaging elements"?

A Well, as I said, the statements -- you know, you can take the individual statements and the individual statements are basically, the way I look at it as a marketing communications expert, they're superiority statements. They're statements that say here's why we're better. We being, you know, the product is better or the brand is better, but consumers, you know, hardly ever, you know, they don't ignore other statements on the products.

So you take the statements individually, then you combine them with other packaging statements and you get a context, and, you know, the context here is that these are exceptional products. That the ingredients are

Page 69

exceptional and here's some reasons why, you know, these products -- that you should favor these products.

They're tapping into things that they appear to know and understand the consumers are very interested in and that consumers believe to be better.

So it's -- you know, context simply means you add it all together. You know, you take it -- you don't just take a word or two, but you add them together with other statements on the package.

Q Let's go to Page 31. So we discussed this a little bit earlier.

In the bottom part of Paragraph 80 there's a statement here about, you state, "The copy block concludes, "Prepared in our Kentucky DogStar Kitchens from fresh local ingredients, this delicious and biologically appropriate food is guaranteed to keep your cherished dog healthy, happy and strong -- read our ingredients and we think you'll agree.'"

That's an example of Champion actually encouraging its consumers to read the ingredient panel and its specific ingredients.

You'd agree with that?

A Yes.

Q The statement about guaranteed to keep your cherished dog happy, healthy and strong, you'd agree

Page 70

that's sort of an aspirational opinion and not something that can be verified?

A Well, you know, they do use the term guaranteed, but I would agree it is aspirational.

I think consumers, dog lovers or pet parents, as that term is now used, they really do cherish their dogs and they want them to be healthy.

Healthy, particularly healthy and they want them to be happy and strong and one way you achieve that is by feeding them good stuff.

Q Paragraph 82 you refer to information seekers.

Wouldn't you agree that in general the consumers who purchase Champion Petfoods with those price points are information seekers and they would want to read as much as they can about the product?

A Yes, I think that actually that's what that paragraph refers to.

Q Then in the last sentence of Paragraph 82 you state, "On its website Champion defines biologically appropriate as, again, quote, 'Food that mirror the diet that nature and evolution intended dogs and cats to eat. This means high amounts of protein from real animal ingredients and as few carbohydrates as possible.'"

Do you see that?

A Yes.

Page 71

Q Isn't it a fact that Champion's diets do include high amounts of protein from real animal ingredients?

A That's my understanding, yes.

Q And the carbohydrates actually are listed on the front of the package as far as what the limited amount of carbohydrates are. Do you recall that?

A Yes, I would agree with that.

Q Okay. Then in Paragraph 83 you refer to a management presentation.

Isn't it true this management presentation was never actually presented to any consumers?

A I would assume it was not presented to consumers. I don't know that, but it's a management presentation and in my experience management presentations aren't handed out to consumers.

Q Let's go to Page 33. You say in the first sentence of Paragraph 85 on Page 33, "Marketers refer to a term like biologically appropriate as a branded ingredient."

What do you mean by a branded ingredient? Because biologically -- well, let me ask you another question.

Doesn't biologically appropriate advertise the qualities of the finished food product?

A Well, again, biologically appropriate -- my

Page 72

understanding of biologically appropriate as it is used by Champion really speaks to the idea of a whole protein diet, very high in protein, very low in carbohydrates.

So, you know, that's what biologically appropriate means. A branded ingredient is not necessarily an ingredient per se. That's a term, a marketing term and it's a way of thinking about how you promote a product, and the way you sometimes promote a product is by culling out one aspect of the product that you can make distinctive and kind of make your own and, therefore, communicate, hey, we're different and better or this product or the service is different or better.

I think that the way Dr. Aaker defines it, which is in quotes there that follows, is a pretty good definition.

Now, from a marketing standpoint, from a branding standpoint, you know, it's very clear to me that biologically appropriate is the -- that's what Champion hangs its hat on to say, hey, this is what makes us different and better than other products, and so in the world of marketing that would be referred to as a branded ingredient even though, you know, if you take the word ingredient very narrowly, it means a specific item that goes into a product, but that's not what a branded ingredient means.

Page 73

Q It's no different than the analogy here to Chevron's use of Techron in its gasoline to biologically appropriate.

Techron is just one component of the gasoline that Chevron sells. Correct?

A Well, that's what they say, yes.

MR. COULSON: Now at this time let's take a ten-minute break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Okay, folks. I'll take us off the video now.

MR. LOCKO: David, do you mind? It's noon here on the west coast. Do you mind if we take a half-hour for lunch?

MR. COULSON: Yes, I suppose that's fine.

THE VIDEOGRAPHER: Okay. I'll take us off the video. The time is 6:56 in the UTC, 2:56 p.m. in the Eastern. We're paused. We're off the record.

(A luncheon recess was taken.)

THE VIDEOGRAPHER: We are back on the video record now. The time is 7:35 p.m. in the UTC, 3:35 Eastern Standard Time. Please continue.

BY MR. COULSON:

Q Sir, I'd like to turn back to Exhibit 1, which is your expert report in this case and turn to Page 34. Ms.

Page 74

Baca will put it up on the screen.

THE VIDEOGRAPHER: Maybe I should take us off the video, sir, if that's okay. I'll take us off the video. The time is 7:36 p.m. in the UTC, 3:36 in the Eastern.

(Discussion had off the record.)

THE VIDEOGRAPHER: We're back on the video record now. The time is 7:37 P.M., 3:37 Eastern.

BY MR. COULSON:

Q Okay, sir. We're back from the break and I wanted to focus back on Exhibit 1, which is your report and specifically Page 34, Paragraph 87.

You reference a 2018 product strategy document. Do you see that?

A In Paragraph 87?

Q Right. Last line.

A Oh, okay. Yes.

Q This was one of the documents provided to you by counsel. Correct?

A That's correct.

Q Do you know who the author of this 2018 product strategy document was?

A I do not.

Q Do you know whether the product strategy document was actually ever implemented?

Page 75

A I do not.

Q Were you aware that this was simply a draft that was prepared by Mr. Muhlenfeld at the time he retired from the company?

A I did not know that.

Q Focusing on Paragraph 88 and the graphic you provided, which is Figure 10 from Orijen Original you see where it says "Grown close to home. We focus on local ingredients that are ethically raised by people we know and trust and deliver to our kitchens fresh or raw each day"?

Did I read that right?

A Yes.

Q Okay. In your opinion based on the reasonable consumer what does focus mean in the context of this sentence?

A It would mean -- I think a reasonable consumer would interpret that to mean that most of the ingredients, particularly the most important ingredients, the primary ingredients would have been raised locally, be they meat products or the vegetables or fruits.

Q And what metrics would you apply to objectively verify whether that statement is true or not?

A I wouldn't have metrics. I can't do it that way.

The question you asked before is what I thought a

Page 76

reasonable consumer would take that to mean, and I think they would take it to mean that "most of." I think those words would come to people's minds.

Q Well, you can say -- when you're an advertising executive you could say you focused on, for example, like automobile companies but you may do advertising for companies in a number of other industries, right, so isn't that common someone says they focus on something, but that doesn't preclude the fact they do other things? Would you agree with that?

A Yes, I would agree with that, although your example isn't very good as far as the advertising business goes unless you're an agency that, you know, primarily works on car accounts. Most don't do it that way.

But, you know, the focus means what -- you know, in the context of talking about -- in the context of this particular sentence I believe that a reasonable consumer would interpret this to mean that, you know, we try to use, primarily use local ingredients, you know, raised by people we know and trust.

Q Do you have an opinion as to whether Champion in fact did focus on local ingredients?

A I think they tried to do that when they could.

Q I asked you some questions before about whether certain locales would be considered local or regional.

Page 77

Focusing -- well, returning to the DogStar Kitchen in Western Kentucky, would Nebraska be considered regional to you?

A I don't think it would be considered regional to me and I don't think it would be considered regional to consumers that have focused on, you know, the Kentucky kitchen where Kentucky is.

Unless my sense of geography is really off, I don't think that Nebraska is contiguous to Kentucky.

Q So your definition of local is that -- or your definition of regional is that it has to be from Kentucky or a state contiguous to Kentucky?

A Well, I'm telling you what I think consumers think, and based on my experience the consumers would think of regional -- well, local would mean very close to home and regional would mean relatively close to home.

I don't think that most consumers would think that -- in this instance that ingredients coming from Nebraska would necessarily be viewed as in the same region as Western Kentucky.

