# EXHIBIT 3

Page 1

1         UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF NEW YORK
3
4   RACHEL COLANGELO and KATHLEEN    )   Case No.
    PARADOWSKI, individually and on  )   6:18-cv-01228
5   behalf of a class of similarly   )   [LEK/DEP]
    situated individuals,            )
6                                    )
            Plaintiffs,              )
7                                    )
    vs.                              )
8                                    )
    CHAMPION PETFOODS USA INC. and   )
9   CHAMPION PETFOODS LP,            )
                                     )
10          Defendants.              )
                                     )
11  _____)
12
13
14         VIDEO-RECORDED VIDEOCONFERENCE
15         DEPOSITION OF BRUCE SILVERMAN
16            Wednesday, March 17, 2021
17                   Volume I
18
19
20
21  Reported by:
    ROCHELLE HOLMES
22  CSR No. 9482
23  Job No. 4487163
24  PAGES 1 - 42
25

Page 2

```
 1           UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF NEW YORK
 3
 4   RACHEL COLANGELO and KATHLEEN   )  Case No.
     PARADOWSKI, individually and on )  6:18-cv-01228
 5   behalf of a class of similarly  )  [LEK/DEP]
     situated individuals,           )
 6                                   )
          Plaintiffs,                )
 7                                   )
     vs.                             )
 8                                   )
     CHAMPION PETFOODS USA INC. and  )
 9   CHAMPION PETFOODS LP,           )
                                     )
10        Defendants.                )
                                     )
11   _____)
12
13
14       Deposition of BRUCE SILVERMAN, testifying from Los
15   Angeles, California, taken on behalf of Defendants, via
16   videoconference, beginning at 9:03 a.m. and ending at
17   10:11 a.m. on Wednesday, March 17, 2021, before ROCHELLE
18   HOLMES, Certified Shorthand Reporter No. 9482, Certified
19   Realtime Reporter No. 0123.
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4     ROBBINS LLP
 5     BY: TREVOR LOCKO, ATTORNEY
 6     5040 Shoreham Place
 7     San Diego, California  92122
 8     (619) 525-3990
 9     TLocko@robbinsllp.com
10     (Appearing via videoconference.)
11
12   For Defendants:
13     GREENBERG TRAURIG, P.A.
14     BY: DAVID A. COULSON, ATTORNEY
15     333 SE 2nd Avenue, Suite 4400
16     Miami, Florida  33131
17     Coulsond@gtlaw.com
18     (Appearing via videoconference.)
19
20   VIDEOGRAPHER:  SCOTT SLATER
21
22   ALSO PRESENT:  JORGE ASTORGA
23
24
25
```

Page 4

```
 1                     INDEX
 2   WITNESS         EXAMINATION BY            PAGE
 3   BRUCE SILVERMAN
 4   Volume I
 5                   MR. COULSON                 7
 6
 7
 8                   EXHIBITS
 9   NUMBER          DESCRIPTION               PAGE
10   Exhibit 4       Expert Report of Bruce G.   16
11                   Silverman, 2/24/2020,
12                   Colangelo Case
13   Exhibit 5       Expert Report of Bruce G.   31
14                   Silverman, 2/24/2020 Zarinebaf
15                   Case
16   Exhibit 6       Expert Report of Bruce G.   36
17                   Silverman, 2/24/2020 Shaker
18                   Case
19
20
21
22
23
24
25
```

Page 5

```
 1               Wednesday, March 17, 2021
 2                9:03 a.m. - 10:11 a.m.
 3
 4          THE VIDEOGRAPHER:  Good morning.  We are on
 5   the record at 9:03 a.m. Pacific Daylight Time on
 6   March 17th, 2021.  Please note that the microphones are
 7   sensitive and may pick up whispering, private
 8   conversations or cellular interference.  Audio and
 9   video recording will continue to take place unless all
10   parties agree to go off the record.
11          This is Media Unit 1 of the video-recorded
12   deposition of Bruce Silverman, taken by counsel for
13   defendants in the matter of Rachel Colangelo and
14   Kathleen Paradowski, et al., versus Champion Petfoods
15   U.S.A. Inc. and Champion Petfoods LP, filed in the
16   United States District Court, Northern District of New
17   York.  Case 6:18-cv-01228.
18          This deposition is being held as a virtual
19   deposition via Zoom with the witness located in
20   Los Angeles, California.  My name is Scott Slater from
21   the firm Veritext Legal Solutions and I am the
22   videographer.  The court reporter is Shelley Holmes
23   from the firm Veritext Legal Solutions.  I am not
24   related to any party in this action, nor am I
25   financially interested in the outcome.
```

Page 6

1    Counsel and all present will now state their
2 appearances and affiliations for the record. If there
3 are any objections to proceeding, please state them at
4 the time of your appearance, beginning with the noticing
5 attorney.
6        MR. COULSON: David Coulson for the
7 defendants. And I do have a few qualifiers after your
8 preface. So this deposition's actually taking place in
9 three cases and we need to qualify further that on
10 November 24th, 2020, Mr. Silverman was deposed in a case
11 called Song versus Champion. And that transcript will
12 apply in these three cases as if it was taken in these
13 three cases.
14        In addition, besides the Colangelo case,
15 Mr. Silverman will be deposed by me in the Zarinebaf
16 case, Z-A-R-I-N-E-B-A-F, versus Champion, that's in the
17 Northern District of Illinois and the Shaker,
18 S-H-A-K-E-R, versus Champion case in the Eastern
19 District of Michigan.
20        So those are my qualifiers.
21        THE VIDEOGRAPHER: Thank you.
22        MR. LOCKO: This is Trevor Locko on behalf of
23 the plaintiffs from Robbins LLP in San Diego,
24 California. And I have no problems with the qualifiers
25 Dave just said. So ready to proceed.

