UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RACHEL COLANGELO,

                         Plaintiff,

        -against-                                        6:18-CV-1228 (LEK/ML)

CHAMPION PETFOODS USA, INC.,
*et al.,*

                         Defendants.

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        Plaintiffs Rachel Colangelo and Kathleen Paradowski, individually and on behalf of

others similarly situated, brought this putative class action against defendants Champion

Petfoods USA, Inc. and Champion Petfoods LP ("Defendants" or "Champion"). Dkt. No. 54

("Amended Complaint"). Plaintiffs, who sought to represent a class of New York purchasers of

Champion dog food, asserted a variety of claims relating to Defendants' labeling and advertising

of their products. Id. ¶¶ 17–20. In response to Defendants' motion to dismiss, Dkt. No. 62, the

Court dismissed Plaintiff's claims for breach of implied warranty, negligence, and negligence per

se, but allowed Plaintiffs' claims for violations of New York General Business Law ("GBL") §§

349 and 350, breach of express warranty, fraudulent misrepresentation, and fraud by omission to

proceed, Dkt. No. 71. Subsequently, the parties stipulated to allow Plaintiffs to file a second

amended complaint. Dkt. Nos. 74, 76 ("Second Amended Complaint"). The parties later

stipulated to dismiss Rachel Colangelo as a plaintiff, Dkt. Nos. 89, 90, leaving Kathleen

Paradowski ("Plaintiff") as the sole named plaintiff. Finally, the parties stipulated to limit the

lines of dogfood at issue, dismissing claims based on all Champion ORIJEN and ACANA diets

except for ACANA Heritage Free-Run Poultry and ACANA Regionals Meadowlands diets manufactured at Champion's DogStar facility. Dkt. Nos. 114, 115.

Now before the Court are Plaintiff's motion for class certification, Dkt. Nos. 108 ("Motion to Certify"), 134 ("Defendants' Opposition to Motion to Certify"), 140 ("Plaintiff's Reply in Support of Motion to Certify"), and Defendants' motion for summary judgement, Dkt. Nos. 130 ("Motion for Summary Judgement"), 130-1 ("Defendants' Summary Judgement Memorandum"), 148 ("Response to Motion for Summary Judgement"), 48-68 ("Plaintiff's Memorandum in Opposition to Summary Judgement"), 153 ("Defendants' Reply in Support of Motion for Summary Judgement"). Also before the Court are Defendants' motions to exclude Plaintiff's expert witnesses Bruce G. Silverman, Dr. Gary Pusillo, and Stefan Boedeker, and Plaintiff's motion to exclude Defendants' expert witness, Dr. Robert H. Poppenga. Dkt. Nos. 131 ("Motion to Exclude Silverman"), 131-1 ("Silverman Memorandum of Law"), 131-3 ("Silverman Report"), 132 ("Motion to Exclude Pusillo"), 132-1 ("Pusillo Memorandum of Law"), 132-6 ("Pusillo Safety Report"), 132-7 ("Pusillo Test Report"), 132-11 ("Poppenga Rebuttal Report"), 133 ("Motion to Exclude Boedeker"), 133-1 ("Boedeker Memorandum of Law"), 133-3 ("Boedeker Report"), 133-4 ("Hanssens Rebuttal Report"), 133-6 ("Hitt Rebuttal Report"), 144 ("Motion to Exclude Poppenga"), 144-1 ("Poppenga Memorandum of Law"), 144-6 ("Poppenga Report").

Through her briefing and expert reports, Plaintiff presents compelling evidence of flaws in Defendants' products and processes. It is undisputed that Acana is among the most expensive dog foods on the market, and a number of Plaintiff's filings and expert reports build on the theme that consumers expect more from such a premium brand. However, selling a non-premium product at premium prices is not, by itself, grounds for liability. Rather, as described below,

liability attaches only where the product is either represented as possessing premium attributes that it in fact lacks or is labeled in a way that omits information the disclosure of which is required under New York law. For the reasons that follow, the Court grants Defendants' Motion for Summary Judgement. The Court also grants in part and denies in part Defendants' Motion to Exclude Silverman, grants in part and denies in part as moot Defendants' Motion to Exclude Pusillo, grants in part and denies in part Defendants' Motion to Exclude Boedeker, and denies as moot Plaintiff's Motion to Exclude Poppenga. Finally, the Court denies Plaintiff's Motion to Certify as moot.

## II.   BACKGROUND

### A.  Factual History

The following facts are undisputed, except where otherwise noted.

#### 1.  The Parties

Defendant Champion USA is a Delaware corporation with a principal place of business in Kentucky. Sec. Am. Compl. ¶ 20; Dkt. No. 78 ("Answer") ¶ 20. Defendant Champion Canada is a Canadian limited partnership with its principal place of business in Alberta. Sec. Am. Compl. ¶ 21; Ans. ¶ 21. Acana is a one of Defendants' brands of dry kibble pet food and has adopted a "Biologically Appropriate" nutritional philosophy, which emphasizes the use of animal-based proteins to "attempt to mirror how wolves or wilds (sic) dogs would get nutrition in nature." Dkt. No. 130-2 ("Defendant's Statement of Material Facts") ¶¶ 1–4; Dkt. No. 148-1 pages 1–37 ("Plaintiff's Response to Defendant's Statement of Material Facts") ¶¶ 1–4. Starting around 2016, most of Defendants' dog food sold in the United States, including all of the dog food at issue in this case, has been manufactured at their DogStar facility in Kentucky. Defs.' SMF ¶ 7; Pl.'s Res. to Defs.' SMF ¶ 7.

3

Plaintiff Kathleen Paradowski is a citizen of New York with two dogs. Sec. Am. Compl. ¶¶ 11, 13; Ans. ¶¶ 11, 13. Plaintiff purchased Acana Heritage Free-Run Poultry in February 2017[1] and Acana Regionals Meadowland from May 2017 until September 2017 and then again in December 2017 and January 2018. Defs.' SMF ¶ 10; Pl.'s Res. to Defs.' SMF ¶ 10. Plaintiff stopped purchasing Champion dog food in 2018. Defs.' SMF ¶ 11; Pl.'s Res. to Defs.' SMF ¶ 11.

### 2. The Packaging & Contents

At all relevant times, the front of the packaging for the DogStar ACANA Regionals Meadowland and Heritage Free-Run Poultry diets stated the diet was "Biologically Appropriate" Defs.' SMF ¶ 13; Pl.'s Res. to Defs.' SMF ¶ 13. In one location on each package the phrase "Biologically Appropriate" was followed by the text: "Our foods mirror the richness, freshness and variety of meats for which dogs are evolved to eat."[2] Defs.' SMF ¶ 14; Pl.'s Res. to Defs.' SMF ¶ 14. In another location on each package, the phrase "Biologically Appropriate" was followed by the phrase "Protein-Rich, Carbohydrate-Limited."[3] Defs.' SMF ¶ 17; Pl.'s Res. to Defs.' SMF ¶ 17. The DogStar Acana Free-Run Poultry packaging contained the following text: "[Y]our dog is a carnivore, designed by nature to thrive on whole game, fowl or fish, and possessing a biological need for foods that are rich and varied in fresh whole animal ingredients"; while the DogStar Acana Meadowland packaging contained the following text: "Delivered to us Fresh or Raw in WholePrey$^{TM}$ ratios, and brimming with goodness and taste.

---

[1] Defendants characterize Plaintiff's purchases as beginning in mid-2016, Defs.' SMF ¶ 10, but the Court does not view this discrepancy as material.

[2] Defendants and Plaintiff disagree as to whether this text "explain[ed]" the phrase "Biologically Appropriate" and whether this text precludes Plaintiff from assigning additional meaning to the phrase. See Pl.'s Res. to Defs.' SMF ¶ 17.

[3] Again, Plaintiffs dispute the meaning of the phrase "Biologically Appropriate," but not the text's presence on the packaging. Pl.'s Res. to Defs.' SMF ¶ 17.

Acana's high inclusions and rich diversity of free-run poultry, eggs and fish ingredients mirror your dog's evolutionary diet . . . ."[4] Defs.' SMF ¶¶ 15, 16; Pl.'s Res. to Defs.' SMF ¶¶ 15, 16.

The DogStar packaging of Acana Free-Run Poultry dog food was labeled with the phrase "Free-Run Poultry Formula," followed below by the text "with Fresh Cobb Chicken, Turkey & Nest-Laid Eggs."[5] Defs.' SMF ¶ 20; Pl.'s Res. to Defs.' SMF ¶ 20.

All relevant packaging included the phrase "infused with freeze-dried chicken liver."[6] Defs.' SMF ¶ 21; Pl.'s Res. to Defs.' SMF ¶ 21. The top left of the front of each package also contained the text "unmatched regional ingredients" followed below by larger text reading "Fresh or Raw."[7] Defs.' SMF ¶ 24; Pl.'s Res. to Defs.' SMF ¶ 24. The back of each 25-pound bag of DogStar Acana Meadowland stated "this 25 lb package of ACANA is made with 17 ½ lb [of] premium animal ingredients. Half are FRESH or RAW and loaded with goodness, and half

---

[4] Plaintiffs dispute these facts "to the extent that Silverman Report opines that CPF packaging conveys a uniform, consistent marketing messages and that all of CPF packaging fails to disclose the presence of heavy metals, non-fresh ingredients, and non-regional ingredients, as well as the risk of BPA" and "to the extent [that] minor differences in the Dog Food's packaging do not impact the uniform 'Biologically Appropriate,' 'Fresh Regional Ingredients,' and natural message CPF communicated to consumers." Pl.'s Res. to Defs.' SMF ¶¶ 15, 16. The Court interprets these statements as relating to the significance of this text and not its presence on the packaging. As such, the Court finds no dispute of fact as to whether the text appeared on the packaging.

[5] The parties appear to disagree about whether the word "with" implies that this formula is "made with" "Fresh Cobb Chicken, Turkey & Nest-Laid Eggs" (i.e. as the primary ingredients), or rather implies that "Fresh Cobb Chicken, Turkey & Nest-Laid Eggs" are an addition to the formula. However, there is no dispute that this text appeared on the packaging. Defs.' SMF ¶ 20; Pl.'s Res. to Defs.' SMF ¶ 20.

[6] Again, Plaintiff disputes the significance of this statement but not its existence on the packaging. See Pl.'s Res. to Defs.' SMF ¶ 21.

[7] See Footnote 6.

are DRIED or OILS to provide a strong and natural source of animal proteins and fats."[8] Defs.'

SMF ¶ 25; Pl.'s Res. to Defs.' SMF ¶ 25. Similarly, the back of each 13-pound bag of Acana

Free-Run Poultry stated "this 13 lb package of ACANA is made with over 7 ¾ lb [of] free-run

poultry & egg ingredients. Half are FRESH or RAW and loaded with goodness and taste, and

half are DRIED or OILS to provide a strong and natural source of animal proteins and fats."[9]

Defs.' SMF ¶ 26; Pl.'s Res. to Defs.' SMF ¶ 26.

Each package mentioned "regional" ingredients and did contain some "regional"

ingredients.[10] Defs.' SMF ¶ 33; Pl.'s Res. to Defs.' SMF ¶ 33. The back of each package also

included an outline of the continental United States with a circle placed approximately over

Kentucky and possibly parts of Tennessee and Indiana. See Defs.' SMF ¶ 34; Pl.'s Res. to Defs.'

SMF ¶ 34. This image was accompanied by the label "Fresh Regional Ingredients," followed by

text reading: "We focus on fresh ingredients from our region that are ranched, farmed or fished

by people we know and trust."[11] Defs.' SMF ¶ 34; Pl.'s Res. to Defs.' SMF ¶ 34. Each package

also identified either "America's Fertile Farmlands" or "America's Fertile Farms and Meadows"

as Defendants' "Source of Inspiration and Fresh Regional Ingredients."[12] Defs.' SMF ¶ 35; Pl.'s

---

[8] See Footnote 6.

[9] See Footnote 6.

[10] Plaintiff notes that she understood these labels to imply that most or all of the ingredients were regional, not merely that some ingredients were regional. Pl.'s Res. to Defs.' SMF ¶ 33.

[11] See Footnote 6.

[12] See Footnote 6.

Res. to Defs.' SMF ¶ 35. Each bag also stated the city or county and state where some key ingredients were sourced.[13] Defs.' SMF ¶ 36; Pl.'s Res. to Defs.' SMF ¶ 36.

Each Acana Regionals Meadowland package accurately stated that the following ingredients were sourced at the specified locations: "Free-Run Chicken: Mayfield, Kentucky; Free-Run Turkey: Mercer County, Ohio; Freshwater Catfish: Paducah, Kentucky; Rainbow Trout: Soda Springs, Idaho." [14] See Defs.' SMF ¶ 37; Pl.'s Res. to Defs.' SMF ¶ 37. However, it is not entirely clear whether each package included each of these ingredients sourced from each of these locations.

Similarly, each Acana Heritage Free-Run Poultry package accurately stated that the following ingredients were sourced at the specified locations: "free-run chicken: Mayfield, Kentucky; free-run turkey: Mercer County, Ohio; eggs: Paducah, Kentucky; vegetables and fruits: Louisville, Kentucky." [15] See Defs.' SMF ¶ 38; Pl.'s Res. to Defs.' SMF ¶ 38. Again, it is not entirely clear whether each package included each of these ingredients sourced from each of these locations.

None of the dog food packages in question stated explicitly that all ingredients were regional or attempted to define the term regional. See Defs.' SMF ¶ 42; Pl.'s Res. to Defs.' SMF ¶ 42.

The back of each package of dogfood contained the following text: "Mirroring nature, ACANA WholePrey™ foods feature a nourishing balance of poultry, organs and cartilage — all

---

[13] See Footnote 6.

[14] See Footnote 10.

[15] See Footnote 10.

of which reflect the whole prey animal, DELIVERING NUTRIENTS NATURALLY. That's why you won't find long lists of synthetic additives in ACANA foods."[16] See Defs.' SMF ¶ 46; Pl.'s Res. to Defs.' SMF ¶ 46. Aside from zinc proteinate, which was noted on the 2016-2017 DogStar Acana Meadowland and Free-Run Poultry packages, the nutrients in Defendants' dog foods come from natural ingredients rather than synthetic ingredients.[17] See Defs.' SMF ¶ 50; Pl.'s Res. to Defs.' SMF ¶ 50.