I just don't think people would see it that way, not based on my experience with consumers.

Q Let's go to Page 35. In Paragraph 92 you'll see an advertising statement that reads "Unmatched regional ingredients fresh or raw."

Page 78

Do you see that?
A Yes.
Q In your opinion what does unmatched mean in that context?
A I think it's a statement of superiority. I think it's basically saying there's nothing better out there.
If you wanted to take it very literally, it could even mean, you know, that there's nothing else -- I think it's a statement of superiority. This is, you know, the best.
Q And would this be something -- would the use of the adjective unmatched be something that you would consider to be puffery?
MR. LOCKO: Objection. Calls for a legal conclusion.
THE WITNESS: I can only give you the way advertisers, advertising people define puffery and I'm not sure if that's defined the same way in a legal context, but I've been encountering the term puffery almost my entire career.
The way advertising people describe puffery is it's a statement that can't be proven, but usually it's a statement of superiority that can't be quantified.
So if -- in this instance it may be puffery or it

Page 79

may not be puffery. I'm not sure, you know -- because it's regional ingredients I'm not sure what ingredients we're speaking of here specifically.
I think it's just a statement that says really these are the best we could get.
BY MR. COULSON:
Q I asked you a similar question earlier, but I'll ask it again. Maybe slightly different wording.
Can you identify any other dry kibble food, pet food, dog food -- strike that. I'll start over again.
Can you identify any other dry kibble dog food sold in the United States from 2014 through 2018 that had a higher amount of regional ingredients that were fresh or raw included in the food -- I'll ask the question again.
Can you identify any other dry kibble dog food sold in the United States between 2014 and 2018 that included more fresh or raw regional ingredients than did Acana or Orijen?
MR. LOCKO: Objection. Outside the scope.
THE WITNESS: Yes, I can't -- I cannot identify them.
BY MR. COULSON:
Q Let's go to the bottom of Paragraph 92 on Page 35. You circle -- if you look at the image of the packaging, you'll see a yellow circle toward the bottom

Page 80

which is indecipherable on the screen, but if you look at the bottom of Paragraph 92 you state what it says.
Quote, "Kentucky's fertile farms and orchards, hyphen, our source of" -- let's go to the next page. Let's see. "Our source of inspiration and fresh regional ingredients."
You see that. Right?
A I do.
Q Have you seen that on other packages produced from the DogStar Kitchen in Kentucky that will say America -- it will say something like "America's farms and ranches are our source of inspiration for fresh and raw ingredients"?
A I may have.
Q Let me try to find an example. Just one second.
A Okay.
Q I'm looking at images from Acana Meadowlands, and on the bottom left on the front of the bag this one says "America's fertile farms and meadows, our source of inspiration in fresh regional ingredients?"
When that language appears, in your opinion how does that qualify the regional statement?
A Well, you know, the way I would interpret it is, you know, America is a source of inspiration.
I believe that America can be a source of

Page 81

inspiration in many ways, but I think the fresh regional ingredients in the context of America may change the meaning of fresh regional ingredients from something as specific as Kentucky because there's regions in the United States where certain things are grown that might not be available in Kentucky and so you go and get those regional ingredients.
I think that would be a fair interpretation.
Q Let's go on to Page 36. In Paragraph 93 you refer to some quantification that Champion does about fresh or raw ingredients in connection with meat math.
Do you see that?
A Yes.
Q To you are fresh and raw synonyms to mean the exact same thing?
A Excuse me. I think in my report I very specifically said that I don't believe the words fresh and raw are synonyms for each other.
You can have raw products that are most certainly not fresh.
Q Okay. Can raw products be ones that were frozen, let's say, shortly after the animal was slaughtered or the fish was caught?
A Again, in my experience consumers think of frozen foods or frozen ingredients differently than they think

Page 82

about non-frozen ingredients.

And, again, I think I mentioned in my report you go to the local supermarket and you go to the meat and fish and poultry department, the fresh department and there's all this fresh product out there, at least what appears to be fresh, and then you go to the freezer case and there's frequently frozen versions of the same things or similar things.

So I think consumers differentiate between fresh and frozen. Certainly I think there is a belief by consumers, particularly with products they buy in supermarkets that fresh frozen -- that certain products are -- certain frozen products are frozen when they're fresh and hopefully that maintains the freshness.

If you don't mind, give me one moment. I just want to chase the guy who's making noise away from my window here.

Sorry about that.

Q Doesn't raw mean uncooked?

A That's my understanding, yes.

Q Are you familiar with an organization called AAFCO?

A No.

Q Are you familiar with how various states regulate pet food packaging?

Page 83

A I am familiar that there is some regulation. I can't say I'm familiar with the regulations themselves. It's not my area of expertise and it's not what I was retained to speak about in this case.

Q In connection with your work in this case have you reviewed AAFCO's definition of fresh?

A I have not, no.

Q In connection with your work in this case have you reviewed AAFCO's definition of raw?

A I have not, no.

Q Do you have an opinion about the nutritional value or -- strike that.

For an ingredient which is fresh frozen, that is, let's take a fish, it's caught, thrown on ice, taken back to harbor and put in ice with other fish where it becomes frozen, do you have an opinion as to the nutritional quality of that ingredient versus the nutritional quality of a fish that was caught but then refrigerated until it was used in the processing of a finished food product?

A Not as an expert, no.

Q Let's talk about meat math.

Have you seen statements on the back of packages that refer to fresh raw or dehydrated ingredients?

A Yes, I have.

Q Have you seen similar statements that say fresh

Page 84

raw or dried ingredients?

A Yes, I have seen that.

Q You'd agree that a dehydrated ingredient is not fresh. Correct?

A That is my understanding of what a dehydrated ingredient is, yes.

Q You'd agree that a dried ingredient is not fresh. Correct?

A Yes.

Q So when fresh, raw or dehydrated is used in a sentence, doesn't that tell you that raw means something different than fresh?

A Could you just restate that question?

Q Yes. When the words fresh, raw or dehydrated are used in a sentence, that does connote that raw means something different than fresh?

A Yes, I would agree with that.

Q So from the context of pet food what is the difference between fresh and raw?

A Well, again, I think that you can have products that are raw that aren't fresh and so you could also have obviously products that are raw that are fresh.

So I think raw and fresh have different meanings.

Q But raw can be ingredients that were frozen when the food was fresh and never processed or otherwise

Page 85

cooked. Isn't that right?

A Yes. That's my understanding, yes.

Q Now, you're not implying in Paragraph 95, for example, that raw ingredients used by Champion are the equivalent of, you know, frozen food sold at a grocery store?

A No. I think there's a difference.

When you're talking about frozen food, Bird's Eye products or what-have-you, that are processed differently. Everything about them is quite different.

Q Let's turn to Page 37. So you start off Paragraph 96 by stating, "My responsibility as an expert witness in this matter does not extend to opining on the reliability or truthfulness of the challenged claims."

Is that correct?

A That's correct.

Q But what's confusing to me is you then go on to say, "But I've seen evidence regarding Champion's statements that definitely raised my eyebrows," and you go on to comment about company e-mails and testimony, so how do you reconcile the commentary you provided in your expert report with you telling us that your responsibility does not extend to opining on the reliability or truthfulness of the challenged claims?

A You know, I'm not providing an opinion about the

Page 86

truthfulness or reliability of the claims.

You know, to me that would mean that I would be saying in my opinion the challenged claims are untrue, in my opinion the challenged claims are untrue or deceptive or false.

I'm not doing that. That's not my job.

My job is to comment on what consumers -- how consumers would react to those claims and whether or not those claims would be material to them in terms of making a purchase decision.

Having said that, you know, and the reason I said it raised my eyebrows all that's doing is saying this is information that I found interesting and I thought was worth pointing out.

That's all it is and I do think it's interesting and worth pointing out. It helped -- it helps explain my opinions regarding the relative -- how consumers would respond to the claims if it turned out that the allegations made by the plaintiffs are correct about whether or not these claims are true or not true, et cetera.

I don't see that as an inconsistency.

Q In Paragraph 96 you refer to a 2006 e-mail chain that involved Mr. Muhlenfeld and Mr. Ogbanna, O-g-b-a-n-n-a, and you talk about the word freshly made.

Page 87

My question for you is do any Champion packages use the phrase "freshly made"?

A I don't recall seeing that, no.