Page 7

1        THE VIDEOGRAPHER: Thank you very much.
2        Will the court reporter please administer the
3 oath.
4              BRUCE SILVERMAN,
5 having been duly administered an oath in accordance with
6 CCP 2094, was examined and testified as follows:
7
8              EXAMINATION
9 BY MR. COULSON:
10   Q   So good morning, Mr. Silverman.
11   A   Good afternoon, Mr. Coulson.
12   Q   Thank you.
13       Okay. So we were last together on
14 November 24th, so since that time, what work have you
15 done from November 24th to today in connection with any
16 of the litigation against Champion Petfoods?
17   A   I prepared three expert reports, one for the
18 Michigan case, one for the Illinois case and one for the
19 New York case.
20   Q   Besides preparing those expert reports, did
21 you do any other work in connection with Champion?
22   A   No other than phone conversations with
23 Mr. Locko.
24   Q   So Since November 24th, besides Mr. Locko,
25 have you spoken with any of the other lawyers

Page 8

1 representing the plaintiffs in any of these cases
2 against Champion?
3   A   Yes.
4   Q   Who was that?
5   A   I spoke to Mr. Wexler about a completely
6 different matter.
7   Q   Okay. But as to Champion, besides Mr. Locko,
8 have you had any other conversations about the Champion
9 cases with any other lawyers for the plaintiffs other
10 than Mr. Locko?
11   A   No.
12   Q   Approximately how many hours of time of work
13 have you put into the Champion litigation since the
14 November 24th deposition?
15   A   Oh, boy. Gosh. I would guess --
16 unfortunately I didn't prepare for that question. So I
17 can only estimate, but I believe it's probably about
18 50 hours of additional work.
19       (Reporter clarification.)
20   Q   BY MR. COULSON: And in total, what are the
21 fees that you have billed to the plaintiffs' counsel for
22 your work in the Champion litigation?
23   A   What I've billed or what I've actually
24 received?
25   Q   What you've billed, I assume. Hopefully for

Page 9

1 you you'll get paid, but --
2   A   Yeah, I've been pretty good about that. I
3 believe it's in excess of $80,000.
4   Q   Now, since November 24th, have you had your
5 deposition taken in any other cases?
6   A   No.
7   Q   And have you testified in trial or any other
8 type of proceeding as an expert witness since
9 November 24th?
10   A   No.
11   Q   Have you -- since November 24th, have you been
12 engaged by any of the plaintiffs' counsel here for any
13 other litigation?
14   A   No.
15   Q   I think you listed a case called Thomas Bailey
16 versus Rite-Aid Corporation, United States District
17 Court, Northern District of California where you
18 indicate you were deposed December 10th, 2020.
19       Does that refresh your recollection?
20   A   Yes. I forgot about -- I forgot about that
21 deposition.
22   Q   What is that case about?
23   A   It's a case about labeling.
24   Q   Is it also a consumer class action complaint?
25   A   It's a consumer class action case involving a

3 (Pages 6 - 9)

Page 10

1  product that Rite-Aid sells under its own label.
2    Q    What's the product?
3    A    The product is acetaminophen.
4    Q    Just in a nutshell, what's the claim made by
5  the plaintiffs?
6    A    Rite-Aid sells, as is typical with mass
7  merchandisers like drugstores, they have -- they sell
8  products under private label that in essence are
9  emulating national brands.  In this case, the product is
10 emulating Tylenol.  And the -- there were two versions
11 of the product.  Well, actually it's more than two, but
12 in essence there are two.  One is a version that is
13 marketed as a rapid release product and the second is a
14 product, acetaminophen product that is not marketed as
15 rapid release.
16       The rapid release product costs more.  And
17 according to the plaintiffs, their allegation, is that
18 the rapid release product actually does not work any
19 faster than the significantly lower-priced acetaminophen
20 product that is not rapid release.  And, in fact, the
21 less expensive product may actually work a little bit
22 faster.
23   Q    And what's the nature of your opinions in the
24 Bailey case?
25   A    My opinions in that case deal with the

Page 11

1  materiality of claims of rapid relief.  That if a
2  product -- if an analgesic product promises fast relief
3  or faster relief, consumers would consider that very
4  important and be motivated to purchase it.
5    Q    Do you know when that case is set for trial?
6    A    I do not.  I've never discussed that with the
7  attorneys.
8    Q    Okay.  Who are the attorneys who retained you
9  in the Bailey case?
10   A    I was retained by a firm in Knoxville,
11 Tennessee.
12   Q    Greg Coleman?
13   A    Yeah, that's it.  Greg Coleman.  You know, I
14 hate to admit this, Trevor probably will be somewhat
15 insulted, I think about my clients in terms of the names
16 of the lawyers I work with more than the names of the
17 firms they work for.
18   Q    In the Bailey case, did you conduct any type
19 of consumer survey?
20   A    No, I did not.
21   Q    Okay.  Did you conduct any kind of research
22 into consumers of those products at issue?
23       (Reporter clarification.)
24       THE WITNESS:  Are you asking if I conducted a
25 survey?