Plaintiff testified that she looked at the bag before purchasing it, and understood that Acana Meadowlands included dried ingredients and oils before purchasing it. See Defs.' SMF ¶ 27; Pl.'s Res. to Defs.' SMF ¶ 27. However, Plaintiff also testified that she understood all of the ingredients to be fresh. See Pl.'s Res. to Defs.' SMF ¶ 27.

Defendants' products contain heavy metals, including lead, mercury, arsenic, and cadmium. See Sec. Am. Compl. ¶ 7; Dkt. Nos. 148-1 pages 37–55 ("Plaintiff's Statement of Material Facts") ¶ 15, 153-1 ("Defendants' Response to Plaintiff's Statement of Material Facts") ¶ 15, 108-28 ("Defendants' White Paper"). Defendants maintain that "[t]he notion of a heavy-metal-free dog food is scientifically impossible." Defs.' Resp to Pl's SMF ¶ 18. The parties dispute the precise quantity of heavy metals present, see, e.g., Ans. ¶ 7, but agree that the question of whether Defendants' dog food was safe is not at issue in this litigation. See Pl.'s Mem. in Opp. to S.J. at 13; Poppenga Mem. of L. at 1; Defs.' Resp to Pl's SMF ¶ 15. Defendants do not regularly test for the chemical bisphenol A ("BPA") in their products, but Defendants' products sometimes contain detectable levels of BPA. See Pl's SMF ¶ 23; Defs.' Resp to Pl's

---

[16] See Footnote 6.

[17] Plaintiff disputes that this fact is relevant given her understanding of the phrase "Delivering Nutrients Naturally." Pl.'s Res. to Defs.' SMF ¶¶ 49, 50.

SMF ¶ 23. As with heavy metals, the question of whether BPA renders Defendants' products unsafe is not at issue. See Pl.'s Mem. in Opp. to S.J. at 13–14; Poppenga Mem. of L. at 1; Defs.' Resp to Pl's SMF ¶ 15.

Defendants define "fresh" as meaning "never more than three weeks old from their date of production." Pl's SMF ¶ 34; Defs.' Resp to Pl's SMF ¶ 34. Defendants' products include fresh ingredients as well as frozen ingredients, dried ingredients, and oils. See, e.g., Pl's SMF ¶ 30; Defs.' Resp to Pl's SMF ¶ 30. The ratio of fresh to frozen ingredients may vary depending on factors such as the time of year. Pl's SMF ¶ 30; Defs.' Resp to Pl's SMF ¶ 36. Defendants occasionally use ingredients that have gone past their "best-used-by" date, Pl's SMF ¶ 36; Defs.' Resp to Pl's SMF ¶ 36, but maintain that they do so only when it "is safe to do so, and it will not compromise nutritional value." Defs.' Resp to Pl's SMF ¶ 36. Nonetheless, in some cases, Defendants have allowed expired ingredients to be used based on sensory evaluation even when the ingredients failed laboratory tests. Pl's SMF ¶ 38; Defs.' Resp to Pl's SMF ¶ 38.[18] Defendants' products also often contain regrinds, which are previously manufactured dog or cat food, rejected for quality assurance issues, ground up, and reincorporated into a new batch of food. See Pl's SMF ¶ 41; Defs.' Resp to Pl's SMF ¶ 41. The majority of batches utilize regrinds, Pl's SMF ¶ 46 with Defs.' Resp to Pl's SMF ¶ 46[19], but the parties disagree about whether the

---

[18] Defendants do not specifically address this claim, but argue that the use of such ingredients is immaterial because Plaintiff has put forward no evidence that she purchased products containing such ingredients. Defs.' Resp to Pl's SMF ¶ 38.

[19] Defendants misleadingly argue that "[t]he evidence shows that most 'batches' of Champion dog food do not contain any regrinds whatsoever." Defs.' Resp to Pl's SMF ¶ 43. However, in the cited deposition testimony, Defendants' former kitchen manager's response to the question "[d]o most batches contain regrinds, though?" was in fact "I don't know. I – a lot do, but I – I wouldn't say most." Dkt. No. 108-14 at 3. Other testimony from the same deposition supports Plaintiff's claims. Id. ("Q. – would the regrind formula be used more than the non-regrind formula?" "A. I'd say yes.")

inclusion of regrinds affects the quality of the food, compare Pl's SMF ¶ 42 with Defs.' Resp to Pl's SMF ¶ 42. When they are included, regrinds usually do not exceed 5% of the bulk dry ingredients, but in some cases have comprised up to 10.96%. Pl's SMF ¶ 43; Defs.' Resp to Pl's SMF ¶ 43.

Some of Defendants' ingredients, such as turmeric, are sourced internationally. Pl's SMF ¶ 48; Defs.' Resp to Pl's SMF ¶ 48. Other ingredients are sourced from parts of the United States outside of the Kentucky region. Pl's SMF ¶ 48; Defs.' Resp to Pl's SMF ¶ 48. However, the only major ingredient identified as sourced from outside the Kentucky region in the diets at issue is rainbow trout from Soda Springs, Idaho, which is noted on the front of the package. See Defs.' SMF ¶ 37; Pl.'s Res. to Defs.' SMF ¶ 37; Defs.' Resp to Pl's SMF ¶ 48. Defendants also include images of specific suppliers on their packages. Pl's SMF ¶ 51; Defs.' Resp to Pl's SMF ¶ 51. However, these farmers do not supply all of the featured ingredients. Pl's SMF ¶ 51; Defs.' Resp to Pl's SMF ¶ 51. In addition, Defendants have intentionally represented certain farms in such a way as to avoid disclosing that the farms are owned by large corporations such as Tyson Inc. and Pilgrim's Pride. See Pl's SMF ¶ 52; Defs.' Resp to Pl's SMF ¶ 52.

## III.   LEGAL STANDARD

### A.  Motions to Exclude

Under Rule 702 of the Federal Rules of Evidence, the Court is charged with a "gatekeeping" obligation with respect to expert testimony. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). The trial judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an

> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the

area in which the witness has superior knowledge, education, experience, or skill, with the

subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d

Cir. 2004). "Generally speaking, expert qualifications are liberally construed." Rondout Valley

Cent. Sch. Dist. v. Coneco Corp., 321 F. Supp. 2d 469, 474 (N.D.N.Y. 2004) (citations omitted).

"Under Daubert, factors relevant to determining reliability include the theory's testability,

the extent to which it has been subjected to peer review and publication, the extent to which a

technique is subject to standards controlling the technique's operation, the known or potential

rate of error, and the degree of acceptance with the relevant scientific community." Restivo v.

Hessemann, 846 F.3d 547, 575–76 (2d Cir. 2017) (internal quotation marks and citations

omitted). The reliability inquiry is a "flexible one," Daubert, 509 U.S. at 594, and the factors to

be considered "depend[] upon the particular circumstances of the particular case at issue,"

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999). "In undertaking this flexible

inquiry, the district court must focus on the principles and methodology employed by the expert,

without regard to the conclusions the expert has reached or the district court's belief as to the

correctness of those conclusions." Amorgianos v. Natl. R.R. Passenger Corp., 303 F.3d 256, 266

(2d Cir. 2002). "Thus, when an expert opinion is based on data, a methodology, or studies that

are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the

exclusion of that unreliable opinion testimony." Id. In other words, "[a] court may conclude that

there is simply too great an analytical gap between the data and the opinion proffered." Gen.

Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "Frequently, though, 'gaps or inconsistencies in the reasoning leading to [the expert's] opinion . . . go to the weight of the evidence, not to its admissibility.'" Restivo, 846 F.3d at 577 (quoting Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 186 (2d Cir. 2001)).

While "[n]either the Supreme Court nor the Second Circuit has definitively decided whether the Daubert standard governs the admissibility of expert evidence submitted at the class certification stage . . . [m]ost courts that have addressed the issue have concluded that the Daubert test does apply in this context." Chen-Oster v. Goldman, Sachs & Co., 114 F. Supp. 3d 110, 114 (S.D.N.Y. 2015). "Several rationales support this view" including that "Daubert is an amplification of Rule 702, and the Federal Rules of Evidence apply generally to 'proceedings' in the courts of the United States;" that "the Supreme Court has directed district courts to conduct a 'rigorous analysis' in class certification proceedings to determine whether the [class certification] requirements of Rule 23 of the Federal Rules of Civil Procedure are met;" and that "the Supreme Court itself has expressed skepticism at the suggestion that Daubert would not apply to expert testimony at the class certification stage." Id. (citations omitted); see also Baker v. Saint-Gobain Performance Plastics Corp., No. 116-CV-0917, 2021 WL 2548825, at *2 (N.D.N.Y. May 7, 2021) (Kahn, J.); In re Fisher-Price Rock 'N Play Sleeper Mktg., Sales Pracs. & Prod. Liab. Litig., No. 19-MD-2903, 2021 WL 4988186, at *2 (W.D.N.Y. Oct. 19, 2021). For these reasons, the Court finds that it is appropriate to undertake a Daubert analysis.

### B.  Summary Judgement

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under

Case 6:18-cv-01228-LEK-ML   Document 176   Filed 03/31/22   Page 13 of 64

the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude

summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d

43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the

nonmoving party should summary judgment be granted.").

     The party seeking summary judgment bears the burden of informing the court of the basis

for the motion and identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party

has failed "to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial." Id. at 322.

     In attempting to repel a motion for summary judgment after the moving party has met its

initial burden, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all

reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary

judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo

v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

    **C.  Class Certification**

13

"Class certification is governed by Federal Rule of Civil Procedure 23." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011). Rule 23(a) requires that a party seeking certification demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23. In addition, a "proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." Dukes, 564 U.S. at 45. A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23. A class may be certified under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23.

## IV.   DISCUSSION

### A.   Motion to Exclude Boedeker

Defendants seek to exclude the expert testimony of Stefan Boedeker. See generally Boedeker Mem. of L. The bulk of the Boedeker Report focuses on two conjoint surveys conducted to estimate damages based on a benefit-of-the-bargain theory. See Boedeker Report at 8–58. In addition, the Boedeker Report includes an expectation survey, conducted to measure consumer perception of the alleged misrepresentations and omissions and the extent of any material impact on consumers. See id. at 59–65.

To start, the Court notes that Defendants do not contend either that Boedeker was unqualified to conduct these analyses, or that either conjoint analysis or expectation surveys are, in general, junk science. See generally Boedeker Mem. of L. Indeed, "Mr. Boedeker is an economist with advanced degrees in statistics and economics, and 25 years of experience applying economic, statistical, and financial models," In re MyFord Touch Consumer Litig., 291 F. Supp. 3d 936, 943 (N.D. Cal. 2018), and "[c]onjoint analysis has been used for decades as a way of estimating the market's willingness to pay for various product features," Guido v. L'Oreal, USA, Inc., No. 11-CV-1067, 2014 WL 6603730, at *5 (C.D. Cal. July 24, 2014). Rather, Defendants contend that Boedeker's application of conjoint analysis cannot accurately estimate damages consistent with Plaintiff's articulated theory, that the expectations survey is fatally flawed because it fails to include a control group, and that all of Boedeker's surveys are unreliable because of mistakes in their implementations. See generally Boedeker Mem. of L. The Court considers each of these arguments in turn.

## 1. Validity of Conjoint Analysis Approach

The goal of Boedeker's conjoint analyses is to model a counterfactual "but-for" world in which Defendants' products did not contain the alleged misrepresentations and omissions. See id. at 8. By comparing the price of Defendants' products in the real world against the modeled price in the but-for world, an estimate of damages can be obtained. In a conjoint survey, survey participants are asked to choose between two hypothetical products with differing attributes and price points.[20] These survey results are then used to build a demand curve, predicting the proportion of potential customers who would purchase a product with particular attributes at any

---

[20] Here, Boedeker employed a "dual-response none method," meaning that in addition to choosing between two hypothetical products, each participant also answered whether they would actually choose to purchase the product selected. Boedeker Mem. of L. at 35.

given price point. Here, Boedeker then used these modeled "but-for" demand curves to estimate the price of Defendants' products without the alleged misrepresentations and omissions. Id. at 26–27. In doing so, Boedeker assumed that quantity of products sold in the "but-for" world would be the same as the quantity sold in the real world. Id.

Defendants raise a number of arguments for excluding Boedeker's conjoint analyses. The most contentious issue relates to whether conjoint analysis is an appropriate approach for calculating benefit-of-the-bargain damages, and in particular whether it sufficiently accounts for supply-side factors. District courts in the Second Circuit and around the country are divided on these questions. Indeed, even since Defendant's Motion to Exclude Boedeker was filed, both Plaintiff and Defendants have brought to the Court's attention newly decided cases supporting their respective arguments. See Dkt. Nos. 158, 160, 162, 166–169 (provided by Plaintiff), 159, 161 (provided by Defendants). Starting from the basics, "the purpose of 'benefit of the bargain' damages is to compensate a defrauded party for amounts that would have been received if the situation had been as the defrauding party represented." Jacobs Mfg. Co. v. Sam Brown Co., 19 F.3d 1259, 1265 (8th Cir. 1994). These damages, then, can be calculated by starting with the price that customers paid for a product, and subtracting the hypothetical price they "should" have paid for the product. The question then arises of whether this hypothetical price should represent the price that customers would have been willing to pay, absent any misconduct, or whether it should represent the market equilibrium price, absent any misconduct. This question lies at the core of the debate over the use of conjoint analysis.

By way of illustration, consider a toaster[21] with a brief useful lifespan of one year. Imagine that the toaster is fraudulently represented as lasting at least three years and sells for $30. A class of customers sues, seeking benefit-of-the-bargain damages. Performing a conjoint analysis could provide a demand curve, showing what percentage of potential buyers would buy the toaster, absent the misrepresentation, at any given price point. This could, in turn, tell us that in order to sell the same number of toasters without misrepresenting their lifespan, the manufacturer would have needed to drop the price to $15. This price represents customers' willingness to pay. The demand curve would also show many other possibilities; for instance, perhaps the manufacture could have sold half as many toasters for $25, or 10% as many toasters without dropping the price at all. If the manufacturer were allowed to consider supply side factors—such as cost of production—then select between points on the demand curve, the point chosen would represent the "but-for" market price. Suppose that given its supply side factors the toaster manufacturer would have chosen the $25 price point with a 50% reduction in sales. There are now two points of dispute about calculating damages. First, should damages be calculated using willingness to pay ($30 - $15 = $15 per toaster sold), or should they be calculated based on the "but-for" market price ($30 - $25 = $5 per toaster sold).[22] Second, if damages should be calculated based on the market price, are there certain assumptions that can be made in

---

[21] This example is inspired by the similar example provided in In re Fisher-Price, 2021 WL 4988186, at *2 (W.D.N.Y. Oct. 19, 2021).