Q Wasn't the discussion in that 2016 e-mail that Mr. Muhlenfeld was frustrated that competitors were claiming that its food was freshly made even though they were making it out of frozen ingredients?

A I don't recall the complete e-mail. If you want to put it up on the screen, I'll be happy to reread it.

Q Anyway, is it possible you misinterpreted what the chain of e-mails were speaking about?

A I don't know. I can't say that without reading it.

Q Let's go to Paragraph 98. I'm sorry. Page 38.

Let's look at paragraph -- the bottom part of Paragraph 97.

You talk about you having personally visited markets in small towns in Egypt, China, Vietnam, Cambodia, Brazil and Paraguay where you say "raw meat was most certainly not always fresh. The nose knows."

What are you referring there in terms of raw meat?

A My wife and I like to travel. We travel a lot. We go to some rather interesting places, and what we always -- we try to get off the beaten track when we can.

Page 88

It's always great to see the pyramids or Abu Simbel or the Great Wall, but sometimes you want to get in to see how people really live.

So in many of these small towns in these places, in fact not only in small towns, in parts of big cities in these places you see raw meat, and it is just -- it doesn't take an expert to say that that raw meat is not fresh. You can smell it half a block away.

Q But I take it that the meat was not being preserved by refrigeration?

A If it was being preserved at all, it might have been sitting in some cases on a bed of ice, but in many cases it was just laying there for who knows how long.

Q It's considered raw, though, still because it's uncooked. Correct?

A It sure looked raw to me, yes.

Q And does fresh mean that it is preserved by no more than refrigeration?

A That's what I would take it to mean, but it's not just refrigeration. Fresh -- there's a point at which I suppose it could start sitting in the refrigerator for a while that it ceases to be fresh. Actually, I don't suppose. From personal experience I know that to be true.

Q So wouldn't it be true that something that's been fresh frozen soon after, for example, the animal is

Page 89

slaughtered the meat was frozen, could that be higher quality from a nutritional standpoint than meat that was placed into a refrigerator for a long period of time?

MR. LOCKO: Objection. Outside the scope.

THE WITNESS: It's outside the scope and it's outside my area of expertise.

BY MR. COULSON:

Q In Paragraph 98 you refer to a document titled President's Club.

What was the date that document was created?

A I don't recall.

Q Who was the author of that document?

A I don't recall.

Q From reviewing that document doesn't it appear to be a document that was actually created by someone who did not work for Champion Petfoods?

A I don't recall.

Q You refer to Miss Washington, Julie Washington in Paragraph 100.

I think I asked you this before, but I'll ask you again. When did Miss Washington actually start working at Champion Petfoods?

A I don't recall.

Q Do you know whether she had any involvement in any of the advertising statements that appear on the

Page 90

Champion pet food diets at issue in this litigation?
A I don't know.
Q If you'll go to Page 39, Paragraph 101. You state, "In my opinion, consumers would disagree that it would be appropriate to use the word regional to refer to the whole United States."
Is that your opinion?
A Yes.
Q And what's that based on?
A It's based on my experience in dealing with consumers.
Q You say, "Like my prior examples for Pace picante sauce and Andeker Beer, Champion's packaging repeatedly emphasizes its local Kentucky or Alberta suppliers as the source of their regional ingredients, not the entire United States or Canada."
Did I read that correctly?
A Yes.
Q Isn't it true that some of the diets' packaging actually refers to the Americans or America as the source of inspiration and for the products produced in Canada refers to Canada or Western Canada as the inspiration source of the ingredients? Were you aware of that?
A I am now. I was aware of that, except that's -- okay. Go ahead. I'm sorry. You're asking the questions.

Page 91

Q Looking at Page 103 -- I'm sorry, Paragraph 103 again you refer to this 2018 product strategy document that had a statement about heavy metals in connection with fresh regional ingredients as a possible key differentiator, and my question again is do you know whether that suggestion was ever implemented by Champion Petfoods?
A I do not.
Q Do you know whether the scientists at Champion Petfoods told the author of the 2018 product strategy document that it's scientifically impossible to remove heavy metals from the ingredients?
A I do not.
Q Let's go to Page 40. In your opinion what does "nourish as nature intended" mean?
A Nourish as nature intended in this context I believe nourish as nature intended refers back to biologically appropriate and the way from my understanding of what Champion means by biologically appropriate.
Q What does "delivering nutrients naturally" mean?
A The word that sticks out for me there is naturally appears to be making a claim that these are natural products or that the nutrients in the products, which I take to mean certain ingredients are natural, natural products.

Page 92

Q Well, the word naturally is an adverb modifying the verb delivering. Do you agree with that?
A Yes.
Q And isn't the statement telling consumers that Champion's products are providing nutrients through natural ingredients without adding supplements the way typical pet foods do?
A I don't know if typical pet foods add supplements or not, but I would agree that this is saying that it doesn't include artificial ingredients as a supplement. That would be my understanding.
Q For this litigation assignment what did you do to educate yourself about the way most pet foods in the market in 2014 through 2018 were providing nutrition as compared to Champion's approach?
A That was not part of my assignment.
I was not -- my assignment here was not to become an expert or to claim expertise about how pet foods are formulated or particularly how Champion's stacked up against other products.
My job was to explain how a reasonable -- how reasonable consumers, a reasonable consumer or consumers would understand and interpret the statements on the products and whether or not those statements would be material to them in making a purchase decision.

Page 93

That was my assignment. I wasn't being asked to say, oh, is this product better or worse than other products. I don't have an opinion about that.
My job is to say how would consumers react to these marketing statements and these are marketing statements.
Q From your review of the ingredient panels on Champion's packaging doesn't it appear that Champion does use natural ingredients?
A From what I've seen, yes, I think that's true.
Q And you agree that Champion does not advertise its food is all natural or 100 percent natural?
A Yes, I agree with that.
Q Let's go to Page 42.
You have some opinions here about the trust statements provide additional context and the ingredients we love, people we trust point, and on Page 46, if we kind of skip over there, there's a trusted everywhere claim.
Do you see that?
A Yes.
Q Weren't these claims that were at issue in the Colorado case, but they're not at issue in the Minnesota case?
A That's my understanding, correct.
Q So why did you leave this verbiage in the report?

Page 94

A Well, I didn't leave this verbiage in the report. My recollection of the Colorado case is the trust statements were being challenged.

Here in my opinion the trust statements had context, they had support to the challenged statements. They give consumers -- what would consumers think. Consumers would look at this and say -- it provides additional support for me to react positively to these claims in terms of making a decision to purchase the product and I believe the context in advertising is very important.

It's been my experience, I think almost anybody that works in advertising would agree with me.

Q Let's look at Page 44. Here on Page 44 there's an image from an Appalachian ranch package for Acana and there's a fellow shown here, Rob of Bluegrass Bison in Shelbyville, Kentucky trusted supplier of fresh ranch raised Bison.

Is it your opinion, sir, that when Champion shows a photograph of a supplier that a reasonable consumer understands that is the only supplier of that particular ingredient that Champion uses?

A I think in this instance when you're dealing with a premium product and a premium product that goes as far as identifying in this instance a rancher and really

Page 95

celebrating his involvement with the product that I think consumers would say, yeah, he's the supplier.

Now, there may be others. I wouldn't say every consumer, you know, would say, oh, he's the only one, but I think most people would say, yeah, he's the one. Why else do they stick him on the box or on the package?

Q Well, could it be just put on the package as an example of the kind of suppliers that help contribute to the ingredients?

A Well, you know, I suppose you could be right, but if I was writing the copy for the package and if that was the case, I would put some words in that explain that.

It would be very easy to say, you know, one of our trusted suppliers of Bison meat or something like that. Why not be as clear as possible?

Q Well, down here it says --

A I was taught -- in working at really good advertising agencies I was taught to tell the truth and to be explicit in every way we possibly can when it comes to making claims about our products.

You know, I did advertising a long, long time ago for Dove soap, and all of the advertising in those days said Dove is one-quarter cleansing cream. It was one-quarter cleansing cream. It wasn't one-third. It wasn't one-half. It wasn't one-tenth.

Page 96

Q It says here "Raised by people we trust like Rob of Bluegrass Bison."

Having the qualifier like doesn't that mean like as for example?

A I think the example here is speaking about this particular product. I mean, this product is -- you know, has a high percentage of Bison meat, so I think it's speaking very specifically about this particular package and the product that's in this package.