Page 12

1    Q    BY MR. COULSON:  Right.  My first question was
2  did you conduct a survey as part of your expert work in
3  the Bailey versus Rite-Aid case?
4    A    And my answer to that was no.
5    Q    Did you do any -- did you interview any
6  consumers or do any particular research as to the
7  consumers of those products in the Rite-Aid case?
8    A    I did not interview consumers, but I did quite
9  a bit of research about behavior of consumers as regards
10 analgesic products.  I happen to have a lot of
11 experience with mass merchandisers and how their
12 customers tend to behave at retail.
13   Q    In the Champion litigation, since
14 November 24th, have you reviewed the deposition
15 transcripts of any of the plaintiff consumers who have
16 sued Champion?
17   A    I have not.
18   Q    Have you interviewed any of the plaintiffs who
19 have sued Champion in any of the cases?
20   A    I have not.
21   Q    Have you interviewed or otherwise talked with
22 consumers of Acana or Orijen products?
23   A    The question is have I spoken to them, not to
24 my knowledge.
25   Q    I take it that you've performed no consumer

Page 13

1  survey as to Champion's products; is that correct?
2    A    Yes.
3    Q    And I take it that you've conducted no focus
4  groups as to Champion's products; is that correct?
5    A    Yes.
6    Q    I asked you last time if you had reviewed the
7  expert report of Mr. Boedeker, that's spelled
8  B-O-E-D-E-K-E-R, he's another expert retained by the
9  plaintiffs, and your answer was no.
10       So since November 24th, have you reviewed any
11 expert reports produced by Mr. Boedeker?
12   A    I don't recall.
13   Q    Have you -- have you seen any surveys or
14 survey results by Mr. Boedeker?
15   A    Hold on one second.  Let me turn this off.  I
16 took the battery out to make sure it doesn't work.
17   Q    Okay.  No problem.  I'll ask the question
18 again.
19       Since November 24th, have you reviewed any
20 surveys performed by Mr. Boedeker?
21   A    No, I haven't.  I don't believe so.  If I did,
22 I don't recall.
23   Q    Have you spoken with Mr. Boedeker?
24   A    I have not spoken to Mr. Boedeker.
25   Q    Champion has engaged an expert witness named

4 (Pages 10 - 13)

Page 14

1  Professor Hanssens, who coincidentally lives and teaches
2  in Los Angeles, have you reviewed Mr. Hanssens' report
3  from the Song case?
4      A   I don't recall.
5      Q   Do you have any recollection of any of
6  Dr. Hanssens' criticisms of your opinions?
7      A   I don't recall.  I can't recall what his
8  opinions were.
9      Q   You have a CV that's attached to the three
10 expert reports that we're going to talk about today.
11         Is there anything new to add to that CV that's
12 material?
13     A   Not to the CV.  The -- I guess the exhibit
14 that lists my experience -- testifying experience would
15 include the Rite-Aid case.
16     Q   Okay.  And since the Rite-Aid deposition on
17 December 10th, have you been deposed at all in any other
18 litigation?
19     A   No.
20     Q   To your knowledge, have you produced any other
21 expert reports in any other consumer litigation since
22 November 24th?
23     A   Yes, I have.
24     Q   And I just want to ask you about ones that are
25 public.  What cases are those?

Page 15

1      A   I don't think any of them are public at this
2  time.
3      Q   Since I last deposed you on November 24th, are
4  you aware of any orders of any court that have excluded
5  in whole or in part any of your opinions?
6      A   No.
7      Q   In your past deposition we had three exhibits.
8  Let's start this one as Exhibit No. 4, it will be your
9  expert report in the Colangelo case.
10         MR. COULSON:  Okay.  So, Mr. Astorga, you can
11 do the share screen from that.
12         MR. ASTORGA:  Sorry.  It says it's disabled.
13         THE VIDEOGRAPHER:  I'm on it.  Go ahead now.
14         MR. ASTORGA:  Thank you.
15     Q   BY MR. COULSON:  Mr. Silverman, do you have a
16 copy of your report in front of you, a hard copy or
17 something you can pull up digitally?
18     A   No, I don't.  I don't have a hard copy and I
19 guess if I -- you know, I guess I could put it up on the
20 screen, you know, putting -- you know, splitting the
21 screen, opening a window.
22         MR. COULSON:  So, Mr. Astorga, are you able to
23 get the Exhibit Share screen?
24         MR. ASTORGA:  I have it up.  You can't see it?
25 Hold on one second.

Page 16

1         THE WITNESS:  Now I'm seeing it.
2      Q   BY MR. COULSON:  Okay.  All right.  It's
3  supposed to be marked as Exhibit 4.
4         Do you recognize this report?
5      A   Yes, I do.
6         (Exhibit 4 was marked for identification
7         and is attached hereto.)
8      Q   BY MR. COULSON:  This is a general question,
9  what changes did you make between what you did in the
10 Song case and what you did here in this Colangelo and
11 Paradowski case?
12     A   That's a -- that's a complex question.  I'll
13 give you the best answer I can.  In these cases, and
14 actually, I believe it's in all three cases, the
15 specific -- the diets that were discussed in each case
16 was somewhat different, they were fewer -- I think, for
17 example, in the New York case here, the Colangelo case,
18 I think there were -- my recollection is there were only
19 two diets that were at issue and they were more in the
20 -- the other two cases.
21        If I recall correctly in this case, they were
22 only -- the diets that were at issue, both Acana, there
23 weren't any Orijen products.  In the New York case,
24 there was -- I did not discuss the issue of
25 pentobarbital.  I was instructed to do that by the

Page 17

1  attorneys.
2         There was one issue that I was asked to
3  consider in these cases that was not included in the
4  Song case, and it had to do with how consumers look at
5  packages in terms of looking at claims on the front of
6  the package versus looking for say disclaimers that
7  might appear on the reverse side of the package or the
8  side of the package or something like that.
9         I was sent a -- an appellate ruling from the
10 7th Circuit from a case called Bell in which the judge
11 -- at least the judge's opinion basically completely
12 reinforced my experience and my opinion about how
13 consumers look at packages when they're in stores and
14 retail.  I think the term I used in my report was that
15 they're not detectives, they're not claimed detectives.
16 They don't -- and they shouldn't be expected to have to
17 hunt down disclaimers that appear on the reverse side of
18 the package.
19        When I read that, I felt it appropriate to
20 speak to that without citing the ruling, that's not my
21 place to do that, but the essence of that idea I did
22 speak about in these three reports.
23     Q   Okay.  Do you recall anything else that's
24 different substantially between the Song report and what
25 you've done on Colangelo?