[22] This disagreement can also be conceived of as a dispute about what factors should be held constant in the "but-for" world. Boedeker argues that everything except for the alleged misconduct—including the quantity of production—should be held constant, Boedeker Report at 11–12, while Defendants' expert Dominique M. Hanssens responds that the allegedly harmful act should be removed in the but-for world and both supply and demand should be allowed to adjust accordingly. See Hanssens Rebuttal Report at 21.

conducting a conjoint analysis that will ensure supply-side factors are sufficiently accounted for, i.e. that willingness to pay is a reasonable approximation of the "but-for" market price.

District Courts, both in the Second Circuit and around the country disagree on the answers to these questions. Compare, e.g., Sharpe v. A&W Concentrate Co., No. 19-CV-768, 2021 WL 3721392, at *9 (E.D.N.Y. July 23, 2021) (allowing conjoint analysis); Hadley v. Kellogg Sales Co., 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) (same); Broomfield v. Craft Brew All., Inc., No. 17-CV-01027, 2018 WL 4952519, at *19 (N.D. Cal. Sept. 25, 2018) (same); In re Dial Complete Mktg. & Sales Pracs. Litig., 320 F.R.D. 326, 337 (D.N.H. 2017) (same) with In re General Motors LLC Ignition Switch Litigation, 407 F. Supp. 3d 212, 236 (S.D.N.Y. 2019) (disallowing conjoint analysis); Zakaria v. Gerber Prod. Co., No. 15-CV-200, 2017 WL 9512587, at *21 (C.D. Cal. Aug. 9, 2017) (same), aff'd, 755 F. App'x 623 (9th Cir. 2018); In re NJOY, Inc. Consumer Class Action Litig., 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (same); Apple, Inc. v. Samsung Elecs. Co., No. 11-CV-01846, 2014 WL 976898, at *12 (N.D. Cal. Mar. 6, 2014) (same). However, many of those courts have confronted conjoint analysis in the context of class certification. In that context, the question under Comcast Corp. v. Behrend is whether the "model purporting to serve as evidence of damages . . . measure[s] only those damages attributable" to the plaintiff's damages theory. 569 U.S. 27, 35 (2013). This contrasts with the Daubert context, where an expert's damages model must "rest[] on a reliable foundation and [be] relevant" to the calculation of damages, Daubert, 509 U.S. at 597, but need not precisely align with the plaintiff's damages model.

Thus, with regard to the question of admissibility, the Court finds the reasoning of our sister court in the Western District of New York in In re Fisher-Price, 2021 WL 4988186, and of the Ninth Circuit in MacDougall v. Am. Honda Motor Co., No. 20-CV-56060, 2021 WL

6101256 (9th Cir. Dec. 21, 2021) to be particularly compelling. In <u>In re Fisher-Price</u>, the court carefully evaluated both the line of cases accepting the conjoint analysis approach and the line of cases rejecting this approach. It concluded that "what these two lines of cases indicate is that there is a legitimate difference of opinion, both among judges and experts, about the significance of supply side information in calculating loss of value. [Plaintiff's expert's] methodology is not wrong or 'fake'—it is simply different in a principled way from [Defendant's expert's] analysis. A difference in opinion is not a basis for exclusion of an expert opinion under Daubert standards." <u>In re Fisher-Price</u>, 2021 WL 4988186, at *7. Similarly, in <u>MacDougall</u>, the Ninth Circuit found that a conjoint analysis could not be excluded under <u>Daubert</u>, reversing a lower court holding. The <u>MacDougall</u> Court noted that while a number of courts have found conjoint analysis to lack "substantive probity in the context of either class-wide damages under <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27, 34 (2013), or under substantive state law," the class certification inquiry under <u>Comcast</u> is distinct from the analysis of admissibility under Rule 702 or <u>Daubert</u>.[23] <u>MacDougall</u>, 2021 WL 6101256, at *1. The court concluded that because the conjoint analysis was "conducted according to accepted principles" and "'relevant' to the issues in the case," the defendant's objection to "the absence of market considerations . . . [went] to the weight given the survey, not its admissibility." <u>Id.</u> (quoting <u>Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.</u>, 618 F.3d 1025, 1036 (9th Cir. 2010)).

Here, the Court reaches the same conclusion. Boedeker's decision to hold production constant does not render his analysis "junk science" or irrelevant to the issues in the case. This

---

[23] District courts in the Second Circuit similarly regard the inquiries under <u>Comcast</u> and <u>Daubert</u> as distinct. <u>See, e.g.</u>, <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 299 F. Supp. 3d 430, 542 (S.D.N.Y. 2018) ("even if this flaw were insufficient to render Dr. Seyhun's impact factor models inadmissible under <u>Daubert</u>, a mismatch would remain" under <u>Comcast</u>).

methodological decision goes to the weight given to the evidence and not its admissibility.[24]

However, this finding under <u>Daubert</u> does not answer whether Boedeker's conjoint analysis

supports class certification under <u>Comcast</u>. The answer to that question would depend upon

whether New York law allows for the use of "willingness to pay" in calculating benefit-of-the-

bargain damages and, if not, whether the circumstances of the case render "willingness to pay"

---

[24] Indeed, the Court notes that depending on the circumstances, either a "willingness to pay" approach or a "but-for" market price approach might provide a more accurate approximation of the actual damage suffered by a class. To see why, consider the following stylized hypothetical. A widget manufacture produces widgets that purport to have two distinguishing attributes: they are green and they are round. Competing widgets are yellow and square. Because of these distinguishing attributes, it costs the widget manufacture $1.50 to make each widget, but it can sell these widgets for $2 each, rather than the $1 each that competitors are able to charge for their square yellow widgets. Now suppose that 20% of the widget manufacture's customers care mostly about having green widgets, while the other 80% care mostly about having round widgets. If the widgets were round but not green, 80% would still pay $1.90 while 20% would pay no more than $1.10. If the widgets were green but not round, 20% would still pay $1.90, but 80% would pay no more than $1.10.

Now, in scenario 1, suppose it is discovered that, despite the manufacture's representations, its widgets are not in fact round. What should the damages be? Under Plaintiff's approach, had the manufacture not misrepresented its product, it would have had to reduce the price to $1.10 to sell the same number of widgets. This results in damages of 90 cents per widget. Under Defendant's approach, on the other hand, without the misrepresentation, the manufacture would have reduced supply by 80% and sold the remaining widgets for a market price of $1.90. This results in a damages estimate of 10 cents per widget. In this scenario, Plaintiff's methodology seems to come closer to placing the harmed consumers in the position they would have been in without the misrepresentation.

However, now consider scenario 2. Here it is discovered that the widgets, while round, are not in fact green. The actual harm done to consumers is significantly reduced compared with scenario 1, but neither damages estimate is affected at all. Rather, Plaintiff's methodology continues to suggest damages of 90 cents per widget, while Defendants' methodology continues to suggest damages of 10 cents per widget. In this scenario Defendants' methodology comes closer to approximating the harm done to consumers.

As this hypothetical demonstrates, both approaches are approximations of the actual harm caused. The "willingness to pay" approach tends to overestimate damages while the "but-for" market price approach tends to underestimate them. Under some circumstances the two estimates might converge, while under other circumstances they can be highly divergent. The Court notes that while an approach that simply averages the "willingness to pay" of a representative sample of class members could more closely track the actual harm caused, such an approach may not be viable under state law and/or the class certification rules.

an acceptable approximation of the "but-for" market price. See generally In re Gen. Motors LLC Ignition Switch Litig., 407 F. Supp. 3d 212, 239 (S.D.N.Y. 2019) (finding, in a defective vehicle case, that state law in California, Missouri, and Texas did not allow the use of "willingness to pay" in calculating benefit-of-the-bargain damages, but noting that many courts in "classic mislabeling cases" have found conjoint analyses to adequately account for supply-side factors).

Defendants also present a second argument that Boedeker's conjoint analysis approach cannot accurately produce damages estimates. Specifically, Defendants contend that because Boedeker performed two separate conjoint surveys—one for Defendants' alleged misrepresentations and the other for Defendants' alleged omissions—Boedecker has provided no way of determining damages for a combination of misrepresentations and omissions. Boedeker Mem. of L. at 14–17. Defendants argue persuasively that the damages estimates for misrepresentations cannot simply be added to damages estimates for omissions. See id. For instance, Plaintiff seeks to hold Defendants liable both for labeling their products as containing fresh ingredients and for not disclosing specific types of non-fresh ingredients including expired ingredients and regrinds. See Sec. Am. Compl. ¶¶ 119, 174, 199. Adding together these damages would be an obvious case of double counting. But while, Boedecker did suggest in deposition testimony that damages estimates for misrepresentations and omissions could simply be added together, Dkt. No. 133-5 at 26–27, he later clarified that this would be possible only if the misrepresentations results and the omissions results were independent. Id. 133-5 at 28. Since Boedeker had not checked whether the misrepresentations results and the omissions results were independent (a proposition the Court finds implausible), he did not propose adding damages estimates for misrepresentations and omissions in his report. See id.; see also Boedeker Report at 53–57. In her Reply in Support of Motion to Certify, Plaintiff reiterates that damages estimates

for misrepresentations and for omissions cannot simply be added together. See Pl.'s Reply in

Support of Motion to Certify at 10. However, she fails to clearly articulate how Boedeker's

survey results could be utilized to calculate damages for a combination of misrepresentation and

omissions claims. See id. While this failure may prove a barrier to class certification under

Comcast, it is not enough to render Boedeker's approach inadmissible. Had the Boedeker Report

advocated simply adding misrepresentation damages with omissions damages, it might rightly be

regarded as junk science, and at least that portion of the report excluded. However, Boedeker

does not advocate such an approach, and even if his findings cannot fully characterize damages,

they remain relevant to the question of damages.[25]

### 2.   Lack of Control Group in Expectations Survey

In addition to his conjoint analysis, Boedeker conducted an expectations survey to

measure consumer perception of the alleged misrepresentations and omissions. Boedeker Report

at 59. This survey consisted of three parts. In the first part, potential customers were shown an

image of Defendants' product and asked questions such as the following: "From the 'Fresh'

statements on the dog food shown, I would expect that the dog food shown. . . ." Id. at 62, 199–

200.[26] For this question, respondents could then choose to strongly disagree, disagree, neither

agree nor disagree, strongly agree, or choose "Don't know/ unsure" for each of the following: (a)

"contains only fresh ingredients unless specifically stated otherwise on the packaging," (b) "does

not contain any expired ingredients," (c) "does not contain any reground dog food," and (d) "is

---

[25] If damages for misrepresentations and omissions must be combined, Boedeker's
analysis is relevant in that it sets a lower bound, namely the greater of misrepresentation
damages and omissions damages.

[26]   For the sake of clarity, citations to the appendices of the Boedeker Report refer to the
pagination generated by CM/ECF, the Court's electronic filing system.

formulated to resemble what dogs would eat in the wild." Id. Similar questions were asked for each of the alleged misrepresentations. See id. at 62–64, 195–200.

In the second part of the survey, respondents were asked: "All else equal, does each label below make you more or less likely to purchase the dog food shown?" Id. at 64, 201–06. Respondents were then shown the following labels: "Biologically Appropriate," "Whole Prey," "High Palatability," "Delivering Nutrients Naturally," "Fresh Ingredients," "Regional Ingredients," and "Fresh Regional Ingredients." Id. For each label, respondents could select "Far less likely," "Less likely," "Same," "More likely," or "Far more likely." Id.

Finally, in the third part of the survey, respondents were again shown an image of Defendants' product and asked: "With regard to the dog food bag shown, if one or more of the following were true, would you be more or less likely to purchase the dog food shown?" Id. at 65, 207–08. Respondents were given the follow statements: "Does not contain expired ingredients," "Does not contain regrinds," "Does not contain heavy metals," "Does not contain BPA," "Does not contain pentobarbital."[27] Id. For each of these statements respondents could then select "Far less likely," "Less likely," "Same," "More likely," or "Far more likely." Id.

Defendants object to Boedeker's failure to employ a control group when undertaking this study. Without a control group, they argue, "he cannot determine whether respondents' agreement or disagreement was due to the Alleged Misrepresentations and Alleged Omissions, or influenced by some other factors such as preexisting impressions, general expectations about dog food, or mere guessing." Boedeker Mem. of L. at 12. This argument applies with particular force to the first section of the survey. Plaintiffs argue that Boedeker included "control

---

[27] While relevant to Plaintiff's original complaint, Dkt. No. 1, pentobarbital is no longer at issue, see generally Sec. Am. Compl.

questions" to account for acquiescence bias.[28] Dkt. No. 145 ("Plaintiff's Response to Motion to Exclude Boedeker") at 14. However, at best this addresses only half of the problem. Even ignoring any issue of acquiescence bias, there is simply the problem that without a control group it is impossible to establish cause and effect. For instance, 88.4% of respondent either strongly agreed or agreed that "[f]rom the 'Fresh' statements on the dog food shown, [they] would expect that the dog food shown . . . does not contain any expired ingredients." See Boedeker Report at 62. However, it is possible, and indeed quite plausible, that most of these respondents simply expect premium dog food, or dog food in general, not to contain any expired ingredients. Thus, we cannot infer that this impression arises from the allegedly misleading labels. When the purpose of a survey is to show causation, and the lack of a control group renders such an inference impossible, courts have found such evidence inadmissible. See, e.g., J.T. Colby & Co. v. Apple Inc., No. 11-CV-4060, 2013 WL 1903883, at *22 (S.D.N.Y. May 8, 2013), aff'd, 586 F. App'x 8 (2d Cir. 2014) (finding a survey inadmissible in part for lack of an adequate control group); Longoria v. Million Dollar Corp., No. 18-CV-02266, 2021 WL 791505, at *8 (D. Colo. Mar. 2, 2021) (excluding a survey because a "causal study . . . requires a control group" and "without a control group, Mr. Buncher cannot demonstrate that the survey responses in fact reflect the thing the survey is designed to prove"). The Court here follows the same approach and excludes the first part of Boedeker's expectations survey.