Q In the context --

A I don't believe that to be an unreasonable conclusion. I believe that consumers would see it that way. That's my testimony.

Q In the context of the dog food industry are you aware that most manufacturers have no idea where the location of the source of the ingredients were, but rather they buy them on a commodity basis from food brokers at the cheapest possible price so if something was reasonable it was just purely coincidental? Were you aware of that?

A I am not aware of that. I'm not an expert in how companies source the ingredients that go into their foods.

What I'm interested in is what consumers would think of the claims are on Champion's packages. That's what I was asked to provide opinions about.

Q Well, the phraseology "ingredients we love,

Page 97

people we trust", isn't that a form of puffery?

MR. LOCKO: Objection. Calls for a legal conclusion.

THE WITNESS: From an advertising standpoint, an advertising standpoint I think that the way the advertising industry would define puffery, I don't think that would be puffery because the people that they're talking about, the suppliers are identifiable.

If Champion was to use that language in a television commercial that was going to be run on broadcast television on a national basis on NBC, CBS, NBC or Fox and they tried to use that claim, in my experience the networks would ask please prove that claim. Tell us who these trusted suppliers are. Identify them.

That wouldn't be puffery under those circumstances, would it?

BY MR. COULSON:

Q Well, isn't it almost by definition that if Champion is using the ingredients, they like the ingredients and where do you differentiate between like and love and because they're buying them don't they trust, have enough trust in the supplier to buy them?

A Yeah. But, you know, they're not using the word

Page 98

supplier. They're using people and, you know, I'm in a business where every word matters, and the sense here, the communication that's being said is that this is a very intimate relationship that's personal.

I will tell you I have to say that I hold almost all of these claims to be very compelling on a personal basis.

You know, my dog seems to be very happy with what we feed her, but if I -- you know, I would look at this and I would come away impressed as a consumer just looking at the packages about the claims that are being made and how they're being made and the context they're being made and, you know, that's marketing.

That's marketing communications. Marketing communications have one purpose and the purpose of marketing communication is to help sell the product.

Q So I take it --

A Persuade consumers to buy the product. Give consumers rationale to buy the product, especially when it comes to a premium product.

Q So I take it you disagree with the Federal judge's opinion in the Denver case that "ingredients we love, people we trust" was puffery?

MR. LOCKO: Objection.

THE WITNESS: Far be it for me to disagree with a

Page 99

Federal judge on a matter of law. You know, I'm a guy who went to law school for one year in 1967. That would be presumptuous and it would be stupid and I don't think I'm stupid. So I'm not disagreeing with him.

I did read those opinions. I found them interesting, but I'm not disagreeing with him because he's saying as a matter of law, and he knows 99 percent more about the law than I do, but I know 99 percent more about advertising than he does so my opinions are based on how consumers respond to advertising messaging.

BY MR. COULSON:

Q Let's go to Page 46. "You see the trusted everywhere claim".

What does that mean?

A Well, I take it to mean that this is a product that is trusted wherever it's sold. That's what I take it to mean.

Q Does it mean it's trusted wherever it's sold by everybody?

A I don't think anything is trusted by everybody. I think it's trusted by the people who sell it.

In my experience specialty retailers want to sell -- usually want to sell products that aren't going to

Page 100

be problematic to them. They want their customers to be happy and satisfied, and I think most marketers want their consumers to be happy and satisfied, and trusted is a way of saying that consumers trust them and are happy with the product.

Q Would you agree --

A I will say this. From an advertising standpoint I think that I personally believe that trusted everywhere is puffery.

Q Let's go to Page 49. Looking at Paragraph 127 you talked about images of packaging that you reviewed.

Do you see that?

A Let me just read the paragraph. Okay.

Q First I see that the person you're paying to do the proofreading missed some of the spellings here. Right?

A Wow. Could you point that out? I just read the paragraph.

Q It says Arcana.

A Actually spelled it wrong? I apologize. I'll try to get the $100 back.

Q What was the updated packaging that you say was introduced in 2018?

A I don't recall.

Q Let's go to Page 51. You refer here about

Page 101

biologically appropriate serving the same purpose.

A Are you on Paragraph 128?

Q Yes. My question for you is among all these different packages you reviewed wouldn't you agree that each of them had a unique formula and it wasn't just like a matter of like a flavor being different?

A I would agree with that, yes. That's my understanding.

Q On Page 53 was that a photograph taken by you at the pet food place you went?

A Yes.

Q I thought you said earlier that it was only Acana that was carried by that pet food store, yet this photo seems to be Orijen.

A Yes, I guess they did. I didn't remember that.

Q Okay. Was it that the pet food store only carried Orijen and did not carry Acana?

A That appears to be the case. I got it backwards.

The point of the photograph, as the copy describes it, it's just sort of -- you know, sort of just shows how packages are displayed and they become mini billboards for products.

Q Let's go to Page 54, Paragraph 136.

Here you observe in the second line there that, "Champion has historically not relied on media advertising

Page 102

in any meaningful way to help sell its products. In fact, for the five-year period 2013 to 2017 its average advertising spend, for example, general advertising expense, display materials, print ads and website design was less than 0.2 percent of revenues."

I want to stop there. How did you derive the .2 percent of revenues figure?

A I don't quite remember, but there's a Footnote 64. If you could scroll down, I'd like to see what that says.

Whoops. Well, whatever that exhibit is, it's at -- I think literally that specific number must be 3671. I'm not all that good at math so I know that I didn't do calculations myself.

Q So what's your reaction to the fact that Champion spent only 0.2 percent of its revenues on advertising?

A It's a meaningless number. They didn't spend money on advertising.

Q And how did that advertising spent by Champion compare to the clients that you did advertising work for as an advertising executive?

A I worked for clients that spent money on advertising.

They spent -- some of them spent as much as a billion dollars a year. Walt Disney Company.

Page 103

And some -- I think the smallest budget I ever worked with was something in the neighborhood of about $125,000 a year. For a company that spent $125,000 a year that was actually a sizeable product, but they made products that were only sold for a three-week period immediately before Halloween. So it was the pumpkin cutters that we see in displays in end aisle displays in supermarkets.

But, you know, it's very evident that, you know, Champion did not rely on media advertising to help promote its products.

Q And is it your understanding that Champion predominantly relied on just word of mouth reputation to sell its products?

A Well, there might have been articles in the press or in magazines that spoke highly of the product.

They certainly had a website that some people might have gone to, et cetera, but in terms of what I consider conventional media advertising, which is when the advertiser spends money very specifically to buy time or space, they were getting their business in other ways.

Specialty shops such as the one where we go to buy basically dog chews and things like that there's Orijen.

I would imagine if people asked the staff there

Page 104

about products, that they would be reasonably knowledgeable, I believe, if they were asked.

Q Just going back to percent of revenues for the clients you represented as an advertising executive in your career, putting aside the pumpkin cutter company, typically what was an average percent of revenues that would be spent on advertising-related activity?

A It really varies by the category. It really does.

I made the very first television commercial that was ever made for the Hershey Bar and I'm not that old. I look old, but I'm not that old. I'm younger than the president of the United States.

At that time Hershey spent almost no money on consumer advertising. They came to us because they were feeling that they needed to advertise.

There really aren't strict percentages. In the airline industry advertising was a relatively low percentage of revenues.

In certain -- particularly in health and nutrition categories advertising can be a very high percentage.

It actually -- it doesn't cost very much to make toothpaste and put it in a tube and put it in a box and so you spend a lot of money advertising it.

Page 105

Beer. The advertising budgets typically are a relatively high percentage, pretty high percentage of revenue simply because it doesn't cost very much to make the product. It's mostly water.

So it's all over the map.

MR. COULSON: We're about to start a new topic. We've gone for about an hour.

Let's take about a ten-minute break.

THE WITNESS: Okay with me.

THE VIDEOGRAPHER: Folks, I'll take us off the video.

The time is 8:35 in the UTC, 4:35 Eastern. We're paused.

(A brief recess was taken.)

THE VIDEOGRAPHER: We're back on the video record folks the time is 8:50 P.M. in the UTC, 4:50 p.m. Eastern.

BY MR. COULSON:

Q Let's turn to Exhibit 1 again, Page 55.

Starting here on Page 55, Section 8 of your report you refer to the presence of heavy metals so that consumers are concerned about heavy metals.

Do you see that?

A Yes.