5 (Pages 14 - 17)

Page 18

1   A   I -- gosh, I don't think so. I mean, you're
2   asking me about -- to try to remember exactly what is in
3   three -- actually four separate reports. And each
4   report is somewhat different. But I think that what I
5   just spoke about kind of is the major issues.
6   Q   Okay. Well, in the Bell case from the 7th
7   Circuit, the qualifier or disclaimer was actually in the
8   ingredient panel that lists the ingredients.
9       Did you recall that?
10  A   Yeah, I do recall that, yeah.
11  Q   Even as to that, isn't it true that the
12  consumers who purchase Champion's products are
13  information seekers, I thought you testified to that
14  last time?
15  A   I said yes, I think I did testify about it and
16  it's in my reports. I think that people who buy
17  relatively expensive products for -- in this case, for a
18  beloved house pet, tend to want to get information about
19  the products that they buy, they seek out information in
20  various ways.
21      But, you know, that doesn't -- you know,
22  there's a difference in getting information and then
23  taking a magnifying glass to seek out information in
24  super detail, especially in a retail environment.
25  Q   What do you think about this kind of stuff,

Page 19

1   the plaintiffs as part of their claim rely on
2   information in small font on the back of the bag?
3       How do you reconcile that with your view that
4   people should not have to be looking at the back of the
5   bag for disclaimers?
6   A   I'm not saying that they shouldn't look at the
7   back of the bag, they can look at the back of the bag
8   and look at the front of the bag. It has to do with
9   what they're looking for, what the process is about.
10      To me, a good advertiser, a good marketing
11  company, a company that does things the right way puts
12  claims on the front of the package that should be
13  basically unarguable. They should be this is what we
14  stand for, this is what we're about, we're willing to
15  stand by in that. And I think that most consumers today
16  have high expectations from first-class companies,
17  especially from companies where they're paying premiums
18  for the product.
19      So, you know, they're going to look at the
20  back for whatever they can look at, it's what they're
21  searching for and whether there's a need to search and
22  whether or not there's something that they would be
23  looking on the back to say, "Well, is the comment, is
24  the statement on the front true?"
25      And in my experience, consumers don't do that.

Page 20

1   And I have not seen that where consumers do that.
2   That's just a mark of consumers not trusting the
3   marketer. And consumers tend to buy products from
4   companies they trust, especially premium priced
5   products.
6   Q   Okay. Let's go to Page 2 of the exhibit --
7   it's actually several pages in. It's Page 2 of your
8   report.
9   A   Could -- it would be helpful if we could get
10  rid of the toolbox on the right side over there of the
11  PDF and if you could just make the page bigger, little
12  bit easier to see.
13      If you hit the little arrow on the side. I
14  guess I live with PDFs more than you do. There's a
15  little arrow right -- go up, up, up, go down that line,
16  down that line, down that line, down that -- there you
17  go. Hit that.
18      Good. Less distracting. Thank you.
19  Q   Okay. So in Paragraph 4 there's two products
20  listed, Acana Heritage Free-Run Poultry and Acana
21  Regionals Meadowland.
22      Do you see that?
23  A   Yes, I do.
24  Q   Who gave you the information about what
25  Champion products were at issue?

Page 21

1   A   Mr. Locko.
2   Q   And do you know the time period for the class
3   that the plaintiffs are seeking to certify?
4   A   Gosh, my recollection is that -- well, I know
5   that I was told when I was working on these three
6   reports that at least the three -- these three reports I
7   should only deal with products that were made in
8   Kentucky, not any of the products that were made in
9   Canada. And again, I'm doing this by memory, but I
10  believe it was 2016 was the first year.
11  Q   And did counsel explain to you why he wanted
12  to confine it to these particular diets and only ones in
13  Kentucky and only starting in 2016?
14  A   My understanding was that they were going to
15  restrict to the diets that the named plaintiffs had
16  actually purchased.
17  Q   Are you aware of whether in this instance --
18  well, first of all, do you know -- are you aware of what
19  Ms. Colangelo's status is in the case?
20  A   No. My understanding is she's one of the
21  plaintiffs.
22  Q   Okay. So you're not aware that she actually
23  dismissed her case?
24  A   No, I'm not aware of that.
25  Q   Okay. And then as to Ms. Paradowski, besides

Page 22

1  the free-run poultry and the meadowland, what other
2  diets had she purchased?
3      A   I don't know.
4      Q   Is it possible that Ms. Paradowski actually
5  purchased other diets than what you list here?
6      A   I have no idea.
7      Q   In the phrase "Delivering nutrients
8  naturally," where is that found on the packaging?
9      A   It's -- if you show me the package I can point
10 it out to you.  It's part of a list that appears, if I
11 remember correctly, on the front of the package.
12     Q   Now, based on your experience, if a consumer
13 started buying a brand, and later -- and continued
14 buying the brand, and later in time the packaging
15 labeling changed, is it common that the consumer
16 doesn't, you know, read the new packaging label but just
17 continues to buy the product?
18     A   It's a very general question.  You know,
19 there's a lot of different kind of products out there
20 and packaging sometimes does get changed.  In my
21 experience, if there appears to be a substantial change
22 the consumer will reexamine the package just to make
23 sure that they're getting what they thought they were
24 getting, that the product is consistent with the product
25 they had been purchasing.