Defendants do not specifically focus their arguments on the second and third parts of the survey. Indeed, it is not clear how a control group could be applied to these parts. These parts do

---

[28] Acquiescence bias refers to the tendency of survey respondents to sometimes endorse the "assertion made in a question, regardless of the assertion's content." Krosnick, J. A., & S. Presser (2010), Question and Questionnaire Design in HANDBOOK OF SURVEY RESEARCH, 275 (J. D. Wright & P. V. Marsden, eds., 2nd ed. 2010).

not seek to infer causation, rather, they directly ask respondents whether certain statements or information would make them more or less likely to purchase Defendants' product. See id. at 64–65. The utility of this type of survey may be limited. It may tend to show that some of Defendants' labeling is material to some potential customers, however, this was already readily apparent from the results of the conjoint analysis. Nonetheless, given that Defendants have not provided a compelling justification to exclude these parts of the survey, the Court declines to do so.

### 3. Lack of Pretest in Expectations Survey

Defendants also argue that the expectations survey should be excluded because Boedeker failed to follow best practices by conducting the survey without first conducting a pre-test to identify potential flaws or sources of misunderstanding. Boedeker Mem. of L. at 23–24. Boedeker noted in deposition testimony that he conducted an informal pretest by reviewing the first fifty answers to a question at the end of his Expectation Survey that asked respondents "Did you have a clear understanding of the questions in this survey?" See Dkt. No. 133-5 at 10; Boedeker Report at 230. This may not be the most rigorous approach to conducting a pre-test and might be insufficient for admissibility were there reason to believe that respondents were misled or confused by the survey questions. Here, however, Defendants have not identified any reason to believe that respondents to the expectations survey were confused by the second and third parts. As such, Defendants' critique goes to the weight and not the admissibility of the evidence. See, e.g., Risinger v. SOC LLC, No. 212-CV-0063, 2018 WL 4258500, at *6 (D. Nev. Sept. 5, 2018) (finding Defendants' argument that a survey was inadmissible for lack of a pretest to be unpersuasive where Defendants provided only "trivial" evidence that the survey was confusing.)

4. *Sample Populations*

Defendants argue that both Boedeker's conjoint surveys and his expectations survey should be excluded because they sampled the wrong population. See Boedeker Mem. of L. at 24–25. For each of Boedeker's surveys, the population was limited to individuals who had had a dog in the past three years, had purchased—or were involved in the purchasing decision of—dry dog food in the past 3 years, and who had purchased or considered purchasing dog food from at least one premium[29] dog food brand in the past three years. Boedeker Report at 59–60. Defendants object to Boedeker's decision to survey respondents across the United States, rather than limiting the survey to New York residents, and the fact that surveys were not limited to actual purchasers of Defendants' products. See Boedeker Mem. of L. at 24–25. Defendants' expert Dominique Hanssens also notes that some of the survey respondents do not appear to have even been potential customers of Defendants' products. Seventeen of the survey participants noted in their follow-up comments that all of the product prices in the survey were much higher than they would pay in the real world, many of the other "premium" brands used in the survey sell products for at least somewhat lower prices than Defendants,[30] and more than a third of survey respondents reported household incomes of less than $50,000, making them less likely to purchase premium dog food products. Hanssens Rebuttal Report at 29–32.

To start, the Court finds the decision not to limit the surveys to New York residents insufficient to justify exclusion under Daubert. The purpose of the conjoint survey is to establish

---

[29] Premium dog food brands were defined to include the set of competitors identified by Defendants' expert in a separate case. Boedeker Report at 31 n.46.

[30] Seven percent of the "premium" brands sold 25 lb bags of dogfood for less than $46.99, 35% below $57.99, and 54% below $66.99—the price of Defendants' products. Hanssens Rebuttal Report at 31.

a counterfactual price point—were it not for the alleged misrepresentations or omissions—for products sold across the United States. See Defs.' SMF ¶ 7 (noting that dog food manufactured at the DogStar facility is sold throughout the United States except for Alaska). As such, it is not clear to the Court that a survey limited to New York residents would be superior. To the extent that it would be, this question goes to the weight of the survey and not its admissibility.

The purpose of the expectations survey is different. The portions that have not already been excluded were conducted to demonstrate the materiality of the alleged misrepresentations and omissions among the class members. See Boedeker Report at 59. As such, a survey limited to New York residents would be preferable to a nationwide survey. "'To assess the admissibility of survey evidence, the court should consider . . . whether [ ] the proper universe was examined and the representative sample was drawn from that universe' . . . . However, simply because a survey does not 'perfectly represent' the examined population 'does not make it irrelevant or unhelpful' since sample surveys 'by their very nature, are sketches, not exact replicas, of the examined population.'" Am. Dairy Queen Corp. v. W.B. Mason Co., 543 F. Supp. 3d 695, 723 (D. Minn. 2021) (first quoting Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007); and then quoting Khoday v. Symantec Corp., 93 F. Supp. 3d 1067, 1082–83 (D. Minn. 2015)). As such, Boedeker's decision to conduct a nationwide survey rather than a survey of New York residents goes to the wight of the evidence and not its admissibility.

For similar reasons, the Court finds that Defendants' other objections to the sample population also go to the weight of evidence and not its admissibility. While Defendants' expert points out that affluent households are more likely to be aware of the ACANA brand and to purchase premium dog food, Hanssens Rebuttal Report at 32, the Court has no way to assess whether it was unreasonable for a third of Boedeker's survey respondents to have annual

incomes below $50,000. Next, while it is not ideal to include 17 respondents in the survey who were clearly not potential customers, these seventeen respondents represent only 1.5% of the 1,127 individuals included in the survey. See id. at 29–31. Defendants have not shown that inclusion of these seventeen respondents makes the survey so unreliable as to be inadmissible, and, as noted above, a survey need not perfectly represent the examined population to be admissible. See Am. Dairy Queen Corp, 543 F. Supp. 3d at 723. Because the Court does not find any fundamental flaw in Boedekter's approach to identifying potential customers, any objections to this methodology go to the weight of the evidence and not its admissibility.

### B.  Motion to Exclude Silverman

Defendants seek to exclude the testimony of Plaintiff's expert Bruce Silverman. Defendants argue that Silverman's testimony is methodologically unreliable because it meets none of the Daubert indicia of reliability, that it does not "fit" the facts of the case because his testimony is inconsistent with the actual labeling of Defendants' products, that Silverman's experience is not relevant because of his limited and dated experience with pet food, and that Silverman's testimony would be unhelpful to a jury because it simply rehashes record evidence. See generally Silverman Mem. of L.

In responding to these arguments, Plaintiffs cite to Price v. L'Oreal USA, Inc., No. 17-CV-614, 2020 WL 4937464, at *3 (S.D.N.Y. Aug. 24, 2020). Dkt. No. 150 ("Plaintiff's Response to Motion to Exclude Silverman") at 4. The Court agrees that Price provides a helpful framework. In Price, Silverman sought to testify regarding the lack of keratin in a line of hair care products called Keratindose. Price, 2020 WL 4937464, at *3. While defendant argued that Silverman lacked adequate expertise due to his lack of experience with hair care products, the Court found Silverman's experience in advertising sufficiently relevant, noting that Silverman

28

had "reviewed thousands of proprietary quantitative studies providing insights into consumers'
understanding and beliefs about various brands, products and advertising; personally interviewed
more than five thousand consumers; and attended at least 3,500 focus group sessions, 'many of
which were devoted entirely to the subject of health and beauty aids.'" Id. The Price defendant
also argued that Silverman's testimony regarding how consumers would understand certain
terms was mere *ipse dixit* and failed the admissibility requirements of Daubert. Id. However, the
Court found that "Mr. Silverman's opinions that are premised on his own experience satisfy the
factors set forth in Rule 702." Id. (quoting Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33,
49 (S.D.N.Y. 2016) for the proposition that "[t]he test for reliability of expert testimony is
flexible, especially in cases where the expert's knowledge is non-scientific and based on his
experience."). Based on this reasoning, the court allowed Silverman to testify that "a reasonable
consumer 'would expect [ ] any product that includes a well-known ingredient as part of its
name' to include that ingredient, and 'consumers would see the Challenged Claims as branded
ingredient(s) that differentiate the Challenged Products from competitive products.'" Id.

    However, the court reached a different conclusion with regard to Silverman's testimony
that "many women . . . are already aware of (or have ample opportunity to be aware of) the
restorative properties of keratin." Id. at 4. This claim was based on "certain Google searches . . .
a search on Amazon.com for 'keratin shampoos' and a review of emails and testimony from
Defendants' employees and the United States Patent and Trademark Office's ('USPTO') ruling
on Defendants' trademark application," rather than on Silverman's personal experience, and was
not based on a reliable methodology. Id.

    The reasoning of Price applies here. While much of Silverman's experience with pet food
relates to the advertising campaigns he created for Gaines and Ralston-Purina in the 1970s,

Silverman has extensive experience in the advertising industry and has conducted focus groups sessions and one-on-one interviews on topics including dog toys, "how consumers went about the process of adopting a pet, why they preferred certain dog food brands, and what they liked (or did not like) in proposed commercials for dog foods." Silverman Report ¶ 27. As Silverman notes, some of his experience with advertising foods for human consumption is also particularly relevant given that many pet owners consider their pets to be part of their family. See id. ¶¶ 34, 35, 65, 66. Silverman's testimony deriving from this experience is admissible under Daubert. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); Hobbs v. Brother Int'l Corp., No. 15-CV-1866, 2016 WL 7647674, at *4 (C.D. Cal. Aug. 31, 2016) (denying motion to exclude Silverman's report opining on the perception of a reasonable consumer based solely on his experience and personal review of the challenged statements because "the evidence that Silverman uses to form his opinion ultimately goes to the weight of the testimony, not admissibility."). However, not all of Silverman's testimony is based on his own experience or on any other sound methodological bases.

Silverman summarizes his testimony as follows:

(a) Affordability and taste aside, most consumers make food purchasing decisions for themselves and their families based on their perception that the products they choose are healthy, made with high-quality ingredients, natural, and are superior to other products in the same category.

(b) Many consumers treat their pets as family members and are thus willing to pay premium prices for a pet food they perceive to be healthy, made with high-quality ingredients, natural and superior to other products in the same category.

(c) The Challenged Statements communicate to consumers that the Champion Products at issue are healthy, made with high quality

ingredients, natural, and are superior to other products in the same category, thus favorably influencing consumer purchasing decisions.

(d) Consumers are likely to rely on the veracity of these statements.

(e) The Champion packages at issue also display a number of non-challenged trust and quality statements as well as animal ingredient inclusion rates and images of farmers. Together, these written and graphic messages provide contextual support for the Challenged Statements which positively affect consumer perception and trust in Champion's Products and Challenged Statements.

(f) Consumers are positively influenced by the Challenged Statements that appear on Champion's packaging when making their purchasing decision at the store as well as when they are exposed to the statements at home.

(g) Consumers who purchase premium-priced dog food are concerned about the possible presence of heavy metals, BPA, non-fresh ingredients, and non-regional ingredients in those products.

(h) Consumers would see the possible presence of heavy metals, BPA, non-fresh ingredients, and non-regional ingredients as inconsistent with the challenged Champion statements, and material to their purchasing decisions.

(i) It is unreasonable to expect consumers to proactively determine whether the Challenged Statements that appear on the front surface of Defendants' packaging are true, or to somehow determine if Defendants had omitted on their packaging the presence of Heavy Metals, non-fresh and non-regional ingredients, and the possible presence of BPA in their products.

(j) Had Champion's packaging disclosed that its products contained and/or had a risk of containing heavy metals, BPA, a material amount of ingredients that were not fresh, and/or a material amount of ingredients that were not local or regional, such disclosures would have adversely affected consumers' willingness to purchase the Champion Products.

(k) Assuming Plaintiffs' allegations are true, a reasonable
consumer would be misled and deceived by Champion's packaging
as a whole.

Silverman Report ¶ 32. Silverman's conclusions (a)–(f) are based on his experience and hence

admissible. This corresponds to paragraphs 34–142 of his report, the contents of which are

admissible with the exceptions of paragraph 111.[31] The remainder of Silverman's claims require

more scrutiny. In short: conclusion (g) is admissible except as to BPA; conclusion (h) is

admissible except as to BPA and heavy metals; conclusion (i) is inadmissible as a statement of

opinion unsupported by any evidence or reasoning; conclusion (j) is admissible except as to

BPA; and conclusion (k) is inadmissible. These conclusions follow from the paragraph-by-

paragraph analysis described below.

In paragraphs 143–168, Silverman seeks to show that consumers are concerned about

heavy metals, that the presence of heavy metals is inconsistent with Defendants' packaging, and

that Defendants were aware of this inconsistency. Much of this portion of the report consists of

summaries of news articles and Defendants' internal documents, which could be just as

effectively interpreted directly by a jury. However, as these summaries are integrated with

observations based on Silverman's expertise and experience, the Court declines to exclude this

section on that ground. But while Silverman has provided an adequate methodology for

concluding that consumers are concerned about heavy metals, he has not similarly provided

support for his claims that "pet parents would object to the presence of [any] heavy metals . . .

---

[31] Paragraph 111 is premised on a dictionary definition of the word "raw," taken from
Merriam-Webster. Silverman provides no explanation as to why he adopts definition 2(a)(1):
"being in or nearly in the natural state: not processed or purified" rather than the more intuitive
definition 1: "not cooked." Raw, Merriam-Webster's Online Dictionary, https://www.merriam-
webster.com/dictionary/raw (last visited Jan. 10, 2021). This approach does not demonstrate a
reliable methodology.

and the possible presence of BPA in the Champion Products at issue in this case," nor in turn for his claim that the "presence of heavy metals . . . alone would indicate . . . that the packaging as a whole is misleading and deceptive." See id. ¶¶ 143, 144. To the extent that Silverman articulates his logic for reaching these conclusions, it appears to be: "most consumers care greatly about the healthiness and safety of . . . the foods their pets consume" and "[c]onsumers understand 'Biologically Appropriate^TM to mean that Champion is a healthy, natural dog food," but "heavy metals are perceived by consumers to have health risks for dogs." See id. ¶¶ 143, 162. However, even if all three of these statements are true, it does not follow that consumers would object to even a minute quantity of heavy metals nor does it follow that consumers would consider such a quantity of heavy metals to be inconsistent with the "Biologically Appropriate" label. See Eiben v. Gorilla Ladder Co., No. 11-CV-10298, 2013 WL 1721677, at *15 (E.D. Mich. Apr. 22, 2013) ("Because the conclusion requires logical leaps, with no foundational facts, Morse's testimony is not sufficiently reliable to be admissible under Daubert."). Indeed, because each of Silverman's premises is largely self-evident, his logical leap does most of the work in reaching his conclusion. As such, the portions of Silverman's report in which he states these conclusions, namely Paragraphs 144, 162, and the final sentence of Paragraph 143 must be excluded. For the same reason, Silverman may opine that Defendants knew consumers were concerned about heavy metals, but not that Defendants knew the presence of heavy metals to be inconsistent with their packaging statements. Paragraphs 163,[32] 167, and the heading preceding Paragraph 161 must be excluded.