Q Can you identify any dry kibble dog food sold in

Page 106

the United States that does not have detectable levels of heavy metals being defined as lead, arsenic, mercury or cadmium?

MR. LOCKO: Objection. Outside the scope.

THE WITNESS: It is well outside the scope. I wouldn't know.

BY MR. COULSON:

Q Do you know what the level is for dog food where the amount of heavy metals would become unsafe?

A I do not know.

Q Are you aware that -- well, let me ask you this.

When I say that heavy metals are naturally occurring in ingredients, what do you understand that to mean?

A As a layman?

Q Yes, or as far as a reasonable consumer.

A You know, if they are -- if they sometimes occur in, you know, things that are grown or whatever, I think that's what it means.

That they just sometimes are there. It isn't like they're added or put there as part of a manufacturing process.

They're just, you know, naturally there, naturally occurring.

Q Well, in connection with your report and opinions

Page 107

are you assuming that Champion Petfoods added heavy metals to its product during the manufacturing process?

A I don't think I said anything like that. I certainly wouldn't assume that.

My opinions here are that this is a subject matter that would be of concern to consumers.

Q Okay. So to your understanding, Champion actually does not add heavy metals to the dog food as part of its manufacturing. Is that correct?

A Again, I'm not an expert in whether or not they add or not add.

I can assume that they don't add and I would respond that way.

Q Are you aware that seafood sometimes has mercury in it?

A I have seen warnings about that at restaurants.

Q Are you aware that seafood has arsenic in it?

A I did not know that.

Q Are you aware that animal proteins have levels of cadmium and lead in them?

A I'm not aware of that. I'm not a toxicologist.

Q Now, for example, the word lead without any context is going to scare a consumer.

Would you agree with that?

A I would agree with that, yes.

Page 108

Q Same with arsenic, mercury or cadmium. Would you agree?

A I do agree.

Q Is it possible to process heavy metals out of the dog food?

MR. LOCKO: Objection. Outside the scope.

THE WITNESS: I have no idea.

BY MR. COULSON:

Q Well, let's go to Page 61, Paragraph 154.

You conclude in 154 that, "This consumer, like others, reasonably expected that Champion would ensure that heavy metals are processed out of the food."

Do you see that?

A I do.

Q Is it scientifically possible to process the heavy metals out of Champion's dog food?

A I don't know.

Q Is it scientifically possible to reduce the amount of the heavy metals in the ingredients that Champion uses in its dog food?

A I don't know.

Q Are you aware that many human foods have detectable amounts of naturally occurring heavy metals in them?

A I am not aware of that. I'm not arguing whether

Page 109

they do or don't. I just don't know.

Q Do you have any knowledge about the European union standards for safe levels of heavy metals in pet food?

A I do not.

Q Do you have any knowledge about the National Resource Council's maximum tolerable levels for heavy metals in pet food?

A It's not my area of expertise.

Q On Page 61, if you just scroll down a little bit, you state, "Champion knows of the presence of heavy metals is inconsistent with Champion's packaging statement."

What is the basis for that opinion?

A Well, actually, just a few paragraphs back I cited communications between a consumer and Champion raising questions about heavy metals, and so clearly in that instance, even if it's one instance, Champion was aware that at least one consumer was concerned.

But I think that manufacturers of food products, be they human food products or animal products, certainly you're aware of consumers' concerns about adulteration and they all try, I would think, at least the better ones, certainly the ones I've worked for do their best to make sure that the product they're putting out is as of highest quality that they can make and isn't adulterated, et

Page 110

cetera.

I think the food manufacturers, I've worked with many food manufacturers and marketers of foods, you know, through restaurants and through fast food, et cetera and I've yet to meet one that is not aware that consumers are concerned about these issues, and, you know, when problems arise it's sort of a nightmare in getting consumers back after a problem does arise. It can be very difficult.

Q Is it your opinion that Champion's pet foods are adulterated with heavy metals?

MR. LOCKO: Objection. Outside the scope.

THE WITNESS: It's well outside my area of expertise. I do not know.

BY MR. COULSON:

Q Do any of Champion's packages say that the food is free of heavy metals or heavy metals free or does not contain any --

A I'm sorry for that. I don't recall that.

Q Have you seen any Champion packages that say BPA free for Champion Petfoods?

A I don't recall.

Q You've probably seen the phrase BPA free on packages of various products just as a consumer, have you?

A Yes, I have.

Q Okay. And, again, isn't it true that no Champion

Page 111

pet food package, whether it's Acana or Orijen says BPA free?

A As I just testified a moment ago, I don't recall.

Q Are you aware of any pet food manufacturer in the United States or the world that discloses the presence of heavy metals on its packaging?

A I am personally not aware of any, but it's well outside the scope of my engagement on this case.

Q Are you aware of any pet foods sold in the United States or the world that discloses that there either is the presence of BPA or the risk of the presence of BPA in the pet food?

A I don't know.

Q Well, let's go to Page 62. Looking at Paragraph 158 you write, "Further, plaintiffs contend that certain non-fresh ingredients used in some of the products at issue actually exceeded the adulteration standard for heavy metal presence."

Do you see that?

A Yes.

Q What is the adulteration standard?

A I don't know. That's not my job to know that.

Q Which ingredients were the ones that allegedly exceeded the adulteration standard?

A I don't know whether it was listed in the

Page 112

complaint or if they just made a general statement. I don't recall.

Q The next sentence states, "In my opinion consumers would not expect a Champion product to contain non-fresh ingredients such as heavy metals that exceed adulteration standards based on Champion's statement that its products use fresh regional ingredients."

Are you suggesting that heavy metals are a non-fresh ingredient that are used to make the pet food?

A No, I'm not suggesting that at all.

Q Then why do you say non-fresh ingredients such as heavy metals?

A Well, I would not -- based on my limited knowledge I would think that heavy metals cannot be considered fresh ingredients.

Q Were heavy metals ingredients used to make Champion's pet food?

A Not to my knowledge.

Q And the adulteration standards being referenced here actually refer to the National Research Council's maximum tolerable limits for heavy metals that is also used by the Food & Drug Administration.

Do you understand that?

A You're telling me that. I'll accept that you're saying that.

Page 113

Q Well, even if an ingredient exceeded an adulteration standard, the ingredient is only one of many ingredients and isn't it true what matters is the finished product and what level of heavy metals are in that finished product?

MR. LOCKO: Objection. Outside the scope.

THE WITNESS: Yes, you're asking me about something that I have no expertise in.

My expertise is what consumer perceptions would be and basically this entire section says, to boil it down to just a handful of words, consumers would be concerned if they knew or if they knew things that maybe would not be -- that there may be circumstances where there are heavy metals, et cetera.

It really comes into the area of consumer concern. Roughly the equivalent of consumers are concerned about safety.

BY MR. COULSON:

Q Would the same consumers be concerned if it was explained to them that the heavy metals are naturally occurring in the ingredients and are at a safe level not even close to a level that would make them unsafe?

A I think, you know, as a marketing expert if consumers were informed of that and if it was given to them in a way that -- if it was communicated to them in a

Page 114

way that was readily understandable, I think that would be a positive thing.

Q In Paragraph 158 you refer here that -- you refer to the Champion statements that the products use fresh regional ingredients.

My question for you is isn't it true that an ingredient can be fresh, but have a high amount of heavy metals in it such as a fish that has a high amount of mercury? The fish is still fresh, right, even though it may contain a heavy metal?

A I suppose that's correct, yes.

Q The same thing an ingredient can be regional, for example, it could be, you know, chicken in Western Kentucky raised in the same county that the DogStar Kitchen is located and yet if there's a detectable amount of cadmium and lead in the chicken, the chicken is still regional, isn't it?

A Yes, the chicken is still regional. I agree the chicken is regional, but I'm looking at that only as an individual consumer.

Q Do you think an individual consumer would think, okay, if the advertisement says it's made with fresh regional ingredients, that means there could be no heavy metals in it?

A I think consumers -- in my opinion consumers

Page 115

would interpret fresh regional ingredients as a signal that the products are healthy, healthful and not contaminated. I think that's the way consumers would interpret these terms.

You know, I always kind of come back to rather simple terms, not that people are simple, but the way they interpret this is it's good for you or it's not good for you, and I think if consumers were aware that there were high levels of some kind of contaminant, they would be concerned.

You know, these words can't always be taken by consumers literally word for word with the dictionary definition. You know, you have to put them together and you have to put it into context.