Page 23

1      Q   Are there consumers out there who buy a brand
2  just out of loyalty to it?
3      A   That's been my experience, yes.  A lot of
4  people are brand loyal and they keep buying it.
5      Q   I realize you don't have this report in front
6  of you, but where in the report did you address this
7  question about how consumers may look at claims on the
8  front versus the back?
9      A   Well, it's in the report.  I don't know
10 whether -- I'm not quite sure exactly what your question
11 means.  As we previously discussed, there's a place in
12 the report where I speak about how consumers are not
13 inclined to go hunting to determine the truth of
14 statements that are made on the front label.
15     Q   Let's go to Page 12 of Exhibit 4.
16     A   Okay.
17     Q   Okay.  Is it subparagraph (i) -- I guess it's
18 Paragraph 32(i), is that the paragraph that relates to
19 this addition you put into this report?
20     A   Well, that's a -- that's a -- this is a list
21 or summary of all the opinions that I'm offering in the
22 case.  So that is one place where I speak to it, if I
23 recall correctly.  Later in the report, in my analysis,
24 I address that issue in a little bit more detail.
25     Q   Are you saying that consumers who purchase

Page 24

1  Acana or Orijen actually do not read the backs of the
2  package?
3      A   I never said that.
4      Q   Well, given that the food is relatively
5  expensive, and those who purchase the food are
6  information seekers, wouldn't you expect them to
7  actually read at least the most prominent language on
8  the back of the packaging?
9      A   I think that consumers of products like this,
10 premium priced products that they're feeding to their
11 dogs, at some point, usually when they're making their
12 initial decision to purchase the product are going to
13 look at the packaging reasonably closely.  There's a lot
14 of information on these packages.  And I do believe that
15 consumers like to get information before they make a
16 purchase.  They want to make a rational purchase.
17         The difference is -- and if we go to
18 subparagraph (i) here, the point is -- is what I'm
19 saying, actually the words say it pretty clearly.  It is
20 unreasonable to expect consumers to proactively
21 determine whether the challenge statements that appear
22 on the front of the package are true or to somehow
23 determine if something isn't there, hasn't been
24 addressed.
25         So that's what it's saying there.  It's

Page 25

1  certainly not saying that consumers, you know, don't
2  look at the back of the package.  In my opinion, you
3  know, a significant portion of consumers of products
4  like these look at both the front and back.
5          It's how they're looking, it's what they're
6  looking for.  That's -- and that's a very large
7  difference.
8      Q   What do you mean by proactive when you said
9  proactively?
10     A   What I meant by proactively is -- it's in my
11 -- in my both experience -- in my experience, consumers
12 don't say to themselves, "Gee, should I trust these
13 claims on the front?  So maybe there's more information
14 on the back and I'll go hunt that down."
15         In my experience, consumers don't think that
16 way, they don't behave that way and they don't do that.
17 And the second part of this -- of this particular
18 opinion is that consumers aren't -- they would have no
19 way of proactively saying, "Gee, I think I'm going to go
20 to the back of the package to see what they left out."
21         I mean, if you think about that that's a
22 completely illogical idea.  You don't look for things
23 that you don't know are there, that you don't expect to
24 be there.  So that's what this paragraph is about, what
25 this opinion is about.

7 (Pages 22 - 25)

Page 26

1   Videographer, if you don't mind, if you could
2  blow that thing up just a bit bigger.  I have a big
3  computer screen, but it's a little bit hard for me to
4  see.
5      Q   In testifying you've used the word disclaimer,
6  what do you mean by a disclaimer?
7      A   Well, it's pretty typical in both labeling and
8  advertising that sometimes there are statements made in
9  ads or in television commercials or labels that limit
10 the -- limit the claims or limit the conditions that the
11 consumer has to meet to make the purchase.
12          The best example I can think of is in
13 automobile advertising that you see on television,
14 particularly for lease programs, there'll be a very
15 long, almost impossible to read superimposed copy on the
16 television screen that states all the conditions that
17 you would have to meet to lease the vehicle.
18          I think those things were invented by people
19 in your profession.  They're most certainly not invented
20 by people in mine.
21     Q   Well, what is the difference between a
22 disclaimer and a marketing message?
23     A   Well, a marketing message -- the purpose of a
24 marketing message is to communicate attributes or
25 benefits to consumers that would encourage them to see

Page 27

1  the product favorably and perhaps purchase it.
2          A disclaimer can be nothing more than
3  additional information that the consumer might need to
4  know about it, about either the claim or the entire
5  marketing program.
6      Q   Okay.  Now, you're aware -- maybe you're not,
7  I don't think I went over this with you before, are you
8  aware that fish often have mercury in them such as tuna
9  or salmon?
10     A   Yeah, I'm aware of that.
11     Q   And so if you're a consumer who's aware of
12 that and you see that an ingre -- you know, that one or
13 more ingredients in the Acana or Orijen food consists of
14 fish, aren't you going to be aware that there's a
15 possibility of at least some amount of mercury in the
16 food?
17     A   Oh, I think that's -- frankly, I think that's
18 asking a lot from the consumer when you're speaking
19 about dog food.  I think buying dog food is very
20 different than going to the supermarket or the fish
21 market and buying a swordfish steak.  At least in
22 California they actually have warnings in the
23 supermarket about certain fish that speak to mercury
24 levels, et cetera.  California is big on warnings about
25 a lot of things for consumers.