---

[32] This paragraph also contains the assertion that a reasonable customer would not see heavy metals as "fresh regional ingredient[s]." Silverman Report ¶ 163. However, this assertion is irrelevant to the case given that no party contends that heavy metals were added as "ingredients." Defs.' SMF ¶ 59; Pl.'s Resp. to Defs.' SMF ¶ 59.

Paragraphs 169–171 purport to justify the conclusion that consumers are becoming increasingly concerned about the presence of BPA in dog food. However, the only justification provided for this conclusion is a reference to a single report about the history of the science and regulation surrounding BPA and a reference to a single article about the report posted on the online platform Medium. See Silverman Report at 63 nn.83, 84. There is no evidence to suggest that Silverman employed any reliable methodology in reaching his conclusion. As such, it is not admissible. See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony.") Similarly, paragraphs 172–175 purport to demonstrate that Defendants know that the presence of BPA is inconsistent with the challenged statements. However, here Silverman cites only internal documents showing that Champion's awareness that California had listed BPA as a "chemical[] known to cause cancer," as well as one email from a journalist and one email from a consumer, each inquiring as to the use of BPA in Defendants' packaging. See Silverman Report ¶¶ 172–73. Neither Silverman's experience, nor any reliable method explains the logical leap from this evidence to the conclusion that BPA is inconsistent with the challenged statements. Furthermore, this section does not utilize Silverman's expertise but rather is comprised of a summary of internal documents that a jury would be equally qualified to review. As such, this portion of Silverman's testimony is also inadmissible. See AU New Haven, LLC v. YKK Corp., No. 15 Civ. 3411, 2019 WL 1254763, at *24 (S.D.N.Y. Mar. 19, 2019) (excluding in part an expert opinion where the expert "goes over internal [defendant] documents and testifies that the documents suggest that [defendant] agrees with his conclusion" because "[t]his testimony is nothing more than a narrative of the case which a juror is equally

capable of constructing"), objections overruled, No. 15-CV-3411, 2019 WL 2992016 (S.D.N.Y. July 8, 2019).

Paragraphs 176–179 seek to support the proposition that consumers are concerned about non-fresh and non-regional ingredients, merely by summarizing two emails sent to Defendants. For the same reasons as described immediately above, these paragraphs are inadmissible.

Paragraphs 180–185, are a closer question. These paragraphs support the conclusion that consumers would consider the presence of non-fresh ingredients, particularly regrinds, to be inconsistent with Challenged Statements. This conclusion is based in part on Silverman's expertise at understanding how consumers interpret product labels, and as such is admissible. However, the contents of paragraphs 180–185 provide no support for the assertion that "Champion knows that the non-fresh ingredients is [sic] inconsistent with the challenged statements," as stated in the heading preceding paragraph 180. As such, this assertion is excluded.

Paragraphs 186–195 relate to the way consumers would interpret claims that Defendants' ingredients are "regional." They rely on Silverman's expertise at understanding how consumers interpret product labels, and as such are largely admissible. However, in paragraphs 189–91 and paragraph 193, Silverman seeks to show that "Champion knows that the presence of non-regional ingredients is inconsistent with the challenged statements," as articulated in the heading preceding paragraph 186. While these paragraphs do provide some support for the assertion of Defendants' knowledge, it comes in the form of summaries of internal documents and other record documents, which could be analyzed just as effectively by a jury. As such, these four paragraphs and the heading preceding paragraph 186 are excluded.

Paragraphs 196–98 simply provide a summary of previous admissible testimony and are admissible.

Finally, paragraphs 199–204 rely on Silverman's expertise to support the claim that consumers would react negatively to the disclosure that Defendants' products had a risk of containing heavy metals, BPA, and ingredients that were not fresh, local, or regional. With the exception of paragraph 201,[33] which is excluded as irrelevant, this section is admissible. Paragraph 205 asserts that there is "not a practical way for consumers to learn about these omissions." Silverman Report ¶ 205. The only support provided for this claim is the sentence below noting that the Defendants' packaging does not note the inclusion of "regrinds or many other non-fresh ingredients." This is not a sufficient methodology to support such a broad conclusion. As such, this paragraph is excluded. Paragraph 206 is a summary of admissible testimony and is admissible.

To summarize the above, Silverman's report is admissible with the following exceptions: Paragraphs 111, 143 (final sentence), 144, 162, 163, 167, 169–179, 189–191, 193, 201, and 205, and the headings preceding paragraphs 161, 169, 172, 176, 180 and 186. With regard to Silverman's conclusions summarized in paragraph 32, conclusion (i) and (k) are excluded, conclusions (g) and (j) are excluded with regard to BPA, and conclusion (h) is excluded with regard to BPA and heavy metals.

### C.  Motion to Exclude Pusillo

---

[33] Paragraph 201 summarizes a misleading marketing campaign by the Activia yogurt brand but makes no reference to consumer reaction to the misleading marketing.

Defendants seek to exclude the testimony of Plaintiff's expert Dr. Gary Pusillo. <u>See</u>

<u>generally</u> Pusillo Mem. of L. This includes Pusillo's Safety Report and his Test Report. The

conclusions of Pussio's Safety Report that remain at issue include the following:

> 7. Champion Petfoods Products Acana and Orijen dog foods
> contain ingredients that are not tested and certified for safety for
> dogs. Depending on the specific formulation, the levels of safety
> vary according to the ingredients used.

> 8. Champion Petfoods dog foods contain ingredients that are not in
> agreement with Champion Petfoods' definition of Biologically
> Appropriate.

> 9. Champion Petfoods' dog foods contain ingredients that are not
> in agreement with Champion Petfoods' definition of "Fresh
> Regional ingredients."

> 10. Champion Petfoods' dog foods contain ingredients that are not
> in agreement with Champion Petfoods' definition of Prey: whole
> animal ingredients that mimic what cats and dogs would eat in
> nature, in appropriate ratios of meat, organs, edible bones and
> cartilage.

> 12. Champion Petfoods uses supplements in their formulations.

> 13. Champion Petfoods uses food additives and premixes that are
> not 100% fresh ingredients.

> 20. There is sufficient evidence to support that dogs; during the
> period covered in this claim and eating the Acana and Orijen
> products listed in Tables (1.1, 1.2); were subjected to the unwilling
> consumption of Lead, Arsenic, cadmium, Mercury, BPA[.]

Dkt. No. 132-2 ¶ 2 (noting that the conclusions at issue are highlighted in Dkt. No. 132-3); Dkt.

No. 132-3. The conclusions of Pussio's Test Report that remain at issue include the following:

> 8. Depending on the food they were consuming from Champion
> Petfoods, the dogs were unwillingly subjected to different levels of
> Lead, Arsenic, Cadmium, Mercury, and BPA (based on the
> allegation in the complaint).

9. The number of different types of fish used contribute to the variation in heavy metal levels in those products that contain fish. See Table (10) Fish ingredients.

10. The number of "regional family farms" contributes to the variation in heavy metal content.

11. The content of heavy metals in the "meat" that Champion Petfoods purchases varies with species, diet, environment and the proportion of non-meat ingredients included in Champion Petfoods' representation of meat.

12. Plastic bins, plastic liners in carboards containers, intermediate bulk containers (IBC), craft paper bags lined with plastic, and various raw ingredient containers are more likely than not a source of BPA.

13. Packaging materials used by Champion Petfoods for the products listed in Tables (1.1, 1.2, 4, and 5) can be a source of BPA.

14. The May 2017 Champion Petfoods, White Paper average results of Arsenic, Cadmium, Lead and Mercury when overlaid on the results in Tables 6.1, 6.2, 6.3, 7.1, 7.2, 7.3, 8, 9.1, 9.2, 9.3 show that the levels vary according to the type of food.

Dkt. No. 132-2 ¶ 2 (noting that the conclusions at issue are highlighted in Dkt. No. 132-3); Dkt. No. 132-3.

The Court begins by examining conclusion numbers 8, 9, 10, 12, and 13 of the Safety Report. With regard to conclusion 8, Pusillo's Safety Report appears to argue that Defendants' products are not biologically appropriate because they are ground and cooked, causing them to interact differently with a dog's gastrointestinal tract than would natural whole prey. See Pusillo Safety Report at 26. This contention is not relevant to any argument put forward by Plaintiff, and as such is excluded. With regard to conclusion number 9, Pusillo's Safety Report simply provides no discussion of "Champion Petfoods' definition of 'Fresh Regional ingredients'" or what ingredients that definition would or would not include. See generally id. As such, the

38

conclusion is not supported by any methodology whatsoever and must be excluded. With regard to conclusion number 10, Pusillo appears to dispute Defendants' "whole prey" labeling. However, this labeling is not in dispute. As such, this conclusion is similarly excluded. With regard to conclusion numbers 12 and 13, Pusillo has simply provided an image of an ingredient label, apparently from a line of dog food no longer at issue in this litigation, which included certain additives and supplements. See id. at 24 (providing an image of the ingredient label for "Orijen Original Dry Dog Food"). Even if this label were relevant to the products at issue, Pusillo has done nothing more than point out ingredients on an ingredient label, a task in no way reliant on his expertise. As such, these conclusions are also excluded. See AU New Haven, 2019 WL 1254763, at *24.

Pusillo's remaining conclusions relate to how heavy metals and BPA may have entered Defendants' products, how they were or should have been detected, and how their concentrations vary depending on ingredients and other factors. Without considering these conclusions, the Court is able, as discussed below, to grant Defendants' Motion for Summary Judgement with regard to Plaintiff's claims relating to heavy metals and BPA. As such, the Court regards Defendants' motion to exclude these conclusions as moot. See In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Tech. & VerSys Femoral Head Prod. Liab. Litig., No. 18-MC-2859, 2021 WL 3475681, at *1 (S.D.N.Y. Aug. 6, 2021) ("Only Zimmer's motion to exclude the testimony of Mari Truman need be resolved for the Court to rule on Zimmer's summary judgment motion. Therefore, the Court will rule only on Zimmer's motion to exclude Truman's testimony and Zimmer's motion for summary judgment, because the grant of summary judgment moots the other motions to exclude expert testimony.").

**D.  Motion to Exclude Poppenga**

Plaintiffs seek to exclude the testimony of Defendants' expert Dr. Robert Poppenga. <u>See</u> <u>generally</u> Poppenga Mem. of L. Poppenga has provided his own expert report, Poppenga Report, in addition to a rebuttal report, Poppenga Rebuttal Report, addressing Pussio's reports. Poppenga's reports focus entirely on heavy metals and BPA, and particularly the health effects of these substances. <u>See generally</u> <u>id.</u>; Poppenga Report. To the extent that the reports address the safety of Defendants' products they are irrelevant because, as Plaintiff points out, this suit does not address the safety of Defendants' products. <u>See</u> Poppenga Mem. of L. at 1 ("[Plaintiff's] claims relate to the quality—not safety—of the Dog Food. Plaintiff's SAC does not allege that the Dog Food is unsafe or any physical harm to Plaintiff's dogs."). However, the Court need not determine which portions of Poppenga's reports to exclude because, as described below, without considering Poppenga's reports, the Court is able to grant Defendants' Motion for Summary Judgement with regard to Plaintiff's claims relating to heavy metals and BPA. <u>See</u> <u>In re Zimmer</u>, WL 3475681, at *1. As such, the Court regards Plaintiff's Motion to Exclude Poppenga as moot.

### E.  Motion for Summary Judgement

Defendants argue that summary judgement should be entered on Counts I–IV based on alleged misrepresentations and Counts I and V based on alleged omissions. <u>See</u> Defs.' S.J. Mem. at 10–25. Specifically, with regard to the alleged misrepresentations, Defendants argue: (1) that the phrase "Biologically Appropriate" is puffery, (2) that even if the phrase is actionable it is not false or misleading due to the presence of heavy metals or BPA; (3) that the "Fresh" labeling is not misleading; (4) that the "Regional" labeling is not false or misleading; and (5) that the statement "Delivering Nutrients Naturally" is not false or misleading. <u>See</u> <u>id.</u> at 10–20. With regard to the alleged omissions, Defendants argue that they "did not solely possess information relevant to a reasonable consumer," that the information was not material to the transactions, and

40

that Defendants had no reason to believe that Plaintiff was acting on the basis of "mistaken

knowledge." See id. at 21–25.

### 1. Plaintiff's Claims

Plaintiff's Counts I and II are brought under Sections 349 and 350 respectively of the

New York General Business Law. Sec. Am. Compl. at 39–43. Section 349 of the New York

General Business Law declares unlawful "[d]eceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. L. § 349(a).

Section 350 prohibits "[f]alse advertising in the conduct of any business, trade, or commerce or

in the furnishing of any service." Id. § 350. "To state a claim under either Section, 'a plaintiff

must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially

misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or

practice.'" Colpitts v. Blue Diamond Growers, 527 F. Supp. 3d 562, 576 (S.D.N.Y. 2021)

(quoting Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)).[34] "In assessing whether an

act is materially misleading, the inquiry is whether, objectively, the act is 'likely to mislead a

reasonable consumer acting reasonably under the circumstances.'" Duran v. Henkel of Am., Inc.,

450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (quoting Cohen v. JP Morgan Chase & Co., 498 F.3d

111, 126 (2d Cir. 2007)). "The only difference between [Section 350 and Section 349] is that

---

[34] Some courts have held that Section 350 claims also require a showing of actual
reliance. See, e.g., Avola v. Louisiana-Pac. Corp., 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013).
However, "this element appears to have been foreclosed by the opinion of the New York Court
of Appeals." Zottola v. Eisai Inc., No. 20-CV-02600, 2021 WL 4460563, at *2 n.5 (S.D.N.Y.
Sept. 29, 2021) (quoting  Koch v. Acker, Merrall & Condit Co., 967 N.E.2d 675, 676 (2012),
which held that "[j]ustifiable reliance by the plaintiff is not an element of [a § 350] claim."). As
discussed above, the Second Circuit "recently described the uniform nature of the tests under
NYGBL §§ 349 and 350," id. (citing Orlander, 802 F.3d at 300), and thus "it appears to this
Court that no reliance element remains to § 350 claims," id. (quoting Kommer v. Bayer
Consumer Health, 252 F. Supp. 3d 304, 310 n.2 (S.D.N.Y. 2017), aff'd sub nom. Kommer v.
Bayer Consumer Health, a division of Bayer AG, 710 F. App'x 43 (2d Cir. 2018)).