Q Well, if the levels of heavy metals in the ingredients in the fresh food are at a healthy level, then why should a manufacturer make any kind of disclosure about it?

A That's outside -- you know, that's not my area of expertise. That's for lawyers to determine, not for copywriters.

Q Let's go to Page 65. This refers to BPA. You see on Paragraph 167 there's a reference to scary results.

Do you see that?

A Yes, I do.

Page 116

Q What is it about BPA that is scary?

A My understanding is that BPA is a carcinogen.

Q It's something that could be a carcinogen in a high enough dosage. Correct?

A I cannot -- I'm not an expert in dosages. I've heard of BPA. I've heard about it for a number of years.

I sold a lot of products that were packaged in plastic containers or plastic containers were used heavily in food distribution and that certainly was an issue.

Consumers were hearing about it, particularly out here in California. They put warning labels up.

But I don't know about what level it becomes a significant problem. It could be tiny. It could be not tiny. I don't know.

Q This is a similar question I had as to heavy metals.

To your understanding Champion does not add BPA as an ingredient. Is that correct?

A That is certainly -- yes, I would agree with that.

Q And to your understanding, is BPA environmentally prevalent because of the wide usage of plastic in our society?

A I don't know how to answer that. I don't know.

Q Let's go to Page 67. In Paragraph 173 it refers

Page 117

to red meat diets.

Do you see that?

A Yes.

Q Why are red meat diets of concern?

A In terms of Pentobarbital?

Q Yes.

A My understanding is that included in red meat diets that an ingredient is tallow, which my understanding is animal fat or is derived from animal fat, and that there have been incidents of Pentobarbital found in animal -- in tallow and it only applies -- my understanding is it would only apply to diets that are based on red meat.

Q Are you aware of whether the two plaintiffs in this Minnesota case, Mr. Wertkin and Miss Song actually in fact ever purchased a red meat diet?

A I don't know.

Q Again, you've not read their depositions. Correct?

A That's correct.

Q Let's go to Page 69. In Paragraph 176 you tell us that, "I have never personally observed a focus group or interviewed a consumer in which the chemical Pentobarbital was discussed."

Do you see that?

Page 118

A Yes.
Q And that's still true to today. Right?
A That is true.
Q You understood that Pentobarbital was not used or added as an ingredient by Champion. Correct?
A My understanding is that -- well, it's certainly not a regular ingredient in their products. I would agree with that.
I think that there may have been an incident where there was a possibility that they used a supply of tallow that may have contained Pentobarbital.
That's my understanding of this particular use of Pentobarbital by Champion.
Q You agree that tallow is not a fresh ingredient, is it?
A That's my understanding. Tallow is not a fresh ingredient.
Q Do you understand that beef tallow and beef fat are synonymous?
A I think they're synonymous. I can't say I'm 100 percent sure of that.
Q Have you reviewed the red diet ingredient panels to see how beef tallow was described?
A I did look at the panels, but I certainly don't recall that. There were a lot of nutrition labels.

Page 119

Q Let's go to Page 72. In Paragraph 183 you state, "Consumers would be offended if they understood that Champion's fresh regional ingredients included beef tallow a non-fresh ingredient with a risk of being contaminated with Pentobarbital in its products."
Do you see that?
A Yes.
Q How big does the risk need to be before a consumer is offended?
A Well, I think we have to break that up into pieces.
I think consumers would likely take fresh regional ingredients quite seriously. It's a very appealing marketing promise to consumers.
And so if beef tallow is inherently not fresh or regional -- I suppose it could be regional, I don't know, it depends on what the origin of it is -- but I think they would not be pleased to know about all the non-fresh, non-regional ingredients that end up in Champion dog food.
I think you know the reason they're paying a premium for these products is partially based on their promise.
Now, if consumers were aware that there was a risk of Pentobarbital being present, I think that would freak them out.

Page 120

Q One out of a billion, one out a hundred million, one out of a million?
A I can't say.
Q What's the metric for the risk?
MR. LOCKO: Objection. Outside the scope.
THE WITNESS: I can't say.
BY MR. COULSON:
Q Do you know what the purpose of beef tallow is when it's added to the diet?
A Well, it's a fat so -- I don't know. I'm not an expert in how you formulate dog food.
Q Have you reviewed Champion's internal guidelines on the usage of regrinds in its product?
A I don't believe I did unless you saw it in my list of material. I don't recall -- I don't recall reading it.
Q And in terms -- when regrinds are used in the manufacture of a lot of dog food by Champion, are they put into or are they mixed together with dry ingredients or with the fresh or frozen ingredients? I mean fresh or raw.
Let me start over again. When Champion manufactures its dog food in those instances where it uses regrinds, are the regrinds added into the dry ingredients or are they added into the fresh or raw ingredients?

Page 121

A I have no idea.
Q Let's go to Page 75. In Paragraph 195 you refer to the use of refreshed ingredients.
What do you understand refreshed ingredients to mean?
A Refreshed ingredients to me meaning where you take an ingredient that for whatever reason has not been used and you process it in such a manner as to make it acceptable for use again, at least as they define it.
Q Is freezing an ingredient processing it?
A Freezing may be part of processing. I'm not exactly sure what you mean by that.
Q How often did Champion use, quote-unquote, refreshed ingredients?
A I don't know.
Q Do you know whether refreshed ingredients were used at the DogStar Kitchen?
A I don't know.
Q Expired ingredients. What do you take expired to mean?
A I would assume that expired ingredients are ingredients that in this case the manufacturer or processor has decided that they no longer can be used. That they dated out for whatever reason.
Q Are you familiar with the concept of best use by

Page 122

dates?
A I am.
Q Okay. And in your own experience do you sometimes have some food that's past its best use by date, but you take a look at it, you smell it and you think it's fine and you go and consume it? Has that happened in your regular life?
A In my regular life I think so. It's probably happened.
When I was in law school I think I mostly lived on expired food.
Q And you lived to tell.
A I'm here.
Q Are you familiar with how often or how rare that Champion used expired ingredients?
A I have no idea.
Q Do you know whether typically the expired ingredients would be dry ingredients or would they be fresh or raw ingredients?
A I don't know.
Q Okay. Let's go on to Page 76. In Paragraph 199 you state that, "Thus, Champion's claim fresh regional ingredients communicates, quote-unquote, an extra fresh message that I believe most consumers would find compelling."

Page 123

Do you see that?
A Yes, I do.
Q How do you define extra fresh as compared to plain old fresh?
A Well, you know, I'm using that phrase because it's one of those terms that historically has shown up in advertising and, you know, without a doubt that is puffery, but I also believe that consumers don't necessarily look at puffery as being silly or ridiculous or meaningless.
You know, if you look at the last few words of that paragraph, fresher than fresh is often used as a cliché. In my opinion you can't be fresher than fresh, but consumers understand that term as meaning it's fresh. It's really good. It's nothing to be concerned about.
And, you know, a lot of -- you know, in my expertise it's marketing communications, and what we're talking about here are terms used to help market these products, and in doing that you're trying to, you know, get the consumer somewhat excited about this verbiage.
Q Did Champion ever actually use the expressions "extra fresh" or "fresher than fresh" in its packaging?
A I never saw that, no.
I used it in this paragraph because I believe that fresh regional ingredients -- if things are coming

Page 124

from close by, if your ingredients are coming from close by, you know, they're going to be fresher than they're going to be if the ingredients are coming from a distance.
If you can get something, you know, out of the ground, particularly if it's a vegetable product or a fruit product, and you're getting it out of the ground on Monday and you're processing it on Tuesday, that's pretty fresh.
If you get it out of the ground on Monday and you're processing it a week later, that's certainly not fresh.
That doesn't mean it's not fresh, but it's not going to be as fresh as and these issues matter to consumers.
They matter to Champion. That's why they stick them on the package.
Q Let's go to Page 78, Paragraph 205.
A Yes.
Q Down here there's a reference to tumeric. Are you familiar with what tumeric is?
A I think it's some sort of a flavoring or spice.
Q Do you know where tumeric is grown?
A I do not know.
Q Do you know what kind of climate is required to grow tumeric?