Page 28

1  But when you're talking about something that's
2  an ingredient, I don't think consumers think about it
3  that way, I really don't.  I suppose that if a consumer
4  was highly aware and highly -- and was very, very
5  concerned about that issue, they might think about it,
6  but I don't think most would.
7          You know, it really comes down to whether or
8  not it's something consumers should know.  Whether or
9  not it's something consumers are entitled to know.  And
10 if consumers are entitled to know about something, then
11 in my opinion the manufacturer should provide that
12 information.
13     Q   And by "entitled," who's the source of that
14 entitlement, you mean like regulations by the government
15 or --
16     A   No.  No, I'm not speaking of government
17 regulations, I'm speaking of, you know, being -- you
18 know, being a good consumer in my opinion includes, you
19 know, doing a reasonable amount of -- tracking a
20 reasonable amount of information so that you're making a
21 smart purchase.
22          If there is an issue of mercury, for example,
23 because there's a lot of fish in the product, in my
24 opinion, that should be revealed on the package that
25 there's a certain amount of -- well, there may be

Page 29

1  mercury included in this particular package, in the dog
2  food.
3      Q   Are you aware of any pet food manufacturer who
4  makes a disclosure about the presence of any of the
5  heavy metals on its packaging, whether it be lead,
6  arsenic, mercury or cadmium?
7          MR. LOCKO:  Objection; outside the scope.
8          THE WITNESS:  Yes.  I have not done any
9  studying like that.
10     Q   BY MR. COULSON:  So the answer is you're not
11 aware; correct?
12     A   That's correct.
13     Q   Okay.  Now, are you aware that consumers of
14 Acana and Orijen often rotate diets for their dogs so
15 they're not always buying the same diet but they buy a
16 variety of diets over time?
17     A   I'm not aware of that, no.
18     Q   Would that surprise you if that's the case?
19     A   It actually does surprise me somewhat.  I've
20 had dogs for decades and decades and decades and we've
21 always been advised to, you know, stick to whatever the
22 dog food is, to stick to it, that it ultimately is
23 better for the dog.
24     Q   Are you still --
25     A   I don't pretend to be a dog nutrition expert.

Page 30

1  Q  Are you still feeding your dog Zignature?
2  A  Yes.
3  Q  After the last deposition when I told you
4  about the heavy metal testing in Zignature's products,
5  have you done any research about the presence of heavy
6  metal in the Zignature products that you buy?
7  A  I honestly don't recall you telling me about
8  heavy metal research on Zignature.  If you did, frankly,
9  my mission was to complete the deposition.  It wasn't to
10 go off and study the bag of dog food that we have.
11 Q  If you go back to your transcript you can find
12 this discussion on Pages 135 to 136.
13    But, you know, the bottom line is, you know,
14 since you've been doing the expert work in this case and
15 since that deposition, you've done no research yourself
16 as to whether the Zignature products you buy contain any
17 level of heavy metals; is that correct?
18 A  That's correct.  That would be very far out of
19 the scope of my assignment.
20 Q  But did you actually review these two packages
21 for the Colangelo case, the Acana free-run poultry and
22 regional meadowlands?
23 A  Yes.  Those two -- the two diets, yes.
24 Q  Yeah.  Did you review only one bag for each of
25 them or did you review various versions of bags for

Page 31

1  those products?
2  A  I think there may have been, you know, two
3  from each, meaning where they changed the packaging at
4  some point.
5  Q  Okay.  Let's mark as Exhibit 5 your expert
6  report from the Zarinebaf case.
7    (Exhibit 5 was marked for identification
8    and is attached hereto.)
9  Q  BY MR. COULSON:  And do you recognize
10 Exhibit 5?
11 A  Yeah.  That appears to be my report.
12 Q  Okay.  Let's go to Page 2.
13    Again, I assume that counsel told you which
14 products were at issue for purposes of your report?
15 A  Yes.
16 Q  Okay.  And did you review the actual packaging
17 for these products?
18 A  At the time I did the report, yes.
19 Q  Do you recall whether you reviewed more than
20 one version of these various packages for these diets?
21 A  I have been provided with the package graphics
22 that apply to each of these products and I reviewed
23 everything that I was given to review.
24 Q  But do you recall whether there was more than
25 one version of bags for some of these products?

Page 32

1  A  Yes.  For some of the products, yes.
2  Q  Let's go to Page 3.  These are the last two.
3  A  Yes.
4  Q  Same question as I had previously, when you
5  compare the Song report to the Zarinebaf report, what is
6  it that you changed?
7  A  Well, pretty much I guess the same answer as I
8  gave you on the New York report would apply.  My best
9  recollection is that there were more diets that were
10 considered challenged in the Song report.  I also
11 believe that there were the specific claims.  In some
12 instances that were being challenged, there might have
13 been fewer, some of the -- they eliminated some of the
14 challenge claims.
15    The -- my opinion regarding whether or not
16 consumers hunt down for contradictions regarding front
17 of package claims, whether they hunt them down on the
18 back, that was in this report as well.  And there may
19 have been other things that are different.  I just can't
20 recall them one to one.  These were -- these were fairly
21 large reports.  I don't memorize my reports.
22 Q  For the Zarinebaf case, are you aware of
23 whether the three plaintiffs, three class representative
24 plaintiffs in the case had purchased other Champion
25 diets other than the ones listed on Pages 2 and 3 of