Section 350 more narrowly targets deceptive or misleading advertisements, while Section 349 polices a wider range of business practices." Id. (quoting Cline v. TouchTunes Music Corp., 211 F. Supp. 3d 628, 635 (S.D.N.Y. 2016)). Here, this difference is not relevant to the question of liability for the alleged misrepresentations and Plaintiff asserts liability for the alleged omissions only under § 349.

Plaintiff's Count III alleges breach of express warranty. Sec. Am. Compl. at 43–45. "To prevail on a claim of breach of express warranty, a plaintiff must show an affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase and that the warranty was relied upon." Factory Assocs. & Exporters, Inc. v. Lehigh Safety Shoes Co. LLC, 382 F. App'x 110, 111–12 (2d Cir. 2010) (internal quotation marks omitted). "New York breach of express warranty claims require (i) a material statement amounting to a warranty; (ii) the buyer's reliance on this warranty as a basis for the contract with his immediate seller; (iii) the breach of this warranty; and (iv) injury to the buyer caused by the breach." Avola v. Louisiana-Pac. Corp., 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013). "[A]lthough an express warranty claim is not analyzed under the reasonable consumer standard, it is analyzed by reference to a reasonable consumer's interpretation of, and reliance on, a defendant's representation." Atik v. Welch Foods, Inc., No. 15-CV-5405, 2016 WL 5678474, at *13 (E.D.N.Y. Sept. 30, 2016).

Plaintiff's Count IV alleges fraudulent misrepresentation. Sec. Am. Compl. at 45–47. "To state a claim for fraudulent misrepresentation, 'plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff[,] and resulting injury.'" Davis v. Hain Celestial Grp., Inc, 297 F. Supp. 3d 327, 337 (E.D.N.Y. 2018) (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291 (2d Cir. 2006)).

Finally, Plaintiff's Count V alleges fraud by omission. Sec. Am. Compl. at 47–48. The elements of fraud by omission include: "(1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 90–91 (2d Cir. 2005).

### 2. Biologically Appropriate

Plaintiff contends that the term "Biologically Appropriate" on Defendants' product packaging was misleading because Defendants' products contained heavy metals, including arsenic, lead, mercury, and cadmium; because Defendants failed to diligently test and monitor for heavy metals; and because there was a risk that Defendants' products contained BPA. Pl.'s Mem. in Opp. to S.J. at 11–14. Defendants present two arguments for summary judgement. First, they argue that the phrase "Biologically Appropriate" is puffery and is not actionable. Defs.' S.J. Mem. at 12–13. Second, they argue that even if the phrase is actionable, it is not misleading, requiring summary judgement be granted with regard to Plaintiff's first four claims. Id. at 13–16. The Court considers each argument in turn.

Puffery, in the false advertising context, includes "[s]ubjective claims about products, which cannot be proven either true or false." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 159 (2d Cir. 2007) (quoting Lipton v. Nature Co., 71 F.3d 464, 474 (2d Cir.1995)). As Defendants acknowledge, at the motion to dismiss stage this Court found the phrase "Biologically Appropriate" was not puffery and was actionable. See Defs.' S.J. Mem. at 12 n.9; Colangelo v. Champion Petfoods USA, Inc., No. 618-CV-1228, 2020 WL 777462, at *8 (N.D.N.Y. Feb. 18, 2020) (Kahn, J.). Defendants argue, however, that because that decision was reached under Rule 12 and "solely based on Plaintiff's allegations, not any evidence (i.e., Champion's complete packaging)," the outcome should be different at summary judgement.

Defs.' S.J. Mem. at 12 n.9. The Court disagrees. As the Court noted in its motion to dismiss decision, the statement that the food is biologically appropriate is an assertion of fact, Colangelo, 2020 WL 777462, at *8 (N.D.N.Y. Feb. 18, 2020) (citing Leppert 2019 WL 216616, at *7), and not, as Defendants contend, "Champion's opinion about what sort of diet is appropriate for a dog," Defs.' S.J. Mem. at 12 n.9. While the parties may not agree on the precise definition of the phrase, both provide definitions that would render some foods appropriate and others inappropriate. See id. at 12 (Defendants' packaging suggesting the phrase to mean that "[o]ur foods mirror the richness, freshness and variety of meats for which dogs are evolved to eat" which is why it includes "ingredients [that] mirror your dog's evolutionary diet"); Pl.'s Mem. in Opp. to S.J. at 11 (Plaintiff interpreting the phrase to mean "digestible and appropriate for a puppy"). The Court need not precisely establish the line between "biologically appropriate" and "biologically inappropriate" in order to conclude that such a line exists. Because such a line exists, the phrase can be shown to be true or false and does not qualify as puffery.

Even if the phrase "Biologically Appropriate" is actionable, Defendants argue, it is not misleading because heavy metals are naturally occurring, BPA is ubiquitous in the environment, and the levels of heavy metals and BPA in their products are well below the levels that would pose a safety risk. See Defs.' S.J. Mem. at 13–16. Plaintiff acknowledges that this litigation does not present the question of whether the level of heavy metals or BPA in Defendants' products is unsafe. See Pl.'s Mem. in Opp. to S.J. at 11; see also Poppenga Mem. of L. at 1. Indeed, while Plaintiff's Second Amended Complaint does allege specific concentrations of each heavy metal in each of Defendants' products, Sec. Am. Compl ¶ 7, Plaintiff does not argue that these particular levels are what makes Defendants labels misleading. Rather, Plaintiff's argument is

that the presence of these metals, in any concentration, is inconsistent with the "Biologically Appropriate" label. See Pl.'s Mem. in Opp. to S.J. at 13.

In her Response to Defendant's Motion for Summary Judgement, Plaintiff raises several arguments. First, Plaintiff contends that "[m]erely because a substance is 'naturally occurring' or impossible to entirely remove from the food supply as a whole does not necessarily mean that it is safe in any quantity, nor does it necessarily mean there is not a duty to disclose it." Id. at 12 (quoting Zeiger v. WellPet LLC, No. 17-cv-04056, 2021 WL 756109, at *16 (N.D. Cal. Feb. 26, 2021). This assertion may be relevant to Plaintiff's omissions claims, but because the safety of Defendants' products is not at issue, it is irrelevant to the question of whether the phrase "Biologically Appropriate" is misleading.

Next, Plaintiff argues that "[t]he issue is not that any single dose is harmful, it is that ingesting these substances would not be safe for dogs because they bioaccumulate to unsafe levels." Id. (quoting Zeiger, 2021 WL 756109, at *6). However, Plaintiff has already foreclosed this argument by acknowledging that this litigation does not raise the question of "whether the levels of heavy metals present in the Dog Food are safe for consumption." Pl.'s Mem. in Opp. to S.J. at 13. Plaintiff appears to contend that she has waived only the argument that a single dose could be dangerous, but this is a strawman; in almost all contexts—from leaded paint to leaded gasoline to mercury in seafood—health concerns about heavy metals relate to bioaccumulation, not to acute poisoning. See, e.g., Ethyl Corp. v. Env't Prot. Agency, 541 F.2d 1 (D.C. Cir. 1976) (noting that lead in the body could come from several different sources including both leaded gasoline and lead paint, and that the "feared adverse effects would not materialize until after a lifetime of exposure"); Porrazzo v. Bumble Bee Foods, LLC, 822 F. Supp. 2d 406, 409 (S.D.N.Y. 2011) (describing plaintiff's health conditions allegedly caused by the accumulation

of mercury from consuming ten six-ounce cans of tuna fish per week for two and a half years).

Here, Plaintiff has foreclosed any argument that Defendants' products are unsafe, and cannot

circumvent that fact by focusing on long-term rather than acute exposure.

Plaintiff also contends that heavy metals and BPA are not biologically appropriate

because they provide no nourishment to dogs. See Pl.'s Mem. in Opp. to S.J. at 13. However, if

the only biologically appropriate foods are those that contain no measurable quantity of any

substance which fails to provide nourishment, the Court doubts whether any food, either for

humans or for pets, could ever be considered biologically appropriate.[35] The Court finds this to

be an unreasonable conclusion, and hence a conclusion that no reasonable jury could reach.

Plaintiff argues that Defendants are "running blind to the presence of heavy metals" and

BPA in their products because they fail to adequately test. Id. at 4, 13. Additional testing may

well be advisable, and the Court declines to speculate as to whether inadequate testing could

support a valid legal claim. However, the "Biologically Appropriate" label refers to the contents

of Defendants' dog food and not to the process by which it is produced. See Song v. Champion

Petfoods USA, Inc., No. 18-CV-3205, 2020 WL 7624861, at *6 (D. Minn. Dec. 22, 2020)

("Whatever it means, the phrase 'biologically appropriate' on a bag of Champion dog food is

clearly a representation about *the dog food*, and not about the processes followed back at the

plant. 'Biologically appropriate' is no more a representation about BPA testing and monitoring

protocols than it is a representation about the number of quality-control analysts who work at the

---

[35] In addition to many naturally occurring non-nutritious compounds, nearly all foods today contain trace amounts of contaminants such as microplastics. For instance, typical bottled water contains about 94 particles of microplastic per liter, and even tap water typically contains about 4 particles of microplastic per liter. Kieran Cox, et al. Human Consumption of Microplastics, 53, 12 ENVTL. SCI. & TECH. 7068 (2019). The Court would hesitate to find that neither bottled nor tap water is biologically appropriate.

plant or the frequency with which the plant's manufacturing equipment is sanitized." (emphasis in original)). As such, Defendants' allegedly inadequate testing does not support a claim that the phrase "Biologically Appropriate" is misleading.

Finally, Plaintiff seeks to present evidence that a reasonable consumer could interpret the phrase "Biologically Appropriate" to mean that the food contains no heavy metals or BPA. First, Plaintiff notes that Defendants' own employees believe that their dog food does not contain any heavy metals. Pl.'s Mem. in Opp. to S.J. at 13. However, as Plaintiff makes no allegation that this belief stems from the "Biologically Appropriate" label, this fact is irrelevant to the present inquiry. Next, Plaintiff cites to Boedeker's expectation survey and Silverman's testimony. See id. However, as described above, the relevant portions of both have been excluded as unreliable. Thus, while Plaintiff has presented evidence that consumers are concerned about heavy metals, she has not provided admissible evidence demonstrating that the "Biologically Appropriate" label would lead a reasonable consumer to believe the products contained no heavy metals or BPA.

At the motion to dismiss stage, the Court noted the "leap between 'biologically appropriate' and 'no arsenic'" was relatively large, "especially when considering that arsenic occurs naturally," but concluded that "the connection is not so tenuous as to fail the plausibility standard." Colangelo, 2020 WL 777462, at *10. Now, taking into account the evidence Plaintiff has provided, the Court concludes that there is not sufficient evidence to support a jury finding that a reasonable consumer would interpret the phrase "Biologically Appropriate" as promising no heavy metals or BPA. As such, summary judgement is granted with regard to the phrase "Biologically Appropriate" under Sections 349 and 350 respectively of the New York General Business Law. See Duran, 450 F. Supp. 3d at 346 (describing the "reasonable consumer"

standard). Similarly, summary judgement is granted with regard to the phrase "Biologically Appropriate" as an express warranty. See Atik, 2016 WL 5678474, at 13 (noting that express warranties are analyzed by reference to a reasonable consumer's interpretation). Finally, because Plaintiff cannot show that the presence of heavy metals and BPA renders the "Biologically Appropriate" label false, nor that she was justified in relying on such an interpretation, summary judgement is granted with regard to the phrase "Biologically Appropriate" as a fraudulent misrepresentation. See Davis, 297 F. Supp. 3d at 337 (describing the elements of fraudulent misrepresentation).[36]

### 3. Fresh

Plaintiff argues that Defendants' labeling of their products as "fresh" was misleading, due to the use of non-fresh ingredients such as regrinds, expired, and frozen ingredients. For instance, as featured in Plaintiff's Complaint, the front of the Acana Regional Meadowland packaging stated "Unmatched Regional Ingredients" followed in large font by "Fresh or Raw." Sec. Am. Compl. at 14. The back of the package stated "Fresh Regional Ingredients," followed in slightly smaller font by: "We focus on fresh ingredients from our region that are ranched, farmed or fished by people we know and trust." Dkt. No. 76-1 at 3; Defs.' SMF ¶ 34; Pl.'s Res. to Defs.' SMF ¶ 34.

To start, the Court finds that the use of frozen ingredients was not misleading. Defendants' products are labeled, in several places including on both the front and back of the package, with the phrase "fresh or raw." Dkt. No. 76-1 at 3, 11; Defs.' SMF ¶¶ 24–26; Pl.'s Res.

---

[36] The Court notes that these holdings apply only to Plaintiff's theory that any level of heavy metals or BPA renders the "Biologically Appropriate" label misleading. The Court expresses no opinion as to what, if any, quantity of these chemicals would render dog food biologically inappropriate in the eyes of a reasonable consumer.

to Defs.' SMF ¶¶ 24–26. And while Plaintiff contends that she interpreted "raw" to mean "fresh," Pl.'s SMF ¶ 12, this is not the common usage of the word. When the CDC provides its annual Thanksgiving guidance[37] about the contamination risks of handling "raw turkey," no one reasonably interprets it to apply only to "fresh" turkey. Reasonable consumers understand that such warnings apply to frozen turkey as well because the word "raw" is commonly understood to mean "not cooked." See footnote 31. Furthermore, the phrase "fresh or raw" strongly implies that "raw" does not simply mean "fresh." Finally, as discussed above, the only evidence Plaintiff provides to support the notion that reasonable customers interpret "raw" to mean "fresh" have been found inadmissible. Thus, Defendants' use of frozen ingredients does not render their labeling misleading.