Page 125

A I do not.
Q Do you know whether tumeric can be grown in the United States other than in a grow house?
A I don't know -- well, actually, I just read the rest of the sentence. Tumeric comes from India.
Q And do you think a reasonable consumer is going to have a problem with tumeric coming from India if it's impossible to grow tumeric in the United States other than in a grow house?
A No, I don't think someone would have a problem with that.
Q What about lamb from New Zealand? Are you familiar with New Zealand's production of lamb?
A I am.
Q And what do you know about New Zealand lamb?
A It's of high quality and it's usually -- in fact, it's almost always shipped to America as a frozen product.
Q Because otherwise if you're going to keep the lamb under refrigeration on a ship as it comes across the Pacific Ocean and then goes by rail or truck in a reefer container to the kitchen, a lot of time will have expired. Right?
A The Pacific Ocean is a very big ocean.
Q Let's go to Page 79. That's something else I was going to ask. Are you aware whether in fact Champion used

Page 126

any vitamins or any other ingredients from China in the dog food that's at issue in this case?

A No, I'm not aware.

Q Let's go to Page 79. You start off Paragraph 209 by stating, "Based on the material discussed above, it is my opinion that pet parents have had access to many media reports regarding the dangers posed to themselves and their pets by the presence of heavy metals, BPA and phenobarbital in pet food."

I just want to stop you there. What media reports are you referring to in this paragraph?

A The reports that are cited in the previous paragraphs.

Q And, in fact, consumers who do research on the Internet have available to them significant information about the presence of heavy metals and BPA in foods.

Would you agree with that?

A I would agree with you, yes.

Q You referred earlier, sir, to some segmentation in the pet food market that developed over time where there's popular-priced products often sold at big box stores and then there's premium-priced products and then super premium-priced products.

Do you remember that testimony?

A Yes.

Page 127

MR. COULSON: Okay. Actually, counsel I don't think this was included in the material we sent the other day for exhibits to use because I, frankly, just thought of this at a break, but I'd like to show an exhibit to Mr. Silverman and we can e-mail it to you as well, but it's a package of another pet food.

I'd like to mark this as Exhibit 2. Ms. Baca, if you can share the screen with that, that would be terrific.

MR. LOCKO: I'm going to object to the extent that it's another document. It's outside the scope. He didn't review other dog packaging.

MR. COULSON: You can have a standing objection on that basis.

(The document was marked "Defendant's Exhibit No. 2 for Identification.")

BY MR. COULSON:

Q Sir, I've marked as Exhibit 2 some images that we got off Pedigree's website that shows a diet called Pedigree Adult Complete Nutrition Roasted Chicken, Rice and Vegetable Flavor Dry Dog Food.

Do you see that?

A Yes, I do.

Q Okay. And it's selling for $19.99. Do you see that?

Page 128

A Yes, I do.

Q And that was for a 33 pound bag, and my question for you is in your experience would this be an example of a popular- priced dog food product?

A I think it would be. I'd have to -- I'd have to look and see what the pricing is of the products.

It's outside the scope of my assignment for this. I didn't make it my business to go out and try to figure out the prices of every dog food around.

There was that one exhibit that I had in my report which was taken directly from Champion material without pricing.

But this sounds -- a 33 pound bag 19.99. I know that there are dog foods that cost even less than this that come in roughly the same size bag.

Q And what were the price -- what was the pricing for a bag around this size for Orijen?

A For Orijen? I don't think they make a 33 pound bag.

Q I forgot their biggest size, but it's 25 pounds or so.

Do you recall what the largest size bag of Orijen was selling for based on the data you reviewed?

A I don't recall offhand. I think it was -- I think it was listed in that chart in my report.

Page 129

We didn't talk about it today. We passed by it in the report.

MR. COULSON: Let's just scroll down a little bit, Ms. Baca.

BY MR. COULSON:

Q And you'll see the ingredient panel there.

A I see it. You'd have to blow it up for me to be able to read it.

Q Let's just blow it up very quickly.

A There you go.

Q All right. That appears to be the ingredient panel for this Pedigree diet. Do you agree?

A That's what it seems to be, yes.

MR. COULSON: Let's move on to Exhibit 3.

(The document was marked "Defendant's Exhibit No. 3 for Identification.")

BY MR. COULSON:

Q Sir, in Exhibit 3 I have in the left column the ingredients panel for Orijen Original made at the DogStar Kitchen in Kentucky, one of the diets at issue in the litigation, and to the right is the ingredient panel from the Pedigree chicken diet that I showed you in Exhibit 2.

My question is does that appear to be the ingredient panel for Pedigree that we just looked at in Exhibit 2?

Page 130

A As best as I can remember, yes.
Q Okay. So if we compare these two, do you see that with the Pedigree diet -- well, first of all, let me ask you in the ingredient panels how are the ingredients listed?
A They're listed in order of percentage with the highest percentage first and working its way down.
Q So if you look at the Pedigree diet, which is a popular-priced product, the first ingredient is ground whole grain corn.
Do you see that?
A Yes.
Q The second ingredient is meat and bone meal. Do you see that?
A Yes.
Q Do you know what a meal is in the context of pet food?
A No.
Q Do you understand that a meal is a dried ingredient?
A If that's what you're saying it is.
Q Do you know what the process is to create a meal?
A Well, if it's dried, I guess you have to cook the meat, maybe not, but you dry the meat and then process it in some way.

Page 131

Q And do you know what temperature the meat is processed at to create the meal?
A I have no idea.
Q The third ingredient is corn gluten meal. Do you see that?
A Yes.
Q And then the next one is animal fat. Do you see that?
A Yes, I do.
Q And then the next ingredient in order is soybean meal. Do you see that?
A Yes.
Q Followed by natural flavor, whatever that is and then chicken. The next one is chicken by-product meal. Do you see that?
A I do.
Q And the next one is dried plain beet pulp. Do you see that?
A Yes.
Q Let's turn to the ingredient panel for Orijen Original.
Do you see the first ingredient listed is deboned chicken. Do you see that?
A Yes.
Q Followed by deboned turkey. Correct?

Page 132

A Yes.
Q Followed by Yellowtail Flounder and then whole eggs. Do you see that?
A Yes.
Q Followed by, in order, whole Atlantic Mackerel, chicken liver, turkey liver, chicken heart, turkey heart, whole Atlantic Herring, dehydrated chicken, dehydrated turkey, dehydrated Mackerel, dehydrated chicken liver, dehydrated turkey liver. Do you see that?
A I do.
Q And after that there's whole green peas and some other vegetables listed. Do you see that?
A I do.
Q Now, in comparing the ingredients of Orijen and the ingredients in Pedigree which is the higher quality ingredients?
A Well, I'm not an expert in the ingredients of dog food and it's well out of the -- it's certainly not what I was asked to provide opinions about in this case.
As a layman it sure looks to me that the ingredients in the Orijen are preferable ingredients.
Q And you would expect that the price of the Orijen product would be significantly higher than the pricing for the Pedigree diet?
A I know it's more expensive.

Page 133

Q Just looking at the ingredient panels wouldn't you agree given the ingredients listed in order on these panels that the pricing for Orijen Original would be significantly higher than the pricing for the Pedigree diet?
A I can only answer that as a layman and not as an expert. I'm an expert in marketing communications, but I do know that chicken and meat and turkey and fish and all of that kind of stuff costs more than -- costs more than corn, and if your ingredient cost -- in every food product I ever worked with the higher the ingredient cost or the greater the ingredient cost, the higher the cost of the ultimate cost of the product to consumers.
Q And wouldn't you agree that this is really not a fair comparison to be comparing the ingredient panel from Orijen Original to the ingredient panel from the popular-priced Pedigree product?
A Are you asking if I think it's a fair comparison or an unfair comparison?
Q I'm asking either way. Would you agree that it's an unfair comparison to compare the ingredients from Orijen Original to the ingredients of the popular-priced Pedigree product?
MR. LOCKO: Objection. Vague. Ambiguous.
THE WITNESS: I would say -- as a consumer I

would say it's an apples to oranges comparison, particularly based on the ultimate price point of the products.

MR. COULSON: What I'd like to do, sir, is take about a ten-minute break. I've covered, I've gone through your report, but I also have an outline I prepared and I know some of the questions I outlined I probably skipped over as I went through your report so I'd like to take a ten-minute break at this point and then we'll come back.

THE VIDEOGRAPHER: Okay, folks. I'll take us off the video. The time is 9:39 UTC, 5:39 Eastern. We are paused.

(A brief recess was taken.)

THE VIDEOGRAPHER: And we're back on the video record now. The time is 9:55 p.m. in the UTC, 5:55 Eastern.

BY MR. COULSON:

Q Sir, in the marketplace would you agree that Orijen and Acana don't stand by themselves? They have many competitors.