Page 33

1  your report?
2  A  I don't know.
3  Q  Do you know when those three plaintiffs
4  actually began purchasing pet food made by Champion?
5  A  If it was listed in the complaint, I don't
6  recall.
7  Q  Do you know what consumer heterogeneity means?
8    (Reporter clarification.)
9  Q  BY MR. COULSON:  I may have mispronounced
10 this, but do you know what consumer heterogeneity means,
11 H-E-T-E-R-O-G-E-N-E-I-T-Y?
12 A  Do I know what it means?  I'm not familiar
13 with the term.
14 Q  In the field of marketing, is it common -- in
15 the field of marketing, is it commonly accepted that
16 consumers differ in their preferences?
17 A  Well, it's certainly commonly accepted that,
18 you know, consumers, we use the word consumers, you
19 know, in the United States that has the potential to
20 mean 330 million different people.
21    What marketers do is they try to seek out
22 consumers -- marketers for their products try to seek
23 out consumers who have a lot of things in common, who
24 have similar demographics, similar psychographics,
25 psychographics meaning lifestyles and value systems,

Page 34
1  similar interests because that's your best shot at being
2  able to effectively communicate to consumers.
3       So you try to, in essence, create -- you
4  guys -- you lawyer guys would call it a class, you know,
5  marketing people refer to it as a target audience of --
6  that makes sense for the product that's being sold and
7  for the way you want to sell it.
8    Q   So even within a target audience, do all those
9  consumers hear about all product features equally?
10   A   No, not in my experience.
11   Q   Even within a target audience, do all
12 consumers buy a product for the same reason?
13   A   Well, you know, that's a very broad question.
14 In this instance, why are the consumers buying the
15 product, they're all buying it for exactly the same
16 reason, they need dog food, they have dogs that they're
17 feeding.
18      So yes, from that standpoint the answer is
19 yes.  If you were to go a little bit broader and you
20 would say why are consumers buying your client's
21 products versus other brands, there are factors about
22 your client's brands that appeal in general on a broad
23 basis appeal to the consumers that purchase it.
24      Is every single factor equal, no.  Does every
25 consumer think exactly the same way as another consumer

Page 35
1  that buys the product, no.  But in general, the answer
2  is yes, the answer is that -- it's what marketing is all
3  about.  Is getting consumers to say, "I'm buying this
4  product because," and then you fill in the blank.
5    Q   Right.  Yeah, but even then the target
6  audience, different consumers could have different
7  reasons for liking or disliking a product; correct?
8    A   The -- there are always individuals, you know,
9  people are people.  But the idea of marketing is --
10 well, the idea of forming a target audience again is to
11 get people who are going to mostly agree together that
12 the reasons they're buying the product are the reasons
13 suggested or communicated by the marketer.
14      That's how consumers choose products,
15 especially products that they personally don't use,
16 meaning, you know, this is a food product, but I don't
17 think many people personally choose to try and eat it.
18   Q   Right.  But even let's take, you know, Orijen
19 or Acana, couldn't it be that some consumers who
20 purchase those products buy it because they like the
21 fact that it's high protein and low carbohydrates, while
22 others really like it because they like the idea of
23 fresh regional ingredients, whereas the person who maybe
24 is really fixated on the high protein doesn't care -- he
25 could care less about whether it's fresh or regional,

Page 36
1  wouldn't you agree with that?
2    A   You know, I -- I -- there's always -- there
3  are always individuals who, you know, kind of think more
4  narrowly.  But I think that in my experience, effective
5  communications allows consumers to add up the attributes
6  and the benefits that are being expressed by the
7  advertiser.
8       Now, some people are always going to be more
9  interested in one than the other.  But I've really never
10 heard of a situation where a consumer completely
11 discounts claims that speak to the quality of the
12 product.  And, you know, everything you've mentioned
13 deals with the quality of the product.  It's the reason
14 consumers will believe this product is of high quality.
15      So I don't see consumers just saying, "Oh, I'm
16 going to ignore that, I don't care about that."  That's
17 contrary to my experience.
18   Q   Okay.  Let's go to Exhibit 6, which is your
19 report in the Shaker case.
20      (Exhibit 6 was marked for identification
21      and is attached hereto.)
22   Q   BY MR. COULSON:  And do you recognize
23 Exhibit 6?
24   A   Yes, that appears to be my report.
25   Q   Okay.  So same questions I asked before, other

Page 37
1  than having different diets listed and dealing with the
2  question about looking at the back of the packaging and
3  including a discussion as to pentaobarbital, were there
4  any other substantive changes between your report in the
5  Shaker case and what you did in the Song case?
6    A   I don't believe so.
7    Q   Let's look at Pages -- actually, let's turn to
8  Page 2 that lists the products.
9       Again, I assume that you were given this list
10 of products by the plaintiffs' counsel?
11   A   Yes, I was.
12   Q   Did you review the actual packages for these
13 products?
14   A   I did.
15   Q   Do you recall whether you reviewed more than
16 one version of a package for these particular products?
17   A   If I had been provided with more than one
18 version I reviewed it, yes.
19   Q   Do you know whether the named plaintiffs in
20 the Shaker case purchased Acana or Orijen products other
21 than those listed on Page 2 of your report?
22   A   I don't know.
23   Q   I see with Orijen Regional Red, one of the
24 statements that you deal with is "Nourish as nature
25 intended."