More problematic is Defendants' use of regrinds and expired ingredients. Expired ingredients may or may not be raw, but are, by definition, unlikely to be fresh. Regrinds are pre-cooked, and hence never raw or fresh. Defendants argue that the packaging never claims that all ingredients are fresh or raw, but this fact alone is not dispositive. See Mantikas v. Kellogg Co., 910 F.3d 633, 638 (2d Cir. 2018) (noting that it "would validate highly deceptive marketing" if a manufacturer could advertise a characteristic so long as the product contains "an iota" of it). Less helpful to Plaintiff's claims, the back of each of Defendants' packages contains a large, brightly colored box with text, in large font, explaining that, of the animal ingredients in the food, "Half are FRESH or RAW and loaded with goodness and taste, and half are DRIED or OILS that provide a strong and natural source of animal proteins and fats."[38] Dkt. No. 76-1 at 3, 11; Defs.'

---

[37] See Preparing Your Holiday Turkey Safely, Centers for Disease Control and Prevention, found at https://www.cdc.gov/foodsafety/communication/holiday-turkey.html (last viewed March 25, 2022).

[38] Note that Plaintiff acknowledges that regrinds are dried ingredients, see Sec. Am. Compl. ¶ 94, and nowhere contends that expired ingredients are neither dried nor raw.

SMF ¶¶ 25–26; Pl.'s Res. to Defs.' SMF ¶¶ 25–26. Any customer who read this panel could not reasonably believe that all of the food's ingredients were fresh or raw.[39] Thus, the question for the Court is whether, given the many references to "fresh" or "fresh or raw" ingredients, this single panel on the back of the packages provides sufficient notice to customers that not all ingredients are fresh or raw.

The Court finds that it does for two reasons. First, while Plaintiff testified that she understood 100% of the ingredients to be fresh, she also testified that she looked at the bag before purchasing it and understood that Acana Meadowlands included dried ingredients and oils before purchasing it. See Defs.' SMF ¶ 27; Pl.'s Res. to Defs.' SMF ¶ 27. This would make it impossible for her to demonstrate reliance as required for counts III and IV, or to demonstrate that she "suffered injury *as a result* of the allegedly deceptive act or practice" as required for counts I and II. Colpitts, 527 F. Supp. 3d at 576 (quoting Orlander, 802 F.3d at 300) (emphasis added).

Second, "the presence of a disclaimer or similar clarifying language may defeat a claim of deception." Fink v. Time Warner Cable, 714 F.3d 739, 742 (2d Cir. 2013). Such a determination "requires an analysis of factors such as the font size and placement of the disclaimer as well as the relative emphasis placed on the disclaimer and the allegedly misleading statement." Nelson v. MillerCoors, LLC, 246 F. Supp. 3d 666, 675 (E.D.N.Y. 2017) (internal quotation marks omitted). An effective disclaimer is one that "explicitly state[s] the relevant

---

Furthermore, Plaintiff never contends that this panel is inaccurate, i.e. that less than half of the animal ingredients are fresh or raw. See generally Sec. Am. Compl.; Pl.'s Mem. in Opp. to S.J.

[39] Plaintiff argues that reasonable consumers would (or do) believe "that CPF only used fresh ingredients, unless the packaging stated otherwise." Pl.'s Mem. in Opp. to S.J. at 15. However, even if Plaintiff is correct, this argument is unavailing because the packaging did state otherwise.

information such that it would be impossible for those who viewed it to be deceived." <u>Id.</u>

(internal quotation marks omitted). Here, the statement that half of the animal ingredients are

dried or oils is not a mere disclaimer. Rather, it is among the most prominently featured

information on the back of the packages with the words *dried* and *oil* in all capital letters. <u>See</u>

Dkt. No. 76-1 at 3, 11. Furthermore, "disclaimers fail to cure allegedly misleading

representations on the front of packaging only where the alleged misrepresentation is clearly

stated and the disclaimer is exceedingly vague or requires consumers to make inferences."

<u>Nelson</u>, 246 F. Supp. 3d at 675 (citing <u>Williams v. Gerber Products. Co.</u>, 552 F.3d 934, 939 (9th

Cir. 2008)). Here, the opposite is true. The allegedly misleading representations do not make

clear whether all ingredients are "fresh" or "fresh or raw," and the disclaimer requires no

inference. Particularly as read in context, no reasonable consumer could interpret "dried"

ingredients and "oils" to qualify as "fresh" or "raw."[40]

Plaintiff presents several pieces of evidence to suggest that Defendants' use of regrinds

and expired ingredients renders their packaging misleading, but none are availing. First, Plaintiff

argues that Champion "internally acknowledged that its use of regrinds was inconsistent with its

packaging claims." Pl.'s Mem. in Opp. to S.J. at 15–16. However, a closer examination of the

cited email reveals that while it expresses concern that use of regrinds may be perceived as

decreasing quality and running counter to the brand's overall story that "we try to use as much

fresh as we can," it does not suggest that any particular packaging is misleading. <u>See</u> Dkt. No.

108-56. Next, Plaintiff points out that Champion "was warned that its use of a mixture of fresh

and frozen chicken would likely face regulatory pushback if described as 'fresh.'" Pl.'s Mem. in

---

[40] The packaging places the two in direct contrast, noting that half of the animal
ingredients are "fresh or raw" and half are "dried or oils." Defs.' SMF ¶¶ 25–26; Pl.'s Res. to
Defs.' SMF ¶¶ 25–26.

Opp. to S.J. at 16. However, closer examination of this cited email reveals that it expressed concern about hypothetical packaging which would include the word fresh as part of the product name. See Dkt. 108-12. There is no evidence that such packaging was ever used, and this email fails to demonstrate that the packaging Plaintiff purchased was misleading. Finally, Plaintiff points to Boedeker's expectation survey and Silverman's report as evidence that consumers find the packaging misleading. With regard to Boedeker's expectation survey, the Court has found the relevant portion to be inadmissible. With regard to Silverman's report, particularly paragraphs 180–185, the Court notes that while Silverman has provided evidence that consumers would not consider expired ingredients or regrinds to be fresh, he has not adequately demonstrated that, given the prominent statement about dried ingredients and oils, the packaging is misleading.[41]

Because the Court concludes that, taken as a whole, Defendants' packaging statements regarding fresh ingredients are not misleading or false, Defendants' Motion for summary judgement is granted with regard to counts I–IV as they pertain to Defendants' "fresh" labeling.

### 4. Regional

Plaintiff argues that Defendants' "Regional" labeling is misleading because some of Defendants' ingredients are sourced from outside the Kentucky region or even outside of North America. See Sec. Am. Compl. ¶¶ 97–109; Pl.'s Mem. in Opp. to S.J. at 18. Specifically, she alleges "the presence of undisclosed, non-regional ingredients, such as turmeric from India, imported fish oils, and vitamins from China." Pl.'s Mem. in Opp. to S.J. at 20. Plaintiff also

---

[41] Silverman implies that the relevant statements on the back of the packaging are merely "disclaimers," however, he later argues that other, less prominently displayed, text on the back of the pack is not a disclaimer. Compare Silverman Report ¶ 118 with id. ¶ 129; see also Dkt. No. 76-1 at 3, 11.

notes that Defendants internal documents indicate that they have shifted their definition of

"regional" over time and acknowledge that they have outgrown their ability to source from the

local region:

> Regional basically means a named area where our ingredients come
> from. Originally, this term meant that we had a strong focus on
> sourcing ingredients from our local region and our fresh regional
> ingredients were required to be from the local region due to the
> "fresh" definition in #8. As we have grown, we have expanded our
> "regional" definition to mean that we source our ingredients from a
> named region, with a key focus being the region nearest our
> kitchens, but in the absence of a good quality source, would be
> expanded to the highest quality source available internationally -
> primarily Europe or New Zealand and Australia. We have recently
> considered changing this definition in our BAFRINO names as we
> have outgrown our ability to source from our local region. This said,
> the term still applies to our fresh ingredients which we focus on
> keeping at high percentages in our diets as these ingredients are
> fantastic quality and perform very well nutritionally and for
> palatability.

Dkt. No. 108-27 at 5.[42]

The new definition described in this internal document is counterintuitive and might well

be misleading to a reasonable consumer. However, Defendants do not rely on this definition in

their Motion for Summary Judgement. Instead, Defendants contend that, even under a narrower

definition of "regional" their labeling is not false or misleading because they never advertised

that their food contains exclusively regional ingredients, instead stating that they "focus" on

regional ingredients. See Defs.' S.J. Mem. at 18. Defendants also note that their packaging

---

[42] Plaintiff also contends that Defendants have misled customers by featuring family
chicken farms, when much of their chicken came from large corporations such as Tyson Inc. and
Pilgrim's Pride. See Pl.'s Mem. in Opp. to S.J. at 19. However, this allegation was not raised in
Plaintiff's Second Amended Complaint and is separate from the question of whether the use of
non-regional ingredients was misleading. As such, the Court does not consider it. See Shah v.
Helen Hayes Hosp., 252 F. App'x 364, 366 (2d Cir. 2007) ("A party may not use his or her
opposition to a dispositive motion as a means to amend the complaint.").

provides context by stating that "America" is the source of inspiration and fresh regional

ingredients. Id. Furthermore, "the presence of some non-regional ingredients," Defendants argue,

"does not make Champion's made with 'regional' ingredients statement false." Id. at 19 (citing

Kennedy v. Mondelēz Glob. LLC, No. 19-CV-302, 2020 WL 4006197, at *12 (E.D.N.Y. July

10, 2020) ("Stating the grahams are 'made with real honey' is a factually true statement about

the product" that "does not foreclose the use of other sweeteners" so as to "make the

representation deceptive."))

     Plaintiff disputes the relevance of the Kennedy decision, noting that shortly after it was

decided, another district court in the Second Circuit reached a different conclusion in Campbell

v. Whole Foods Mkt. Grp., Inc., 516 F. Supp. 3d 370, 385 (S.D.N.Y. 2021). See Pl.'s Mem. in

Opp. to S.J. at 19. The Court finds the reasoning of Campbell compelling. However, the

Campbell court did not hold that a package advertising the use of honey must contain no other

sweeteners; rather, it held that the plaintiff "adequately alleged that the packaging is likely to

mislead a reasonable consumer into thinking that the product's primary sweetener is honey."

Campbell, 516 F. Supp. 3d at 385 (emphasis added). The same reasoning applies here. By

labeling their products as made from "fresh regional ingredients," Defendants may have led

reasonable consumers to believe that their products' ingredients were primarily regional.

However, Plaintiff has failed to allege that the ingredients were not primarily regional and has

pointed only to minor ingredients with allegedly non-regional origins. See Pl.'s Mem. in Opp. to

S.J. at 20 (highlighting "turmeric from India, imported fish oils, and vitamins from China"); see

generally Sec. Am. Compl.[43] Even Plaintiff appears to acknowledge that Defendants' packaging

---

     [43] In addition to the "turmeric from India, imported fish oils, and vitamins from China"
mentioned in Plaintiff's Memorandum in Opposition to Summary Judgement, Plaintiff mentions
other allegedly non-regional ingredients in both her Second Amended Complaint and her

suggested that most, but not necessarily all, ingredients were sourced regionally. See Pl.'s Res. to

Defs.' SMF ¶ 33 ("'Regional' statements were understood by Plaintiff, along with reasonable

consumers to mean that CPF used mostly, if not entirely, regional ingredients.") (emphasis

added). Plaintiff has not provided evidence the primary ingredients are non-regional. As such,

Defendants' regional labeling is not false nor misleading to a reasonable consumer,[44] and

summary judgment is granted as to Plaintiff's misrepresentation claims based on the regional

labeling.

5. *Delivering Nutrients Naturally*

Plaintiff argues that the "Delivering Nutrients Naturally" packaging claim is false and

misleading because Defendants' products contain heavy metals and BPA. Pl.'s Mem. in Opp. to

S.J. at 20. In evaluating this claim the Court finds it important to place the statement in context.

The phrase appears on a panel on the back of Defendants' packages, which reads:

> Mirroring nature. ACCANA WholePrey[TM] foods feature a richly
> nourishing balance of poultry, organs and cartilage — all of which
> reflects the whole prey animal, DELIVERING NUTRIENTS
> NATURALLY. That's why you won't find long lists of synthetic
> additives in ACANA foods.

Defs.' SMF ¶ 46; Pl.'s Res. to Defs.' SMF ¶ 46. Read in context, the most intuitive interpretation

of the phrase "Delivering Nutrients Naturally" is that the nutrients in Defendants' products come

---

Statement of Material Facts. However, none of these ingredients are used in the two diets at issue
in this case. Compare Sec. Am. Compl. ¶ 100 and Pl.'s SMF ¶¶ 48–49 with Defs.' SMF ¶ 40.

[44] Silverman states in his report that, in his opinion, "consumers would perceive the
presence of non-regional ingredients . . . as inconsistent with the challenged statements."
Silverman Report ¶ 195. However, this conclusion appears to be based on the large quantities of
non-regional ingredients present in diets no longer at issue in this case. See id. ¶ 194. To the
extent that Silverman contends that any use of non-regional ingredients, no matter how minor,
renders Defendants' packaging misleading, such an interpretation is legally foreclosed as
discussed above.

from natural sources rather than synthetic sources. Neither heavy metals nor BPA deliver any nutrients (naturally or otherwise), and thus would seem irrelevant to this statement.

Nonetheless, Plaintiff maintains that she has presented sufficient evidence for a reasonable jury to find the phrase misleading because, 1) Plaintiff herself testified that she understood the phrase to mean that "non-nutritious and potentially harmful chemicals such as heavy metals would not be included," 2) Silverman "opined that a reasonable consumer would perceive BPA to be unnatural and inconsistent" with the phrase, and 3) the "results of the consumer survey echo this reasonable expectation." See Pl.'s Mem. in Opp. to S.J. at 20–21. Because the relevant portion of the expectation survey and the cited portion of the Silverman Report[45] have been found inadmissible, Plaintiff's only remaining evidence is her own testimony. Plaintiff was asked: "What did you understand the phrase 'delivering nutrients naturally' to mean?" and responded "Oh. Not a lot of preservatives, no heavy metals, nothing bad in the food. The word 'naturally' would mirror Mother Nature, and eating an animal which would be natural. So naturally would be nothing bad added. Everything's good." Dkt. No. 130-8 at 32.