A They appear to have many competitors, yes.

Q You'd agree that a consumer then is faced with, you know, many choices to make in determining what dog food to buy for their dog?

A Yes, I think that's a very fair statement.

Q And what brands are the closest competitors to Orijen?

A Oh, you know, I didn't memorize the names of any, but there's that chart that I referred to earlier that had prices and the brands that are closest in price, particularly to Acana.

Orijen appears to me to be in a class of its own, but I would rate those as competitors because of the price points.

You know, consumers -- I doubt very much that consumers that are inclined to buy a product like Acana or Orijen are, you know, hot to buy Pedigree. They're oriented to get a premium product for their dog.

I guess that -- I kind of hope that whatever is the Zignature we're feeding our dog falls into the premium product because I know what we pay for it.

I'm not sure if one would consider it a competitor of Champion's products, but I suppose it is.

Q So if I were to tell you that we've conducted heavy metal testing on Zignature and found that Zignature has detectable levels of lead, arsenic, mercury and cadmium, is that going to influence your decision to continue purchasing Zignature?

A It very well might.

Q And if every dog food has detectable levels of heavy metals in them, then what dog food would you purchase?

A I have no idea. If every dog food had detectable levels of those things, then I'd have to -- you know, it's a wash.

I've got to feed the dog something. I want to feed her as well as we possibly can.

Q Let's go back to Exhibit 1. I'd like to focus on Paragraph 27.

MS. BACA: I'm sorry?

MR. COULSON: Let's go back to Paragraph 27 of Exhibit 1.

BY MR. COULSON:

Q Anyway, as I understand it, you're forming your opinions here based upon the professional experience that you, Mr. Silverman, have amassed over your long career in advertising. Is that correct?

A That's correct.

Q Are you familiar with the scientific method?

A Certainly, yes, I can say I am.

Q Do you agree that the scientific method is a process of formulating hypotheses and then conducting analysis or experiments to prove or falsify the hypothesis?

A Yes, I understand that.

Q What were the hypotheses, if any, that you tested in your report?

A As is stated here and in response to the question you asked earlier, the opinions I've expressed here are based on my experience dealing with consumers and learning about consumers.

The process of using -- the process I used when creating and which I continue to do, I actually created a lot of commercials not too long ago for political candidates, that process starts with trying to understand what consumers want or need to hear to motivate them.

So, you know, you look at -- I look at -- in this sort of experience, dealing as an expert witness, my process is to sort of reverse engineer the process I used when creating advertising.

What is the most likely thing consumers want to hear and in this instance what they want to hear are the challenged statements made by Champion.

There's nothing weird or crazy about any of these statements. They respond to the kind of information in food products, be it food for humans or dogs, that consumers are going to want to hear to rationalize the price point. That's my process.

Q To what extent does the actual content of the

product divorced from any advertising statements have to do with the decision to purchase by consumers?

A The product is very important. Advertising can create interest in a product.

Well, first it can create awareness of a product and it can create interest in a product and then they can motivate to buy the product, but at the end of the day it's all about the product, the product itself because that's what they're buying, and, you know, so, you know, most consumers need to be re-reminded why they like a product, so that's why advertising frequency is used and why advertising continues to be used for products.

That's why labels are continued to be placed on bags of products. But the product itself is obviously very important. The product has to live up to the advertising.

Q Now, could different advertising professionals who have had different experiences than you arrive at different conclusions than you have in your report about the statements, the challenged statements on Champion's package?

A Anything is possible, but in my opinion and in my experience both as a working advertising professional and as an expert witness who used to work on a lot of cases not totally dissimilar to this one, I don't think that a

person with the kind of experience I have would come up with different conclusions than I came up with. I really don't.

Q Again --

A Anything is possible.

Q But in connection with your work here, just to confirm, you've conducted no research studies, consumer surveys, interviewed consumers of pet food or read the depositions of any of the consumers that have been deposed in all the related litigation. Is that correct?

A That's correct.

MR. COULSON: At this time I have no further questions for Mr. Silverman.

MR. LOCKO: I have a few questions.

CROSS EXAMINATION

BY MR. LOCKO:

Q Okay. Bruce, do you believe consumers would perceive that Champion dog food contains a material amount of non-regional, non-fresh ingredients?

A Yes. Well, excuse me. Ask the question again, Trevor.

Q I'm sorry. Do you believe consumers would perceive that Champion dog food contains a material amount of undisclosed non-regional and non-fresh ingredients?

A No, I don't think they would.

I think I testified to this earlier. I think the consumers would be strongly influenced by the challenged statements.

Champion across the board speaks about fresh regional ingredients. You know, that's sort of their mantra and so the expectation would be fresh regional ingredients.

Q Now, assuming plaintiffs' allegations were correct, would you believe that consumers would perceive that Champion dog food contains a material amount of undisclosed non-regional and non-fresh ingredients?

A If the allegations are correct -- do me a favor. I'm sorry to be difficult here, but would you just restate the question? I want to make sure that I'm hearing you correctly.

Q Sure. If consumers knew about Champion's use of regrinds or expired ingredients or ingredients from India or China, if they knew about that, do you think they would find that material to their purchasing decision?

A I do, yes.

Q Okay. And based on Champion's packaging, including the context, do you believe that consumers perceive that Champion has a uniform marketing method of being biologically appropriate and using fresh regional ingredients?

A Yes, they're very consistent. As an advertising professional I applaud them for that because that's the best practice.

Q Do you think consumers are concerned about the risk of heavy metals, BPA and Pentobarbital even if the amounts present would not necessarily kill their dog or been toxic?

A I think consumers would be concerned about that, yes, about those possible substances in the food.

Q Okay. We discussed consumer perception as to the term raw.

Do you think a regional consumer would automatically know that raw means that the ingredient has been frozen? Not possibly frozen, but had been frozen?

A I don't think they would automatically know that, no.

Q Okay. And we discussed puffery in the advertising sense in the advertising world.

In the advertising world would you consider a marketing claim like fresh regional ingredient to be puffery?

A No, because in advertising the question is is this something you can prove or quantify.

Well, it either is fresh and regional or it's not and that can be documented, so that is not puffery where I

Page 142

come from.

Q How about the same question in regard to biologically appropriate?

A Well, based on my understanding of biologically appropriate I do not believe that's puffery at all.

Q And, last question, in the advertising world would you consider a natural claim to be puffery?

MR. COULSON: Objection. Vague and ambiguous.

THE WITNESS: I don't think natural is puffery. I do believe that natural is a -- I don't think there's an official legal definition for natural, which is somewhat problematic because consumers sometimes confuse natural with organic and things like that. They see natural as a positive and I also think that natural specifically means, at least consumers think it means that it doesn't have additives, and if that's the case, it's not puffery.

BY MR. LOCKO:

Q Okay. And to clarify my last question, specific to Champion's natural claims, delivering nutrients naturally and nourish as nature intended, you would also not consider those claims to be puffery. Is that correct?

MR. COULSON: Objection.

THE WITNESS: That's correct.

MR. LOCKO: I have no further questions.

Page 143

MR. COULSON: Sir, thank you for your time.

THE VIDEOGRAPHER: Okay, folks. I'll take us off the video.

MR. LOCKO: We would just like to read and sign the transcript.

THE REPORTER: And you're ordering it. Right?

MR. COULSON: Yes.

THE VIDEOGRAPHER: I'll take us off the video. It's 10:10 p.m. in the UTC, 6:10 p.m. Eastern Standard Time. We're off.

THE REPORTER: Trevor, do you want a copy?

MR. LOCKO: Yes. We don't need it expedited.

MS. BACA: Could you please give me your e-mail to Chat so I can send you the exhibits?

(Thereupon, the deposition was concluded at 6:10 p.m.)

Page 144

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA)
: SS
COUNTY OF DADE)

I, THERESA M. COHEN, a Florida Registered Reporter, certify that I was authorized to and did stenographically report the deposition of BRUCE SILVERMAN; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties', nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 28th day of November 2020.

Theresa M. Cohen
Registered Professional Reporter

Page 145

CERTIFICATE OF OATH

STATE OF FLORIDA)
: SS
COUNTY OF DADE)

I, the undersigned authority, certify that BRUCE SILVERMAN personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 28th day of November 2020.

THERESA M. COHEN
Notary Public-State of Florida
Commission #GG 174339
Expires March 28, 2022.