10 (Pages 34 - 37)

Page 38

1   Do you see that?
2   A   Yes.
3   Q   But in the Zarinebaf report we just looked at,
4   that was not listed under Orijen.
5       Do you recall that?
6   A   Yes, I do.
7   Q   And why not?
8   A   I was told by Mr. Locko that -- my
9   understanding is that the judge on the case ruled that
10  that was to be taken out.
11  Q   Have you formed an opinion on what "Nourish as
12  nature intended" means?
13  A   Have I formed an opinion as to what it means?
14  Q   Right.
15  A   I think that -- I think I did speak to it in
16  my report.  I think -- I think I addressed very
17  specifically that phrase.
18      MR. COULSON:  Let's take a ten-minute break.
19  I don't have a lot left.  I think we'll finish within a
20  half hour at most.
21      THE WITNESS:  Okay.
22      MR. COULSON:  So let's take a ten-minute
23  break.
24      THE WITNESS:  Okay.
25      THE VIDEOGRAPHER:  We are off the record.  The

Page 39

1   time is 10:02 a.m.
2       (A brief recess was taken.)
3       THE VIDEOGRAPHER:  We are back on the record.
4   The time is 10:09 a.m.
5   Q   BY MR. COULSON:  Were you asked to render any
6   opinions other than those that you provided when you
7   were deposed November 24th and those that you've
8   provided in your various expert reports and provided
9   today?
10  A   That's it.
11  Q   Okay.  Other than the opinions from your
12  various expert reports and from the November 24th
13  deposition and today, have you formed any other opinions
14  that you will provide at trial?
15  A   No.
16  Q   Is there any testimony you've given either
17  back on November 24th or today that you'd like to
18  change?
19  A   I think that -- I think that in the
20  November 24th deposition when I reviewed the transcript
21  I did find some things to correct.  So they were noted
22  on the errata sheet.  But other than that, nothing.
23      MR. COULSON:  Okay.  At this time I have no
24  further questions.
25      MR. LOCKO:  No questions on my behalf.  I

Page 40

1   would like to reserve the right for Bruce to review and
2   sign the deposition.
3       MR. COULSON:  And, Shelley, we'd like to order
4   this expedited because we're -- you know, the expert
5   report, rebuttal report's due relatively soon.
6       THE REPORTER:  Okay.
7       THE VIDEOGRAPHER:  We are off the record.  The
8   time is 10:11 a.m. on March 17th, 2021.
9       This concludes today's testimony given by
10  Bruce Silverman.  The total number of media units used
11  was two and will be retained by Veritext Legal
12  Solutions.
13          (Time Noted: 10:11 a.m.)

Page 41

1           PENALTY OF PERJURY
2
3   I, BRUCE SILVERMAN, do hereby declare under penalty
4   of perjury that I have read the foregoing transcript of
5   my deposition; that I have made such corrections as
6   noted herein, in ink, initialed by me, or attached
7   hereto; that my testimony as contained herein, as
8   corrected, is true and correct.
9
10      EXECUTED this _____ day of _____,
11  20__, at _____, _____.
                (City)              (State)
12
13
14      _____
                BRUCE SILVERMAN
15          Volume I

Page 42

1  CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2     I, Rochelle Holmes, the undersigned, a Certified
3  Shorthand Reporter of the State of California, do hereby
4  certify:
5     That the foregoing proceedings were taken
6  before me via videoconference; that any witnesses in the
7  foregoing proceedings, prior to testifying, were
8  administered an oath; that a record of the proceedings
9  was made by me using machine shorthand which was
10 thereafter transcribed under my direction; that the
11 foregoing transcript is a true record of the testimony
12 given.
13    Further, that if the foregoing pertains to the
14 original transcript of a deposition in a Federal Case,
15 before completion of the proceedings, review of the
16 transcript [X] was [ ] was not requested.
17    I further certify I am neither financially
18 interested in the action nor a relative or employee
19 of any attorney or any party to this action.
20    IN WITNESS WHEREOF, I have this date subscribed my
21 name.  Dated: March 18, 2021
22
23
24         *Rochelle Holmes*
           Rochelle Holmes
25         CSR No. 9482, CCRR No. 0123

Page 43

1        ERRATA SHEET
2   DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
    In Re: RACHEL COLANGELO and KATHLEEN PARADOWSKI VS.
3        CHAMPION PETFOODS USA INC.
    CLAIM NO.: 6:18-cv-01228
4   DATE: 3/17/2021
    DEPONENT: BRUCE SILVERMAN
5
6   PAGE  LINE    CORRECTION & REASON
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18
19  Under penalties of perjury, I declare that I have
20  read the foregoing document and that the facts stated
21  are true.
22
23
24  _____
25  DATE         BRUCE SILVERMAN

Page 44

1  March 17, 2021
2  BRUCE SILVERMAN
   C/O: TREVOR LOCKO, ATTORNEY
3  OF:  ROBBINS LLP
        TLocko@robbinsllp.com
4
   Re: 3/17/2021 Deposition of: BRUCE SILVERMAN
5  RACHEL COLANGELO and KATHLEEN PARADOWSKI VS.
   CHAMPION PETFOODS USA INC.
6  CLAIM NO.: 6:18-cv-01228
7  Dear Sir/Madam:
8     This letter is to advise that the transcript of
   the above-referenced deposition has been completed
9  and is available for review.  Please contact our
   office to come to our office at (800) 275-7991 to
10 make arrangements to read and sign or sign below to
   waive review of this transcript.
11
      It is suggested that the review of this
12 transcript be completed within 30 days of your
   receipt of this letter, as considered reasonable
13 under Federal Rules*; however, there is no Florida
   Statute to this regard.
14
      The original of this transcript has been
15 forwarded to the ordering party and your errata, once
   received, will be forwarded to all ordering parties.
16
17 Sincerely,
18
   ROCHELLE HOLMES, Certified Shorthand Reporter
19
20    WAIVER:
      I, _____ hereby waive the reading &
21 signing of my deposition transcript.
22 _____  _____
      Deponent Signature          Date
23
24 *Federal Civil Procedure Rule 30(e)/Florida Civil
25  Procedure Rule 1.310(e)