As such, Plaintiff's only evidence for her counterintuitive interpretation of the phrase is her own, unexplained interpretation. This is not sufficient evidence from which a reasonable jury could conclude that a reasonable consumer would be misled by the phrase or that the phrase is

---

[45] Plaintiff cites Silverman Report ¶¶ 172–75, which have been excluded. The Court notes that Silverman's opinions about the phrase "Delivering Nutrients Naturally," id. ¶¶ 122–29, have not been excluded. In those paragraphs Silverman describes the phrase as Defendants' "'Natural' claim" and opines on interpretations of the words "natural" and "natural foods." Id. Silverman provides no further explanation as to why the phrase "Delivering Nutrients Naturally" is a "'Natural' claim" or should be interpreted in the same way as simply the word "natural." See id. More importantly, while Silverman asserts in these paragraphs that consumers care about whether products are natural, he does not contend that the phrase "Delivering Nutrients Naturally" is misleading. See id.

otherwise false. <u>See, e.g.</u>, <u>Rahman v. Mott's LLP</u>, No. 13-CV-3482, 2014 WL 5282106, at *10 (N.D. Cal. Oct. 15, 2014) (granting summary judgement where "[a]part from plaintiff's own testimony, the only evidence advanced by plaintiff tending to show that a reasonable consumer would be deceived [was] an assertion by Prof. Belch, unsupported by any independent facts or data.") As such, Defendants' Motion for summary judgement is granted with regard to counts I–IV as they pertain to Defendants' "Delivering Nutrients Naturally" labeling.

      *6. Omissions*

In addition to their claims stemming from Defendants' alleged misrepresentations, Plaintiff argues that by failing to disclose certain information about their products, Defendants perpetrated fraud by omission and violated New York General Business Law § 349. Specifically, Plaintiff alleges that "Defendants concealed from and failed to disclose to Plaintiff[] and the Class that their Contaminated Dog Foods contained heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements." Sec. Am. Compl. ¶ 99.

In order to prove fraud by omission, Plaintiff must show: "(1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." <u>TVT Records</u>, 412 F.3d at 90–91. Here, Defendants focus on the duty to disclose. "The duty to disclose arises in three situations: '(1) where a party has made a partial or ambiguous statement, as a party cannot give only half of the truth; (2) where a party has a fiduciary duty to another; or (3) where a party has superior knowledge that is not available to the other party and the party with superior knowledge knows that the other party is acting on the basis of mistaken knowledge.'" <u>Watts v. Jackson Hewitt Tax Serv. Inc.</u>, 579 F. Supp. 2d 334, 352 (E.D.N.Y. 2008) (quoting <u>Century</u>

Pacific, Inc. v. Hilton Hotels Corp., 528 F.Supp.2d 206, 232 (S.D.N.Y.2007)) (some internal quotation marks omitted). Plaintiff contends that the third of these situations is present here.

Defendants argue in their Motion for Summary Judgement that they lacked a duty to disclose for two reasons: first, they "did not possess peculiar knowledge of essential or material facts that renders the purchase of its dog food inherently unfair," Defs.' S.J. Mem. at 22, and second "Champion would have no reason to believe that this particular Plaintiff was acting on the basis of any 'mistaken knowledge,'" id. at 24. The Court considers each of Defendants' arguments.

First, with regard to heavy metals, Plaintiffs argue that Defendants held superior knowledge as to the quantities of heavy metals present. See Pl.'s Mem. in Opp. to S.J. at 22. The Court agrees. However, Plaintiff's position is not that Defendants should have disclosed the precise quantity of heavy metals present, or that Defendants should have disclosed that the quantity of these substances exceeded a safe threshold[46]—indeed as both parties have repeatedly pointed out, the safety of Defendants' products is not at issue. Rather, the material facts, as pled in Plaintiff's Complaint, are that "Defendants' dog foods contained and/or had a material risk of containing . . . heavy metals." Sec. Am. Compl. ¶ 5. Plaintiff further points to evidence showing that "reasonable consumers did not know heavy metals or BPA would be included in the Dog Food." Pl.'s Mem. in Opp. To S.J. at 22. However, that is not the standard under New York Law. Rather, "[t]o establish superior knowledge, the plaintiff must prove that the material fact was information peculiarly within the knowledge of the defendant, and that the information was not

---

[46] The Court notes that Plaintiff's theory of damages for omissions assumes that Defendants should have included warnings on their packaging that the products "may contain measurable amounts of" heavy metals and BPA. See Boedeker Report ¶ 142; Motion to Certify at 23–24 (basing the theory of damages on the Boedeker Report).

such that could have been discovered by the plaintiff through the exercise of ordinary intelligence." <u>Sw. Payroll Serv., Inc. v. Pioneer Bancorp, Inc.</u>, No. 119-CV-1349, 2020 WL 1889013, at *4 (N.D.N.Y. Apr. 16, 2020), <u>on reconsideration</u>, 2020 WL 4353219 (N.D.N.Y. July 7, 2020); see also <u>Jana L. v. West 129th Street Realty Corp.</u>, 22 A.D.3d 274 277 (1st Dep't 2005). While Plaintiff may not have been able to discover the exact quantity of heavy metals in Defendants' products, "by ordinary diligence and attention, Plaintiff[] should have known that anything containing fish might also contain high concentrations of heavy metals." <u>Simpson v. Champion Petfoods USA, Inc.</u>, 397 F. Supp. 3d 952, 972–73 (E.D. Ky. 2019).[47] Both diets at issue include catfish meal among their first eight ingredients and each also contains other fish-based ingredients such as herring oil, pollock meal, and rainbow trout. <u>See</u> Defs.' SMF ¶ 40; Pl.'s Resp. to Defs.' SMF ¶ 40.

 With regard to non-fresh ingredients, the fact that Defendants disclosed, prominently on their packaging, that at least half of their animal ingredients were not fresh, Defs.' SMF ¶¶ 25–26; Pl.'s Res. to Defs.' SMF ¶¶ 25–26, renders it implausible that Plaintiff could not have

---

[47] An additional, though not independently sufficient, reason for denying Plaintiff's omissions claim as to heavy metals is that, as Defendants note, nearly all pet food contains measurable quantities of heavy metals. <u>See</u> Defs.' SMF ¶¶ 57, 69–70; Pl.'s Res. to Defs.' SMF ¶¶ 57, 69–70. While the Court is hopeful that new technologies will enable the pet foods of the future to be produced without heavy metals and other undesirable substances, <u>see, e.g.</u>, Luiz Alberto Junior Letti et al., <u>Cultivated Meat: Recent Technological Developments, Current Market and Future Challenges</u> Biotechnology Research & Innovation, 2021, at 7 (describing how new cultured meat technology can "guarantee[] the complete or almost complete removal of animal diseases and pathogens, such as Salmonella and Escherichia coli . . . as well as heavy metals, pesticides and hormones conventionally applied during traditional meat production"), today a holding for Plaintiff on her omission claim would amount to a requirement that nearly all pet foods be labeled as containing heavy metals. In the absence of a strong showing that such labeling is required under existing New York law, such a broad requirement is a policy decision best left to the legislature.

discovered the inclusion of non-fresh ingredients through the exercise of ordinary intelligence. It also renders implausible the allegation that Defendants knew Plaintiff was acting on her mistaken belief that all of the ingredients were fresh.[48]

With regard to non-regional ingredients, Plaintiff has not plausibly alleged that Defendants knew she was relying on her impression that all ingredients, even very minor ones, were sourced regionally. As described previously, Plaintiff does point to an internal document indicating concern within Champion that the company had outgrown its ability to source from its local region. Pl.'s Res. to Defs.' SMF ¶ 33. That document notes that the term "regional" originally "meant that we had a strong focus on sourcing ingredients from our local region and our fresh regional ingredients were required to be from the local region," but that the definition had changed over time. Dkt. No. 108-27 at 5. Even if this document could reasonably suggest Defendants knew that customers were relying on the original definition of "regional," it does not suggest that they knew Plaintiff was relying on the impression that 100% of the ingredients were regional. As such, there is no evidence that Defendants knew Plaintiff was acting based on mistaken knowledge as required to prove fraud by omission.

The same is true with regard to the risk that Defendants' products contained BPA. Plaintiff has provided no evidence, nor even alleged, that Defendants knew that she or any other customer was relying on the impression that Defendants' products carried no risk of containing

---

[48] The Court does not consider whether the inclusion of regrinds or expired ingredients, considered alone, represents a fraudulent omission. Plaintiff's position is, and always has been, that "Defendants concealed from and failed to disclose to Plaintiffs and the Class that their Contaminated Dog Foods contained heavy metals, BPA, non-fresh ingredients, non-regional ingredients, and/or unnatural or other ingredients that do not conform to the products' labels, packaging, advertising, and statements." Sec. Am. Compl. ¶ 199. In other words, under Plaintiff's theory, the problem with regrinds and expired ingredients is that they are examples of undisclosed non-fresh ingredients. This is the theory that the Court evaluates.

BPA. <u>See generally</u> Sec. Am. Compl.; Pl.'s Mem. in Opp. to S.J. Thus, summary judgement is granted as to Plaintiff's fraud by omission claims.

Finally, the Court turns to Plaintiff's omissions claims under NY GBL § 349. As described above, to state a claim under this section "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." <u>Colpitts</u>, 527 F. Supp. 3d at 576 (quoting <u>Orlander</u>, 802 F.3d at 300). Furthermore, when "alleging a deceptive act based on an omission, it is not sufficient for a plaintiff to point solely to the omission." <u>Dimond v. Darden Restaurants, Inc.</u>, No. 13-CV-5244, 2014 WL 3377105, at *13 (S.D.N.Y. July 9, 2014) (citing <u>Pelman v. McDonald's Corp.</u>, 237 F. Supp. 2d 512, 529 (S.D.N.Y. 2003)). "Instead, the plaintiff must show why the omission was deceptive by alleging that the information omitted was solely within the defendant's 'possession or that a consumer could not reasonably obtain such information.'" <u>Id.</u> (quoting <u>Pelman</u>, 237 F. Supp. 2d at 529); <u>see also</u> <u>Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank</u>, 647 N.E.2d 741, 745 (N.Y.1995) (noting that in cases involving omissions, "the statute surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation[,]" but provides an exception "where the business alone possesses material information that is relevant to the customer and fails to provide this information").

Defendants argue that "Plaintiff is attempting to shoehorn an 'omissions' claim based on the same conduct as the claims for misrepresentation," and that as such, her omissions claims are deficient for the same reasons. Mot. for S.J. at 21 (citing <u>Weaver v. Champion Petfoods USA Inc.</u>, No. 18-CV-1996, 2019 WL 2774139 at *5 (E.D. Wis. July 1, 2019)). With regard to fresh and regional ingredients and BPA, the Court agrees. Setting aside the statements on Defendants'

packaging, Plaintiff would have no plausible reason to assume that all of the ingredients in dog food are fresh or regional. Similarly, given the undisputed evidence that small quantities of BPA are not only common in many packaged products, but also exist in our air, dust, and water, see Defs.' SMF ¶¶ 75–77; Pl.'s Res. to Defs.' SMF ¶¶ 75–77, Plaintiff would have no reason, absent the allegedly misleading packaging, to assume there was no risk of BPA in Defendants products.[49] Since these omissions claims are completely reliant on Defendants' alleged misrepresentations they are better characterized as misrepresentation claims and are dismissed for the reasons described above.

With regard to the inclusion of heavy metals, the Court is not convinced that Plaintiff's omissions claims under NY GBL § 349 are duplicative of her misrepresentation claims. The claim that the packaging is misleading because it says "biologically appropriate" is simply not the same as the claim that it is misleading to sell a product containing heavy metals without disclosing their inclusion. Nonetheless, the Court finds that Plaintiff's claims under NY GBL § 349 fail for the same reason as her claims for fraud by omission fail. In particular, while the precise quantity of heavy metals in Defendants' products was information solely within Defendants' possession, the fact that the products had a material risk of containing heavy metals, see Sec. Am. Compl. ¶ 5; see also footnote 46, was information that Plaintiff could reasonably obtain. See Simpson, 397 F. Supp. 3d at 972–73 ("[B]y ordinary diligence and attention, Plaintiff[] should have known that anything containing fish might also contain high

---

[49] Plaintiff does not argue that Defendants' products contained any particular quantity of BPA or even consistently contained BPA, but rather that Defendants failed to disclose the material risk of detectable levels of BPA in their products. See Pl.'s Mem. in Opp. to S.J. at 4, 14, 22.

concentrations of heavy metals."). As such, summary judgement is granted as to all of Plaintiff's omissions claims.

### F.  Class Certification

Because Defendants' Motion for Summary Judgment is granted in full, Plaintiff's Motion to Certify the class is denied as moot. See Kwok Sze v. Annucci, No. 913-CV-534, 2017 WL 913646, at *3 (N.D.N.Y. Mar. 7, 2017) ("Because the court grants summary judgment on Sze's individual claim, his motion for class certification on this claim is necessarily moot.")

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Exclude Boedeker (Dkt. No. 132) is **GRANTED** with respect to the first part of Boedeker's expectation survey but otherwise **DENIED**; and it is further

**ORDERED**, that Defendants' Motion to Exclude Silverman (Dkt. No. 131) is **GRANTED** with respect to paragraphs 111, 143 (final sentence), 144, 162, 163, 167, 169–179, 189–191, 193, 201, and 205, and the headings preceding paragraphs 169, 172, 176, 180 and 186. With regard to Silverman's conclusions summarized in paragraph 32, Defendants' Motion to exclude is **GRANTED** as to conclusion (i) and (k), as to conclusions (g) and (j) with regard to BPA, as to conclusion (h) with regard to BPA and heavy metals. Defendants' Motion to Exclude Silverman is otherwise **DENIED**; and it is further

**ORDERED**, that Defendants' Motion to Exclude Pusillo (Dkt. No. 133) is **GRANTED** with regard to conclusions 8, 9, 10, 12, and 13 on page 13 of his Safety Report (Dkt. No. 132-6) and otherwise **DENIED as moot**; and it is further

**ORDERED**, that Plaintiff's Motion to Exclude Poppenga (Dkt. No. 144) is **DENIED as moot**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgement (Dkt. No. 130) is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's Motion for Class Certification (Dkt. No. 108) is **DENIED as moot**; and it is further

**ORDERED**, that the Clerk close this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 31, 2022
            Albany, New York

LAWRENCE E. KAHN
United States District Judge